**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**PLANNED PARENTHOOD ARKANSAS
& EASTERN OKLAHOMA, d/b/a
PLANNED PARENTHOOD OF THE
HEARTLAND; and
STEPHANIE HO, M.D., on behalf of
themselves and their patients**                                        **PLAINTIFFS**

**v.**                                        **Case No. 4:15-cv-00784-KGB**

**LARRY JEGLEY, Prosecuting Attorney for
Pulaski County, in his official capacity, his
agents and successors; and MATT DURRETT,
Prosecuting Attorney for Washington County,
in his official capacity, his agents and
successors**                                        **DEFENDANTS**

<u>**TEMPORARY RESTRAINING ORDER**</u>

Before the Court is the renewed motion for temporary restraining order filed by plaintiffs

Planned Parenthood of Arkansas & Eastern Oklahoma, d/b/a Planned Parenthood of the Heartland

("PPAEO") and Stephanie Ho, M.D., on behalf of themselves and their patients (Dkt. No. 84).

Plaintiffs bring this action seeking declaratory and injunctive relief on behalf of themselves and

their patients under the United States Constitution and 42 U.S.C. § 1983 to challenge Section

1504(d) of the Abortion-Inducing Drugs Safety Act, 2015 Arkansas Acts 577 (2015) ("Section

1504(d)," "the Act," or "the contracted physician requirement"), codified at Arkansas Code

Annotated § 20-16-1501 *et seq.*  This Court has jurisdiction under 28 U.S.C. §§ 1331 and

1343(a)(3).  Defendants Larry Jegley, prosecuting attorney for Pulaski County, in his official

capacity, his agents and successors, and Matt Durrett, prosecuting attorney for Washington

County, in his official capacity, his agents and successors, responded in opposition to the motion

(Dkt. No. 101).  PPAEO and Dr. Ho submitted a rebuttal declaration of Colleen Heflin, Ph.D., in

reply (Dkt. No. 102).

## I.     Procedural Background

The Court will first recount the procedural history of this case.  Plaintiffs filed their complaint on December 28, 2015 (Dkt. No. 1).  On December 30, 2015, the Court held a hearing on plaintiffs' request for a temporary restraining order.  The Court granted the request for a temporary restraining order, but the Court stated that the order would expire on January 14, 2016, unless the Court, for good cause, extended the order (Dkt. No. 22).  The parties requested an extension of the Order (Dkt. No. 24), which the Court granted, allowing the temporary restraining order to remain in effect until 5:00 p.m. on March 14, 2016 (Dkt. No. 25).  During that time, the parties pursued some discovery while the temporary restraining order was in effect (Dkt. Nos. 32, 34, 38, 46, 53).  The Court then conducted a hearing on plaintiffs' motion for preliminary injunction on March 2, 2016.  The Court entered an Order granting plaintiffs' request for a preliminary injunction on March 14, 2016 (Dkt. No. 60).

On March 29, 2016, the Food and Drug Administration ("FDA") updated the final printed labeling ("FPL") of the Mifeprex medication, which is used in medication abortions.  As a result, plaintiffs' medication abortion regimen, which plaintiffs represent is used by a majority of abortion providers across the county and is significantly safer and more effective than the regimen previously required, now complies with the FDA labeling of Mifeprex.  Therefore, plaintiffs represent that their challenge to the FPL mandate in Section 1504(a) of the Act is now moot (Dkt. No. 65, at 1-2).

Defendants filed a notice of appeal to the Eighth Circuit Court of Appeals on May 12, 2016, as to this Court's Order (Dkt. No. 70).  On June 27, 2016, the United States Supreme Court issued its opinion in *Whole Women's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) ("*Hellerstedt*"), a case involving similar legal issues to those presented here.  On July 28, 2017, with the benefit of

*Hellerstedt*, the Eighth Circuit issued an opinion vacating this Court's preliminary injunction order on the grounds that this Court was required to, and did not, "make a finding that the . . . contract-physician requirement is an undue burden for a large fraction of women seeking medication abortions in Arkansas." *Planned Parenthood of Arkansas & Eastern Oklahoma v. Jegley*, 864 F.3d 953, 959 (8th Cir. 2017). The Eighth Circuit therefore remanded this case back to this Court to "conduct fact finding concerning the number of women unduly burdened by the contract-physician requirement and determine whether that number constitutes a 'large fraction.'" *Jegley*, 865 F.3d at 960. The Eighth Circuit's mandate was entered on May 31, 2018, at which point this Court regained jurisdiction of the case (Dkt. No. 87).

Plaintiffs filed the present renewed motion for temporary restraining order seeking a temporary restraining order from this Court preventing defendants from enforcing Section 1504(d). The Court conducted a hearing on plaintiffs' renewed motion for temporary restraining order on June 8, 2018. After that hearing, the Court requested additional briefing from the parties on several issues, including: (1) whether the mandate rule requires this Court to re-open the record, and if not, if the Court should do so; (2) which findings of fact this Court must make to satisfy the Eighth Circuit's mandate; and (3) whether any rule or precedent prevents this Court from considering multiple requests for preliminary relief in a given case.[1] The parties submitted the requested briefs on June 13, 2018 (Dkt. Nos. 110, 111).

---

[1] The Court made this request after both plaintiffs and defendants submitted to the Court additional evidentiary materials for consideration in resolving the pending renewed motion for temporary restraining order (Dkt. Nos. 84, 101, 102) and after defendants argued that the Court is prohibited from considering plaintiffs' request for temporary relief "until after additional, adversarial fact-finding." (Dkt. No. 88, at 1).

Having carefully considered the record and briefings before it, for the following reasons, the Court grants plaintiffs' renewed motion for temporary restraining order (Dkt. No. 84).[2]

## II. The Mandate Rule

Based upon the briefings provided by the parties regarding the mandate rule and its application to this case, the Court opts to consider the pending renewed motion for temporary restraining order and reopen the record. The mandate rule generally requires a district court to comply strictly with the mandate rendered by the reviewing court. *See United States v. Bartsh,* 69 F.3d 864, 866 (8th Cir. 1995). Similarly, under the "mandate rule," while a district court is "bound to follow the mandate, and the mandate 'controls all matters within its scope, . . . a district court on remand is free to pass upon any issue which was not expressly or impliedly disposed of on appeal.'" *Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.*, 299 F. Supp. 2d 903, 914 (N.D. Iowa 2004) (citations omitted). The mandate rule provides that a district court is bound by any decree issued by the appellate court and "is without power to do anything which is contrary to either the letter or spirit of the mandate construed in light of the opinion." *Pearson v. Norris*, 94 F.3d 406, 409 (8th Cir. 1996) (quoting *Thornton v. Carter*, 109 F.2d 316, 320 (8th Cir. 1940)).

Even when the mandate rule applies to an issue, courts have recognized exceptions that allow a matter to be revisited. Those exceptions are "(1) the availability of new evidence, (2) an intervening change of controlling law, or (3) the need to correct a clear error or prevent manifest injustice." *Federated Rural Elec. Ins. Corp. v. Arkansas Elec. Cooperatives, Inc.*, 896 F. Supp.

---

[2] If plaintiffs request a preliminary injunction, and there currently is no such request pending before this Court, the Court anticipates setting a hearing and requesting that the parties present testimony from witnesses who have submitted affidavits in this matter. The parties are free to agree otherwise, but the Court's preference after having carefully studied the current factual record and legal authorities is to have witnesses, from both sides, present testimony at any preliminary injunction hearing.

912, 914 (E.D. Ark. 1995) (citing *Bethea v. Levi Strauss,* 916 F.2d 453, 457 (8th Cir.1990); *In re Progressive Farmers Ass'n,* 829 F.2d 651, 655 (8th Cir. 1987) (on remand lower court required to follow appellate court decision unless new evidence introduced or decision is clearly erroneous and works manifest injustice)). Further, in regard to the imposition of an injunction that is in the first instance subject to the mandate rule, courts have determined that, under certain circumstances, the mandate rule does not bar courts from consideration of the status of the injunction, given the unique nature of injunctive relief and the equitable considerations that inform it. *See Americans United For Separation of Church & State v. Prison Fellowship Ministries*, 555 F. Supp. 2d 988, 991 (S.D. Iowa 2008) (examining whether the mandate rule barred the lower court from dissolving an injunction, the grant of which had been ordered or approved of by the appeal). "There is a fundamental difference . . . between the granting of retrospective relief and the granting of prospective relief." *Id.* (quoting *Amado v. Microsoft Corp.,* 517 F.3d 1353, 1360 (Fed. Cir. 2008)). "Due to the equitable nature of injunctive relief, district courts have wide discretion to determine under what circumstances the grant of injunctive relief is appropriate, and under what circumstances the modification or dissolution of that injunction is warranted." *Id.* (internal citations omitted).

Neither party takes the position that this Court is foreclosed by the mandate from reopening the record on remand. The Court first raised this procedural issue. Defendants now argue that the Court should consider "the preliminary injunction proceedings" in this case "concluded." (Dkt. No. 111, at 2). However, as to the question of whether there is any procedural bar to a party filing multiple requests for a temporary restraining order or preliminary injunction in a single case, defendants concede that, even after issuance of a decision on a preliminary injunction, plaintiffs may file a second request if they are able to state "new facts warranting reconsideration of the prior

decision." (Dkt. No. 111, at 9 (quoting *F.W. Kerr Chemical Co. v. Crandall Assoc., Inc.*, 815 F.2d 426, 428 (6th Cir. 1987)).

If the Court opts to consider the pending renewed motion for temporary restraining order, defendants acknowledge that "[b]ecause the opinion is silent on this point, whether to re-open the record on Plaintiff's motion for preliminary injunction is a decision that rests with this Court." (Dkt. No. 111, at 3 (citing *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 572 (1943)). Defendants now urge the Court to exercise its discretion not to do so (Dkt. No. 111, at 3).

Several factors persuade this Court to do so, including but not limited to the following. First, the last time this Court examined the facts of this dispute was on March 14, 2016 (Dkt. No. 60), over two years ago. Evaluating the propriety of any injunctive relief, but especially this type of injunctive relief, depends on the facts and circumstances that exist at the time the relief is requested. *Hellerstedt*, 136 S. Ct. at 2310 ("[T]he Court, when determining the constitutionality of laws regulating abortion procedures, has placed considerable weight upon evidence and argument presented in judicial proceedings."); *West Ala. Women's Ctr. v. Miller*, 299 F. Supp. 3d 1244, 1252 (M.D. Ala. 2017) (granting preliminary injunction and noting that "[t]he undue-burden test requires courts to examine 'the [challenged] regulation in its real-world context.'") (quoting *Planned Parenthood Se. Inc. v. Strange*, 9 F. Supp. 3d 1272, 1287 (M.D. Ala. 2014) ("*Strange II*")). Arkansas requires the collection of data regarding abortions performed in the state. Several more years of data are now available for this Court's review in resolving this dispute. The Court is reluctant to foreclose consideration of that data and other facts that have developed and changed during the two years since this Court last undertook its review. Second, several key factual disputes have been reviewed and decided by the Supreme Court that bear directly on factual disputes first presented to this Court in 2016. *See generally Hellerstedt*, 136 S. Ct. 2291. Third,

several legal issues have been clarified that bear directly on this Court's legal analysis of the dispute presented. *Id.* Fourth, many more district courts have examined these issues and permitted parties to develop factual and legal arguments related to similar disputes in other states since this Court last examined the merits. Both sides of this dispute should be permitted to present, not foreclosed from presenting, similar factual and legal arguments to this Court, if they are inclined to do so. For all of these reasons, the Court will consider the pending renewed motion for temporary restraining order and, in doing so, consider the new factual materials presented for consideration by plaintiffs and defendants.

### III. Findings Of Fact

The Court adopts by reference its findings of fact in its prior Order granting plaintiffs' request for a preliminary injunction (Dkt. No. 60, at 3-18). *See* Fed. R. Civ. P. 10(c). The Court also makes the following additional findings of fact. To the extent the findings of fact in this Order contradict the findings of fact made in the Court's prior Order, the findings of fact in this Order control. Further, the Court will address these and additional factual matters in the context of its discussion of the legal issues; the Court makes the findings of fact addressed in that context as well. The Court has considered and weighed all of the evidence presented in the record at this stage; the Court has resolved any disputes consistent with the statements in this Order.

1.      PPAEO or predecessor organizations have been providing health care services in Arkansas for over 30 years and medication abortions since 2008 (Dkt. No. 84, Supp. Ho Decl., ¶ 4).

2.      PPAEO does not offer surgical abortions at its Arkansas health centers and cannot do so at this time. To provide surgical abortions, Dr. Ho represents that PPAEO would have either to relocate to another medical office and/or undergo renovations at its current Arkansas health

centers, partly in order to comply with state regulations that apply to surgical abortion facilities but not medication abortion facilities (*Id.*, ¶ 7).

3.      To relocate its current Arkansas health centers, PPAEO would have to find a landlord willing to rent office space to PPAEO, which is not easy due to the hostile climate faced by abortion providers and those associated with them, according to Dr. Ho (*Id.*).

4.      To renovate its current Arkansas health centers, PPAEO would incur considerable expense which Dr. Ho represents PPAEO cannot afford at this time (*Id.*).

5.      In the calendar year 2017, PPAEO's physicians performed 843 medication abortions in Arkansas, 653 of which were at PPAEO's health center in Fayetteville, Arkansas (*Id.*, ¶ 6).

6.      PPAEO now provides medication abortions to patients through 70 days last menstrual period ("LMP") (*Id.*, ¶ 10).

7.      PPAEO now employs two other physicians besides Dr. Ho (*Id.*, ¶ 11).

8.      Currently, rather than staffing the 24-hour hotline with registered nurses, Dr. Ho and nurse practitioners take turns answering patient calls (*Id.*, ¶ 12).  The nurse practitioners cannot access patient medical records from outside the office; they can do so when they are in the office (*Id.*).  If remote access is needed, the nurse practitioners contact a physician with remote access (*Id.*).  Any calls made to the 24-hour hotline are entered into a patient's medical record on the next business day (*Id.*).

9.      Planned Parenthood Great Plains ("PPGP") took over operation of the Arkansas health centers from Planned Parenthood of the Heartland in 2016 (*Id.*, ¶ 13).

10.     Physicians and nurse practitioners working at the Arkansas health centers contact Dr. Orrin Moore, the medical director of PPGP, who is a board certified obstetrician/gynecologist,

a fellow of the American College of Obstetricians and Gynecologists ("ACOG"), and licensed to practice medicine in Kansas, if they have any need to consult with a physician (*Id*.). Dr. Moore has been practicing medicine, including providing abortions, for over 30 years; he provides both medication and surgical abortions (*Id.*).

11. PPAEO staff and Dr. Ho have taken additional efforts to find a contracted physician who will allow PPAEO to comply with Section 1504(d) (*Id*., ¶ 15).

12. Dr. Ho created a list of every obstetrician/gynecologist in Arkansas, using the physician directories provided by the Arkansas Medical Society and Arkansas State Medical Board (*Id*., ¶ 16).

13. In early August 2017, PPAEO sent a letter to each of these obstetrician/gynecologists, signed by PPAEO's then-interim CEO, Aaron Samulcek (*Id*.).

14. This letter explained Section 1504(d)'s requirements, and it explained that "[i]t is critical [PPAEO] find a way to comply with the law so that we can continue providing medication abortion to patients in Arkansas." (Dkt. No. 84, at 15).

15. This letter stated that, while "agreeing to be our contracting physician does not involve providing abortion services, it is critical in helping preserve access to abortion in the state of Arkansas." (*Id*.).

16. The letter invited the recipients to "contact [Mr. Samulcek] as soon as possible" to "discuss compensation and other logistics." (*Id*.). The letter also invited the recipient to forward "any suggestions of another physician with the requisite privileges who would be willing to serve as a contracting physician . . . ." (*Id*.).

17. Separately, Dr. Ho and PPAEO staff called many of the obstetrician/gynecologists who had been identified to explain Section 1504(d)'s requirement and the impact on abortion access if PPAEO cannot comply with Section 1504(d) (Dkt. No. 84, Supp. Ho Decl., ¶ 17).

18. Dr. Ho and the PPAEO staff reached out to at least 60 physicians in total via telephone (*Id*.).

19. In response, certain physicians or group practices turned down PPAEO's offer (*Id*.).

20. Other recipients simply stated that they would not work with PPAEO (*Id*.).

21. At some group practices, in response to PPAEO's outreach, "the front desk staff was so hostile . . . that they would not even let [PPAEO staff] even speak to the physicians and refused to take messages." (*Id*.).

22. Despite these efforts, PPAEO is still unable to satisfy Section 1504(d)'s contracted physician requirement (*Id*., ¶ 18).

23. Dr. Ho also avers that medication abortion patients at the Fayetteville health center "will find it immensely difficult, if not impossible, to travel to Little Rock to have an abortion." (*Id*., ¶ 19).

24. Dr. Ho describes one medication abortion patient who had trouble getting to PPAEO's Fayetteville health center and had to rely upon a co-worker for a ride, forcing her to reveal her decision to terminate her pregnancy to that co-worker (*Id*., ¶ 20).

25. Dr. Ho describes another patient who lives close to Fort Smith, Arkansas, who had trouble getting to PPAEO's health center due to a lack of transportation (*Id*.). This patient had to reschedule her appointment twice, which delayed her abortion by about two weeks (*Id*.).

26. Another Fayetteville medication abortion patient was altogether prevented from having a medication abortion because she had car trouble between her first and second

appointment, which forced her past the gestational age at which medication abortion is offered (*Id*.).

27.    Finally, Dr. Ho states that another patient, who is homeless, burst into tears because she needed to make a return visit to PPAEO's health center to have an abortion, and she had trouble finding anyone who could give her a ride back to the health center for her second appointment (*Id*.).

28.    Dr. Ho states that "[a]pproximately 57% of medication abortions patients at the Fayetteville health center live at or below 110% of the federal poverty level." (*Id*., ¶ 21).

29.    Dr. Ho states that, in 2014, "medication abortions accounted for 31% of all nonhospital abortions and for 45% of abortions before nine weeks' gestation." (*Id*., ¶ 22 (citing Rachel K. Jones and Jenna Jerman, *Abortion Incidence and Serv. Availability in the U.S., 2014*, 49 Persp. on Sexual and Reprod. Health 17, 21-22 (2017)).

30.    Dr. Ho states that, in her experience, some patients have a strong preference for medication abortion (*Id*., ¶ 24).  Some patients are afraid of a surgical procedure (*Id*.).  Other patients feel that medication abortion is more natural than a surgical abortion (*Id*.).  Other patients prefer to complete the procedure in the privacy of their own homes or in the presence of their support person or loved ones (*Id*.).

31.    Plaintiffs also present the affidavit of Lori Williams, a nurse practitioner and the Clinical Director of Little Rock Family Planning Services ("LRFP") (Dkt. No. 84, Williams Decl., ¶ 1).

32.    LRFP has operated an abortion clinic in Little Rock since 1973, and it has been licensed by the State of Arkansas as an abortion provider since such licensing began in the mid-1980's (*Id*., ¶ 3).

33.     Ms. Williams has worked at LRFP since 2004 and has been the Clinical Director since 2007 (*Id*., ¶ 2).  She is responsible for all aspects of LRFP's day-to-day operations, including overseeing patient care in coordination with the physicians and other health care professionals, maintaining policies and procedures, and ensuring that LRFP complies with all laws and regulations (*Id*.).

34.     LRFP provides early medication abortions and surgical abortions (*Id*., ¶ 4).  LRFP is one of only three abortion clinics in Arkansas and the only one that offers surgical abortions (*Id*.).  LRFP is the only one of Arkansas' abortion clinics that offers abortions past ten weeks, as dated from the first day of the patient's LMP (*Id*.).

35.     LRFP is not able to comply with Section 1504(d)'s requirement that medication abortion providers have a written contract with a physician who has active admitting privileges and gynecological/surgical privileges at an Arkansas hospital and who has agreed to handle complications (*Id*., ¶ 5).

36.     LRFP has sent a letter to every obstetrician-gynecologist it could identify in Arkansas, but LRFP has been unable to retain a physician with the required privileges (*Id*., ¶ 6).

37.     Since LRFP cannot comply with Section 1504(d)'s contracted physician requirement, LRFP has cancelled medication abortions (*Id*., ¶ 7).

38.     In 2017, LRFP provided 92 medication abortions and 2,334 surgical abortions to patients (*Id*., ¶ 8).

39.     Ms. Williams avers that LRFP regularly sees patients who prefer a medication abortion over a surgical one (*Id*., ¶ 9).  Some patients, including victims of sexual assault, want to avoid having surgical instruments in their vagina (*Id*.).  Other patients prefer to complete the procedure in the privacy of their home or with another person there to support them (*Id*.).  Some

patients also have medical conditions, such as vaginismus and large fibroids, that make medication abortion medically indicated (*Id*.).

40. Finally, plaintiffs present the declaration of Colleen Heflin, a professor of public administration and international affairs at Syracuse University's Maxwell School of Citizenship and Public Affairs (Dkt. No. 84, Heflin Decl., ¶ 1).

41. Dr. Heflin has studied, written, and opined about social policy, poverty policy, and child and family policy, and she has researched issues facing women living in poverty in the United States (*Id*., ¶ 5).

42. Dr. Heflin cites research that shows an association between increased travel distance and decreased abortion rates (*Id*., ¶ 11). Specifically, she cites a study by Scott Cunningham that examined the reduction in the abortion rate in Texas after the Texas legislature codified a requirement that abortion providers have admitting privileges at a hospital (*Id*., ¶ 12).

43. Mr. Cunningham's study estimates that abortion rates decline by 15% in counties requiring between 50 and 100 miles of travel to access services, by 25% in counties requiring between 100 and 150 miles of travel, and by 40% for those counties requiring between 150 and 200 miles of travel (*Id*., ¶ 13).

44. Dr. Heflin avers that Mr. Cunningham's study examines data that is both recent in time and data from Texas, a state bordering Arkansas, and a state that shares many characteristics with Arkansas (*Id*., ¶ 14).

45. Dr. Heflin states that "the data shows that a total of 571 women who received abortions at the Fayetteville health center will, as a result of the [contracted physician] requirement, have to travel over 150 miles from their home county to go to Little Rock." (*Id*., ¶ 15). She also

notes that the "data shows that an additional 28 women will have to travel between 100-150 miles from their home county to go to Little Rock for an abortion." (*Id*.).

46.     Accordingly, based upon the analysis in the Cunningham study, Dr. Heflin estimates that a total of 235 women will be prevented from having an abortion as a result of the contracted physician requirement (*Id*.).

47.     Among the materials defendants submit, all of which this Court has considered, defendants submit the affidavit of Tumulesh K.S. Solanky, a professor and chair of the mathematics department at the University of New Orleans (Dkt. No. 101-2, Solanky Aff., ¶ 2). Dr. Solanky has written extensively on the subject of statistics, presented research at multiple conferences, and previously testified in court regarding statistical matters (*Id*., ¶¶ 4-5).

48.     Dr. Solanky is critical of both the Cunningham study and Dr. Heflin's opinions offered here (*Id*., ¶¶ 22-28, 44-45).  Dr. Solanky also discusses other studies that examine abortion rates and trends that may impact the outcome of this case (*Id*., ¶¶ 12-22, 29-37).

49.     Defendants also submit the affidavit of Shirley Louie, the Director of the Center for Public Health Practice with the Arkansas Department of Health (Dkt. No. 101-1, Louie Aff., ¶ 2). Attached to her affidavit are two spreadsheets, the first of which lists the Arkansas occurrences of induced abortions performed on Arkansas residents in 2017, and the second of which lists the Arkansas occurrences of induced abortions performed on residents from states other than Arkansas (*Id*., ¶ 3).

## IV.     Conclusions Of Law

When determining whether to grant a motion for a temporary restraining order, this Court considers:  (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between the harm to the movant and the injury that granting an injunction would cause other interested parties; and (4) the public interest. *Kroupa v. Nielsen*, 731

F.3d 813, 818 (8th Cir. 2013) (quoting *Dataphase Sys. Inc. v. CL Sys.,* 640 F.2d 109, 114 (8th Cir. 1981)).  Preliminary injunctive relief is an extraordinary remedy, and the party seeking such relief bears the burden of establishing the four *Dataphase* factors.  *Watkins Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir. 2003).  The focus is on "whether the balance of the equities so favors the movant that justice requires the court to intervene to preserve the *status quo* until the merits are determined." *Id.*  "Although no single factor is determinative when balancing the equities," a lack of irreparable harm is sufficient ground for denying a temporary restraining order.  *Aswegan v. Henry*, 981 F.2d 313, 314 (8th Cir. 1992).

### V.     Standard of Review:  Modified *Dataphase* Factors

The Court examines the *Dataphase* factors as applied to plaintiffs' request for a temporary restraining order.  *See Dataphase*, 640 F.2d at 109.  Under *Dataphase*, no one factor is determinative.  *Id.* at 113.  The Eighth Circuit revised the *Dataphase* test when applied to challenges to laws passed through the democratic process.  Those laws are entitled to a "higher degree of deference."  *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 725, 732 (8th Cir. 2008).  In such cases, it is never sufficient for the moving party to establish that there is a "fair chance" of success.  Instead, the appropriate standard, and threshold showing that must be made by the movant, is "likely to prevail on the merits."  *Id.*  Only if the movant has demonstrated that it is likely to prevail on the merits should the Court consider the remaining factors.  *Id.*

### A.     Likely To Prevail On The Merits

Federal constitutional protection of reproductive rights is based on the liberty interest derived from the due process clause of the Fourteenth Amendment.  *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 846 (1992) (majority opinion).  The United States Supreme Court, when recognizing this right, stated:

> We forthwith acknowledge our awareness of the sensitive and emotional nature of the abortion controversy, of the vigorous opposing views, even among physicians, and of the deep and seemingly absolute convictions that the subject inspires. One's philosophy, one's experiences, one's exposure to the raw edges of human existence, one's religious training, one's attitudes toward life and family and their values, and the moral standards one establishes and seeks to observe, are all likely to influence and to color one's thinking and conclusions about abortion.
>
> In addition, population growth, pollution, poverty, and racial overtones tend to complicate and not to simplify the problem.

*Roe v. Wade*, 410 U.S. 113, 116 (1973).

Unless and until *Roe* is overruled by the United States Supreme Court, to determine whether a state statute is unconstitutional and violates substantive due process rights in this context, the Court applies the "undue burden" standard developed in *Casey*, 505 U.S. at 876-79 (plurality opinion), and *Hellerstedt,* 136 S. Ct. at 2309-11.

## 1.     The Proper Legal Standard

Although PPAEO and Dr. Ho's complaint does not specify whether this action is brought as a "facial" constitutional challenge to the Act or as an "as-applied" challenge, at the prior preliminary injunction stage, this Court reviewed plaintiffs' claim as one for facial relief. The Eighth Circuit also implicitly treated this case as a facial challenge. *Jegley*, 864 F.3d at 958 (analyzing whether this Court correctly applied the undue burden test from *Casey*, which applies to facial challenges). Since the Eighth Circuit entered its mandate in this case, neither party has argued that this case should be treated as anything other than a facial challenge to Section 1504(d). Accordingly, this Court will review this request for a temporary restraining order as a facial challenge to Section 1504(d).

The Eighth Circuit has recognized that facial challenges to abortion statutes can succeed only if a plaintiff can show that "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505

U.S. at 895 (majority opinion); *see also Planned Parenthood Minn., N.D., S.D. v. Rounds*, 653 F.3d 662, 667-68 (8th Cir. 2011), *vacated in part on reh'g en banc sub nom. Planned Parenthood Minn., N.D., S.D. v. Rounds*, 662 F.3d 1072 (8th Cir. 2011) and *in part on reh'g en banc sub nom. Planned Parenthood Minn., N.D., S.D. v. Rounds*, 686 F.3d 889 (8th Cir. 2012); *see also Rounds*, 530 F.3d at 733 n.8 ("*Rounds* cases"). "*Casey* teaches that the court need not find that a law imposes an undue burden on a precise percentage of impacted women in order [to] find that facial relief is warranted . . . ." *Planned Parenthood Se., Inc. v. Strange*, 172 F. Supp. 3d 1275, 1288 (M.D. Ala. 2016) ("*Strange V*"), *judgment entered*, 2016 WL 1178658 (M.D. Ala. 2016).[3]

In *Casey*, a plurality of the Supreme Court determined that, if a government regulation has "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus," the regulation is an undue burden on a woman's right to have an abortion and is unconstitutional. 505 U.S. at 877 (plurality opinion). In *Gonzales v. Carhart*, the Supreme Court then simplified *Casey*'s description, settling on the effects test. 550 U.S. 124, 158 (2007). The Supreme Court recently reiterated the undue burden standard that "a statute which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Hellerstedt*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S. at 877 (plurality opinion)).

---

[3] As discussed in greater detail later in this Order, an Alabama statute that requires abortion providers to obtain staff privileges at a local hospital was declared to restrict unconstitutionally the rights of women seeking abortions in Alabama. *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1381 (M.D. Ala. 2014) ("*Strange IV*") (supplementing liability opinion with evidentiary findings); *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1378 (M.D. Ala. 2014) ("*Strange III*") (finding that the staffing privileges requirement was unconstitutional as applied to plaintiffs); *Strange II*, 9 F. Supp. 3d 1272, 1276 (M.D. Ala. 2014 ) (summary judgment opinion laying the foundation for the application of the undue-burden test); *Planned Parenthood Se., Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1290 (M.D. Ala. 2013) ("*Strange I*") (temporarily enjoining the enforcement of the staff privileges requirement).

The Supreme Court in *Gonzales* stated as follows: "[T]he State, from the inception of the pregnancy, maintains its own regulatory interest in protecting the life of the fetus that may become a child, [and this premise] cannot be set at naught by interpreting *Casey's* requirement of a health exception so it becomes tantamount to allowing a doctor to choose the abortion method he or she might prefer. Where it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power to bar certain procedures and substitute others, all in furtherance of its legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn." *Gonzales*, 550 U.S. at 158. The Court acknowledges that the state may, in a valid exercise of its police power, regulate abortion. The state's police power is, however, limited where a protected liberty interest is at stake. *Casey*, 505 U.S. at 851 (majority opinion). "The State's interest in regulating abortion previability is considerably weaker than postviability." *Stenberg v. Carhart*, 530 U.S. 914, 930 (2000) (citing *Casey*, 505 U.S. at 870 (majority opinion)). Therefore, while the Court acknowledges that Section 1504(d) may be a valid exercise of the state's police power, the Court is obligated to examine whether it unduly burdens the constitutional right of Arkansas women to a pre-viability abortion.

To show an undue burden, PPAEO and Dr. Ho must show that "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895 (majority opinion). A court limits its inquiry to "the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* at 894 (majority opinion). "An undue burden is an unconstitutional burden." *Id.* at 877 (plurality opinion).

The undue burden analysis requires this Court to "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Hellerstedt*, 136 S. Ct. at 2309.

There must be "a constitutionally acceptable" reason for regulating abortion, and the abortion regulation must also actually advance that goal in a permissible way. *Id.* at 2309-10. The regulation will not be upheld unless the benefits it advances outweigh the burdens it imposes. *Id.* at 2310. "[T]he means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it." *Casey,* 505 U.S. at 877 (plurality opinion).

Further, under the applicable undue burden standard, although the Court must "review 'legislative fact finding under a deferential standard,'" *Hellerstedt*, 136 S. Ct. at 2310, the court "retains an independent constitutional duty to review [a legislature's] factual findings where constitutional rights are at stake . . . . Uncritical deference to [the legislature's] factual findings in these cases is inappropriate." *Gonzales*, 550 U.S. at 165, 167; *see Hellerstedt*, 136 S. Ct. at 2310.

Generally, the state has the burden of demonstrating a link between the legislation it enacts and what it contends are the state's interests. *See Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 430 (1983), *overruled on other grounds by Casey*, 505 U.S. 833 (describing the burden as that of the state). As a part of the Court's inquiry, the Court may take into account the degree to which the restriction is over-inclusive or under-inclusive, *see, e.g., Hellerstedt*, 136 S. Ct. at 2315 (discussing over- and under-inclusive scope of the provision), and the existence of alternative, less burdensome means to achieve the state's goal, including whether the law more effectively advances the state's interest compared to prior law; *id*. (noting that prior state law was sufficient to serve asserted interest); *id.* at 2314 ("The record contains nothing to suggest that [the challenged provisions] would be more effective than pre-existing [state] law at deterring wrongdoers . . . from criminal behavior.").

PPAEO and Dr. Ho, who challenge Section 1504(d), retain the ultimate burden of proving the statute's unconstitutionality. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (reversing

appellate court for enjoining abortion restriction where plaintiffs had not proven that the requirement imposed an undue burden); *Casey*, 505 U.S. at 884 (plurality opinion) (affirming provision where "there [was] no evidence on this record" that the restriction would amount to an undue burden).

## 2. Efforts To Comply With Section 1504(d)

This Court finds on the record before it at this stage of the proceeding that, despite trying to find a contracted physician, PPAEO and Dr. Ho cannot comply with the contracted physician requirement (Dkt. No. 2, de Baca Decl., ¶ 12). *Casey* requires a contextualized inquiry into how an abortion restriction interacts with facts on the ground, not only on the law's direct effects. 505 U.S. at 887-895 (majority opinion); *see Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 915 (9th Cir. 2014).

Defendants claim that PPAEO has not made a serious effort to locate a contracted physician (Dkt. No. 101, at 9). Specifically, defendants argue that PPAEO has only offered "token compensation" to potential contracted physicians and that LRFP offers no proof that it offered any compensation to potential contract physicians (*Id.*). Defendants acknowledge that PPAEO sent letters to "every ob-gyn [PPAEO] could identify," but defendants point out that this letter "criticiz[ed] the Arkansas General Assembly and denounc[ed] the contract-physician requirement as 'medically unnecessary.'" (*Id.*, at 9-10).

PPAEO and Dr. Ho maintain that, in addition to the efforts undertaken in 2016 and explained at more length in this Court's prior preliminary injunction Order (Dkt. No. 60), they compiled a list of every obstetrician/gynecologist in Arkansas using the physician directories of the Arkansas Medical Society and Arkansas State Medical Board and sent a letter in August 2017 to every one of those obstetrician/gynecologists (Dkt. No. 84, Supp. Ho. Decl., ¶ 16). This letter

described the contracted physician requirement and asked the recipients to "consider contracting with PPGP as required by the Act." (Dkt. No. 84, at 15). This letter asked the recipients to "contact [PPGP] as soon as possible if you are interested in serving as a contracting physician and we can discuss compensation and other logistics." (*Id*.). The letter also invited the recipient to inform PPAEO if the recipient knew of any other physicians "with the requisite privileges who would be willing to serve as a contracting physician . . . ." (*Id*.). Ms. Williams, the Clinical Director of LRFP, states that LRFP "sent a letter to every obstetrician-gynecologist we could identify in the state, but were unable to retain a physician with privileges." (Dkt. No. 84, Williams Decl. ¶ 6).

Dr. Ho also called many of the identified obstetrician/gynecologists—at least 60 physicians were contacted via telephone by her or PPAEO's staff (Dkt. No. 84, Supp. Ho. Decl., ¶ 17). These physicians would also have received the letter sent in August 2017. Certain physicians or group practices informed PPAEO that they do not support a woman's right to access abortion and would not help PPAEO (*Id*.). Others stated that they could not work with PPAEO, while at others the front staff "was so hostile once they heard that we were calling from Planned Parenthood that they would not even let us speak to the physicians and refused to take messages." (*Id*.). Dr. Ho represents that, despite these efforts, PPAEO is still unable to satisfy the contracted physician requirement (*Id*., ¶ 18).

There is evidence in the record that physicians who provide abortions or associate with physicians who provide abortions risk being ostracized from their communities and face harassment and violence toward themselves, their families, and their private practices (Dkt. No. 30, Stulberg Decl., ¶¶ 13-17). Even if a physician is willing to take on these risks, there is evidence in the record that many private practice groups, hospitals, HMOs, and health networks will not permit physicians working for them to associate with abortion providers (Dkt. No. 30, Stulberg

Decl., ¶¶ 9-12).  There is specific evidence that Arkansas's urban medical facility, the University of Arkansas for Medical Sciences ("UAMS") system, did not want to risk association with PPAEO or risk permitting its physicians to work with PPAEO (Dkt. No. 29, Ho. Decl., ¶ 6).  Defendants have presented no information to the contrary on these points.

Other district courts have found that abortion providers face threats of physical violence and professional stigmatization.  *See June Med. Servs. LLC v. Kliebert*, 250 F. Supp. 3d 27, 51-53 (M.D. La. 2017) ("*Kliebert II*") (abortion doctors received threats as a result of affiliation with abortion clinics); *Planned Parenthood of Wisconsin, Inc. v. Schimel*, 806 F.3d 908, 917 (7th Cir. 2015) (Posner, J.) (noting the "vilification, threats, and sometimes violence directed against abortion clinics and their personnel in states . . . in which there is intense opposition to abortion."), *cert. denied*, 136 S. Ct. 2545; *W. Ala. Women's Ctr. v. Williamson*, 120 F. Supp. 3d 1296, 1303 (M.D. Ala. 2015) (discussing possible violence, harassment, and stigma abortion providers face); *Strange III*, 33 F.Supp.3d at 1349-53 (describing the anti-abortion harassment and stigma that prevents physicians from associating with abortion providers, including protestors who "threaten economic destruction for any doctor who enable[s] the provision of abortion").  These dangers are magnified by Section 1504(d)'s requirement that the contracted physician make public his or her name and phone number.  Ark. Code Ann. § 20-16-1504(d)(3).

Several other courts have found that abortion providers and their personnel face significant threats to their safety and livelihoods and that hospitals are hesitant, if not hostile, to the prospect of granting admitting privileges to doctors who provide abortions.  *See Schimel*, 806 F.3d at 917 (noting it is difficult for abortion providers to recruit physicians "because of the vilification, threats, and sometimes violence directed against abortion clinics and their personnel in states such as Wisconsin, in which there is intense opposition to abortion"); *Strange III*, 33 F.Supp.3d at 1348-

49 (noting it is difficult for abortion providers to recruit physicians "due to the severe professional consequences of [association with abortion] and the lingering threat of violence against abortion doctors, particularly in Alabama").

Finally, other courts have found that hospitals deny admitting privileges to abortion doctors for other various reasons. *See Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786, 792 (7th Cir. 2013) ("*Van Hollen III*") ("The criteria for granting admitting privileges are multiple, various, and unweighted."), *cert. denied*, 134 S. Ct. 2841 (2014). Other courts have analyzed the multiple factors that are considered when determining if a doctor should be granted admitting privileges, including how often the physician uses the hospital, the quantity of services provided to the patient at the hospital, the revenue generated by a particular admitting physician, and the physician's admission to a particular practice or academic faculty. *Id*. In *Hellerstedt*, the Supreme Court noted that it would be difficult for doctors performing abortions at the El Paso, Texas, clinic to gain admitting privileges because "[d]uring the past 10 years, over 17,000 abortion procedures were performed at the El Paso clinic [and n]ot a single one of those patients had to be transferred to a hospital for emergency treatment, much less admitted to the hospital." 136 S. Ct. at 2312 (alterations in original). Or, in other words, abortion doctors are unable to gain admitting privileges because "abortions are so safe" that such doctors are "unlikely to have any patients to admit." *Id*.; *Van Hollen III*, 738 F.3d at 793 ("[T]he number of patient admissions by doctors who perform abortions is likely to be negligible because there appear to be so few complications from abortions and only a fraction of those require hospitalization . . . ."); *Williamson*, 120 F. Supp. 3d at 1303 (admitting privileges denied "because complications from abortions are so rare" that abortion doctor "would never be able to do the required amount of procedures.").

The record evidence at this stage of the litigation in this case is consistent with the findings in the cases discussed above: doctors face threats to their livelihoods and physical safety if they attempt to provide abortions or act as contracted physicians to abortion providers. The Court is skeptical that the compensation offered by plaintiffs would be enough to overcome these obstacles. These obstacles very likely keep even those doctors in Arkansas who may not have a moral or ethical opposition to abortion from providing abortions or serving as contracted physicians. *See Strange III*, 33 F. Supp. 3d at 1355 ("[T]he inability to obtain local abortion doctors is not a matter of money, but rather a reflection of the difficulty of pursuing that occupation in the State."). Furthermore, due to both widespread animus toward abortion among hospital staff and the peculiarities of the requirements necessary for admitting privileges, the Court finds that, based on the record evidence at least at this stage of the litigation, it is highly unlikely that the abortion clinics in Arkansas will be able satisfy Section 1504(d)'s contracted physician requirement.

### 3. Burdens Imposed By Section 1504(d)

Section 1504(d) of the Act, which is the statute plaintiffs continue to challenge, requires:

(1) The physician who gives, sells, dispenses, administers, or otherwise provides or prescribes the abortion-inducing drug shall have a signed contract with a physician who agrees to handle complications and be able to produce that signed contract on demand by the patient or by the Department of Health.

(2) The physician who contracts to handle emergencies shall have active admitting privileges and gynecological/surgical privileges at a hospital designated to handle any emergencies associated with the use or ingestion of the abortion-inducing drug.

(3) Every pregnant woman to whom a physician gives, sells, dispenses, administers, or otherwise provides or prescribes any abortion-inducing drug shall receive the name and phone number of the contracted physician and the hospital at which that physician maintains admitting privileges and which can handle any emergencies.

Ark. Code Ann. § 20-16-1504(d). Arkansas law also requires all women seeking abortions—medication or surgical—to receive certain state-mandated information in-person at least 48-hours

prior to the abortion. *See* Ark. Code Ann. § 20-16-1703. There are no exceptions to this requirement.

If the contracted physician requirement of the Act goes into effect, plaintiffs represent that only one health center in the state—located in Little Rock—will provide abortions (Dkt. No. 84, Williams Decl., ¶ 4). They also represent that these abortions will only be surgical. There is record evidence that, if Section 1504(d) takes effect, all three Arkansas health centers will no longer offer medication abortion (Dkt. No. 84, Supp. Ho. Decl., ¶ 3; Williams Decl., ¶ 7).

### a. Women For Whom The Regulation Is Relevant

To evaluate the burdens imposed by the contracted physician requirement, the Court must first define the group of women whose burdens must be analyzed. *See Hellerstedt*, 136 S. Ct. at 2320 ("[T]he relevant denominator is 'those [women] for whom [the provision] is an actual rather than an irrelevant restriction.'") (quoting *Casey*, 505 U.S. at 895 (majority opinion)). When this Court first analyzed this question, it was unclear if the "denominator" in the "large fraction" analysis was "all women of child-bearing age in Arkansas" or "all women seeking a medication abortion in Arkansas." In the interim, the Supreme Court decided *Hellerstedt* and reaffirmed that a law creates an undue burden when it places a "substantial obstacle to a woman's choice" in "a large fraction of the cases in which" it "is relevant." 136 S. Ct. at 2313 (quoting *Casey*, 505 U.S. at 895 (majority opinion)). Furthermore, the Eighth Circuit held that "because the contract-physician requirement only applies to medication-abortion providers, the 'relevant denominator' here is women seeking medication abortions in Arkansas." *Jegley*, 864 F.3d at 958 (citing *Hellerstedt*, 136 S. Ct. at 2320).

### b. Examining The "Large Fraction" Test

The Court next turns to examine the "large fraction" test. Defendants cite, and urge this Court to follow, the Sixth Circuit Court of Appeals' 2006 decision in *Cincinnati Women's Services, Inc. v. Taft*, 468 F.3d 361 (6th Cir. 2006), when assessing the large fraction. In *Taft*, the Sixth Circuit determined that Ohio's requirement that women receive an informed-consent lecture in person at least 24 hours prior to obtaining an abortion would be an almost insurmountable barrier for only about 12% of Ohio women. *Id.* at 364-65, 372-73. Specifically, analyzing the impact of the informed-consent requirement, the Sixth Circuit found that

> [O]f every 1000 women who seek an abortion, 50 to 100 are excused by the clinic from an in-person informed-consent meeting. According to the facts provided by the clinics, 6 to 12.5 of those 50 to 100 excused women will face a substantial obstacle in obtaining an abortion if forced to comply with the In–Person Rule. Therefore, for approximately 6 to 12.5 women out of every 1000 women seeking an abortion, the state's In–Person Rule would likely deter them "from procuring an abortion as surely as if [Ohio] has outlawed abortion in all cases." *Casey,* 505 U.S. at 894.

*Id.* at 373. The Sixth Circuit found that, accepting the relevant denominator as "all women presently excused by the clinic from the clinic's own in-person informed-consent requirement," the informed-consent requirement did not burden a "large fraction" because "[a]lthough a challenged restriction need not operate as a *de facto* ban for all or even most of the women actually affected, the term 'large fraction,' which, in a way, is more conceptual than mathematical, envisions something more than the 12 out of 100 women identified here." *Id.* at 373.

The Eighth Circuit, however, has implied that an abortion regulation that burdens 18% of a relevant class of women constitutes a "large fraction" under the test articulated in *Casey*. *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1462 n.10 (8th Cir. 1995) (Arnold, J.) (noting that undue burden existed because the 18% of minors who live in single-parent households could not conceivably access the "abuse exception" to South Dakota's parental

notification law), *cert. denied sub nom.*, 116 S. Ct. 1582 (1996); *see also A Woman's Choice-East Side Women's Clinic v. Newman*, 904 F. Supp. 1434, 1462 (S.D. Ind. 1995) (noting undue burden existed because "the number of Indiana women obtaining abortions is likely to drop by approximately 11 to 14%, and this effect is likely to be the result [of] the burdens of the law . . . ."); David S. Cogen & Jeffrey B. Bingenheimer, *Abortion Rights and the Largeness of the Fraction 1/6*, 164 U. Pa. L. Rev. Online 115, 121 (2016) (discussing the application of the large-fraction test by lower courts following *Casey*).

Most recently, the Fifth Circuit Court of Appeals held that 17% was not a "large fraction." *Whole Woman's Health v. Cole*, 790 F.3d 563, 588 (5th Cir. 2015). The *Cole* Court used "women of reproductive age" as the denominator in the calculation. *Id*. This decision was reversed and remanded by the Supreme Court's decision in *Hellerstedt* a year later. 136 S. Ct. at 2320 (noting that the "large fraction" referred to "a class narrower than 'the class of *women seeking abortions* identified by the state'") (quoting *Casey*, 505 U.S. at 894-95) (majority opinion) (emphasis in original). This Court acknowledges that the percentage affected by the restrictions at issue in *Cole* may be higher on remand if, as the Supreme Court suggests in *Hellerstedt*, a class of women narrower than "all women of reproductive age" is used as the denominator.

In this case, the Eighth Circuit expressed skepticism that 4.8 to 6.0% is sufficient to qualify as a "large fraction." *Jegley*, 864 F.3d at 959 n.8 (citing *Taft*, 468 F.3d at 374).[4] The Eighth Circuit reversed and remanded this Court's prior preliminary injunction, determining that, "in order to

---

[4] To illustrate its point, in a footnote, the Eighth Circuit proposed one possible numerator to determine whether a "large fraction" of women are burdened by the contracted physician requirement in this case. In this footnote, the Eighth Circuit focused only on those women living in Washington County, Arkansas, who, as a result of the contracted physician requirement, will not receive *any* abortion, medication or otherwise. For reasons explained in this Order, focusing only on the impact in Washington County, Arkansas, overlooks the broader impact this regulation will have on women in surrounding counties, given Arkansas' geography.

sustain a facial challenge and grant a preliminary injunction," this Court is "required to make a finding that the Act's contract-physician requirement is an undue burden for a *large fraction of women seeking medication abortions in Arkansas*." *Id.* at 959 (emphasis added). The Eighth Circuit held that this Court "did not make this finding," noting that this Court's prior findings of fact "did not determine how many women would face increased travel distances," nor did they "estimate the number of women who would forgo abortions." *Id.* Accordingly, in making these findings of fact, the Court follows the Eighth Circuit's direction and uses those "women seeking medication abortions in Arkansas" as the denominator of the "large fraction" test.

### c.     Analyzing Burdens Imposed By Section 1504(d)

The Court now turns to analyze and attempt to quantify based on the record evidence at this stage of the proceedings the burdens imposed by the contracted physician requirement upon those women in Arkansas who would otherwise have received a medication abortion. Below, the Court makes the findings requested by the Eighth Circuit in *Jegley*.

First, the Court describes the burden imposed due to the effective ban on medication abortions in Arkansas. The record evidence before the Court at this stage of the proceedings shows that medication abortion will no longer be available in Arkansas for any woman who might choose that method of abortion over surgical abortion or for any woman for whom medication abortion is medically necessary or preferred.

Second, the Court observes that the contracted physician requirement will effectively deny Northwest Arkansas an operational abortion clinic. Only one area of Arkansas, in Little Rock, will have a provider that performs surgical abortions. Plaintiffs maintain that the contracted physician requirement is burdensome, in part, because it requires women seeking an abortion who live significant distances from LRFP to make two lengthy trips to have an abortion—one for the

informed consent appointment mandated by Arkansas Code Annotated § 20-16-1703 and a second for the surgical abortion itself.[5]  Several burdens flow from this, as explained below.

Third, the Court analyzes the burden on women who will not obtain an abortion at all because medication abortions are no longer available in Fayetteville and traveling to Little Rock for a surgical abortion will present too great a burden.  Some percentage of women will entirely forgo an abortion as a result of the contracted physician requirement, and the Court quantifies, using various metrics, what percentage of women seeking medication abortions in Arkansas will face this burden.

Fourth, the Court discusses the burden that falls upon those women who must, as a result of the contracted physician requirement, travel to Little Rock for a surgical abortion.  These women, who would otherwise have sought medication abortions in Fayetteville, will opt to travel to Little Rock to obtain a surgical abortion but will face increased travel time, lost wages, and decreased service at the remaining abortion clinic in Little Rock

Fifth, the Court discusses the potential burden facing all women who will seek an abortion at Arkansas' sole remaining abortion clinic in Little Rock.  The number of clinics in Arkansas offering abortion services will be reduced.  This decrease in providers will burden Arkansas women who seek medication abortion and also burden all Arkansas women who seek abortion, as explained.  With all of these burdens considered individually and collectively, and cognizant of the fact that "the 'large fraction' standard is in some ways 'more conceptual than mathematical,'"

---

[5] The Court presumes, based upon the record evidence, that a surgical abortion in Arkansas requires two round-trips:  the first for the 48-hour waiting period requirement and the second for the procedure itself.  The Court notes that Texas' pre-existing regulatory framework, which was analyzed in *Hellerstedt*, required a women to wait 24 hours after receiving state-mandated information, but this requirement could be shortened to a two-hour wait if the woman certified that she lived more than 100 miles from her nearest abortion provider.  *Cole*, 790 F.3d at 594.

the Court makes the finding that, at this point in the litigation on the limited record evidence before it, the contracted physician requirement presents a significant burden to a large fraction of women seeking medication abortions in Arkansas. *Jegley*, 864 F.3d at 960 (citing *Taft*, 468 F.3d at 374).

### (1) Burdens Imposed: Effective Ban On Medication Abortions

First, the Court finds that every woman in Arkansas seeking a medication abortion faces a burden due to the contracted physician requirement. The parties agree that, as a result of the contracted physician requirement and plaintiffs' inability to comply with it, none of the three existing abortion clinics in Arkansas will offer medication abortions. There is no exception to the contracted physician requirement, so every woman seeking a medication abortion in Arkansas is affected by the unavailability of such abortions in Arkansas.

While the Court acknowledges that the lack of medication abortion in Arkansas does not ban pre-viability abortions in the state, the record evidence indicates that a large fraction—71%— of women "have a very strong preference" for medication abortions as opposed to surgical ones (Dkt. No. 84, Supp. Ho Decl., ¶ 23). Dr. Ho asserts that this finding is "consistent with [her] own personal experience," as some of her patients are afraid of surgical procedures, others feel that a medication abortion is "more natural than a surgical abortion and is more like a miscarriage," and still others "want to complete the procedure in the privacy of their own homes or in the presence of their support person or loved ones." (*Id.*, ¶ 24).

Defendants point to a finding by the Sixth Circuit that "these statements give rise to the inference that some women prefer a medical abortion over a surgical abortion, but they do not support the conclusion that the unavailability of a medical abortion would create a *substantial obstacle* for a large fraction of women in deciding whether to have an abortion." *Planned Parenthood Southwest Ohio Region v. DeWine*, 696 F.3d 490, 516 (6th Cir. 2012) (emphasis in

original).  Here, the record evidence indicates that 71% of women who seek abortions have a strong preference for medication abortions (Dkt. No. 84, Supp. Ho Decl., ¶ 23).  Further, the Supreme Court in *Hellerstedt* found that medication abortions, like surgical abortions, are not dangerous. 136 S. Ct. at 2311 (citing evidence that abortions in general have a complication rate of "less than one-quarter of 1%").  The Court acknowledges that, under the holding in *DeWine*, the unavailability of a medication abortion does not, by itself, create a substantial obstacle to a woman's right to have an abortion if other methods of pre-viability abortion remain available. Although Section 1504(d) only regulates medication abortion, the Court looks to the availability of medication and surgical abortions overall to assess the regulation's purported burdens.

Regardless, the Court finds that the record evidence does support an inference that the lack of medication abortion in Arkansas presents some burden to those women who prefer medication abortions over surgical ones due to the cost, risk, and potential recovery required by a surgical abortion.  In other words, the Court concludes that, by effectively ending medication abortions in Arkansas, the contracted physician requirement burdens those women who are seeking medication abortions in Arkansas.

Even if this burden, by itself, does not render the contracted physician requirement a "substantial obstacle in the path of a woman's choice," *Hellerstedt*, 136 S. Ct. 2312 (citing *Casey*, 505 U.S. at 877 (plurality opinion)), the Court will not discount it as some evidence of burden.  To make the "substantial obstacle" determination, the burden imposed by the elimination of medication abortions "must be taken together with other[]" burdens caused by the contracted physician requirement and weighed against "any health benefit" to determine if an "undue burden" exists.  *Id.* at 2313.

The Court also notes that, in *DeWine,* the Sixth Circuit did not apply the balancing test articulated in *Hellerstedt*, but instead reviewed only the burden imposed by Ohio's ban on medication abortions. *Compare DeWine*, 696 F.3d at 516 (discussing only the burden imposed upon women), *with Hellerstedt*, 136 S. Ct. at 2310 ("The rule announced in *Casey*, however, requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer."). The Court questions whether the analysis in *DeWine* survives muster in the wake of *Hellerstedt*. In *Humble*, the Ninth Circuit Court of Appeals found that Arizona's medication abortion ban imposed an undue burden because the "the Arizona law substantially burdens women's access to abortion services, and Arizona has introduced no evidence that the law advances in any way its interest in women's health." 753 F.3d at 916. The Ninth Circuit noted that "the burden imposed by the Arizona law is undue even if some women who are denied a medication abortion under the evidence-based regimen will nonetheless obtain an abortion," as the Supreme Court has never "held that a burden must be absolute to be undue." *Id*. at 917 (citation omitted). The Court finds the Ninth Circuit's reasoning in *Humble* consistent with the balancing test articulated by the Supreme Court in *Hellerstedt*.

In the present case, regardless of the fraction of women who prefer medication abortions to surgical ones, *none* of the women who prefer medication abortions can satisfy that preference in Arkansas, if the contracted physician requirement takes effect given that plaintiffs have demonstrated an inability to comply with it. Accordingly, 100% of "women seeking medication abortions in Arkansas," *Jegley*, 864 F.3d at 959, are burdened to some extent by the contracted physician requirement. The fact that some of the women who prefer medication abortions will nonetheless receive a surgical abortion does not affect this analysis.

Further, removing medication abortion as an option for women will result in negative consequences for those women for whom medication abortion is medically indicated (Dkt. Nos. 2, Fine Decl., ¶ 13; 84, Williams Decl., ¶ 9). It remains unclear from this record what percentage of the patient population that may be.

(2)     **Burdens Imposed:   Reduction In Number Of Clinics Providing Abortions**

If the contracted physician requirement takes effect and if plaintiffs are unable to comply with it, PPAEO's clinics will be forced to cease offering any type of abortion. PPAEO's clinics in Fayetteville and Little Rock do not provide surgical abortions and cannot upgrade their facilities to do so based in part on existing state regulations applicable to surgical abortion facilities but not medication-only facilities (Dkt. Nos. 57-1, de Baca Rebuttal Decl., ¶ 8; 84, Supp. Ho. Decl., ¶ 7 (averring that PPAEO would need to relocate or upgrade its facilities to offer surgical abortions partly in order to comply with state regulations that apply to surgical abortion facilities but not medication abortion facilities; it may not find a landlord willing to rent space to an abortion provider and does not have a sufficient budget to renovate the existing center at this time)). *See Hellerstedt*, 136 S. Ct. 2318 (noting that record evidence of the cost of expanding clinics supported a conclusion that more clinics "will not soon fill the gap when licensed facilities are forced to close."). As explained, if the contracted physician requirement takes effect and plaintiffs are unable to comply with it, Arkansas will be left without a medication abortion provider. Further, the Fayetteville metropolitan area will no longer have an abortion provider that can provide either medication or surgical abortions. In other words, the number of clinics in Arkansas offering abortion services will be reduced; whereas before the regulation took effect there were two population centers with abortion clinics open, there will only be one population center in Arkansas

with an abortion clinic open if this regulation takes effect and if plaintiffs are unable to comply, as they represent.

The Court compares the Arkansas situation to the Missouri situation recently analyzed by Judge Phillips in *Comprehensive Health of Planned Parenthood Great Plains v. Williams*, Case No. 4:17-cv-4207-BP (W.D. Mo. June 11, 2018) ("*Williams II*"). Judge Phillips denied plaintiffs' motion for preliminary injunction finding that, while the abortion regulation at issue in Missouri restricts the provision of medication abortion, surgical abortion is able to be provided in all relevant areas of the state of Missouri. *Id.* at 16-17. There, abortion clinics in Springfield and Columbia, Missouri, cannot satisfy a "complication plan" requirement and will therefore be forced to cease providing medication abortions. *Id.* at 16. The Columbia clinic, however, provides surgical abortions, and Judge Phillips concluded that there is no "legal impediment" preventing the Springfield clinic from doing so as well. *Id.* Further, abortion clinics in Kansas City and St. Louis, Missouri, still offer medication abortions. *Id.* at 3. That is not the case here; PPAEO's clinics in Fayetteville and Little Rock do not provide surgical abortions and cannot upgrade their facilities to do so. Accordingly, compared to the effect of Missouri's "complication plan" requirement, the effect of Section 1504(d)'s contracted physician requirement imposes a qualitatively greater burden upon women seeking medication abortions in Arkansas.

### (3) Burdens Imposed: Women Who Will Forgo An Abortion

In *Jegley*, to determine whether a "large fraction" of women were burdened, the Eighth Circuit focused on the number of women forced to forgo *any* abortion as a result of the contract physician requirement. 864 F.3d at 959 n.8. The Court must rely upon the opinions of statistical researchers to determine how many women will forgo an abortion as a result of the contracted physician requirement.

On remand, plaintiffs present the affidavit of Dr. Colleen Heflin.  Dr. Heflin opines that, when an abortion clinic within 50 miles is closed, "abortion rates decline by 15% in counties requiring between 50 and 100 miles of travel to access services, by 25% in counties requiring between 100 and 150 miles of travel[,] and by 40% for those counties requiring between 150 and 200 miles of travel." (Dkt. No. 84, Heflin Decl., ¶ 13).  Evidence that increased travel distances lead to decreases in the abortion rate has been accepted by several federal courts.  *See Schimel*, 806 F.3d at 919  (noting that "18 to 24 percent of women who would need to travel to Chicago or the surrounding area [from Wisconsin] would be unable to make the trip."); *Strange III*, 33 F. Supp. 3d at 1356-60 (crediting statistical evidence that increased travel distance led to decreased abortion rates, particularly for urban women who are forced to travel more than 50 miles to an abortion clinic); *see also Kliebert II*, 250 F. Supp. 3d at 83 (crediting evidence that "[i]ntercity travel for low-income women presents a number of significant hurdles" and that "with just one or two providers remaining, many more women will be forced to travel significant distances to reach a clinic, which also imposes a substantial burden."); *Comprehensive Health of Planned Parenthood Great Plains, et al., v. Williams*, 263 F. Supp. 3d 729, 735 (W.D. Mo. 2017) ("*Williams I*") ("A fall-off in professionally-handled abortions in a locale seems almost certain when there is no convenient place to go.").  The Court notes that those women who forgo a legal abortion may attempt to self-abort or seek care from unsafe providers (Dkt. No. 2, Fine Decl., ¶ 55).

Defendants argue by submitting the affidavit of Dr. Solanky and updated statistics for Arkansas on remand that the methodology used in the study relied upon by Dr. Heflin is flawed. The study in question was conducted by Scott Cunningham and published by the National Bureau

of Economic Research.[6] Specifically, defendants argue that the study fails to demonstrate causality between falling abortion rates and reduced numbers of abortion clinics (Dkt. No. 101, at 27). Defendants also assert that Dr. Heflin's conclusions, which are based upon a study conducted in Texas, are not applicable to Arkansas because of the "large international boarder that Texas shares with Mexico." (*Id*., at 27 n.9). Defendants also point out that Dr. Heflin "apparently failed to realize that the Cunningham study she relies on measures the effect of increased driving distances *where there is an abortion facility within 50 miles*." (*Id*., at 28 (emphasis in original)). They also argue that Dr. Heflin "improperly used the total driving distance from the patients' county of residence to Little Rock, instead of the *change* in driving distance from travelling to Little Rock rather than Fayetteville." (*Id*. (emphasis in original)). Defendants also note that Dr. Heflin's calculations "rest on an erroneous assumption" that patients who would have otherwise gone to the Fayetteville clinic will not go to a private physician or an out-of-state clinic for an abortion (*Id*., at 28-29).

Plaintiffs present the rebuttal declaration of Dr. Heflin to address the arguments made by defendants through Dr. Solanky (Dkt. No. 102). Dr. Heflin asserts that the Cunningham study upon which she relies "is a causal analysis and does not show mere correlation [between clinic closures and decreases in the abortion rate]." (*Id*., ¶ 4). Specifically, Dr. Heflin points out that the Cunningham study "incorporates data before and after the [Texas admitting-privileges law] [was] implemented" and "controls for differences in treatment and control groups . . . ." (*Id*.). Furthermore, Dr. Heflin points out that she did not rely upon other studies she cited in her initial declaration because the Cunningham study "is a more rigorous study," as one of the other studies

---

[6] Scott Cunningham, et al., Working Paper No. 2336: *How Far is Too Far? New Evidence on Abortion Clinic Closures, Access, and Abortions*, NBER Working Paper Series (2017, rev. 2018).

uses fewer "refinements" than the Cunningham study and the other looks at the number of licensed abortion clinics to determine how many abortions occurred, rather than whether the licensed clinics were actually performing abortions (*Id.*, ¶¶ 5-7).

Dr. Heflin also argues that she correctly "included women who reside in counties that are more than 50 miles from the Fayetteville health center in estimating the number of women prevented from accessing abortion by the Arkansas law," because the Cunningham study uses a multiple regression model that "includes travel distance from every county in Texas for each year, but breaks those travel distances into 50 mile categories or 'bin.'" (*Id.*, ¶ 8).  Therefore, according to Dr. Heflin, the Cunningham study "provides causal estimates of the relationship between travel distances in specific bins relative to those counties with access within 50 miles and the reduction in abortion rates." (*Id.*).

Finally, Dr. Heflin states that "[it] is correct to use the total driving distance when applying the Cunningham study to Arkansas, rather than the change in driving distance, because the Cunningham study relied upon data that measured the total driving distance (in a particular county in a particular year) as its measure of access in the analysis." (*Id.*).  Indeed, she notes that the Cunningham study not only measures total distance traveled to an abortion clinic, but it also includes "a measure of congestion to account for the fact that remaining providers in Texas were unable to meet the new higher level of demand for their services." (*Id.*, ¶ 3).

In the light of the record evidence, at this stage of the litigation, and given the widespread acceptance of such methodology by other federal courts, *see e.g., Schimel*, 806 F.3d at 919; *Strange III*, 33 F. Supp. 3d at 1356-60, the Court concludes that Dr. Heflin's conclusions appear grounded in valid statistical methods and analytically sound.  Accordingly, at this early stage of the litigation, the Court accepts Dr. Heflin's conclusion that when abortion clinics are closed, "abortion rates

decline by 15% in counties requiring between 50 and 100 miles of travel to access services, by 25% in counties requiring between 100 and 150 miles of travel[,] and by 40% for those counties requiring between 150 and 200 miles of travel." (Dkt. No. 84, Heflin Decl., ¶ 13). As discussed in more depth below, by applying these metrics to the data attached to Dr. Heflin's declaration, the Court analyzes whether a large fraction of women seeking medication abortions in Arkansas will be prevented from having an abortion at all, medication or surgical, due to the contracted physician requirement. Because we are at an early stage in this litigation and because Dr. Solanky is critical of Dr. Heflin's analysis, the Court also tests the burden analysis against numbers that account for some of defendants' criticisms.

While the record contains inconsistent evidence at this early stage of the litigation about the number and type of abortions that occur in Arkansas, the Court is able to make the findings sought by the Eighth Circuit based on the record before it. Given the Eighth Circuit's ruling in *Jegley*, the Court will calculate the "large fraction" by using the number of women seeking medication abortions in Arkansas as the denominator. Dr. Ho asserts that, in 2017, PPAEO's physicians performed 843 medication abortions in Arkansas, 653 of which were at the Fayetteville health center (Dkt. No. 84, Supp. Ho. Decl. ¶ 6). Ms. Williams asserts that LRFP conducted 92 medication abortions in 2017 (Dkt. No. 84, Williams Decl., ¶ 8). Accordingly, the Court infers that 935 medication abortions occurred in Arkansas in 2017. Defendants' data indicate that Arkansas residents sought 838 medication abortions and 83 non-Arkansas residents sought medication abortions in Arkansas in 2017, for a total of 921 total medication abortions in Arkansas (Dkt. No. 101-1, at 5-8). It is not clear whether the Eighth Circuit intended this Court to include non-Arkansas residents who seek medication abortions in Arkansas as part of the denominator of the "large fraction." Accordingly, in the following sections, the Court analyzes the various

combinations of denominators and numerators which may be used to calculate whether a "large fraction" of women seeking medication abortions in Arkansas will forgo an abortion altogether.

(i)         **Dr. Heflin's Calculation Applied To All Women Who Sought Medication Abortions In Fayetteville**

Dr. Heflin's declaration includes a spreadsheet that indicates 599 medication abortions occurred at the Fayetteville clinic in 2017 (Dkt. No. 84, at 50). Applying her findings about the effects of increased travel distance to these data, Dr. Heflin estimates that of those women who sought a medication abortion at the Fayetteville clinic, "a total of 235 women will be prevented from having an abortion" due to the effects of the contracted physician requirement (Dkt. No. 84, Heflin Decl., ¶ 15).[7] If a total of 935 medication abortions occurred in Arkansas in 2017, Dr. Heflin's calculation means that at least 25% of all women seeking medication abortions in Arkansas will forgo an abortion entirely.[8] Using 921 as the denominator, then approximately 26% of all women seeking medication abortions in Arkansas will forgo an abortion entirely.[9] If the Court limits its denominator to the 838 medication abortions sought by Arkansas residents in Arkansas in 2017, then Dr. Heflin's calculation means that 28% of Arkansas residents seeking medication abortions in Arkansas will forgo an abortion entirely.[10]

---

[7] Like Dr. Heflin, other courts' findings indicate that travel distances of 50 miles or less also decrease the abortion rate to some extent. Accounting for this finding likely means a larger percentage of Arkansas women are burdened by this requirement. For purposes of resolving the motion for temporary restraining order now pending before the Court, the Court focuses its analysis only upon those women who must travel more than 100 miles to illustrate how the effect on those women, by itself, is enough to establish that a "large fraction" of women seeking medication abortions in Arkansas will forgo an abortion altogether under the facts presented.

[8] 235/935=25%.

[9] 235/921=26%.

[10] 235/838=28%.

The Court also applies Dr. Heflin's findings to those Arkansas residents who live in Northwest Arkansas and who would have otherwise sought an abortion in Fayetteville. This analysis is intended to explore Dr. Solanky's criticism of Dr. Heflin's use of out-of-state resident numbers.

Dr. Heflin's spreadsheet indicates that, of those 599 medication abortions at the Fayetteville clinic in 2017, 519 of those women live in Arkansas counties that are reasonably construed as "Northwest Arkansas."[11] Of those 519 women in Northwest Arkansas, 500 of them live in counties that are 150 miles or more from Little Rock (Dkt. No. 84, at 50).[12] The remaining 19 live in counties that are 100 to 150 miles from Little Rock (*Id.*).[13] According to Dr. Heflin's affidavit, "compared to having an abortion clinic relatively close (which they define as within 50 miles), abortion rates decline . . . by 40% for those counties requiring between 150 and 200 miles of travel" and "25% in counties requiring between 100 and 150 miles of travel . . . ." (*Id.*, Heflin Decl., ¶ 13). Forty percent of 500 women equals 200 women, and 25% of 19 women is

---

[11]  The Court determined this number by adding the number of reported patients for Benton, Boone, Carroll, Crawford, Johnson, Madison, Franklin, Newton, Sebastian, and Washington counties who sought medication abortions from the Fayetteville clinic in 2017 (Dkt. No. 84, at 50). Given the geography of Arkansas, at this stage of the litigation and with the record before it, the Court determines this is a reasonable estimate. *See 2017-2019 Highway Map of Arkansas* (2017), http://ardot.gov/Trans_Plan_Policy/mapping_graphics/2017-2019/Statehwymap_front17-19.pdf. The Court notes defendants' data (Dkt. No. 101-1, at 4-5) indicate that 526 women in the aforementioned counties received medication abortions in 2017.

[12]  Benton, Carroll, Crawford, Madison, Sebastian, and Washington counties are more than 150 miles away from Little Rock (Dkt. No. 84, at 50).

[13]  Boone, Franklin, Johnson, and Newton counties are 100 to 150 miles away from Little Rock (Dkt. No. 84, at 50).

approximately 8 women. Accordingly, applying Dr. Heflin's methodology to Northwest Arkansas, approximately 208 women will forgo an abortion entirely. Using 208 women as the numerator, if the Court credits Dr. Ho and Ms. Williams' representations that 935 medication abortions occurred in Arkansas in 2017, this means that at least[14] 22% of all women seeking medication abortions in Arkansas will forgo an abortion entirely.[15] If 921 is the denominator, then at least approximately 23% of all women seeking medication abortions in Arkansas will forgo one.[16] If, on the other hand, the Court credits defendants' data that Arkansas residents sought 838 medication abortions in Arkansas in 2017, then if 208 women are prevented from obtaining an abortion, that means at least 25% of Arkansas residents seeking medication abortions in Arkansas will forgo an abortion entirely.[17]

>        (iii)        **Dr. Heflin's Data, Applied To Women In Benton And Washington Counties**

Defendants also object to Dr. Heflin's conclusions on the grounds that the study she relies upon measures decreases in the abortion rate due to *increased* travel distances once an abortion clinic is closed (Dkt. No. 101, at 28). Dr. Solanky specifically criticizes Dr. Heflin's conclusions on the grounds that "of the 14 Arkansas Counties she has based her computations on, 11 (=78.6%) are not less than 50 miles from the Fayetteville facility." (Dkt. No. 101-2, Solanky Aff., ¶ 44). The Court disagrees with Dr. Solanky's criticism.

---

[14] The Court focuses upon those women who live in Northwest Arkansas to illustrate that Dr. Heflin's overall conclusion is consistent even if out-of-state residents are excluded from the calculation.

[15] 208/935=22%.

[16] 208/921=23%

[17] 208/838=25%

For illustration purposes only, and to explore Dr. Solanky's criticism that Dr. Heflin inappropriately included in her calculations women whose travel distances will not increase specifically to alter her conclusions, the Court examines what percentage of women seeking medication abortions in Arkansas would forgo an abortion entirely if the Court were to restrict its analysis to a group of women who no party can dispute would experience an *increase* in travel distance of more than 150 miles as a result of the contracted physician requirement.

With few exceptions, any woman living in either Benton or Washington County will face increased travel distances of approximately 150 miles or more to receive an abortion as a result of the contracted physician requirement. Dr. Heflin's data indicate that 404 women residing in Benton and Washington counties sought medication abortions at the Fayetteville clinic in 2017 (Dkt. No. 84, at 50).[18] The Court acknowledges that more women in Arkansas likely will face an increase of more than 150 miles as a result of this requirement, but the Court focuses on this class of women for illustration purposes, as there can be no dispute that these women will be forced to *increase* their travel distance between approximately 150 to 200 miles due to the cessation of abortion at the Fayetteville clinic. Again, applying Dr. Heflin's 40% metric to these women, the Court concludes that 162 of these women will be forced to forgo an abortion entirely as a result of the increased travel burden.[19] Using 162 women as the numerator, if the Court credits Dr. Ho and Ms. Williams' representations that 935 medication abortions occurred in Arkansas in 2017, this means that at least 17% of all women seeking medication abortions in Arkansas will forgo an

---

[18] 182 women in Benton County sought abortions in Fayetteville in 2017, and 222 women in Washington County sought abortions in Fayetteville in 2017. 182+222=404.

[19] 404*40%=162.

abortion entirely.[20]  If the Court uses 921 as the denominator, then at least 17% of all women seeking medication abortions in Arkansas will forgo one entirely.[21]  If the Court credits defendants' data that Arkansas residents sought 838 medication abortions in Arkansas in 2017, then at least 19%[22] of Arkansas residents seeking medication abortions in Arkansas will forgo an abortion entirely.[23]

**(iv)      Dr. Henshaw's Data, Applied To Women In Northwest Arkansas**

The Court also reviews the data as it existed in the record prior to the Eighth Circuit's decision in *Jegley*.  According to defendants' evidence, in 2014 there were 551 medication abortions sought by Arkansas residents (Dkt. No. 55-8, Aff. Kakkar, ¶ 7).  The record does not indicate how many non-residents sought medication abortions in 2014.  Plaintiffs submit the affidavit of Dr. Stanley Henshaw, who opines that "an additional travel burden of 100 miles will cause 20 to 25% of women who would have otherwise obtained abortions not to obtain them."

---

[20]  162/935=17%.

[21]  162/921=17%.

[22]  162/838=19%.

[23]  Plaintiffs' data show that the overwhelming majority of the medication abortions performed in Arkansas occurred at PPAEO's Fayetteville clinic:  of the 935 medication abortions performed in Arkansas in 2017, 653, or 70%, of those occurred at the Fayetteville clinic (Dkt. No. 84, Supp. Ho. Decl. ¶ 6; Williams Decl., ¶ 8).  The Court notes that other courts to review as-applied challenges have applied some variant of the "large fraction" test.  *See Williams II*, 296 F. Supp. 3d at 1139-1141 (applying "large fraction" test to as-applied challenge regarding an abortion clinic in Columbia, Missouri); *Williamson*, 120 F. Supp. at 1311-12 (determining that abortion regulation was unconstitutional as applied to abortion clinic in Tuscaloosa, Alabama, and discussing effects of that regulation on various classes of women in Alabama).  If the Court were to perform a large fraction analysis based upon an as-applied challenge to Section 1504(d)'s effect in Northwest Arkansas only, presumably the denominator in that analysis would be *smaller* than the denominators used by the Court in the facial analysis it conducts here, resulting in a higher overall percentage of women burdened by the contracted physician requirement.

(Dkt. No. 28, Henshaw Decl., ¶¶ 11, 22). He also opines that "greater distances will be a barrier to an even higher percentage of women" and that "the effect of eliminating the closest abortion provider would likely be even more burdensome for women in and around Fayetteville . . . ." (*Id.*, ¶ 22). Dr. Henshaw does not quantify the percentage of women who will forgo an abortion if they have a travel distance greater than 100 miles, though he does acknowledge that such greater distances will lead to higher reductions in the abortion rate—reductions of more than 20 to 25% (*Id.*, ¶¶ 11, 22). According to the 2014 data provided by defendants, Arkansas residents in Benton, Boone, Carroll, Crawford, Johnson, Madison, Franklin, Newton, Sebastian, and Washington counties (each more than 100 miles distant from Little Rock) sought 288 medication abortions. The Court assumes these medication abortions were performed in Fayetteville, as Fayetteville is closer to these counties than Little Rock. Applying Dr. Henshaw's reduction estimate to these data, the Court concludes that at least 58 to 72 women would have forgone an abortion entirely due to the increased travel distance.[24] This means that at least 11 to 13% of the 551 medication abortions sought in 2014 would not have occurred.[25]

Applying Dr. Henshaw's reduction estimate to the 2017 data on women living in counties distant to Little Rock presents different results. In 2017, according to Dr. Heflin, 519 women in Benton, Boone, Carroll, Crawford, Johnson, Madison, Franklin, Newton, Sebastian, and Washington counties sought medication abortions in Fayetteville. If 20 to 25% of those women would not receive any abortion as a result of the contracted physician requirement, at least 104 to 130 women would forgo an abortion.[26] This means that approximately 11 to 14% of the 935

---

[24] 288*20%=58 and 288*25%=72.

[25] 58/551=11% and 72/551=13%.

[26] 519*20%=104 and 519*25%=130.

medication abortions sought in 2017 would not have occurred.[27]  If 921 is the denominator, then at least approximately 11 to 14% of those women would forgo an abortion.[28]  If the Court credits defendants' assertion that only 838 Arkansas residents sought medication abortions in Arkansas in 2017, Dr. Henshaw's data indicates that approximately 12 to 16% of those medication abortions would not have occurred.[29]

**(v)**        **Dr. Heflin's Data Versus Dr. Henshaw's Data**

The Court credits Dr. Heflin's data and methodology as they are based upon more up-to-date information.  Dr. Henshaw's conclusions, although well-supported, were submitted to the Court in 2016 and are based on information that is out-of-date compared to the Cunningham study that Dr. Heflin relies upon.  In fact, the most up-to-date analysis Dr. Henshaw cites is a 2014 study of the effects of the abortion restrictions that were eventually overturned in *Hellerstedt* (Dkt. No. 28, Henshaw Decl., ¶ 10).  These restrictions were also the subject of the Cunningham study, but the Cunningham study has the added benefit of one years' additional data from 2015 (Dkt. No. 84, Heflin Decl., ¶ 12).  Accordingly, the Court credits Dr. Heflin's data and conclusions over Dr. Henshaw's.  The Court also observes that Dr. Heflin's conclusions are not inconsistent with Dr. Henshaw's.  Dr. Henshaw's data is not incorrect but applying it to all women facing a burden due to Section 1504(d) on these facts leads to incomplete results.  Dr. Henshaw acknowledges travel distance over 100 miles leads to a greater than 20 to 25% reduction in abortions.  He did not quantify how much greater a reduction given increased travel distances over 100 miles.  Dr. Heflin

---

[27]  104/935=11% and 130/935=14%.

[28]  104/921=11% and 130/921=14%.

[29]  104/838=12% and 130/838=16%.

does (*Compare* Dkt. No. 28, Henshaw Decl., ¶¶ 11, 22, *with* Dkt. No. 84, Heflin Decl., ¶ 13).  She provides a percentage to be applied in that scenario.  The Court is satisfied that scenario regarding travel distances over 100 miles exists here.

The Court also concedes that neither researcher's estimates may be precisely correct.  The highest percentage generated by analyzing these data indicates that 28% of women seeking medication abortion in Arkansas will forgo one entirely as a result of the contracted physician requirement, while the lowest percentage is 11%.  The average of these two percentages is approximately 20%.  The Court considers all of these figures when assessing the proportion of women in Arkansas seeking medication abortions who will forgo one entirely as a result of the contracted physician requirement.

### (4)    Burdens Imposed:  Women Who Will Travel For Surgical Abortion

The record evidence reveals that a large fraction of women who would otherwise receive medication abortions at the Fayetteville clinic will face various and substantial burdens if they must travel to LRFP for surgical abortions.  Per the data submitted by Dr. Ho and Ms. Williams, 653 medication abortions were performed at the Fayetteville clinic in 2017, out of a total of 935 medication abortions in Arkansas (Dkt. No. 84, Supp. Ho. Decl. ¶ 6; Williams Decl., ¶ 8).  Defendants assert that a total of 921 medication abortions occurred in Arkansas in 2017 (Dkt. No. 101-1, at 5-8).  Accordingly, if all of those women seek an abortion in Little Rock, approximately 70 to 71%[30] "of women seeking medication abortions in Arkansas," *Jegley*, 864 F.3d at 959, face increased travel distances due to the contracted physician requirement.  If, as discussed above,

---

[30]  653/935=70% and 653/921=71%.

approximately 208[31] women in Northwest Arkansas forgo an abortion entirely, then approximately 46%[32]of women seeking medication abortions in Arkansas will face increased travel distances. Limiting this analysis to the 519 women in Northwest Arkansas who sought medication abortions in Fayetteville in 2017 (Dkt. No. 84, at 50), even if 208 of those women forgo an abortion entirely, the remainder—60%—of Northwest Arkansas women seeking a medication abortion will face increased travel distances.[33]

While lengthy travel "do[es] not always constitute an 'undue burden,'" such travel is a "legitimate burden" that, depending upon the particular facts of the case, can ultimately contribute to a determination that a statute creates an undue burden. *See Schimel*, 806 F.3d at 919 (noting that requiring women to travel 90 miles is a burden on women seeking abortions and a particular burden on low-income women); *Van Hollen III*, 738 F.3d at 796 (noting that a 400 mile trip for two required appointments is a "nontrivial burden on the financially strapped and others who have difficulty traveling long distances to obtain an abortion, such as those who already have children"); *Planned Parenthood of Indiana and Kentucky Inc. v. Commissioner, Indiana State Dep't of Health*, 273 F. Supp. 3d 1013, 1037 (S.D. Ind. 2017), *appeal filed*, No. 17-1883 (7th Cir. 2017) (citing *Hellerstedt*, 136 S. Ct. 2313). Nothing in *Hellerstedt* or the Eighth Circuit's decision alters this. A round-trip drive from Fayetteville to Little Rock is 380 miles (Dkt. No. 2, Fine Decl., ¶ 52; de

---

[31] As discussed previously, by applying Dr. Heflin's reduction estimate to the number of women in Northwest Arkansas who sought an abortion at the Fayetteville clinic in 2017, the Court concludes that 208 women in Northwest Arkansas would forgo an abortion entirely due to the contracted physician requirement. If the Court used Dr. Heflin's estimate that 235 women will forgo an abortion, then at least approximately 45 to 48% of women seeking medication abortions in Arkansas will face increased travel distances. 653-235=418. 418/935=48% and 418/921=45%.

[32] 635-208=427. 427/935=46% and 427/921=46%.

[33] 519-208=311. 311/519=60%.

Baca Decl., ¶ 18). Thus, due to Arkansas' 48-hour waiting period, a woman living in Fayetteville must travel 760 miles to obtain a surgical abortion in Little Rock. Women living in Northwest Arkansas are similarly burdened.

As an example, since it is beyond dispute that those women who live in Washington and Benton County, Arkansas, will face increased travel distances as a result of the contracted physician requirement, the Court notes that the undisputed record indicates that in 2017, 222 patients from Washington County, Arkansas, and 182 patients from Benton County, Arkansas, received medication abortions from plaintiffs' Fayetteville location (Dkt. No. 84, at 50). Accordingly, 404[34] residents of those two counties sought medication abortions from the Fayetteville clinic. All of these women—43% of the 935 (or 44% of the 921) women who sought medication abortions in Arkansas in 2017 and 48% of the 838 Arkansas residents who sought medication abortions in Arkansas in 2017—would now face two round-trip commutes to Little Rock to complete a surgical abortion.[35] Due to Arkansas' 48-hour waiting requirement, the record evidence indicates that some of those women who would otherwise have received medication abortions in Fayetteville will be forced to take off two full days of work in order to make two round-trips to Little Rock to have an abortion (*Id.*, ¶ 20). These women will be forced to pay for additional travel expenses, to pay childcare expenses, to lose wages, and perhaps to risk their employment altogether. *See Planned Parenthood of Indiana and Kentucky Inc.*, 273 F. Supp. 3d at 1037. Such travel is especially difficult for low-income women who do not have access to a car. The record evidence indicates that 57% of the women who receive medication abortions at

_____

[34]  182+222=404.

[35]  These figures are derived from the following calculations: 404/935=43%; 404/921=44%; and 404/838=48%.

the Fayetteville clinic live at or below 110% of the federal poverty level (Dkt. No. 84, Supp. Ho. Decl. ¶ 21).

Some women who will seek abortion services in Little Rock will be delayed by the increased travel distances and increases in costs, forcing these women into later abortions that are both riskier and more expensive, if they can obtain them at all (Dkt. Nos. 2, Fine Decl., ¶¶ 53-54; 29, Ho Decl., ¶¶ 20-24). There is evidence in the record supporting this (Dkt. Nos. 28, Henshaw Decl. ¶ 20; 2, Fine Decl. ¶ 54). Further, inability to travel to the sole remaining clinic in the state will lead some women to take desperate measures, such as attempting to self-abort or seeking care from unsafe providers, which would further put their health at risk (Dkt. No. 2, Fine Decl., ¶ 55).

Defendants argue that, for two reasons, plaintiffs overstate the burdens presented by increased travel times. First, defendants argue that Dr. Heflin "erroneously ignored closer out-of-state abortion facilities that commonsense tells us a patient is more likely to visit and, thereby, grossly overstates the distances many patients would need to travel." (Dkt. No. 101, at 28-29). As this Court held in its prior preliminary injunction Order, it will not factor into its analysis that neighboring states provide opportunities across state lines for Arkansas residents to obtain an abortion (Dkt. No. 60, at 66-67). *See Schimel*, 806 F.3d at 918 (rejecting argument that the availability of second-trimester abortions in Chicago could justify the closure of Wisconsin's only abortion clinic); *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 457 (5th Cir. 2014), *cert denied*, 136 S. Ct. 2536 (2016) (holding that the undue-burden analysis "focuses solely on the effects within the regulating state"); *see also Strange III*, 33 F. Supp. 3d at 1360-61 (even if out-of-state providers were considered, 80 mile distance to out-of-state clinic means the "threshold difficulties related to losing an abortion clinic in her home city" still present a burden). Given

these authorities and the possibility that a neighboring state might unilaterally alter access to abortion, the Court declines to consider out-of-state abortion providers in this analysis.

The Court acknowledges that the Supreme Court did not address whether out-of-state abortion facilities should be considered in the undue burden analysis. *See Hellerstedt*, 136 S. Ct. at 2304. Prior to the Supreme Court's ruling in *Hellerstedt*, the Fifth Circuit reversed the district court's finding that abortion restrictions were unconstitutional as-applied to the El Paso clinic because women in El Paso could and did use abortion providers in nearby New Mexico. Specifically, the Fifth Circuit noted that, if the El Paso clinic closed, there was an abortion facility "approximately twelve miles away in Santa Teresa, New Mexico" and that "independent of the actions of the State," "Texas women regularly *choose to have an abortion in New Mexico*." *See Cole*, 790 F.3d at 596-97 (emphasis in original). Still, rather than upholding the Fifth Circuit's decision, the Supreme Court reversed the Fifth Circuit's decision and found that the same statute at issue in *Cole* was facially unconstitutional because it imposed an undue burden on women seeking abortions. *Hellerstedt*, 136 S. Ct. at 2318. This Court infers that if the availability of an out-of-state abortion provider within 12 miles was not enough to ameliorate the burdens imposed by Texas' surgical-center requirement, then the approximately 100 mile distance between Fayetteville and Tulsa, Oklahoma, does not relieve the undue burden created by Section 1504(d)'s contracted physician requirement.

Second, defendants argue that Dr. Heflin overstates the burdens caused by the contracted physician requirement because she does not address the fact that, under Arkansas law, any licensed physician may provide an abortion (Dkt. No. 101, at 28). Defendants do not cite Arkansas statutes or regulations that allow any licensed physician to provide abortions, nor do they cite the number of abortions performed by private providers.

On the other hand, the Court acknowledges that plaintiffs bear the burden at this stage of the litigation. The record evidence indicates that approximately 935 medication abortions occurred in 2017 at the three abortion clinics in Arkansas (Dkt. Nos. 84, Ho Decl., ¶ 6; Williams Decl., ¶ 8) (843 medication abortions at plaintiffs' two clinics and 92 at LRFP's clinic). Of those medication abortions that occurred at the Fayetteville clinic, approximately 71 of those were for non-Arkansas residents (Dkt. No. 84, at 50). Therefore, based upon these data, Arkansas residents received approximately 864 medication abortions in 2017. Defendants present data that indicate there were 921 total medication abortions and 838 medication abortions for Arkansas residents in 2017 (Dkt. No. 101-1, at 5). The source of the discrepancies in these data is unclear at this stage of the litigation.

Further, defendants present data that Arkansas residents sought 2,039 surgical abortions in 2017 and non-residents sought 289 surgical abortions in Arkansas, for a total of 2,328 surgical abortions in Arkansas in 2017 (*Id*., at 4-8). LRFP, the only surgical abortion provider in Arkansas, indicates that it conducted 2,334 surgical abortions in 2017 (Dkt. No. 84, Williams Decl. ¶ 8). Again, the discrepancy between these data sets is not explained by the parties at this stage of the litigation. In any event, if private physicians unaffiliated with the three abortion clinics in Arkansas were conducting medication or surgical abortions, then the Court would expect the number of abortions reported by plaintiffs likely to be *lower* than those reported by defendants. This is not the case. While plaintiffs carry the burden of proof, they are not required to provide negative proof.

Finally, "[e]ach induced termination of pregnancy which occurs in [Arkansas] regardless of the length of gestation shall be reported to the [Division of Vital Records] within five (5) days by the person in charge of the institution in which the induced termination of pregnancy was

performed." Ark. Code Ann. § 20-18-603(b)(1). If "the induced termination of pregnancy was performed outside an institution, the attending physician shall prepare and file the report." Ark. Code Ann. § 20-18-603(b)(2). Defendants—who presumably have access to such records—have presented none to the Court. At this stage of the litigation, there is no record evidence to indicate that private physicians are currently providing abortions in Arkansas.

### (5) Burdens Imposed: All Women Seeking Abortions At LRFP's Little Rock Clinic

The record also contains evidence that all women seeking medication abortions in Arkansas—not just those who would otherwise have received a medication abortion in Fayetteville—will be burdened by the effects of the contracted physician requirement. If the contracted physician requirement takes effect, and if plaintiffs are unable to comply with the requirement as they represent, then there will only be one abortion provider in Arkansas—LRFP located in Little Rock, and LRFP will only be able to provide surgical abortions (Dkt. No. 84, Williams Decl., ¶ 4).

Based upon the record evidence before the Court, LRFP provided 92 medication abortions and 2,334 surgical abortions in 2017 (Dkt. No. 84, Williams Decl. ¶ 8). Dr. Ho represents that, in 2017, PPAEO's physicians performed 843 medication abortions in Arkansas, both in Little Rock and in Fayetteville (Dkt. No. 84, Supp. Ho. Decl. ¶ 6). Plaintiffs therefore assert that 935 medication abortions were performed in Arkansas in 2017.[36] Defendants assert that a total of 921 women sought medication abortions in Arkansas in 2017 (Dkt. No. 101-1, at 5-8). Minus the number of women who will forgo an abortion due to the burdens imposed by the contracted physician requirement, the remainder of the women who would previously have sought medication

---

[36] 843+92=935.

abortions from PPAEO will be forced to turn to LRFP for a surgical abortion. Applying the Court's prior finding that at least approximately 208 Arkansas residents in Northwest Arkansas will forgo abortions entirely, *see supra*, the Court presumes that between approximately 713 to 727 women who would otherwise have sought medication abortions will seek surgical abortions from LRFP.[37]

This is an approximately 31% increase from the number of surgical abortions LRFP provided in 2017.[38]  It is unclear on this record whether LRFP will be able to absorb such an increase in the number of surgical abortions or whether that remaining clinic will be able to cover fully the needs of women who might have sought medication abortions at PPAEO's clinics.  While the record at this stage of the litigation does not reflect whether LRFP could absorb such an increase in demand for surgical abortions, the Court—like the Supreme Court in *Hellerstedt*— declines to assume that "medical facilities . . . operate below capacity as a general matter."  136 S. Ct. at 2317.  Due to an increase in surgical abortions at LRFP's facility, at a minimum, the care provided to each surgical abortion patient would likely not be equal in quality to the care provided prior to the enforcement of the contracted physician requirement:  the LRFP clinic would become more crowded, and the women who seek abortions there are "less likely to get the kind of individualized attention, serious conversation, and emotional support that doctors at less taxed facilities may have offered."  *Hellerstedt*, 136 S. Ct. at 2318.  To imply otherwise contradicts "common sense," which "suggests that, more often than not, a physical facility that satisfies a

---

[37]  921-208=713 and 935-208=727.  The 208 number is derived by the Court by applying Dr. Heflin's reduction estimate to the number of women in Northwest Arkansas who, according to plaintiffs, sought an abortion at the Fayetteville clinic in 2017.  If the Court uses Dr. Heflin's estimate that 235 women will forgo an abortion, then 700 to 686 women will still seek surgical abortions at LRFP's clinic.  921-235=686 and 935-235=700.  This would present LRFP with a 29 to 30% increase in surgical abortions.  686/2,334=29% and 700/2,334=30%.

[38]  727/2,334=31% and 713/2,334=31%.

certain physical demand" will not be able to meet additional demand "without expanding or otherwise incurring significant costs." *Id*. at 2317 (noting that remaining clinics would go from providing 14,000 abortions annually to "60,000 to 70,000," a five-fold increase); *see Miller*, 299 F. Supp. 3d at 1263-64 (noting that closing all but three abortion clinics in Alabama will reduce capacity and impose a burden on women seeking an abortion from those clinics).

Accordingly, based upon the record evidence at this stage of the litigation, the Court concludes that the contracted physician requirement will likely force those women who choose to seek a surgical abortion at LRFP's Little Rock facility to endure longer wait times and reduced quality of care compared to the quality of care they would have received if the contracted physician requirement were not enforced, even if LRFP can absorb the increased demand for surgical abortions. As LRFP will be the sole remaining abortion provider in Arkansas, the Court concludes that this burden will fall upon 100% of the women seeking any abortion in Arkansas after Section 1504(d) takes effect.

### (6)    Cumulative Burden

The record evidence at this stage of the litigation, viewed cumulatively, indicates that the contracted physician requirement places a "substantial obstacle in the path of a woman's choice." *Hellerstedt*, 136 S. Ct. at 2312 (citing *Casey*, 505 U.S. at 877 (plurality opinion)). The record evidence indicates that a considerable fraction of women seeking abortions—71%—prefer medication abortions to surgical ones for various reasons (Dkt. No. 84, Supp. Ho Decl. ¶ 23). Of those women who prefer medication abortions over surgical ones, 100% of them cannot obtain a medication abortion in Arkansas. The record evidence shows that the contracted physician requirement will render Northwest Arkansas without any operational abortion provider. Depending upon how the numerator and denominator of the "large fraction" are manipulated,

upwards of 28% to as low as 11% of all women seeking medication abortions in Arkansas will be forced to forgo any abortion altogether. The record evidence suggests that at least 43% and as many as approximately 71% of all women seeking medication abortions in Arkansas will be forced to travel greater distances to receive an abortion as a result of the contracted physician requirement. Finally, the record evidence suggests that, if LRFP becomes the sole option for an abortion in Arkansas, any women seeking an abortion in Arkansas will be burdened by longer wait times and reduced quality of care, even if LRFP can absorb the increased demand for surgical abortions.

Per *Hellerstedt*, the Court considers these burdens cumulatively to determine if a large fraction of women seeking medication abortions in Arkansas face a "substantial obstacle in the path of [their] choice." 136 S. Ct. at 2312, 2313 (noting that different burdens—driving distance and clinic closings—should be considered together). The Court also notes binding Eighth Circuit precedent which suggests that 18% is a "large fraction." *Planned Parenthood, Sioux Falls Clinic*, 63 F.3d at 1462 n.10; *cf. Hellerstedt*, 136 S. Ct. at 2313 (noting undue burden existed due to clinic closures but omitting any discussion of the number of abortions that would be foregone as a result). Considering all of the burdens presented in the record evidence and the controlling precedents, the Court finds that, for "a large fraction of women seeking medication abortions in Arkansas," *Jegley*, 864 F.3d at 959, the contracted physician requirement "places a 'substantial obstacle in the path of a woman's choice.'" *Hellerstedt*, 136 S. Ct. at 2312 (citing *Casey*, 505 U.S. at 877 (plurality opinion)).

### 4. Deference To Legislative Findings

As part of evaluating the benefits of a regulation, this Court must evaluate the Arkansas General Assembly's findings when enacting the regulation. When this Court initially examined the legal issues presented, courts differed in their determination as to what level of deference is

appropriately given by a court to a legislative enactment affecting a woman's right to an abortion. Prior to *Hellerstedt*, the Fifth Circuit articulated a level of deference akin to rational basis review. *See Cole*, 790 F.3d at 575-76. In *Hellerstedt*, the Supreme Court examined this issue and resolved it.

Specifically, the Supreme Court made clear that "[t]he statement that legislatures, and not courts, must resolve questions of medical uncertainty is also inconsistent with this Court's case law. Instead, the Supreme Court, when determining the constitutionality of laws regulating abortion procedures, has placed considerable weight upon evidence and argument presented in judicial proceedings." *Id.* at 2310. The Supreme Court, citing its *Casey*, 505 U.S. 833, and *Gonzales,* 550 U.S. 124, decisions, reaffirmed that a court reviews legislative fact finding under a "deferential standard" but "must not 'place dispositive weight'" on those findings. *Hellerstedt*, 136 S. Ct. at 2310 (citing and quoting *Gonzales*, 550 U.S. at 165). The Court stated that the "*Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake.*" *Id.* (emphasis in original) (quoting *Gonzales*, 550 U.S. at 165). Where record evidence contradicts some legislative findings, uncritical deference to the legislative factual findings is inappropriate. *Id.*

The Arkansas legislature made several legislative findings when enacting Section 1504(d) which could be interpreted to conflict with the Court's findings. *See* Ark. Code Ann. § 20-16-1502 (legislative findings). The Court has given the legislature's findings careful consideration. Here, most of the legislative findings are no longer accurate or current, given the FDA's update to the FPL of Mifeprex. Further, based on the evidence presented here and the Supreme Court's *Hellerstedt* majority opinion, this Court finds that, to the extent that the legislature made factual findings that early-term abortions are unsafe, those findings were simply "incorrect." *Gonzales,*

550 U.S. at 165. The evidence in this case, and in the prior cases cited by this Court including *Hellerstedt*, is clear that the procedures are remarkably safe. On these matters, deference to the legislature's factual findings would be inappropriate. *Id.*

In this case, unlike in others, the legislature made no findings regarding an identified set of perceived problems with the current method of care for medication abortion patients that the contracted physician requirement is intended to address. *Cf. Strange III*, 33 F. Supp. 3d at 1376-77 (discussing and evaluating legislative findings specific to an admitting privileges requirement). Further, the legislature made no findings that the contracted physician requirement would solve such problems or do much to solve such problems, if such problems even existed. For this additional reason, because most of this Court's findings concern the contracted physician requirement and the stated goals of the legislature, this Court's findings do not otherwise conflict with the legislative findings.[39] Having resolved this, the Court turns to analyze the purported benefits of Section 1504(d).

_____

[39] There are two legislative findings that the Court highlights at this point in the litigation. The first finding is: "Abortion-inducing drugs are associated with an increased risk of complications relative to surgical abortion and the risk of complications increases with advancing gestational age, and, in the instance of the Mifeprex regimen, with failure to complete the two-step process. . . ." *See* Ark. Code Ann. § 20-16-1502 (legislative findings). The second finding is: "Medical evidence demonstrates that women who use abortion-inducing drugs incur more complications than those who have surgical abortions . . . ." (*Id.*).

At this early stage of the litigation, there is record evidence before this Court that: "[t]he FDA report on adverse events associated with mifepristone medication abortion covers a period of more than 10 years (from approval of mifepristone in September 2000 through April 2011), during which approximately 1.52 million women had a medication abortion." (Dkt. No. 2, at 5-6 (citing U.S. Food & Drug Admin., Mifepristone U.S. Postmarketing Adverse Events Summary through 04/30/2011, http://www.fda.gov.downloads/Drugs/DrugsSafety/PostmarketDrugSafety InformationforPatientsandProviders/UCM263353.pdf)). "The FDA data reflects that medication abortion is extremely safe, with a mortality rate of less than 1 per 100,000 abortions, which is comparable to the rate for first-trimester surgical abortion." *Id.* Both of these rates are lower than the mortality rate for childbirth, which is 8.8 per 100,000; the mortality rate associated with penicillin which is 2 per 100,000; and the mortality rate from outpatient plastic surgery procedures in accredited facilities which is 1.7 per 100,000 procedures. *Id.* (citing Elizabeth Raymond &

## 5.     Benefit Of Section 1504(d)'s Contracted Physician Requirement

The Court next turns to examine the benefits, if any, of Section 1504(d)'s contracted physician requirement.  At the outset of this analysis, the Court acknowledges several matters.  First, it is settled law that a state may enact regulations "to foster the health of a woman seeking abortion" or "to further the State's interest in fetal life," provided that those regulations do not impose an "undue burden" on the woman's decision.  *Casey*, 505 U.S. at 877-78 (plurality opinion).  The relevant question before the Court is whether Section 1504(d)'s contracted physician requirement provides the asserted benefits *as compared to the prior law*.  *See Hellerstedt*, 136 S. Ct. at 2311 ("We have found nothing in Texas' record evidence that shows that, *compared to the prior law*, . . . the new law advanced Texas' legitimate interest in protecting women's health."); *id*. at 2314 ("The record contains nothing to suggest that [the challenged law] *would be more effective than pre-existing Texas law . . . .*") (emphasis added).  Therefore, the specific question at this juncture is whether requiring abortion providers in Arkansas to comply with Section 1504(d)'s contracted physician requirement furthers a legitimate interest of the state, as compared to Arkansas' pre-existing regulations affecting abortions.

Second, there is precedent from the Eighth Circuit in *Women's Health Center of West County, Inc. v. Webster*, 871 F.2d 1377 (8th Cir. 1989), in which the court addressed a Missouri statute requiring abortion providers to have admitting privileges.  The Court is mindful that

---

David Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstet. & Gynecol. 215, 216-17 (Feb. 2012); Alfred I. Neugut et al., *Anaphylaxis in the United States:  An Investigation Into Its Epidemiology*, 161 Archives Internal Med. 15, 18 (2001); Elizabeth Raymond et al., *Mortality of Induced Abortion, Other Outpatient Surgical Procedures and Common Activities in the United States*, 90 Contraception 476, 468 (2014)).  Further, these two legislative findings seem inconsistent with the discussion in other court opinions regarding similarities and differences in complications from medication and surgical abortion.  *See Strange III*, 33 F. Supp. 3d at 1365-67 (observing that, although still exceedingly rare, complications from surgical abortion may be more severe and dangerous to the woman).

*Webster* was decided before *Casey* and before many other legal, social, and medical changes surrounding abortion. The Court also is aware that the evidence in *Webster* was that only one doctor state-wide could not comply with the requirement and that other doctors at that same clinic could comply with the requirement, resulting in little impact to patients and little to no effect on access to abortions statewide. *Id.* at 1381. As a result, the Court will examine Section 1504(d) in the light of all controlling current authorities and on the current record evidence before it.

In *Hellerstedt*, the Supreme Court examined a statute that did not set forth any legislative findings. *Id.* Specifically, the Supreme Court examined the Texas Legislature House Bill 2's ("H.B.2") requirement that a "physician performing or inducing an abortion . . . must, on the date the abortion is performed or induced, have active admitting privileges at a hospital that . . . is located not further than 30 miles from the location at which the abortion is performed or induced." *Id.* (citing Tex. Health & Safety Code. Ann. § 171.0031(a)). The prior Texas law required doctors who provided abortions to "have admitting privileges or have a working arrangement with a physician who ha[d] admitting privileges at a local hospital in order to ensure the necessary back up for medical complications." *Id.* (citing 25 Tex. Admin. Code, § 139.56 (2009)).[40]

It also is important to note that H.B.2 imposed an admitting privileges requirement on physicians performing both medication and surgical abortions, unlike Section 1504(d) of the Act

---

[40] It is important to note that Texas has a law that prohibits hospitals from discriminating against a physician applying for privileges based on that physician's status as an abortion provider or views as to abortion. *See* Tex. Occ. Code § 103.002(b). This type of statute in effect protects physicians who perform abortions from targeted discrimination when applying for admitting privileges. *See, e.g.*, *Cole*, 790 F.3d at 596 n.44; *Planned Parenthood of Greater Texas Surgical Health Services v. Abbott*, 748 F.3d 583, 598 n.13 (5th Cir. 2014). As other courts have observed, the situation is different in states without such laws. *See, e.g., June Med. Servs. LLC v. Kliebert*, 158 F. Supp. 3d 473, 501 (M.D. La. 2016) ("*Kliebert I*").

under review by this Court, which imposes the requirement only on those performing medication abortions.

### a.      Health-Related Benefits Of Section 1504(d)

When considering H.B.2's admitting privileges requirement, defendants argued, and in *Hellerstedt* the Supreme Court recognized, that "[t]he purpose of the admitting-privileges requirement is to help ensure that women have easy access to a hospital should complications arise during an abortion procedure." 136 S. Ct. at 2311. The district court "found that it brought about no such health-related benefit," determining that "[t]he great weight of the evidence demonstrate[d] that, before the act's passage, abortion in Texas was extremely safe with particularly low rates of serious complications and virtually no death occurring on account of the procedure." *Id.* (citing *Whole Woman's Health v. Lakey*, 46 F. Supp. 3d 673, 684 (W.D. Tex. 2014). It was on this basis, as noted by the Supreme Court in *Hellerstedt*, that the district court determined "there was no significant health-related problem that the new law helped to cure." *Id.*

According to *Hellerstedt*, this conclusion was based on, among other things:

- "A collection of at least five peer-reviewed studies on abortion complications in the first trimester, showing that the highest rate of major complications—including those complications requiring hospital admission—was less than one-quarter of 1%."

- "Figures in three peer-reviewed studies showing that the highest complication rate found for the much rarer second trimester abortion was less than one-half of 1% (0.45% or about 1 out of about 200)."

- "Expert testimony to the effect that complications rarely require hospital admission, much less immediate transfer to a hospital from an outpatient clinic. *Id.*, at 266-267 (citing a study of complications occurring within six weeks after 54,911 abortions that had been paid for by the fee-for-service California Medicaid Program finding that the incidence of complications was 2.1%, the incidence of complications requiring hospital admission was 0.23%, and that of the 54,911 abortion patients included in the study, only 15 required immediate transfer to the hospital on the day of the abortion)."

- "Expert testimony stating that 'it is extremely unlikely that a patient will experience a serious complication at the clinic that requires emergent hospitalization' and 'in the rare case in which [one does], the quality of care that the patient receives is not affected by whether the abortion provider has admitting privileges at the hospital.'"

- "Expert testimony stating that in respect to surgical abortion patients who do suffer complications requiring hospitalization, most of those complications occur in the days after the abortion, not on the spot."

- "Expert testimony stating that a delay before the onset of complications is also expected for medical abortions, as 'abortifacient drugs take time to exert their effects, and thus the abortion itself almost always occurs after the patient has left the abortion facility.'"

- "Some experts added that, if a patient needs a hospital in the day or week following her abortion, she will likely seek medical attention at the hospital nearest her home."

*Hellerstedt*, 136 S. Ct. at 2311 (internal record citations omitted).

Further, the Supreme Court in *Hellerstedt* noted that, "when directly asked at oral argument whether Texas knew of a single instance in which the new requirement would have helped even one woman obtain better treatment, Texas admitted that there was no evidence in the record of such a case." *Id.* at 2311-12. The Supreme Court observed: "This answer is consistent with the findings of the other Federal District Courts that have considered the health benefits of other States' similar admitting-privileges laws." *Id.* at 2312 (citing *Planned Parenthood of Wis., Inc. v. Van Hollen*, 94 F. Supp. 3d 949, 953 (W.D. Wis. 2015) ("*Van Hollen IV*"), *aff'd sub nom Schimel*, 806 F.3d 908; *Strange III*, 33 F. Supp. 3d at 1378).

To the extent either party wishes to revisit the issue of the dangerousness of first trimester and second trimester abortions, this Court determines that the Supreme Court has now spoken on this subject, and this Court is required to follow. *See Williams I*, 263 F. Supp. 3d at 733 (granting a preliminary injunction regarding a Missouri abortion law and noting that it "would be impermissible judicial practice" to contradict the Supreme Court's dangerousness finding in

*Hellerstedt*). Further, this Court agrees that the factual conclusions reached in *Hellerstedt* "were not confined to Texas." *Id.* at 733-34 (noting that the *Hellerstedt* majority relied on Texas, Wisconsin, and Alabama case-law and amicus briefs and materials unrelated to Texas). "Lower court judges are bound by Supreme Court precedent even if they seriously question what the Court has done." *Id.* at 733 (citing *MKB Mgmt. Corp. v. Stenhjem*, 795 F.3d 768, 772 (8th Cir. 2015)).

This Court acknowledges that *Hellerstedt* reviewed medication and surgical abortion statistics and research, not just medication abortion. There is nothing in the record before this Court that directly addresses the evidence relied on by the Supreme Court in *Hellerstedt* and makes the case that a review of medication abortion statistics only would lead to a different conclusion. PPAEO has provided medication abortions in Arkansas since 2008, and the record contains evidence that it is "extremely rare" for PPAEO to refer a patient to a local emergency room or for a patient to go to an emergency room on her own due to medication abortion complications (Dkt. Nos. 29, Ho Decl., ¶ 16; 84, Supp. Ho Decl., ¶ 4). As a result, this Court determines that there is "no significant health-related problem" Section 1504(d) is intended to address. *Hellerstedt*, 136 S. Ct. at 2311.

### b.    Regulatory Benefits Of Section 1504(d)

The Court next turns to examine whether, despite there being no significant health-related problem with medication abortion that Section 1504(d) of the Act is intended to address, there is nonetheless a benefit from Section 1504(d) of the Act. The Eighth Circuit suggests Section 1504(d) of the Act may set a "floor of care," such as was present in Texas. *See Jegley*, 864 F.3d at 960 n.9. The Eighth Circuit also suggests that a "legal floor" "would constitute a benefit" because it would prevent an abortion provider from, in the future, reducing their continuity-of-care practices. *Id.* To examine the "floor of care" in Arkansas, the Court turns to examine the rules

and regulations in Arkansas that currently govern abortion providers, as well as cases from other jurisdictions that compare the benefit of an abortion restriction against a purportedly pre-existing "floor of care."

### (1)  Current Arkansas Rules And Regulations

As plaintiffs' argue, defendants do not deny, and this Court acknowledges, abortion in Arkansas is heavily regulated and monitored.  As an example, the Arkansas Department of Health in 2014 enacted a current set of "Rules and Regulations for Abortion Facilities." *See generally* Ark. Admin. Code § 007.05.2.  The Court notes that PPAEO has provided medication abortions in Arkansas since 2008, six years prior to the implementation of these regulations (Dkt. No. 84, Supp. Ho Decl., ¶ 4).  An "abortion facility" under the regulations is defined as "[a] clinic, health center, or other facility in which the pregnancies of ten (10) or more women known to be pregnant are willfully terminated or aborted each month, including non-surgical abortions."  Ark. Admin. Code § 007.05.2-3(B).  Abortion facilities are licensed by the state.  Ark. Admin. Code § 007.05.2-4.

Their governance is prescribed by regulation, Ark. Admin. Code § 007.05.2-5, and the organized governing body must include one member, who may be the medical director, "with local representation which shall be legally responsible for maintaining patient care and establishing policies for the facility and shall be legally responsible for the conduct of the facility." *Id.*  The medical director must be "a physician currently licensed to practice medicine in Arkansas, and who shall be responsible for the direct coordination of all medical aspects of the facility program." Ark. Admin. Code § 007.05.2-6(K).  Operation of the facility is regulated, and the regulations require "written policies and procedures developed and approved by the Medical Director and Administrator which define the care provided at the facility."  Ark. Admin. Code § 007.05.2-6(L).

Only physicians who are currently licensed to practice medicine in Arkansas may perform abortions. Ark. Admin. Code § 007.05.2-7(A)(1).

Each patient "shall have access to twenty-four (24) hour telephone consultation with either a Registered Nurse or physician associated with the facility." Ark. Admin. Code § 007.05.2-7(E). A registered nurse is required to "plan, supervise, and evaluate the nursing care of each patient from admission to the facility through discharge." Ark. Admin. Code § 007.05.2-7(F). Counseling services are required to be provided to each patient prior to the abortion and then, "each patient shall be assessed by a Registered Nurse for counseling needs post-abortion . . . ." Ark. Admin. Code § 007.05.2-7(G)(4).

Patients may only be discharged upon order of a physician. Ark. Admin. Code § 007.05.2-8(D). Further, at discharge, each patient is to receive "written instructions for post-abortion care," including "at least the following: (a) signs and symptoms of possible complications; (b) activities allowed and to be avoided; (c) hygienic and other post-discharge procedures to be followed; (d) abortion Facility emergency telephone numbers available on a twenty-four (24) hour basis; and (e) follow up appointment, if indicated." Ark. Admin. Code § 007.05.2-7(G)(5). Abortion facilities are required to maintain a system for the completion and storage of patients' medical records, including but not limited to policies and procedures for the use of electronic medical records. Ark. Admin. Code § 007.05.2-9. Those medical records must include, among other things, documentation of post-abortion patient education regarding the matters specified above. Ark. Admin. Code § 007.05.2-9(B)(8). Abortion facilities shall have provisions for pharmaceutical services as set out by regulation. Ark. Admin. Code § 007.05.2-11.

Among the regulations for program requirements, each "Abortion Facility shall have written procedures for emergency transfer of a patient to an acute care facility." Ark. Admin. Code

§ 007.05.2-8(B).   In addition, for complications, each general abortion facility "shall have emergency drugs, oxygen and intravenous fluids available to stabilize the patient's condition, when necessary" and shall have an "ambu bag, suction equipment and endotracheal equipment . . . in the clinical area for immediate access." Ark. Admin. Code § 007.05.2-8(E)(1).  Each medical-only abortion facility "shall have oxygen, medication, oral airways and supplies available."  Ark. Admin. Code § 007.05.2-8(E)(2).

The Arkansas Department of Health "may deny, suspend or revoke the license of any Abortion Facility on the following grounds:  violation of any of the provisions of the Act or Rules and Regulations lawfully promulgated hereunder; and/or conduct or practices detrimental to the health or safety of patients and employees of any such facilities."  Ark. Admin. Code § 007.05.2-8(G).

In other words, by regulation in Arkansas, abortion facilities must "have written procedures for emergency transfer of a patient to an acute care facility."  Ark. Admin. Code § 007.05.2-8(B). Further, on discharge, each patient "shall have access to twenty-four (24) hour telephone consultation with either a Registered Nurse or physician associated with the facility," Ark. Admin. Code § 007.05.2-7(E), and each patient on discharge receives "written instructions for post-abortion care," including "at least the following:   (a) signs and symptoms of possible complications; (b) activities allowed and to be avoided; (c) hygienic and other post-discharge procedures to be followed; (d) abortion Facility emergency telephone numbers available on a twenty-four (24) hour basis; and (e) follow up appointment, if indicated."  Ark. Admin. Code § 007.05.2-7(G)(5).   Plaintiffs are not free to alter or disregard these requirements without jeopardizing the license of their facility.

### c.      Examining Wisconsin Law

In *Schimel*, a case cited by the Supreme Court in *Hellerstedt*, the district court and Seventh Circuit Court of Appeals examined a Wisconsin statute that required every doctor who performed abortions to have admitting privileges at a hospital within a 30-mile radius of each clinic at which the doctor performed abortions, with the law being signed on a Friday and compliance required by the following Sunday.  806 F.3d at 911.  The district court granted a temporary restraining order, *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 963 F. Supp. 2d 858 (W.D. Wis. 2013) ("*Van Hollen I*"), and a preliminary injunction, *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, No. 13-cv-465-WMC, 2013 WL 3989238 (W.D. Wis. Aug. 2, 2013) ("*Van Hollen II*"). The Seventh Circuit affirmed the entry of the preliminary injunction.  *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786, 799 (7th Cir. 2013) ("*Van Hollen III*").  The district court then conducted a full trial, resulting in the district court imposing a permanent injunction against enforcement of the statute.  Defendants then appealed, arguing that "the statute protects the health of women who experience complications from an abortion."  *Schimel*, 806 F.3d at 910.

On appeal, the Seventh Circuit determined that, for the proposed statute to be justified, there had to be "reason to believe that the health of women who have abortions is endangered if their abortion doctors don't have admitting privileges."  *Id.* at 912.  The Seventh Circuit affirmed the district court and found that "there is no reason to believe that."  *Id.*  The Seventh Circuit observed:

> A woman who experiences complications from an abortion (either while still at the clinic where the abortion was performed or at home afterward) will go to the nearest hospital, which will treat her regardless of whether her abortion doctor has admitting privileges.  As pointed out in a brief filed by the American College of Obstetricians and Gynecologists, the American Medical Association, and the Wisconsin Medical Society, "it is accepted medical practice for the hospital-based physicians to take over the care of a patient and whether the abortion provider has admitting privileges has no impact on the course of the patient's treatment."  As

> Dr. Serdar Bulum, the expert witness appointed in this case by the district court judge under Fed. R. Evid. 706, testified, the most important factor would not be admitting privileges, but whether there was a transfer agreement between the clinic and the hospital. As we've said, abortion doctors in Wisconsin are *required* to have such transfer agreements . . . . The treating doctor at the hospital probably would want to consult with the doctor who had performed the abortion, but for such a consultation the abortion doctor would not need admitting privileges.

*Schimel*, 806 F.3d at 912 (citing the requirement in Wis. Admin. Code Med. § 11.04(1)(g) for abortion clinics to adopt transfer protocols intended to assure prompt hospitalization of any abortion patient who experiences complications serious enough to require hospitalization) (emphasis in original). There is no mention in *Schimel* of any "floor of care" other than the transfer agreement requirement. There is no mention of any admitting privileges requirement, other than the requirement challenged and enjoined by the court.

The *Schimel* court further concluded based on record evidence presented and cited by the court that "complications from abortion are both rare and rarely dangerous—a fact that further attenuates the need for abortion doctors to have admitting privileges." *Id.* at 913 (citing record studies and evidence). The court observed that abortion clinics uniquely among outpatient providers of medical services in Wisconsin were required to adopt transfer protocols. *Id.* The court observed that defendants "presented no other evidence of complications from abortions in Wisconsin that were not handled adequately by the hospitals in the state." *Id.* at 913. The court rejected the argument that such admitting privileges within 30 miles of a clinic were required to ensure the "Good Housekeeping Seals of Approval" on doctors. *Id.* at 915. Further, the court rejected the argument that admitting privileges improved continuity-of-care. *Id.* ("But nothing in the statute requires an abortion doctor who has admitting privileges to care for a patient who has complications from an abortion . . . .").

### d.     Examining Alabama Law

In *Strange III*, the other case cited by the Supreme Court in *Hellerstedt*, the district court examined an Alabama law requiring "every doctor performing abortions in Alabama to 'have staff privileges at an acute care hospital within the same standard metropolitan statistical area as the facility is located that permit him or her to perform dilation and cutterage, laparotomy procedures, hysterectomy, and any other procedures reasonably necessary to treat abortion-related complications.'" 33 F. Supp. 3d at 1336. A clinic administrator who knowingly and willfully operated an abortion clinic with doctors who did not have such privileges faced felony criminal liability, and the State of Alabama could revoke the clinic's license for violations of the law. *Id.*

Relevant to the issue of an established "floor of care," prior to the challenged law, to be qualified to perform an abortion in Alabama, the physician had to either "have completed a residency or fellowship that included abortion training;" had to "maintain admitting privileges at a United States hospital that allow[ed] her to perform abortions at that hospital;" or had to "provide verification from a disinterested, properly trained physician that she has sufficient skill at performing abortions." *Strange II*, 9 F. Supp. 3d at 1276. The pre-existing regulations in Alabama also included other specific provisions, including requiring the physician to remain at the clinic until the last patient left; providing the patient, after she leaves the clinic, with access to a 24-hour answering service that would immediately refer calls about complications to a qualified nurse, nurse practitioner, physician assistant, or physician; and to record every such call. *Id.* at 1276. Further, the law also required that each abortion clinic "have a physician on staff who has admitting privileges at a local hospital or to maintain a written contract with a 'covering physician.'" *Id.* at 1277. The then in-effect regulations required the covering physician to "have admitting privileges that permit her to perform 'dilation and curettage, laparotomy procedures, hysterectomy, and any

other procedures necessary to treat abortion-related complications' at a hospital within the same metropolitan statistical area as the clinic" and that the affiliated doctor with admitting privileges be available "for 72 hours after the procedure to treat any complications that may arise" when performing abortions. *Id.*

In *Strange III*, the State argued that the staff-privileges requirement had two "strong justifications," both related to an interest in protecting women's health. 33 F. Supp. 3d at 1341. First, the State argued the requirement ensured proper care for complications, and second, the State argued the requirement had a secondary benefit of "'credentialing' high quality doctors." *Id.* In regard to continuity-of-care, the district court identified this concept as "the goal of ensuring that a patient receives high-quality care not only during a certain procedure but also after it, including treatment of complications and any necessary follow-up care" but conceded from the evidence "this is a somewhat elusive concept." *Id.* at 1363.

According to the *Strange III* court, three models emerged for ensuring continuity-of-care. There, the court termed these the first model, the second model, and the third model, also referring to the third model as the "country-doctor model." *Id.* at 1364-65. According to the court, the first model relies upon the 24-hour telephone access to a doctor or nurse at the abortion clinic at any time. Under this model, the doctor or nurse may give instructions for in-home treatment, schedule the woman for a follow-up visit at the clinic, or, if appropriate, direct the woman to the nearest emergency room to be assessed immediately or treated. If a patient needs to be transferred directly to a hospital from the clinic, which the court found is an admittedly rare circumstance, the abortion doctor should communicate with the emergency room doctor to provide continuity-of-care. *Id.* at 1364-65.

Under the second model, there is a covering physician or a doctor with admitting privileges. *Id.* at 1365. The court recognized that the baseline of Alabama's law regulating abortion providers at the time fell under this model. Under this model, the doctor who performs the procedure may arrange for a covering doctor to provide follow-up care for any complications that may arise after the procedure. Even under this procedure, however, if it is an urgent situation, the record evidence in *Strange III* established that it was more important for a patient to go to the nearest emergency room than to be treated by the initial doctor or covering physician. *Id.*

The third model or "country-doctor" approach required the physician who performed the initial procedure to provide consistently most care for complications that may arise, rather than relying on a covering physician, a transfer agreement, or the emergency room. 33 F. Supp. 3d at 1365. A specialist may need to be brought in for certain treatments, but the original doctor would handle nearly all complications. *Id.* The State argued, and the court agreed, that the challenged admitting privileges law fell into this category. *Id.*

Based on the evidence presented, the court determined that the third model advocated by the State fell "outside that range of disagreement" within the medical community regarding the appropriate model of complication care for minor surgeries and medication-based procedures, like early term abortion. *Id.* at 1364. In making this determination, the *Strange III* court recognized this about the nature and treatment of abortion complications:

> Most complications from such [early term] abortions closely resemble the complications from early-term miscarriages. The common complications from miscarriages, as well as medication and early-term surgical abortions, are bleeding, infection, and cramps. These complications sometimes arise because fetal tissue remains in the uterus or because the cervix fails to close fully after the fetal tissue is expelled. The treatment for these complications is the same, regardless of how the pregnancy ended.
>
> In extremely rare instances, other complications may arise which could not occur from a miscarriage. In the case of a medication abortion, an allergic reaction to the

abortion drugs was the only possibility suggested by the evidence in this case. For a surgical abortion, it is possible that an instrument may perforate or lacerate the uterus.

Most complications from early-term abortions do not require hospital treatment. Most minor complications which arise *during* the course of an early-term surgical abortion are treated at the abortion clinic before the patient is discharged. Moreover, as discussed above, most complications that arise *after* a patient has been discharged are best treated with over-the-phone instructions, prescription medication from a pharmacy, or a follow-up visit to the abortion clinic. However, even when hospital care is unnecessary, patients will sometimes seek emergency-room treatment without first contacting the provider. Indeed, in some cases, the woman may not be suffering from any complication at all, but may simply need reassurance.

For the majority of complications which *do* require hospitalization, the appropriate treatment may include intravenous antibiotics or a further dilation and curettage to empty the uterus completely. The staff-privileges provision requires all abortion doctors to have local-hospital privileges that allow them to perform two specific, additional gynecological procedures: hysterectomy and laparotomy. Rare circumstances, such as a suspected uterine perforation, may require a laparotomy or the similar but less invasive laparoscopy, each of which involves examining the uterus or cervix and repairing any damage. In certain other extreme situations, a hysterectomy, or removal of the uterus, may be necessary. It is extremely rare that either a hysterectomy or laparotomy would be necessary following an abortion, even a later-term abortion. Indeed, with approximately 9,000 abortions performed in Alabama each year, in most years not a single early-term abortion in the State would require either procedure.

*Id.* at 1365-66 (emphasis in original).

The *Strange III* court determined that the initial-screening aspect of the credentialing function provided negligible benefit, as compared to Alabama's pre-existing law. *Id.* at 1373. Further, the court determined that it was "left with the speculative assertion that hospital oversight, through staff privileges, would actually ensure that the physicians and clinics" would provide high-quality care and be an "effective supplement to the Department of Public Health oversight." 33 F. Supp. 3d at 1376. The court concluded that, to determine whether a regulatory decision grounded in such speculation would be an acceptable use of the State's police powers, the court was required to engage in the balancing test applied to abortion regulations. *Id.* As a result of engaging in that

balancing test, the *Strange III* court concluded that, "[i]n the light of the severity of the obstacles presented by the requirement and the weakness of the State's justifications," the "obstacles imposed by Alabama's staff-privileges requirement are 'more significant than is warranted by the State's justifications for the regulation.'" *Id.* at 1378. The case was decided by the Honorable Myron H. Thompson.[41]

Later, in 2015, a licensed abortion clinic and doctor brought a challenge against an Alabama health officer claiming that Alabama's "floor of care" regulation—that to perform abortions a doctor had to have admitting privileges at a local hospital or the clinic had to contract with a covering physician who had such privileges—was unconstitutional as applied to the clinic and doctor. *Williamson*, 120 F. Supp. 3d 1296 (M.D. Ala. 2015). This case also was assigned to Judge Thompson. The challenged regulation had been in effect since 2007. *Id.* at 1300. It would have been superseded by the admitting privileges requirement challenged and struck down by Judge Thompson in *Strange III*. *Id.* at 1300-01.

Five abortion clinics operated in Alabama at the time of *Williamson*, a case that followed *Strange III*. Two clinics had physicians on staff who had local admitting privileges, and three operated by having a contract with a covering physician. Those three clinics that operated by having a contract with a covering physician sued to enjoin the admitting privileges law as applied to the three clinics. *Id.*

Until December 2014, the clinic in Tuscaloosa complied with Alabama's "floor of care" regulation by having a doctor on staff with local admitting privileges. *Id.* at 1301. That doctor

---

[41] Defendants appealed Judge Thompson's ruling in *Strange III*. On July 15, 2016, on the grounds that "Alabama's law is identical in all relevant respects to the law at issue in [*Hellerstedt*]," defendants moved to dismiss the appeal because they no longer had a "good faith argument that the law is constitutional under controlling precedent." *Planned Parenthood Se., Inc., et al., v. Luther Strange, et al.*, No. 16-11867, at 6 (11th Cir. 2016, July 15, 2016).

retired in December 2014. *Id.* The Tuscaloosa clinic hired a replacement doctor, but that doctor lacked local admitting privileges. 120 F. Supp. 3d at 1301. Further, the Tuscaloosa clinic could not find a covering physician willing to contract with it. As a result, it brought an as applied challenge to Alabama's "floor of care" regulation. *Id.* at 1301-02.

The Tuscaloosa clinic operated for 20 years, providing reproductive health services, including abortions, birth control, treatment for sexually transmitted infections, pregnancy counseling, and referral for adoption. *Id.* at 1302. By 2013, 40% of all abortions in Alabama took place at the Tuscaloosa clinic, far more than any other clinic in the state. In fact, during that time, the Tuscaloosa clinic performed almost two and a half times more abortions than the next Alabama clinic. Further, about 80% of abortion procedures performed there were performed prior to 10 weeks postfertilization, with almost 96% of abortion procedures being performed before 16 weeks postfertilization. About 4% of abortions were performed mid-second trimester. *Id.* It was only one of two clinics in Alabama that performed abortions throughout the first 20 weeks postfertilization, and it provided around 75% of Alabama's mid-second-trimester abortions. *Id.*

During its 20 years of operation, the Tuscaloosa clinic had never been placed on probation, suspended, or revoked for failure to meet any safety regulation. *Id.* at 1302. Further, during the most recent five year period, less than one-tenth of 1% of its patients were transferred to a hospital for observation or complication. 120 F. Supp. 3d at 1302. The clinic had never been closed for failing to treat its patients. *Id.*

After its long time doctor retired, the clinic hired Dr. Parker, a replacement doctor who was board certified in obstetrics and gynecology with subspecialty training in family planning, contraception, and abortion. *Id.* at 1303. He had over 20 years of experience in women's health, was on the faculty of Northwestern School of Medicine, and held admitting privileges there. *Id.*

He performed abortions in a number of states, including Alabama and Mississippi, and when hired was providing abortions at the Montgomery clinic.  *Id.*  This doctor attempted to obtain admitting privileges himself in Tuscaloosa.  *Id.*  He was unable to do so because the hospital there required him to perform a number of hysterectomies and laparotomies, but according to the court "the reality is that, because Dr. Parker is a full-time abortion provider and because complications from abortions are so rare, he would never be able to do the required amount of procedures."  120 F. Supp. 3d at 1303.  The record evidence indicated that, of the estimated 10,000 abortions Dr. Parker performed in the three years prior on women up to 20 weeks postfertilization, only two were transferred to the hospital, and one was transferred for observation only.  *Id.*  Dr. Parker had never had a patient who needed a hysterectomy from an abortion complication.  *Id.*

Dr. Parker made a good faith effort to work with the hospital board, offering to perform the requisite number of procedures on other patients; he could not satisfy the requirement by performing the procedure on his own patients, because his own patients would not need them due to the low complication rate from abortion.  *Id.*  Record evidence indicated that an agreement appeared to be reached to satisfy the hospital board's requirement in this way, but that agreement never materialized and instead quickly fell apart.  *Id.*  The hospital board reiterated its demand that Dr. Parker satisfy the required procedures by performing them on his own patients.  *Id.*  As the court recognized, this was "an impossible task for a full-time abortion provider . . . given the low number of complications from abortion."  120 F. Supp. 3d at 1303.

Dr. Parker and the Tuscaloosa clinic then attempted to contract with a covering physician instead.  *Id.* at 1304.  None of the physicians in the area agreed to contract, some citing anti-abortion views or the fear of reputational harm.  *Id.*  Dr. Parker and the Tuscaloosa clinic then applied for a waiver, citing Dr. Parker's safety record and the clinic's policies and procedures in

place if complications were to arise, including a 24-hour hotline and a protocol for the clinic to communicate with any treating physicians at emergency rooms. *Id.* The request for waiver was denied. *Id.*

The court enjoined enforcement of Alabama's "floor of care" regulation as applied to the Tuscaloosa clinic, concluding that plaintiffs had a substantial likelihood of success on their argument that the Alabama "floor of care" regulation would have imposed an undue burden on a woman's right to choose to have an abortion in violation of the Due Process Clause of the Fourteenth Amendment. *Id.* at 1306-07. The court first examined the burdens. 120 F. Supp. 3d at 1307-12. The court then turned to examine the justifications for the challenged regulation. *Id.* at 1312.

Alabama justified the challenged regulation by claiming that the regulation was "meant to ensure that women who obtain abortions receive adequate complication-related care" and do so "by authorizing two alternative models for continuity of care." *Id.* The court then analyzed the three possible models for continuity-of-care first articulated in *Strange III*. *Id.* Plaintiffs argued that the Tuscaloosa clinic's protocol was sufficient to ensure adequate continuity-of-care and that requiring the clinic to contract with a covering physician would not benefit patient health in any meaningful way. *Id.* at 1313. Plaintiffs argued this based on Dr. Parker's "extraordinary safety record" and the clinic's emergency-care protocol which it claimed was as effective at ensuring high-quality continuing of care as the covering physician model. *Id.*

The court reaffirmed its determination that "complications from early-term abortions which are the vast majority of the procedures performed at the [Tuscaloosa clinic] are 'vanishingly rare.'" *Id.* The court cited statistics that only 0.89% of first trimester abortions cause any complication of any kind and that only 0.05% of first trimester abortions cause a complication that

requires hospital-based care. *Id.* The court concluded that "clinics do not make frequent use of their covering physicians because the procedures they perform are extremely safe and because, where possible, the clinics themselves provide complication care." *Id.* (citing *Strange III*, 33 F. Supp. 3d at 1370 n.23).

> Further, the court observed:

> Moreover, when a complication requires hospital admission, the regulation itself does not guarantee that a clinic patient would ever be seen by the covering physician, even if the Center were to contract with one. First, the regulation itself does not actually require a clinic to *make use* of the covering physician in the case of any complication: to comply with the regulation, a clinic need only maintain a contract promising the covering physician's availability. Second, if a patient who experiences complications lives outside the Tuscaloosa area—as do at least some of the Center's patients—the fact that the Center might have a contract with a covering physician who could admit her to the Tuscaloosa hospital is unlikely to affect her complication-related care in any way, as she will (and should) seek emergency care closer to home.

*Id.* (emphasis in original).

In the case of a patient transferred directly from the clinic to the hospital, the clinic was already required to "alert 911 and the hospital to the pending transfer; to provide the hospital's emergency department with necessary information about the patient's case; and to send a copy of the patient's medical records to the hospital along with the patient." *Id.* The emergency room doctor and staff, along with a hospital specialist, might examine the patient. *Id*. at 1314-15. The clinic would "communicate directly with the hospital and Dr. Parker would be available for consultation with the hospital's physicians at any time during the patient's course of treatment." 120 F. Supp. 3d at 1315.

If a contracted physician relationship existed, the court acknowledged the likely scenario that Dr. Parker would contact that contracted doctor at the soonest possible point in the process, that contracted doctor would meet the patient at the hospital to assume care, and that contracted

doctor would in theory have a relationship with Dr. Parker.  *Id.*  Although, as the court observed, because complications from abortion procedures are rare, it is unclear whether Dr. Parker would be in regular communication or have a relationship with the contracted physician in reality.  *Id.*

The court also noted that, if there were a contracted physician and if that contracted physician had staff privileges at the hospital nearest to the patient, then Dr. Parker and clinic staff might notify the contracted physician so that she could admit the patient to the hospital herself. *Id.*  However, as the court determined, nothing in Alabama's regulation required Dr. Parker and the clinic staff to do so.  *Id.*

Even if Dr. Parker and the clinic staff notified the contracted physician, the court determined that "there is no guarantee that the covering physician will reach the hospital to admit the patient before the patient is assessed or treated by the emergency-room physicians; that the covering physician will be any more knowledgeable about the patient or her condition than would be the hospital physician; or that the covering physician will be any more qualified to treat the patient than would be the hospital physicians."  *Id.*  Further, the court determined that, because Dr. Parker and clinic staff continue to advocate for the patient directly with the hospital and provide consultation as necessary, the patient has an advocate for her care even after a transfer to the hospital.  120 F. Supp. 3d at 1320.

The court also concluded the clinic's policies ensured that patients received adequate continuity-of-care after discharge from the clinic.  *Id.*  The court determined that the current practice required that Dr. Parker be accessible for at least 72-hours following any procedure.  *Id.* "[P]atients are provided 24-hour telephone access to the Center's medical staff."  *Id.*  The Court found that the patient could speak to a nurse or to Dr. Parker.  If the patient needed to be assessed immediately, the Court noted that the nurse or Dr. Parker could advise the patient to go to the

nearest hospital. *Id.* Further, the nurse or Dr. Parker could call the hospital ahead to provide any pertinent information about the patient or provide his contact information to the patient to provide to the hospital along with the request that the patient ask the hospital to contact Dr. Parker. *Id.* As a result of this benefits analysis, when weighed against the burdens of the regulation, the court enjoined the regulation as applied to Dr. Parker and the Tuscaloosa clinic. *Id.* at 1320.

### e.     Examining Louisiana Law

Likewise, in *Kliebert I*, the district court examined Louisiana's Act 620 which required every doctor who performed abortions in Louisiana to have "active admitting privileges" at a hospital within 30 miles of the facility where the abortions were performed. 158 F. Supp. 3d at 484. The district court, given the controlling law of the Fifth Circuit at that time, applied rational basis review to determine whether Act 620 was rationally related to a legitimate state interest. *Id.* at 485.

In *Kliebert I*, doctors performing abortions at Louisiana's abortion clinics could not comply with the admitting privileges law, despite being given time to attempt to do so. *Id.* at 506-07. The court observed that there was no state or federal statute governing the rules for granting or denying hospital admitting privileges in Louisiana and that the process and rules varied from hospital to hospital. *Id.* at 491-92. Further, the court determined there was "no Louisiana statute which prohibits a Louisiana hospital or those individuals charged with credentialing responsibilities from deciding an application for admitting privileges based on the applicant's status as an abortion provider," regardless of the provider's competency. *Id.* at 495. In addition, Louisiana had no maximum time period within which applications had to be acted upon, so a hospital could effectively deny an application for admitting privileges by failing to act on it, without expressing the true reasons or any reasons for doing so. 158 F. Supp. 3d. at 533.

Based on record evidence, the court determined that Louisiana's abortion providers were not given privileges or given only limited privileges that did not meet the statutory requirement. *See id.* at 489. The resulting effect was an undue burden on the right of a large fraction of Louisiana women to an abortion, based on the record evidence. *Id.* at 533. As a result, the court determined Louisiana's Act 620 was facially unconstitutional. *Id.*

### f.  Examining Mississippi Law

In *Currier*, the Fifth Circuit examined Mississippi's House Bill 1390 ("H.B. 1390") which required, as relevant to the dispute, that "[a]ll physicians associated with the abortion facility must have admitting privileges at a local hospital and staff privileges to replace local hospital on-staff physicians." 760 F.3d at 450. Prior to H.B. 1390's enactment, Mississippi law required that "abortion facilities have only a transfer agreement with a local hospital, a written agreement for backup care with a physician with admitting privileges, and at least one affiliated doctor with admitting privileges." *Id.* (citation omitted). In *Currier*, doctors performing abortions at Mississippi's only abortion clinic in Jackson could not comply with the admitting privileges law, despite being given time to attempt to do so. *Id.* at 450-51. As a result, the record indicated the only abortion clinic in Mississippi would close. *Id.* at 452-53. The district court, and the Fifth Circuit, determined plaintiffs met the undue burden requirement in the as-applied challenge and enjoined enforcement of the law. *Id.* at 455, 459. Both courts applied rational basis review to the proposed regulation as then required by controlling Fifth Circuit law at that time; the Supreme Court in *Hellerstedt* later rejected that lower level of scrutiny for abortion regulations. *Id.* at 455, 459.

### g.      Other States Surrounding Arkansas

Even in *Williams II*, cited by defendants, the court explained at the temporary restraining order stage in regard to a Missouri regulation very similar to Section 1504(d) of the Act that the court "harbor[ed] serious doubts that requiring the Columbia clinic to contract with an OB/GYN who will provide 24 hour a day, seven day a week treatment of all complications produces any benefit to women or the State." 296 F. Supp. 3d at 1140. The court did not alter this view of the regulation's purported benefits at the preliminary injunction stage, despite denying the request for a temporary restraining order. Case No. 17-4207-cv-c-BP, 2018 WL 2927775, at *5-7 (W.D. Mo. June 11, 2018).

The Court also notes that Oklahoma struck down an admitting privileges law. *Burns v. Cline*, 387 P.3d 348, 354 (Okla. 2016) (holding that, in the light of *Hellerstedt*, Oklahoma's admitting privileges law "creates a constitutionally impermissible hurdle for women who seek lawful abortions."). Tennessee, after *Hellerstedt*, agreed not to enforce an admitting privileges law that was being challenged. *See Adams & Boyle P.C., et al. v. Herbert Slaterly, et al.*, Case No. 3:15-cv-00705, Dkt. No. 60, at 2-3 (M.D. Tenn. April 14, 2017) (agreeing to enjoin permanently enforcement of, among other things, an admitting-privileges statute that was "similar to the provision[] struck down in [*Hellerstedt*] . . . .").

### h.      Section 1504(d)'s Benefits

Having these controlling and persuasive precedents in mind, the Court turns to examine the issues presented here. In regard to the state's interests, defendants' main argument is that this provision purportedly ensures continuity-of-care for the woman having the abortion (Dkt. No. 55, at 25). Defendants also claim that the Act's contracted physician requirement "protects not only the health of the woman having the abortion, but also the integrity, ethics, and reputation of the

medical provider who performs it for her." (Dkt. No. 55, at 5). *See* Ark. Code Ann. § 20-16-1502(b) ("[I]t is the purpose of this subchapter to . . . protect women from the dangerous and potentially deadly off-label use of abortion-inducing drugs . . . .").

As for continuity-of-care, the record evidence before the Court at the earlier preliminary injunction stage has generally not changed; to the extent the record has changed, it does not contradict the record developed at the earlier preliminary injunction stage of this litigation.

The Court begins its analysis of the state's claimed interest by examining the details of the contracted physician requirement. Section 1504(d) requires a contracted physician to agree to handle complications that arise from medication abortion, Arkansas Code Annotated § 20-16-1504(d)(1), but nothing requires the contracted physician to handle actually such complications. As many other courts have observed, if the patient does not call the abortion clinic or the contracted physician, and instead presents her to a local emergency room, there is nothing to assure that the contracted physician will care for the patient who has complications from a medication abortion, see the patient before the complications arise, accompany the patient to the hospital, be able to admit the patient to that hospital, treat her there, visit her, or call her. *See e.g.*, *Van Hollen III*, 738 F.3d at 798 ("[N]othing in the statute requires an abortion doctor who has admitting privileges to care for a patient who has complications from an abortion. He doesn't have to accompany her to the hospital, treat her there, visit her, call her, or indeed do anything that a doctor employed by the hospital might not do for the patient."); *Williamson*, 120 F. Supp. 3d at 1315 (same). If the medication abortion patient takes her additional pill or pills to complete the medication abortion procedure and has complications later near her home, but not near the clinic or the location where the contracted physician has admitting privileges, the patient is just as apt to call PPAEO's nurses or physicians or, in cases where necessary, go to the nearest hospital emergency room if she is

experiencing complications—a hospital at which the contracted physician under this provision is not likely to have admitting privileges, especially in this case based on the patient population and the distances traveled by those patients as described by PPAEO and Dr. Ho (Dkt. No. 2, de Baca Decl., ¶ 4).

Given the mandatory language of Section 1504(d), it is unclear whether medication abortion providers would be required to provide only the contracted physician's phone number and hospital with admitting privileges, regardless of the distance involved or the level of emergency, or whether the option would still exist to provide the information and guidance PPAEO and Dr. Ho currently provide, and are required to provide and document under Arkansas law, to their patients, including their contact information and advice to proceed to the nearest emergency room for troubling complications.

The contracted physician would be agreeing to be continuously on call, a difficult commitment. There is nothing in this provision that requires the contracted physician to manage his or her calls any differently than the record evidence establishes that PPAEO and Dr. Ho manage such calls, which is to staff the telephone line with either a doctor or nurse practitioners competent to answer questions and skilled enough to elevate concerns as necessary to a doctor trained and able to respond (Dkt. No. 84, Supp. Ho Decl., ¶ 12). This requirement also cannot be changed by PPAEO or Dr. Ho without jeopardizing their abortion facility license. *See* Ark. Admin. Code § 007.05.2-7(E) (requiring abortion facilities to provide patients with 24-hour access to telephone consultation).

Nothing in the challenged provision ensures that the contracted physician will be familiar with the details of the patient's case or be able to access timely and effectively her medical records. As other courts have observed, the likely scenario is that the contracted physician would contact

PPAEO staff or Dr. Ho to obtain information about the patient's medical records. PPAEO and Dr. Ho are required to maintain medical records for all patients and are regulated by the Arkansas Department of Health in doing so. *See* Ark. Admin. Code § 007.05.2-9.

Nothing in the statute requires that the contracted physician have the ability or experience necessary to provide a surgical abortion; that is not a statutory requirement. PPAEO and Dr. Ho contend that "the vast majority" of hospitals do not provide abortions and do not provide admitting privileges to physicians who provide abortions (Dkt. Nos. 57 at 20 n.12; 57-2, Fine Rebuttal Decl., ¶¶ 13-14).

The contract would be available to many upon demand, thereby assuring that the identity of the contracted physician would become public knowledge. There is record evidence that physicians who provide abortion services, or otherwise associate themselves with this practice, subject themselves and their staff to protestors, harassment, potential violence, and professional isolation (Dkt. No. 30, Stulberg Decl., ¶¶ 13-17). Other courts to examine these types of regulations confirm this. Even if a willing physician could be found, there is record evidence that clinics or hospitals associated with the physician are not likely to be similarly inclined, and the provision requires disclosure of the hospital at which the contracted physician maintains admitting privileges and which can handle any emergencies. There is record evidence that at least one Arkansas hospital system, UAMS, did not permit its physicians to work with PPAEO (Dkt. No. 29, Ho Decl., ¶ 6). Other courts to examine these types of regulations also confirm this. *See e.g.*, *Van Hollen III*, 738 F.3d at 792 (referring to "pretexts" for denying abortion physicians admitting privileges); *Kliebert I*, 158 F. Supp. 3d at 491-97 (detailing difficulties experienced by abortion physicians who attempted to gain admitting privileges at various hospitals in Louisiana).

PPAEO and Dr. Ho maintain that their protocols already guarantee continuity-of-care (Dkt. No. 29, Ho Decl., ¶¶ 11-19). As an initial matter, PPAEO and Dr. Ho include record evidence that only a small subset of medication abortion patients experience complications (Dkt. No. 57-2, Fine Rebuttal Decl., ¶ 3). There is record evidence that, for most of the small number of patients who experience complications or need follow-up care, many can be, and are, treated at the clinic or health center, not a hospital (Dkt. No. 57-2, Fine Rebuttal Decl., ¶ 3). In those cases, a contracted physician could provide no benefit (*Id.*). The Court further notes that PPAEO has provided medication abortions in Arkansas since 2008, and the record contains evidence that it is "extremely rare" for PPAEO to refer a patient to a local emergency room or for a patient to go to an emergency room on her own due to medication abortion complications (Dkt. Nos. 29, Ho Decl., ¶ 16; 84, Supp. Ho Decl., ¶ 4). To the extent either party wishes to revisit the issue of the dangerousness of first and second trimester abortions, this Court determines that the Supreme Court has now spoken on this subject, and this Court is required to follow. *See Williams I*, 263 F. Supp. 3d at 733.

PPAEO and Dr. Ho contend that, as with any outpatient medical procedure, when patients are sent home from the health center, they are sent home with specific instructions for home care, directions on how to contact PPAEO if they are experiencing any concerns or complications, and an appointment for follow-up with PPAEO clinicians (Dkt. Nos. 2, de Baca Decl., ¶¶ 7-8; 57-1 de Baca Rebuttal Decl., ¶¶ 2-3). Contrary to defendants' assertions, there is no record evidence that those instructions direct patients just to go to the emergency department if they need care or otherwise indicate these patients are abandoned (Dkt. No. 29, Ho Decl., ¶¶ 11-19). Further, these instructions are set out and required by Arkansas regulation. Ark. Admin. Code § 007.05.2-8(B). That these instructions have been given to each patient is a matter PPAEO and Dr. Ho are required

to document in medical records.  Ark. Admin. Code § 007.05.2-9.  The Arkansas Department of Health is tasked with ensuring compliance with the regulation.  *Id*.

The record evidence demonstrates that, as required under Arkansas regulation, PPAEO instructs patients that, if they are experiencing a complication or concern, they should call PPAEO and speak to nurse practitioners or Dr. Ho, who are available 24 hours a day (Dkt. No. 84, Supp. Ho Decl., ¶ 12).  There is record evidence that those individuals can access patient charts and can consult, as needed, with Dr. Ho, the PPAEO physician who provides medication abortions in Little Rock, or the medical director of PPGP, Dr. Moore, who is board certified in obstetrics and gynecology, a fellow of the ACOG, licensed to practice medicine in Kansas, and a provider of both medication and surgical abortion with over 30 years of experience practicing medicine (Dkt. Nos. 57-1, de Baca Rebuttal Decl., ¶¶ 3, 4, 6; 84, Supp. Ho Decl., ¶¶ 12-13).  As necessary, the physician can speak directly to the patients (Dkt. No. 57-1, de Baca Rebuttal Decl., ¶ 3).  In most cases, according to the record evidence presented by PPAEO and Dr. Ho, patients can be reassured over the phone or, if need be, arrangements are made for the patient to return to the health center for care (Dkt. No. 2, de Baca Decl., ¶ 9).

In what PPAEO and Dr. Ho describe as the "extremely rare" event that a case warrants more immediate treatment, PPAEO staff will refer a patient to a local emergency department, where she will obtain any necessary treatment from the hospital-based physicians (Dkt. Nos. 29, Ho Decl., ¶ 16; 84, Supp. Ho Decl., ¶ 4).  In Arkansas, if a medication abortion patient is referred to a local emergency department, at least one of PPAEO's physicians is notified (Dkt. Nos. 29, Ho Decl., ¶¶ 16-18; 57-1, de Baca Rebuttal Decl., ¶ 5).  There is record evidence that the PPAEO staff always follows-up with the patient the next day, requests a release for hospital records from the

patient, and arranges for the patient to receive any necessary follow-up care recommended by hospital physicians (Dkt. No. 57-1, de Baca Rebuttal Decl., ¶ 5).

Further, there is record evidence that, if a hospital physician ever needed information about a patient who arrived at the hospital, that physician could also reach PPAEO nurses, nurse practitioners, or physicians and PPAEO on-call physicians as necessary either during business hours or after hours, and PPAEO staff have access to patient health records, which are maintained electronically, even when they are out of the office (Dkt. Nos. 29, Ho Decl., ¶¶ 16-18; 57-1, de Baca Rebuttal Decl., ¶ 6; 84, Supp. Ho Decl. ¶ 12-13). Again, the maintenance of medical records is a matter of Arkansas regulation. Ark. Admin. Code § 007.05.2-9. PPAEO and Dr. Ho maintain that this practice complies with the standard of care provided by other providers of outpatient care (Dkt. Nos. 29, Ho Decl., ¶ 19; 57-2, Fine Rebuttal Decl., ¶ 5). As explained in this Court's analysis, other courts to have examined these issues agree.

PPAEO and Dr. Ho also maintain that this practice complies with the ACOG's Practice Bulletin 143, which states:

> Women who undergo medical abortion may need to access emergency surgical intervention, and it is medically appropriate to provide referral to another health care provider. However, state or local laws may have additional requirements.

> Clinicians who wish to provide medical abortion services either should be trained in surgical abortion or should be able to refer to a clinician trained in surgical abortion.

The American College of Obstetricians and Gynecologists, *Medical Management of First-Trimester Abortion* (Practice Bulletin 143, March 2014) ("Practice Bulletin 143"), *available at* https://www.acog.org/~/media/Practice%20Bulletins/Committee%20on%20Practice%20Bulletins%20--%20Gynecology/Public/pb143.pdf?dmc=1.

Defendants dispute that PPAEO and Dr. Ho comply with the ACOG's recommendation but, in this Court's view, fail to cite with specificity what is missing from the protocol that the ACOG recommends. Contrary to defendants' assertions, this Court is not swayed on the record evidence before it currently that PPAEO and Dr. Ho's practice is inconsistent with the ACOG Practice Bulletin 143 (Dkt. No. 55, at 27-28). Consistent with ACOG's recommendation, PPAEO and Dr. Ho can and do refer patients in need of care to other providers and specifically "a clinician trained in surgical abortion" (Dkt. Nos. 57-1, de Baca Rebuttal Decl., ¶ 7; 57-2, Fine Rebuttal Decl., ¶ 9). PPAEO and Dr. Ho maintain that, in a small number of cases and after a repeat dose of medication if the patient chooses, patients will need a surgical procedure after their medication abortion has failed or is incomplete (Dkt. Nos. 29, Ho Decl., ¶ 17; 57-1, de Baca Rebuttal Decl., ¶ 7). Record evidence establishes that regimen for medication abortion utilized by PPAEO has a failure rate of less than 2% (Dkt. No. 57-2, Fine Rebuttal Decl., ¶ 37).

PPAEO and Dr. Ho make arrangements for referral of patients to other providers, depending on where the patient lives, for the surgical abortion (Dkt. No. 57-1, de Baca Rebuttal Decl., ¶ 7). The only surgical abortion provider in Arkansas is LRFP (Dkt. Nos. 57-1, de Baca Rebuttal Decl., ¶ 7; 84, Williams Decl., ¶ 4). PPAEO and Dr. Ho also maintain that surgical completion does not require urgent or hospital-based care, and PPAEO and Dr. Ho state that they do not just refer their patients to the emergency department, despite defendants' claim (Dkt. Nos. 29, Ho Decl. ¶¶ 11-19; 57-1, de Baca Rebuttal Decl., ¶ 7). PPAEO and Dr. Ho contend that their protocols for treating a patient experiencing a rare complication after medication abortion are both consistent with the standard of care and provide continuity-of-care (Dkt. Nos. 29, Ho Decl., ¶¶ 11-19; 57-2, Fine Decl., ¶¶ 32-39). As explained in this Court's analysis, other courts to have examined these issues agree.

Given the record evidence presented at this stage, the Court is skeptical that any benefit is conferred by § 1504(d).

### i. Defendants' Affidavits

The limitations in § 1504(d) as identified by the Court seem not to be acknowledged or addressed by the individuals whose affidavits defendants submit. Defendants' witness affidavits also do not specifically identify in relation to PPAEO and Dr. Ho's protocol—which is currently required under Arkansas regulations—what should be modified or how the contracted physician requirement serves to effectuate that modification. These witnesses' testimony offered by affidavit seems disconnected with the contracted physician provision and evidences unfamiliarity with PPAEO and Dr. Ho's existing protocol. Regardless of which party bears the burden in relation to the state's interest, the lack of specificity makes defendants' written submissions less compelling at this stage.

Donna Harrison, M.D., the executive director of the American Association of Pro-Life Obstetricians and Gynecologists ("AAPLOG"), states that "[s]ince complications from medical abortions are common, not rare, it is reasonable and medically necessary that the abortion provider have a concrete plan to quickly and effectively handle the predictable complications that arise after drug-induced abortion." (Dkt. No. 55-4, Decl. of Donna Harrison, M.D., in Supp. of Dft.' Response in Opposition to Plt.'s Mot. For TRO and/or Prelim. Inj. ¶ 40 ("Harrison Decl.")). Defendants argue that PPAEO's management of patient emergencies is insufficient to ensure continuity-of-care (*Id.*, ¶ 45). The Court determines that, in the light of the factual underpinning accepted by the majority in *Hellerstedt*, Dr. Harrison's statements regarding the incidence of complications from medication abortions must be rejected. The Court also considers that Dr. Harrison does not indicate that she provides abortions, medication or otherwise, in her practice.

Dr. Harrison also notes that, since 2002, she has focused her professional activities on the American Association of Pro-Life Obstetricians and Gynecologists (*Id.*, ¶ 3). Given the record in this case, Dr. Harrison's view of what PPAEO and Dr. Ho offer patients appears inaccurate and incomplete.

Defendants also present an affidavit from Kevin Breniman, M.D., who is of the opinion that the Act "ensures the continuity of care" (Dkt. No. 55-7, Aff. of Kevin Breniman, M.D., in Supp. of Dft.' Response in Opposition to Plt.'s Mot. For TRO and/or Prelim. Inj., ¶ 7) ("Breniman Aff."). He states that admitting privileges "ensure that a physician is qualified and competent in his or her stated area of practice." (Breniman Aff., ¶ 4). Current Arkansas regulations require the medical director for an abortion facility and any doctor performing an abortion in Arkansas to be licensed by the State of Arkansas. Ark. Admin. Code § 007.05.2-6(K). The record evidence is unclear as to what Arkansas hospitals require for admitting privileges and whether, based on what is required, acquiring admitting privileges provides any incremental evidence of qualification or competence over and above what Arkansas law currently requires. Further, the record does not include evidence that Dr. Breniman has provided abortions to his patients.

Scott Archer, M.D., who is Chief of Emergency Medicine for Saline Memorial Hospital and another defense witness, implies that admitting privileges are based on qualifications and competence as a practitioner (Dkt. No. 55-6, Aff. of Scott Archer, M.D., in Supp. of Dft.' Response in Opposition to Plt.'s Mot. For TRO and/or Prelim. Inj. ¶ 3) ("Archer Aff."). There is record evidence, and other courts have determined, that although competence may be a factor in admitting privileges, other considerations are involved, many of which have nothing to do with competence, such as where a physician resides, whether the physician can meet a minimum number of admissions each year, or whether the physician has any faculty appointments (Dkt. No. 57-2, Fine

Rebuttal Decl., ¶ 13).  *See Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591 (8th Cir. 2009) (involving an economic credentialing policy and alleging as a result antitrust claims against the nonprofit hospital operator, nonprofit mutual insurance company and its subsidiary, operator of health maintenance organization, and health maintenance organization operator's owner); *see also Kliebert I*, 158 F. Supp. 3d at 492 n.25 (noting that the decision to grant admitting privileges may be swayed by many factors unrelated to competence, including but not limited to economic factors and views on abortion); *Williamson*, 120 F. Supp. 3d. at 1316 (same); *Van Hollen IV*, 94 F. Supp. 3d at 953 (same); *Strange III*, 33 F. Supp. 3d at 1338 (same).  Dr. Archer also fails to indicate whether he has ever performed a medication or surgical abortion.  Indeed, Dr. Archer's affidavit does not clearly represent that he has ever treated a woman who presents with complications arising from an abortion; rather, he states, "In my experience, women who have abortions are not forthright with their past medical care." (Dkt. No. 55, Archer Aff., ¶ 7).

Defendants also submit an affidavit from Lee G. Wilbur, M.D., a Professor of Emergency Medicine and Vice Chairman for the Department of Emergency Medicine at UAMS, who agrees with defendants' other witnesses that Section 1504(d)'s contracted physician requirement promotes continuity-of-care for medication abortion patients.  Dr. Wilbur notes that "[s]maller facilities located in less populated, rural areas are less equipped to provide the highest level of care because of the availability of providers or specialists and the availability of equipment is limited." (Dkt. No. 56, Amend. Aff. Of Lee G. Wilbur, M.D., in Supp. of Dft.' Response in Opposition to Plt.'s Mot. For TRO and/or Prelim. Inj. ¶ 6) ("Wilbur Amend. Aff.").  Dr. Wilbur also states that "[t]he contracted physician requirement establishes a line of communication between the physician and a contracted physician with greater expertise." (*Id.*, ¶ 10).  Dr. Wilbur contends that "[n]o other physician specialty, other than obstetrics/gynecology, receives specific training in the procedure,

anticipated effects, or complication related to medication-induced abortion . . . . Identifying an expert in medication-induced abortion available for consultation will improve the care that [Dr. Wilbur] can provide to these patients." (*Id.*, ¶ 11). Dr. Wilbur also contends that, "[w]ithout this contracted physician requirement, [Dr. Wilbur] is left to arrange follow up with a local obstetrician/gynecologist that is unfamiliar with the patient, unfamiliar with the medication regimen she received, and unfamiliar with the staff and capabilities of the facility that provided the original procedure." (*Id.*, ¶ 16).

The Court notes, however, that Dr. Wilbur does not point to any instance where he needed to contact a patient's original medication abortion provider and was unable to do so, resulting in a continuity-of-care gap. Further, the Court notes that many of Dr. Wilbur's representations about the benefits of a contracted physician requirement are general in nature. To date, nothing in the record indicates that non-abortion providers in Arkansas are burdened by contracted physician requirements similar to Section 1504(d).

It remains unclear to the Court why Dr. Ho and PPAEO's physicians would not be able to serve this function of a line of communication for doctors like Dr. Wilbur, given there is record evidence that they do. Any suggestion that the contracted physician would provide a better line of communication under these circumstances is not supported by record evidence at this point. According to the materials presented to the Court at this stage, the contracted physician likely will not have experience in providing abortions, will not have had prior contact with the patient, and will not have access to her records. Dr. Ho is experienced in providing medication abortions, and her supervisor at PPAEO, Dr. Moore, who is board certified in obstetrics and gynecology, a fellow of the ACOG, licensed to practice medicine in Kansas, and has over 30 years of experience in practicing medicine, including providing abortions, is an experienced provider of both surgical

and medication abortions (Dkt. Nos. 29, Ho Decl., ¶ 4; 57-1, de Baca Rebuttal Decl., ¶ 4; 84, Supp. Ho Decl. ¶ 13).

Further, based on the record before the Court at this stage of the proceeding, the Court concludes, at least preliminarily, that emergency room physicians are well qualified to evaluate and treat most complications that can arise after a medication abortion, to the extent they arise, and, when necessary, have immediate access to consultation with on-call specialists (Dkt. Nos. 2, Fine Decl., ¶ 34; 29, Ho Decl., ¶¶ 11-19). As an initial matter, based on the factual determinations in *Hellerstedt*, it is established that any complications that arise after a medication abortion are exceedingly rare. Further, the types of issues that arise in rare emergent care situations, according to record evidence, are identical to those suffered by women experiencing miscarriage, who receive treatments in hospitals every day through emergency physicians and on-call specialists, if necessary (Dkt. No. 2, Fine Decl., ¶ 34). Dr. Wilbur, an emergency physician and witness for defendants, appears to acknowledge this (Dkt. No. 56, Wilbur Amend. Aff., ¶¶ 12, 14). Nothing in Dr. Wilbur's affidavit explains why the contracted physician requirement is better than the protocol PPAEO and Dr. Ho have in place currently (Dkt. No. 57-2, Fine Rebuttal Decl., ¶ 26). Again, the lack of specificity still makes defendants' written submissions less compelling at this stage.

Defendants argue that abortion patients are unwilling to acknowledge they have had an abortion. This statement was repeated by defendants at the earlier preliminary injunction stage without record support. Even if the Court assumes it to be true at this stage of the proceeding, it is unclear what the contracted physician requirement would do to change this circumstance. Whether the contracted physician requirement is implemented or not, if the patient does not acknowledge she has had a medication abortion and provide information to the treating emergency

room physician, it appears to matter little if there is a contracted physician or a PPAEO physician on stand-by to consult. Further, there is evidence in the record that this should not impact the ability of the hospital physician to care for these patients, given the similarity of miscarriage management to post-medication-abortion follow-up care (Dkt. Nos. 29, Ho Decl., ¶ 13; 57-2, Fine Rebuttal Decl., ¶ 25). Dr. Fine and Dr. Wilbur agree that patients are usually frank about their medical history and that hospital physicians are trained to elicit information from reluctant patients (Dkt. Nos. 56, Wilbur Amend. Aff., ¶ 9; 57-2, Fine Rebuttal Decl., ¶ 2).

For these reasons, the Court is skeptical, based upon the limited record before it, that Section 1504(d) sets a minimum standard of care that exceeds the pre-existing protocols followed by medication abortion providers in Arkansas and mandated by the state. This is especially so given that, as established by the Supreme Court, abortion in the first and second trimester is a safe procedure. *See Hellerstedt*, 136 S. Ct. 2302 (noting that rate of complications for first-trimester abortions is less than "one-half of 1%"); *Schimel*, 806 F.3d at 913 (noting rate of complications "is below 1 percent" and the rate of complications requiring hospitalization is "one-twentieth of 1 percent"); *Strange III*, 33 F. Supp. 3d at 1364 (noting that an abortion is "[s]afer than getting a shot of penicillin."); *see also Kliebert II*, 250 F. Supp. 3d at 61 (same).

The Court also rejects, at least at this stage of the litigation and on the record before it, defendants' alternative argument that the contracted physician requirement furthers the "integrity, ethics and reputation of the medical provider" who performs the abortion (Dkt. No. 55, at 5). On this record, there is no evidence Section 1504(d) furthers this interest any more than it furthers the asserted interest in women's health. As this Court explained, current Arkansas regulations require the medical director for an abortion facility and any doctor performing an abortion in Arkansas to be licensed by the State of Arkansas. Ark. Admin. Code §§ 007.05.2-6(K); 007.05.2-7(A)(1). The

record evidence is unclear as to what Arkansas hospitals require for admitting privileges and whether, based on what is required, acquiring admitting privileges provides any incremental evidence of qualification or competence over and above what Arkansas law currently requires. This argument has been examined and rejected by many other courts under circumstances similar to those presented here.

### j.    Quantifying Section 1504(d)'s Purported Benefit

At this point, on the record before it, the Court reaffirms that PPAEO's existing protocol casts doubt as to any benefit gained from the contracted physician requirement (Dkt. No. 2, de Baca Decl., ¶¶ 7-11). A careful review and balancing of the existing record evidence suggests that the state's overall interest in the regulation of medication abortions through the contracted physician requirement is low and not compelling. In making this determination, the Court has taken into account the degree to which the restriction is over-inclusive or under-inclusive, *see, e.g., Hellerstedt*, 136 S. Ct. at 2315, and the existence of alternative, less burdensome means to achieve the state's goal, including whether the law more effectively advances the state's interest compared to prior law, *see, e.g., id.* at 2311, 2314. The Court remains persuaded, for now, that PPAEO and Dr. Ho have established that Section 1504(d)'s contracted physician requirement does little if anything to advance Arkansas' "legitimate interest in protecting women's health." *Hellerstedt*, 136 S. Ct. 2311.

### 6.    Weighing The Burdens And Benefits

Having considered separately the burdens and benefits of Section 1504(d)'s contracted physician requirement, the Court must next resolve the ultimate question of whether Section 1504(d) creates an undue burden. "To determine whether the burden imposed by the statute is undue (excessive), the court must weigh the burdens against the state's justification, asking whether and to what extent the challenged regulation actually advances the state's interest. If a

burden significantly exceeds what is necessary to advance the state's interests, it is undue, which is to say unconstitutional." *Schimel*, 806 F.3d at 919 (citation and quotation marks omitted); *see Hellerstedt*, 136 S. Ct. at 2309 ("The rule announced in *Casey*, however, requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer.").

In regard to burdens, considered cumulatively, the record evidence at this stage of the litigation demonstrates that the contracted physician requirement, given plaintiffs' inability to comply with it, significantly burdens a large faction of women in Arkansas seeking medication abortions. *See Casey*, 505 U.S. at 895 (majority opinion) (holding that the undue burden analysis looks "to those for whom [the challenged law] is an actual rather than an irrelevant restriction.").

In regard to the benefit of Section 1504(d), analyzing the record evidence currently before the Court at this stage of the litigation, and binding and persuasive legal precedents, this Court concludes at this stage that Section 1504(d)'s contracted physician requirement confers little if any benefit on those women who are affected by it. The Court's findings are consistent with those of other district courts that have considered the benefits (or lack thereof) of contracted physician requirements.

Weighing the burdens and benefits, given the foregoing evidence in the record currently before the Court at this stage of the litigation and given binding and persuasive legal precedents, the Court determines that Section 1504(d)'s contracted physician requirement, given plaintiffs' inability to comply with it, imposes significant burdens on a large fraction of Arkansas women seeking medication abortions against a near absence of evidence that the law promotes any state interest or provides any benefits to those women. *See Hellerstedt*, 136 S. Ct. at 2318 (striking down an admitting privileges requirement because the law "provides few, if any, health benefits

for women" and "poses a substantial obstacle to women seeking abortions"); *Van Hollen III*, 738 F.3d at 798 ("The feebler the medical grounds, the likelier the burden, *even if slight*, to be 'undue' in the sense of disproportionate or gratuitous.") (emphasis added); *Miller*, 299 F. Supp. 3d at 1286 (noting fetal demise law was passed in pursuit of legitimate goals, but those goals were not sufficient to justify "such a substantial obstacle to the constitutionally protected right to terminate a pregnancy before viability"); *Kliebert II*, 250 F. Supp. 3d at 88 (noting that admitting privileges law provided no "measurable benefit to women's health, but it is clear that the Act will drastically burden women's right to choose abortion."); *Williams I*, 263 F. Supp. 3d at 735 (noting that case was "not a close one" where hospital affiliation law forced women into two round-trips of hundreds of miles with little concomitant benefit); *Planned Parenthood of Indiana and Kentucky, Inc.*, 273 F. Supp. 3d at 1039 (noting undue burden where law required ultrasound viewing a day before an abortion rather than the day of the abortion because this change provided little to no benefit when measured against prior law). In other words, the Court concludes that, based upon the limited record before it at this stage of the litigation, requiring medication abortion providers to contract with a physician with admitting privileges presents a "burden for a large fraction of women seeking medication abortions in Arkansas," *Jegley*, 864 F.3d at 959, with little to no benefit to those women.

Because Section 1504(d) likely does not "confer[] benefits sufficient to justify the burdens upon access [to abortion] that [it] imposes," *Hellerstedt*, 136 S. Ct. at 2301, the Court finds that plaintiffs are likely to prevail on the merits of their due process challenge that Section 1504(d) is facially unconstitutional because it places a "substantial obstacle to a woman's choice" to terminate a pregnancy before viability in "a large fraction of the cases in which" it "is relevant." *Hellerstedt*, 136 S. Ct. 2313 (quoting *Casey*, 505 U.S. at 895 (majority opinion)).

### B.       Irreparable Harm

A plaintiff seeking temporary injunctive relief must establish that the claimant is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The deprivation of constitutional rights "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977) (same).

PPAEO and Dr. Ho allege that enforcement and enactment of Section 1504(d) causes irreparable harm because plaintiffs are unable to comply and the contracted physician requirement therefore eliminates medication abortions in Fayetteville and Little Rock, forcing any woman in Arkansas who seeks an abortion to drive to Little Rock for a surgical abortion (Dkt. No. 84, Supp. Ho. Decl., ¶ 20). Defendants contest these assertions, arguing that there is no irreparable harm caused to Arkansas women by the contracted physician requirement (Dkt. No. 101, at 31). Also, reiterating their prior argument, defendants argue that the contracted physician requirement does not irreparably harm Arkansas women seeking medication abortions because out-of-state abortion providers remain a viable option (*Id.*). Defendants argue that, even if this Court cannot consider out-of-state abortion providers in the undue burden analysis, such providers may be considered in the irreparable harm analysis. Defendants cite no authority for this proposition.

For now, this Court finds, based on the state of the record before the Court at this stage of the proceeding, that Section 1504(d) causes ongoing and imminent irreparable harm to the plaintiffs and their patients. As detailed above, the record at this stage of the proceeding indicates that Section 1504(d) will force PPAEO's two abortion clinics to cease providing medication abortions, the only type of abortion offered by those two clinics, leaving Arkansas with only one abortion clinic, which is located in Little Rock and provides only surgical abortions. Those women

who live in Northwest Arkansas and seek a medication abortion are now faced with the prospect of making two 380-mile round trips to Little Rock for a surgical abortion (Dkt. Nos. 2, Fine Decl., ¶ 52; 84, Supp. Ho. Decl., ¶ 20). Further, it makes little sense for this Court to disregard out-of-state providers at the "burden" stage of this analysis, as this Court concludes is required by established precedent, but, on the other hand, consider out-of-state providers to determine if "irreparable harm" has or will occur. To do so would lead to absurd results, and this Court declines to do so. Even if the Court were inclined to consider abortion providers in other states, the results of this Court's analysis would not change. There are no abortion providers within the same metropolitan area as Fayetteville. It is not a short distance to an alternative provider for most women seeking a medication abortion in Arkansas affected by the challenged regulation, and the availability of abortions at all in states surrounding Arkansas is subject to on-going and changing regulation, as well. Since the record at this stage of the proceedings indicates that Arkansas women seeking medication abortions face an imminent threat to their constitutional rights, the Court concludes that they will suffer irreparable harm without preliminary relief.

## C. Balance Of Equities And The Public Interest

PPAEO and Dr. Ho argue that the aforementioned injuries caused to their patients by Section 1504(d) far outweigh the harm that will be caused to defendants if preliminary relief is granted (Dkt. No. 85, at 20). PPAEO and Dr. Ho also argue that the public interest weighs in favor of entering a temporary restraining order as "Arkansas can have no interest in enforcing unconstitutional laws." (*Id*.). Defendants respond that the public interest favors "setting minimal continuity-of-care standards where none previously existed," and they argue that the public has an interest "in ensuring that abortion providers do not . . . abandon patients who suffer complications." (Dkt. No. 101, at 31).

The Court must examine its case in the context of the relative injuries to the parties and to the public. *Dataphase*, 640 F.2d at 114. After balancing the relative injuries and the equities, while evaluating the limited record before it, the Court finds that because enforcement of Section 1504(d) would result in irreparable harm to PPAEO and Dr. Ho, as well as the patients of PPAEO and Dr. Ho, the resulting harm to PPAEO and Dr. Ho is greater than the potential harm to the state. Accordingly, at this stage of the proceedings, the Court finds that the threat of irreparable harm to PPAEO and Dr. Ho, and the public interest, outweighs the immediate interests and potential injuries to the state.

## VI.       Security

Under Federal Rule of Civil Procedure 65(c), a district court may grant a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In these proceedings, Mr. Jegley and Mr. Durrett have neither requested security in the event this Court grants a temporary restraining order nor have they presented any evidence that they will be financially harmed if they are wrongfully enjoined. For these reasons, the Court declines to require security from PPAEO or Dr. Ho.

## VII.       Conclusion

For the foregoing reasons, the Court determines that PPAEO and Dr. Ho have met their initial burden for the issuance of a temporary restraining order. Therefore, the Court grants PPAEO and Dr. Ho's renewed motion for temporary restraining order (Dkt. No. 84). The Court hereby orders that Mr. Jegley and Mr. Durrett, and all those acting in concert with them, are temporarily enjoined from enforcing the requirements of Section 1504(d) of Arkansas Act 577, codified at Arkansas Code Annotated § 20-16-1504(d). Further, Mr. Jegley and Mr. Durrett are

enjoined from failing to notify immediately all state officials responsible for enforcing the requirements of Section 1504(d) of Arkansas Act 577, codified at Arkansas Code Annotated § 20-16-1504(d), about the existence and requirements of this temporary restraining order. Pursuant to Federal Rule of Civil Procedure 65(b)(2), this temporary restraining order shall not exceed 14 days from the date of entry of this Order and shall expire by its own terms on Monday, July 2, 2018, at 5:00 p.m. The Court enters this Order on Monday, June 18, 2018, at 5:00 p.m.

Kristine G. Baker
United States District Judge