**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**PLANNED PARENTHOOD ARKANSAS
and EASTERN OKLAHOMA, d/b/a
PLANNED PARENTHOOD OF THE
HEARTLAND; and
STEPHANIE HO, M.D., on behalf of
themselves and their patients**                                        **PLAINTIFFS**

**v.**                                            **Case No. 4:15-cv-00784-KGB**

**LARRY JEGLEY, Prosecuting Attorney for
Pulaski County, in his official capacity, his
agents and successors; and MATT DURRETT,
Prosecuting Attorney for Washington County,
in his official capacity, his agents and
successors**                                                        **DEFENDANTS**

<u>**PRELIMINARY INJUNCTION ORDER**</u>

Before the Court is the second motion for preliminary injunction filed by plaintiffs Planned

Parenthood of Arkansas and Eastern Oklahoma, d/b/a Planned Parenthood of the Heartland

("PPAEO"), and Stephanie Ho, M.D., on behalf of themselves and their patients (Dkt. No. 116).

Plaintiffs bring this action seeking declaratory and injunctive relief on behalf of themselves and

their patients under the United States Constitution and 42 U.S.C. § 1983 to challenge Section

1504(d) of the Abortion-Inducing Drugs Safety Act, 2015 Arkansas Acts 577 (2015) ("Section

1504(d)," "the Act," or "the contracted physician requirement"), codified at Arkansas Code

Annotated § 20-16-1501 *et seq.* This Court has jurisdiction under 28 U.S.C. §§ 1331 and

1343(a)(3). Defendants Larry Jegley, prosecuting attorney for Pulaski County, in his official

capacity, his agents and successors, and Matt Durrett, prosecuting attorney for Washington

County, in his official capacity, his agents and successors, responded in opposition to the motion

(Dkt. No. 135). The Court conducted an evidentiary hearing on the motion (Dkt. Nos. 133, 138).

Both sides submitted additional briefings after the hearing concluded (Dkt. Nos. 139, 140).

## I.     Procedural Background

The Court recites the procedural history of this case.  Plaintiffs filed their complaint on December 28, 2015 (Dkt. No. 1).  On December 30, 2015, the Court held a hearing on plaintiffs' request for a temporary restraining order.  The Court granted the request for a temporary restraining order, but the Court stated that the order would expire on January 14, 2016, unless the Court, for good cause, extended the order (Dkt. No. 22).

The parties filed a joint motion for extension of time of the temporary restraining order (Dkt. No. 24).  The parties also proposed a briefing schedule.  The Court granted this motion, allowing the temporary restraining order to remain in effect until 5:00 p.m. on March 14, 2016 (Dkt. No. 25).  During that time, the parties pursued some discovery while the temporary restraining order was in effect (Dkt. Nos. 32, 34, 38, 46, 53).

The Court conducted a hearing on plaintiffs' first motion for preliminary injunction on March 2, 2016.  Although both sides filed lists of witnesses to be called to testify at the hearing (Dkt. Nos. 44, 44-1), the parties agreed among themselves not to present additional evidence but instead to present only argument, and the Court agreed to hear only argument (Dkt. No. 53).  The Court entered an Order granting plaintiffs' request for a preliminary injunction on March 14, 2016 (Dkt. No. 60).

On March 29, 2016, the Food and Drug Administration ("FDA") updated the final printed labeling ("FPL") of the Mifeprex medication, which is used in medication abortions.  As a result, plaintiffs' medication abortion regimen, which plaintiffs represent is used by a majority of abortion providers across the county and is significantly safer and more effective than the regimen previously required, now complies with the FDA labeling of Mifeprex.  Therefore, plaintiffs

represent that their challenge to the FPL mandate in Section 1504(a) of the Act is now moot (Dkt. No. 65, at 1-2).

Defendants filed a notice of appeal to the Eighth Circuit Court of Appeals on May 12, 2016, as to this Court's Order (Dkt. No. 70). On June 27, 2016, the United States Supreme Court issued its opinion in *Whole Women's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) ("*Hellerstedt*"), a case involving similar legal issues to those presented here. On July 28, 2017, after the FDA updated the FPL of the Mifeprex medication and with the benefit of *Hellerstedt*, the Eighth Circuit issued an opinion vacating this Court's preliminary injunction order on the grounds that this Court was required to, and did not, "make a finding that the . . . contract-physician requirement is an undue burden for a large fraction of women seeking medication abortions in Arkansas." *Planned Parenthood of Arkansas & Eastern Oklahoma v. Jegley*, 864 F.3d 953, 959 (8th Cir. 2017). The Eighth Circuit therefore remanded this case back to this Court to "conduct fact finding concerning the number of women unduly burdened by the contract-physician requirement and determine whether that number constitutes a 'large fraction.'" *Jegley*, 864 F.3d at 960. The Eighth Circuit's mandate was entered on May 31, 2018, at which point this Court regained jurisdiction of the case (Dkt. No. 87).

After renewed briefing and a hearing on June 8, 2018, on June 18, 2018, the Court entered a temporary restraining order enjoining enforcement of Section 1504(d) until July 2, 2018, at 5:00 p.m. (Dkt. No. 114). Plaintiffs filed the present motion on June 21, 2018, requesting a preliminary injunction (Dkt. No. 116). Defendants responded (Dkt. No. 135). The Court conducted an evidentiary hearing (Dkt. Nos. 133, 138). At the hearing on plaintiffs' second motion for preliminary injunction, both sides opted to call witnesses and to present documentary evidence (Dkt. Nos. 125, 126, 127, 130, 136). The Court placed no limits on the number of witnesses either

side could call at the hearing.  Further, the hearing concluded early the afternoon of Friday, June 29, 2018, with all parties having presented proof.  On June 30, 2018, the parties submitted supplemental briefings (Dkt. Nos. 139, 140).

In ruling on this matter, as stated on the record in open Court, the Court has considered the entire record before it.  Having carefully considered the record and briefings before it, for the following reasons, the Court grants plaintiffs' second motion for preliminary injunction (Dkt. No. 116).

## II.     The Mandate Rule

Based upon the briefings provided by the parties regarding the mandate rule and its application to this case, the Court opts to consider the pending second motion for preliminary injunction on the entire record before it.  The mandate rule generally requires a district court to comply strictly with the mandate rendered by the reviewing court.  *See United States v. Bartsh,* 69 F.3d 864, 866 (8th Cir. 1995).  Similarly, under the "mandate rule," while a district court is "bound to follow the mandate, and the mandate 'controls all matters within its scope, . . . a district court on remand is free to pass upon any issue which was not expressly or impliedly disposed of on appeal.'"  *Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.*, 299 F. Supp. 2d 903, 914 (N.D. Iowa 2004) (citations omitted).  The mandate rule provides that a district court is bound by any decree issued by the appellate court and "is without power to do anything which is contrary to either the letter or spirit of the mandate construed in light of the opinion."  *Pearson v. Norris*, 94 F.3d 406, 409 (8th Cir. 1996) (quoting *Thornton v. Carter*, 109 F.2d 316, 320 (8th Cir. 1940)).

Even when the mandate rule applies to an issue, courts have recognized exceptions that allow a matter to be revisited.  Those exceptions are "(1) the availability of new evidence, (2) an intervening change of controlling law, or (3) the need to correct a clear error or prevent manifest

injustice." *Federated Rural Elec. Ins. Corp. v. Arkansas Elec. Cooperatives, Inc.*, 896 F. Supp. 912, 914 (E.D. Ark. 1995) (citing *Bethea v. Levi Strauss,* 916 F.2d 453, 457 (8th Cir.1990); *In re Progressive Farmers Ass'n,* 829 F.2d 651, 655 (8th Cir. 1987) (on remand lower court required to follow appellate court decision unless new evidence is introduced or decision is clearly erroneous and works manifest injustice)).  Further, in regard to the imposition of an injunction that is in the first instance subject to the mandate rule, courts have determined that, under certain circumstances, the mandate rule does not bar courts from consideration of the status of the injunction, given the unique nature of injunctive relief and the equitable considerations that inform it.  *See Americans United For Separation of Church & State v. Prison Fellowship Ministries*, 555 F. Supp. 2d 988, 991 (S.D. Iowa 2008) (examining whether the mandate rule barred the lower court from dissolving an injunction, the grant of which had been ordered or approved of by the appeal).  "There is a fundamental difference . . . between the granting of retrospective relief and the granting of prospective relief." *Id.* (quoting *Amado v. Microsoft Corp.,* 517 F.3d 1353, 1360 (Fed. Cir. 2008)).  "Due to the equitable nature of injunctive relief, district courts have wide discretion to determine under what circumstances the grant of injunctive relief is appropriate, and under what circumstances the modification or dissolution of that injunction is warranted."  *Id.* (internal citations omitted).

Neither party takes the position that this Court is foreclosed by the mandate from reopening the record on remand.  The Court first raised this procedural issue.  Although defendants then argued that the Court should consider "the preliminary injunction proceedings" in this case "concluded" (Dkt. No. 111, at 2), as to the question of whether there is any procedural bar to a party filing multiple requests for a temporary restraining order or preliminary injunction in a single case, defendants concede that, even after issuance of a decision on a preliminary injunction,

plaintiffs may file a second request if they are able to state "new facts warranting reconsideration of the prior decision." (Dkt. No. 111, at 9 (quoting *F.W. Kerr Chemical Co. v. Crandall Assoc., Inc.*, 815 F.2d 426, 428 (6th Cir. 1987)).

Several factors persuade this Court to re-open the record, including but not limited to the following. First, the last time this Court examined the facts of this dispute was on March 14, 2016 (Dkt. No. 60), over two years ago. Evaluating the propriety of any injunctive relief, but especially this type of injunctive relief, depends on the facts and circumstances that exist at the time the relief is requested. *Hellerstedt*, 136 S. Ct. at 2310 ("[T]he Court, when determining the constitutionality of laws regulating abortion procedures, has placed considerable weight upon evidence and argument presented in judicial proceedings."); *W. Ala. Women's Ctr. v. Miller*, 299 F. Supp. 3d 1244, 1252 (M.D. Ala. 2017) (granting preliminary injunction and noting that "[t]he undue-burden test requires courts to examine 'the [challenged] regulation in its real-world context.'") (quoting *Planned Parenthood Se. Inc. v. Strange*, 9 F. Supp. 3d 1272, 1287 (M.D. Ala. 2014) ("*Strange II*")). Arkansas requires the collection of data regarding abortions performed in the state. Several more years of data are now available for this Court's review in resolving this dispute. The Court is reluctant to foreclose consideration of that data and other facts that have developed and changed during the two years since this Court last undertook its review. Second, several key factual disputes have been reviewed and decided by the Supreme Court that bear directly on factual disputes first presented to this Court in 2016. *See generally Hellerstedt*, 136 S. Ct. 2291. Third, several legal issues have been clarified that bear directly on this Court's legal analysis of the dispute presented. *Id*. Fourth, many more district courts have examined these issues and permitted parties to develop factual and legal arguments related to similar disputes in other states since this Court last examined the merits. Both sides of this dispute should be permitted to present, not

foreclosed from presenting, similar factual and legal arguments to this Court, if they are inclined to do so. For all of these reasons, the Court will consider the pending second motion for preliminary injunction and, in doing so, consider the new factual materials presented for consideration by plaintiffs and defendants. The Court also considers all of the factual materials previously entered into the record.

### III. Findings Of Fact

The Court adopts by reference its findings of fact in its prior Orders entered in this matter, to the extent those findings do not conflict with factual findings recited here (Dkt. Nos. 22; 60, at 3-18; 114, at 7-14). *See* Fed. R. Civ. P. 10(c). The Court also makes the following additional findings of fact. To the extent the findings of fact in this Order contradict the findings of fact made in the Court's prior Orders, the findings of fact in this Order control. Further, the Court will address these and additional factual matters in the context of its discussion of the legal issues; the Court makes the findings of fact addressed in that context as well. In making the following findings of fact and conclusions of law, the Court has considered the record as a whole. The Court has observed the demeanor of witnesses and has carefully weighed their testimony and credibility in determining the facts of this case and drawing conclusions from those facts. All findings of fact contained herein that are more appropriately considered conclusions of law are to be so deemed. Likewise, any conclusions of law more appropriately considered a finding of fact shall be so classified. The Court has considered and weighed all of the evidence presented in the record at this stage; the Court has resolved any disputes consistent with the statements in this Order.

1. There are two methods of performing abortions: medically, by administering drugs, and surgically, using various instruments (Dkt. No. 2, Decl. of Paul M. Fine, M.D., ¶ 6 ("Fine Decl.")).

2.     Medication abortion involves a combination of two prescription pills: mifepristone, also known as RU-486 or by its commercial name Mifeprex, which blocks the hormone progesterone, which is necessary to maintain pregnancy. Mifepristone increases the efficacy of the second medication, misoprostol, also known by its brand name Cytotec, which causes the uterus to contract and expel its contents (*Id.*, ¶ 7).

3.     Abortion providers are heavily regulated in Arkansas. The Arkansas Department of Health in 2014 enacted a current set of "Rules and Regulations for Abortion Facilities." *See generally* Ark. Admin. Code § 007.05.2. PPAEO has provided medication abortions in Arkansas since 2008, six years prior to the implementation of these regulations (Dkt. No. 84, Supplemental Declaration of Stephanie A. Ho, M.D., ¶ 4 ("Supp. Ho Decl.")).

4.     An "abortion facility" under the regulations is defined as "[a] clinic, health center, or other facility in which the pregnancies of ten (10) or more women known to be pregnant are willfully terminated or aborted each month, including non-surgical abortions." Ark. Admin. Code § 007.05.2-3(B). Abortion facilities are licensed by the state. Ark. Admin. Code § 007.05.2-4.

5.     The governing body of an abortion facility must include one member, who may be the medical director, "with local representation which shall be legally responsible for maintaining patient care and establishing policies for the facility and shall be legally responsible for the conduct of the facility." Ark. Admin. Code § 007.05.2-5. The medical director must be "a physician currently licensed to practice medicine in Arkansas, and who shall be responsible for the direct coordination of all medical aspects of the facility program." Ark. Admin. Code § 007.05.2-6(K). Operation of the facility is regulated, and the regulations require "written policies and procedures developed and approved by the Medical Director and Administrator which define the care provided

at the facility." Ark. Admin. Code § 007.05.2-6(L). Only physicians who are currently licensed to practice medicine in Arkansas may perform abortions. Ark. Admin. Code § 007.05.2-7(A)(1).

6. Each patient of an abortion facility "shall have access to twenty-four (24) hour telephone consultation with either a Registered Nurse or physician associated with the facility." Ark. Admin. Code § 007.05.2-7(E). A registered nurse is required to "plan, supervise, and evaluate the nursing care of each patient from admission to the facility through discharge." Ark. Admin. Code § 007.05.2-7(F). Counseling services are required to be provided to each patient prior to the abortion and then, "each patient shall be assessed by a Registered Nurse for counseling needs post-abortion . . . ." Ark. Admin. Code § 007.05.2-7(G)(4).

7. Abortion facility patients in Arkansas may only be discharged upon order of a physician. Ark. Admin. Code § 007.05.2-8(D). Further, at discharge, each patient is to receive "written instructions for post-abortion care," including "at least the following: (a) signs and symptoms of possible complications; (b) activities allowed and to be avoided; (c) hygienic and other post-discharge procedures to be followed; (d) abortion Facility emergency telephone numbers available on a twenty-four (24) hour basis; and (e) follow up appointment, if indicated." Ark. Admin. Code § 007.05.2-7(G)(5). Abortion facilities are required to maintain a system for the completion and storage of patients' medical records, including but not limited to policies and procedures for the use of electronic medical records. Ark. Admin. Code § 007.05.2-9. Those medical records must include, among other things, documentation of post-abortion patient education regarding the matters specified above. Ark. Admin. Code § 007.05.2-9(B)(8). Abortion facilities shall have provisions for pharmaceutical services as set out by regulation. Ark. Admin. Code § 007.05.2-11.

8.      Among the regulations for program requirements, each "Abortion Facility shall have written procedures for emergency transfer of a patient to an acute care facility." Ark. Admin. Code § 007.05.2-8(B).  In addition, for complications, each general abortion facility "shall have emergency drugs, oxygen and intravenous fluids available to stabilize the patient's condition, when necessary" and shall have an "ambu bag, suction equipment and endotracheal equipment . . . in the clinical area for immediate access." Ark. Admin. Code § 007.05.2-8(E)(1).  Each medical-only abortion facility "shall have oxygen, medication, oral airways and supplies available." Ark. Admin. Code § 007.05.2-8(E)(2).

9.      The Arkansas Department of Health "may deny, suspend or revoke the license of any Abortion Facility on the following grounds:  violation of any of the provisions of the Act or Rules and Regulations lawfully promulgated hereunder; and/or conduct or practices detrimental to the health or safety of patients and employees of any such facilities."  Ark. Admin. Code § 007.05.2-8(G).

10.     PPAEO's Fayetteville clinic is an Arkansas licensed medication abortion facility in good standing.  Ms. Williams testified that Little Rock Family Planning Services ("LRFPS") is also in good standing with the State of Arkansas.

11.     Further, "[e]ach induced termination of pregnancy which occurs in [Arkansas] regardless of the length of gestation shall be reported to the [Division of Vital Records] within five (5) days by the person in charge of the institution in which the induced termination of pregnancy was performed."  Ark. Code Ann. § 20-18-603(b)(1).  If "the induced termination of pregnancy was performed outside an institution, the attending physician shall prepare and file the report." Ark. Code Ann. § 20-18-603(b)(2).

12.     Neither Dr. Ho nor Ms. Williams are aware of any private providers performing abortions in Arkansas.

13.     In March 2015, supplementing the regulations discussed above, Arkansas enacted Act 577, titled the Arkansas Abortion-Inducing Drugs Safety Act, codified at Ark. Code Ann. § 20-16-1501 *et seq*.

14.     Section 1504(d) of the Act, the "contracted physician requirement," requires medication abortion providers to "have a signed contract with a physician who agrees to handle complications." Ark. Code Ann. § 20-16-1504(d).  This contracted physician "shall have active admitting privileges and gynecological/surgical privileges at a hospital designated to handle any emergencies associated with the use or ingestion of the abortion-inducing drug." *Id.*  It also mandates that every medication abortion patient "receive the name and phone number for the contracted physician and the hospital at which that physician maintains admitting privileges and which can handle any emergencies." *Id.*

15.     PPAEO or predecessor organizations have been providing health care services in Arkansas for over 30 years and medication abortions since 2008 (Dkt. No. 84, Supp. Ho Decl., ¶ 4).

16.     Dr. Ho is a family physician who obtained her medical degree from the University of Arkansas for Medical Sciences ("UAMS") in 2008.  She has been practicing medicine in Arkansas since 2008 (Dkt. No. 29, Declaration of Stephanie A. Ho, M.D., ¶ 2 ("Ho Decl.")).

17.     Dr. Ho is and has been since 2013 employed by Planned Parenthood of Arkansas and Eastern Oklahoma, which is under the blanket of the Planned Parenthood of the Great Plains ("PPGP") affiliate.  PPGP took over operation of the Arkansas health centers from Planned Parenthood of the Heartland in 2016 (Dkt. No. 84, Supp. Ho Decl., ¶ 13).  Dr. Ho began working

part time for PPAEO in 2013 and moved to full time in 2017. Prior to 2017, she also had a private medical practice in Fort Smith, Arkansas (Dkt. No. 29, Ho Decl., ¶ 4).

18.     Dr. Ho provides patient care, serves as the lab director for the Fayetteville and Little Rock clinics, and supervises a number of staff, including nurse practitioners and medical assistants. Currently, she provides patient care only at the Fayetteville clinic but is capable of providing patient care at the Little Rock clinic, should the need arise.

19.     Dr. Ho has some experience working as an emergency room physician in Arkansas and Oklahoma and as a hospitalist (Dkt. No. 29, Ho Decl., ¶ 3).

20.     Post-residency, Dr. Ho worked at the Johnson Regional Medical Center and briefly at the Mercy Medical Center in Fort Smith.

21.     Dr. Ho does not currently have admitting privileges at any hospital.

22.     Dr. Ho has provided abortion services including medication and surgical abortion since April 2013; has provided approximately 2,000 abortions total during her career; and approximately 80% of those have been medication abortions.

23.     Dr. Ho has not performed surgical abortions in Arkansas, but she did perform surgical abortions during her training in Denver, Colorado.

24.     PPAEO does not offer surgical abortions at its Arkansas health centers and cannot do so at this time. Dr. Ho testified that the Fayetteville clinic does not currently meet the state mandated requirements for a surgical abortion facility. *See* Ark. Code R. 007.05.2-12(G). She explained the facility would either have to expand to meet those requirements, find another space to lease to meet those requirements, or build a facility to meet those requirements. She understands that PPAEO does not currently have that ability in its budget.

25. To renovate its current Arkansas health centers, PPAEO would incur considerable expense which Dr. Ho represents PPAEO cannot afford at this time.

26. Dr. Ho acknowledges that there is a landlord in Fayetteville who will rent to PPAEO for the purpose of housing a clinic providing medication abortion.

27. Dr. Ho acknowledged that she does not handle the rent or the contract with the landlord. She admitted that she had not spoken to the current landlord and was unaware of anyone on her team or staff who had spoken with the current landlord regarding any other properties to rent.

28. Dr. Ho testified that conversations with the landlord over rent and contracts would take place between the health center manager or PPAEO's affiliate administration. Dr. Ho testified that she does interact with those individuals from time to time, but she does not know whether those individuals have spoken to the current landlord about renovating PPAEO's Fayetteville clinic to meet the state mandated requirements for a surgical abortion facility or about other suitable locations the landlord may own.

29. PPAEO maintains that the stigma against abortion providers in Arkansas makes it extremely difficult for PPAEO to locate and secure real estate, as landlords and sellers are unwilling to work with PPAEO (Dkt. No. 57-1, Rebuttal Declaration of Suzanna de Baca, ¶ 8 ("de Baca Rebuttal Decl."); Dkt. No. 30, Declaration of Debra Stulberg, M.D., ¶ 14 ("Stulberg Decl.")).

30. PPAEO now employs two other physicians besides Dr. Ho (Dkt. No. 84, Supp. Ho Decl., ¶ 11).

31. In the calendar year 2017, PPAEO's physicians performed 843 medication abortions in Arkansas, 653 of which were at PPAEO's health center in Fayetteville, Arkansas (*Id.*, ¶ 6).

32.     PPAEO now provides medication abortions to patients through 70 days last menstrual period ("LMP") (*Id.*, ¶ 10).

33.     Dr. Ho testified at the 2018 preliminary injunction hearing about the process for obtaining an abortion at PPAEO.  First, the woman seeking an abortion places a phone call to a local clinic or a general number, with the staffer who answers the call obtaining basic information to ensure that the woman meets the general requirements to make her an appropriate candidate for a medication abortion.

34.     If the woman is an appropriate candidate for a medication abortion, the first appointment is made for as soon as the next day or for several weeks away sometimes.

35.     Because of a different Arkansas abortion restriction that requires all women seeking abortions—medication or surgical—to receive certain state-mandated information in person at least 48 hours prior to the abortion, all women seeking abortions in Arkansas will have to make the trip to access abortion services more than once.  *See* Ark. Code Ann. § 20-16-1703.

36.     Arkansas law provides no exceptions to this requirement for receiving state-mandated information in person at least 48 hours prior to the abortion based on distance traveled for the procedure.  *See* Ark. Code Ann. § 20-16-1703.

37.     At the first appointment, also called day one according to Dr. Ho, the woman receives an ultrasound to establish how far along in pregnancy she is to enable PPAEO to date correctly her pregnancy.  She then receives lab work and counseling on the medication abortion process, things to expect, and symptoms, as well as to address her concerns.  Many written materials are used as aids in this counseling and given to the woman for reference later after the

appointment.[1]  Each woman receives these written materials.  After meeting with staff, the woman meets with a physician who personally goes over the same information and provides the state-mandated information regarding abortion.

38.     At that point, the woman is scheduled for her day two appointment at least 48 hours later and perhaps a week or two later, depending on how far along in pregnancy the woman is and the demands on the clinic.

39.     At the day two appointment, the woman again receives counseling.  The same information and instructions she heard at the day one appointment are repeated, all questions are answered, and written materials are discussed and sent home with her as reference.  Again, many written materials are used as aids in this counseling and given to the woman for reference later after the appointment.[2]  Included in these written materials is a patient consent form from the drug manufacturer that, in writing, gives the patient information about the process, instructions of what to expect, and a description of symptoms to expect and symptoms to be concerned about.  That form states in writing that the woman agrees to bring that document or other information she has to another healthcare provider, should the need arise for her to see another healthcare provider during this process.  The woman receives oral instructions and visual instructions during that appointment.  The counseling ensures that she is comfortable with the instructions and process and that she understands symptoms to expect and symptoms that should prompt her to seek further care.  During the appointment, she sees the doctor who administers the medication abortion pill to

---

[1]  These written materials were admitted as Plaintiffs' Exhibit 9 at the 2018 preliminary injunction hearing.
[2]  These written materials were admitted as Plaintiffs' Exhibit 9 at the 2018 preliminary injunction hearing.

her.  During this process, she receives in writing the phone number for the 24-hour, seven day a week access to a PPAEO nurse practitioner or doctor on call.

40.     At that day two point, the woman is scheduled for her third appointment.  The third appointment is for her to return to the clinic so that the clinic can repeat the ultrasound and ensure the medication abortion process is complete.

41.     Record evidence demonstrates that PPAEO instructs patients that, if they are experiencing a complication or concern, they should call PPAEO and speak to nurses who are available 24 hours a day.  Currently, rather than staffing the 24-hour hotline with registered nurses, Dr. Ho and nurse practitioners take turns answering patient calls (Dkt. No. 84, Ho. Supp. Decl., ¶ 12).  The nurse practitioners cannot access patient medical records from outside the office; they can do so when they are in the office (*Id*.).  If remote access is needed, the record indicates that the nurse practitioners may always contact a physician with remote access (*Id*.).  Any calls made to the 24-hour hotline are entered into a patient's medical record on the next business day (*Id*.).  Dr. Ho testified that those nurses can consult, as needed, with Dr. Ho or PPAEO's medical director.

42.     In most cases, according to the record evidence presented by PPAEO and Dr. Ho, patients can be reassured over the phone or, if need be, arrangements are made for the patient to return to the health center for care (Dkt. No. 2, Decl. of Suzanna de Baca, ¶ 9 ("de Baca Decl.")).

43.     Physicians and nurse practitioners working at the Arkansas health centers contact Dr. Orrin Moore, the medical director of PPGP, who is a board certified obstetrician/gynecologist, a fellow of the American College of Obstetricians and Gynecologists ("ACOG"), and licensed to practice medicine in Kansas, if they have any need to consult with a physician other than Dr. Ho (Dkt. No. 84, Supp. Ho. Decl., ¶ 13).  Dr. Moore has been practicing medicine, including providing abortions, for over 30 years; he provides both medication and surgical abortions (*Id.*).

44.      PPAEO and Dr. Ho include record evidence that only a small subset of medication abortion patients experience complications (Dkt. No. 57-2, Rebuttal Declaration of Paul Fine, M.D., ¶ 3 ("Fine Rebuttal Decl.")).  There is record evidence that, for most of the small number of patients who experience complications or need follow-up care, many can be, and are, treated at the clinic or health center, not a hospital (Dkt. No. 2, Fine Decl., ¶¶ 14-16; Dkt. No. 57-2, Fine Rebuttal Decl., ¶ 3).

45.      According to Dr. Ho, PPAEO has never had an emergency situation in Arkansas in which it had to transfer directly a patient to the hospital in an ambulance; there have been extremely rare occasions on which PPAEO has referred a patient to a local emergency room or the patient has gone to the local emergency room on her own (Dkt. No. 29, Ho. Decl. ¶ 16).

46.      In what PPAEO and Dr. Ho describe as "a rare case of concerns that warrant more immediate treatment," PPAEO staff will refer a patient to a local emergency department, where she will obtain any necessary treatment from the hospital-based physicians (Dkt. No. 2, de Baca Decl., ¶ 9).  PPAEO and Dr. Ho contend that their protocols for treating a patient experiencing a rare complication after medication abortion are both consistent with the standard of care and provide continuity of care (Dkt. No. 29, Ho Decl., ¶¶ 11-19; Dkt. No. 2, Fine Decl., ¶¶ 32-39).

47.      Dr. Ho testified that bleeding is one of the reasons a medication abortion patient might be referred to the nearest emergency room for an assessment, and it is not uncommon for women who are pregnant and experiencing bleeding to seek care at an emergency room.

48.      Dr. Ho testified that she has never referred a patient to the emergency room for the complaint of cramping.

49.     Dr. Ho testified that there has been one instance where she felt the patient needed to be emergently evaluated and recommended that the patient go to the emergency room to be evaluated for bleeding.

50.     She also testified that, for reassurance and not because she believes it is medically necessary, she recommends certain women to the emergency room, but that this occurs less than once a month.  Dr. Ho also testified that when she recommends a patient to an emergency room, she recommends that they go to the nearest one.  In the rare event that she believes the patient is experiencing a true emergency, Dr. Ho testified that she calls ahead to the emergency room to let them know that the patient is coming.

51.     PPAEO and Dr. Ho can and do refer patients in need of care to other providers and specifically "a clinician trained in surgical abortion" (Dkt. No. 57-1, de Baca Rebuttal Decl., ¶ 7; Dkt. No. 57-2, Fine Rebuttal Decl., ¶ 9).  PPAEO and Dr. Ho maintain that, in a small number of cases and after a repeat dose of medication if the patient chooses, patients will need a surgical procedure after their medication abortion has failed or is incomplete (Dkt. No. 29, Ho Decl., ¶ 17; Dkt. No. 57-1, de Baca Rebuttal Decl., ¶ 7).  If medication abortion is not complete, Dr. Ho testified that she refers the patient to surgical abortion providers who are able to perform the type of procedure the patient requires and who are close geographically to the patient.

52.     The only surgical abortion provider in Arkansas is LRFPS (*Id.*).

53.     PPAEO and Dr. Ho also maintain that surgical completion does not require urgent or hospital-based care, and PPAEO and Dr. Ho state that they do not just refer their patients to the emergency department, despite defendants' claim (Dkt. No. 29, Ho Decl. ¶¶ 11−19, Dkt. No. 57-1, de Baca Rebuttal Decl., ¶ 7).

54. Dr. Ho testified that emergency room doctors are trained to assess quickly patients, stabilize patients with true emergencies, and then treat the patient or ensure the patient receives the care she needs (Dkt. No. 29, Ho Decl., ¶ 16).

55. In Arkansas, if a medication abortion patient of PPAEO is referred to a local emergency department, at least one of PPAEO's physicians is notified (Dkt. No. 29, Ho Decl., ¶¶ 16-18; Dkt. No. 57-1, de Baca Rebuttal Decl., ¶ 5). There is record evidence that the PPAEO staff always follows-up with the patient the next day, requests a release for hospital records from the patient, and arranges for the patient to receive any necessary follow-up care recommended by hospital physicians (Dkt. Nos. 29, ¶ 14; 57-1, de Baca Rebuttal Decl., ¶ 5). Further, there is record evidence that, if a hospital physician ever needed information about a patient who arrived at the hospital, that physician could also reach PPAEO nurses, nurse practitioners, and on-call physicians as necessary either during business hours or after hours. PPAEO's staff have access to their patients' medical records while on-site, or they can contact Dr. Ho or another PPAEO physician to access such records remotely (Dkt. No. 84, Supp. Ho. Decl., ¶ 12). Dr. Ho testified that PPAEO staff will reach out to the hospital to ensure that the patient's medical records can be added to her medical records on file with PPAEO.

56. Based upon Dr. Ho's experience, all of her patients who have presented to the emergency room for care have received exceptional and appropriate care (Dkt. No. 29, Ho Decl., ¶¶ 12-13).

57. Defendants present the affidavits of four doctors, Donna Harrison, M.D., the executive director of the American Association of Pro-Life Obstetricians and Gynecologists ("AAPLOG"); Lee G. Wilbur, M.D., a Professor of Emergency Medicine and Vice Chairman for the Department of Emergency Medicine at UAMS; Scott Archer, M.D., who is Chief of

Emergency Medicine for Saline Memorial Hospital; and Kevin Breniman, M.D., a doctor with obstetrical and gynecologic admitting and surgical privileges at Baptist Health Medical Center in Little Rock (Dkt. Nos. 55-6, Aff. of Scott Archer, M.D ("Archer Aff."); 55-4, Decl. of Donna Harrison, M.D. ("Harrison Decl."); 56, Amended Affidavit of Lee G. Wilbur, M.D. ("Wilbur Amend. Aff."); 55-7, Aff. of Kevin Breniman ("Breniman Aff.")). None of these doctors aver that they have ever personally witnessed a medication abortion patient experience substandard care in an emergency room. Dr. Wilbur's affidavit states that he does see medication abortion patients in the emergency room (Dkt. No. 56, Wilbur Amend. Aff., ¶ 7).

58. PPAEO and Dr. Ho maintain that the practice implemented by PPAEO complies with the standard of care provided by other providers of outpatient care (Dkt. No. 29, Ho Decl., ¶ 19; Dkt. No. 57-2, Fine Rebuttal Decl., ¶ 5). Dr. Wilbur avers that "[i]t is common for outpatient physicians to call the emergency room, even when that that physician is in a separate community, to inform us that they are sending their patient in for an evaluation, diagnosis, or treatment of a specific condition." (Dkt. No. 56, Wilbur Amend. Aff., ¶ 15).

59. Further, if the medication abortion patient takes her additional pill or pills to complete the medication abortion procedure and has complications later near her home, she is likely to access emergency medical care near her home, which is unlikely to be a hospital at which the contracted physician under this provision would be likely to have admitting privileges given the patient population and distances patients travel as described by PPAEO and Dr. Ho (Dkt. No. 2, de Baca Decl., ¶ 4).

60. The types of issues that arise in rare emergent care situations, according to record evidence, are identical to those suffered by women experiencing miscarriage, who receive

treatments in hospitals every day through emergency physicians and on-call specialists, if necessary (Dkt. Nos. 2, Fine Decl., ¶ 34; 29, ¶ 11; 56, Wilbur Amend. Aff., ¶¶ 11-12).

61.     PPAEO and Dr. Ho's experts and at least one of defendants' witnesses agree that patients are usually frank about their medical history and that hospital physicians are trained to elicit information from reluctant patients (Dkt. No. 57-2, Fine Rebuttal Decl., ¶ 25, Dkt. No. 56, Wilbur Amended Aff., ¶ 9).

62.     ACOG Practice Bulletin 143 states:

Women who undergo medical abortion may need to access emergency surgical intervention, and it is medically appropriate to provide referral to another health care provider.  However, state or local laws may have additional requirements.

Clinicians who wish to provide medical abortion services either should be trained in surgical abortion or should be able to refer to a clinician trained in surgical abortion.

http://www.acog.org/-/media/Practice-Bulletins/Committee-on-Practice-Bulletins-Gynecology/Public/pb143.pdf (the "ACOG Practice Bulletin 143").

63.     There is record evidence that "the vast majority" of hospitals do not provide abortions and do not provide admitting privileges to physicians who provide abortions (Dkt. No. 57-2, Fine Rebuttal Decl., ¶¶ 13-14).

64.     There is record evidence, and other courts have determined, that although competence may be a factor in determining whether to grant admitting privileges, other considerations are involved, many of which have nothing to do with competence, such as where a physician resides, whether the physician can meet a minimum number of admissions each year, or whether the physician has any faculty appointments (Dkt. No. 57-2, Fine Rebuttal Decl., ¶ 13).

65.    When Dr. Ho was in private practice, she had a relationship with a hospital-based physicians group with Sparks hospital. Dr. Ho did not have an association with Sparks hospital while she was in practice (Dkt. No. 29, Ho Decl., ¶ 14).

66.    Dr. Ho had this association with the hospital-based physicians group from August 2011 to February 2017.

67.    Dr. Ho testified that the main reason she had that relationship was to access medical records remotely and quickly from the hospital, instead of waiting for medical records to arrive after patients were discharged from the hospital. She had to have that relationship to access records from that hospital.

68.    Dr. Ho was not required to have that relationship to practice medicine.

69.    Dr. Ho does not believe that relationship changed the quality of care her patients received while in the hospital (Dkt. No. 29, Ho Decl., ¶ 14).

70.    For PPAEO's first attempt to comply with the contracted physician requirement:

(a)    Dr. Ho compiled data from the Arkansas Medical Society's website as well as from the Arkansas chapter of the ACOG (*Id*., ¶ 6).

(b)    from that list, Dr. Ho excluded:

i.    physicians affiliated with religious hospitals because, according to Dr. Ho, it is common knowledge that they do not support abortion services or provide them in their facilities (*Id*.);

ii.    physicians affiliated with UAMS because those doctors were prohibited from providing or associating with abortion providers, as evidenced by the record in this case which indicated UAMs receives government funding and faced the threat of losing that government

funding should UAMS provide abortions or contract with abortion providers (*Id.*, ¶ 8; Dkt. No. 47-2 (sealed));

iii. physicians with the Sparks Health System based upon her personal experience when completing her residency during the interview process with Sparks. She was informed during that process that, because she intended to provide abortions at some point in her career, she would no longer be interviewed or considered for a position at Sparks (Dkt. No. 29, Ho Decl., ¶ 8); and

iv. physicians in rural areas because, according to Dr. Ho, it is not uncommon for those physicians to be the only physician in the community and associating with an abortion provider could affect that local physician's ability to practice medicine and, in turn, affect patients' access to healthcare in the community (*Id.*).

(c) Dr. Ho and her staff contacted the remaining physicians on the list to inform them of the law and ask whether they would be willing to contract with PPAEO to enable PPAEO to comply with the law (*Id.*, ¶ 7).

(d) This initial contact did not include mention of compensation

71. The record evidence is that these contacts were made prior to December 2015.

72. Based on these initial efforts, no doctors able to satisfy the contracted physician requirement were willing to contract with PPAEO (*Id.*, ¶ 9).

73. Dr. Ho testified that there were approximately ten or fewer phone calls in which physicians spoke to her during the first effort. Many times, Dr. Ho spoke to either a nurse or clinic

manager and sometimes had to leave a message with the receptionist. Dr. Ho testified that she was forthcoming when leaving messages about the purpose and nature of her call.

74.     PPAEO staff and Dr. Ho have made additional efforts to find a contracted physician who will allow PPAEO to comply with Section 1504(d) (Dkt. No. 84, Supp. Ho Decl., ¶ 15).

75.     Dr. Ho testified that in January 2016, PPAEO sent a written letter to all obstetricians/gynecologists in Arkansas, having identified them from the Arkansas Medical Society member list and the Arkansas chapter of the ACOG member list, informing them of the Act and asking whether they would be willing to contract with PPAEO to enable PPAEO to comply with the Act (Dkt. Nos. 29, ¶ 10; 57-3).

76.     This 2016 letter was sent either by U.S. mail or email to every physician on this list, and this 2016 letter did not mention compensation (Dkt. No. 29, Ho Decl., ¶ 10).

77.     A second letter was sent sometime around August 2017. A version of this letter was referenced as Plaintiff's Exhibit 2 at the 2018 preliminary injunction hearing (Dkt. No. 84, at 15). This 2017 letter was sent to the same obstetricians/gynecologists who were sent the 2016 letter.

78.     This 2017 letter explained Section 1504(d)'s requirements and explained that "[i]t is critical [PPAEO] find a way to comply with the law so that we can continue providing medication abortion to patients in Arkansas." (*Id*.).

79.     This 2017 letter stated that, while "agreeing to be our contracting physician does not involve providing abortion services, it is critical in helping preserve access to abortion in the state of Arkansas." (*Id*.).

80.     The 2017 letter invited the recipients to "contact [PPAEO's CEO] as soon as possible" to "discuss compensation and other logistics." (*Id*.). The 2017 letter also invited the

recipient to forward "any suggestions of another physician with the requisite privileges who would be willing to serve as a contracting physician . . . ." (*Id.*).

81. Dr. Ho testified that PPAEO received no positive responses to the 2017 letter.

82. According to Dr. Ho, PPAEO did receive a telephone call from a physician supportive of a woman's right to choose and willing to help PPAEO comply with the law but who was prevented from contracting with PPAEO due to his affiliation with a Catholic facility that barred him from doing so.

83. After the 2017 letter was sent, Dr. Ho made further efforts to secure a contracted physician by compiling a list of physicians from the Arkansas State Medical Board and Arkansas Medical Society because she believed that this was a more up-to-date list due to the requirement of license renewal each year. She grouped the physicians on this list into practices and contacted these physicians to inform them of the Act and ask whether they would be willing to contract with PPAEO to enable PPAEO to comply with the Act.

84. Dr. Ho and PPAEO staff called many of the obstetricians/gynecologists who had been identified to explain Section 1504(d)'s requirement and the impact on abortion access if PPAEO is unable to comply with Section 1504(d) (Dkt. No. 84, Supp. Ho Decl., ¶ 17).

85. Dr. Ho and the PPAEO staff reached out to at least 60 physicians in total via telephone (*Id.*). During her testimony, Dr. Ho acknowledged that, although she likely spoke to or left messages for more, she could recall only three physicians by name with whom she spoke personally.

86. PPAEO and Dr. Ho did not use the initial pared down list during the second round of contact. Instead, contact was made with all physicians on the list, including but not limited to

those physicians affiliated with Catholic hospitals, Baptist hospitals, located in small towns, affiliated with UAMS, and affiliated with Sparks.

87.     In response, certain physicians or group practices turned down PPAEO's offer (*Id.*).

88.     Other recipients simply stated that they would not work with PPAEO (*Id.*).

89.     At some group practices, in response to PPAEO's outreach, "the front desk staff was so hostile . . . that they would not even let [PPAEO staff] even speak to the physicians and refused to take messages." (*Id.*).

90.     Despite these efforts, PPAEO is still unable to satisfy Section 1504(d)'s contracted physician requirement (*Id.*, ¶ 18).

91.     If PPAEO's Fayetteville clinic stops providing abortions all together due to an inability to meet the contracted physician requirement, women in the Fayetteville area will be required to travel 380 miles to make one round trip to Little Rock to access surgical abortion services in the state of Arkansas (Dkt. No. 2, Fine Decl., ¶ 52; de Baca Decl., ¶ 18).

92.     During the time the contracted physician requirement took effect in Arkansas for a few weeks, that fact, information about the Act, and information about the Act's impact on abortion access was reported widely in the Arkansas news.

93.     During that time, according to Dr. Ho, several physicians reached out to PPAEO to support PPAEO's work and efforts to help women in Arkansas, but none volunteered to become the contracted physician.

94.     Dr. Ho testified that abortion providers in Arkansas are subject to stigma and harassment and risk being ostracized from their practice and their medical community.

95.     Dr. Ho testified regarding harassment she perceived during residency as a result of her efforts to obtain training to provide abortion care and to provide abortion care, the impact her

desire to provide abortion services had on her job search after residency, and the lack of physicians willing to associate publicly with her in practice or to go into practice with her.

96. There is other evidence in the record that physicians who provide abortions or associate with physicians who provide abortions risk being ostracized from their communities and face harassment and violence toward themselves, their families, and their private practices (Dkt. No. 30, Stulberg Decl., ¶¶ 13-17). Even if a physician is willing to take on these risks, there is evidence in the record that many private practice groups, hospitals, HMOs, and health networks will not permit physicians working for them to associate with abortion providers (*Id*., at ¶¶ 9-12)

97. Dr. Ho also described an article on the internet stating something like "Beware: Dr. Stephanie Ho also works for Planned Parenthood" and other antiabortion websites that publish photos and personal identifying information regarding abortion providers.

98. Dr. Ho avers that medication abortion patients at the Fayetteville health center "will find it immensely difficult, if not impossible, to travel to Little Rock to have an abortion." (Dkt. No. 84, Supp. Ho. Decl., ¶ 19).

99. Dr. Ho describes one medication abortion patient who had trouble getting to PPAEO's Fayetteville health center and had to rely upon a co-worker for a ride, forcing her to reveal her decision to terminate her pregnancy to that co-worker (*Id*., ¶ 20).

100. Dr. Ho describes another patient who lives close to Fort Smith, Arkansas, who had trouble getting to PPAEO's health center due to a lack of transportation (*Id*.). This patient had to reschedule her appointment twice, which delayed her abortion by about two weeks (*Id*.).

101. Another Fayetteville medication abortion patient was altogether prevented from having a medication abortion because she had car trouble between her first and second

appointment, which forced her past the gestational age at which medication abortion is offered (*Id.*).

102.     Finally, Dr. Ho states that another patient, who is homeless, burst into tears because she needed to make a return visit to PPAEO's health center to have an abortion, and she had trouble finding anyone who could give her a ride back to the health center for her second appointment (*Id.*).

103.     Dr. Ho's affidavit states that "[a]pproximately 57% of medication abortions patients at the Fayetteville health center live at or below 110% of the federal poverty level." (Dkt. No. 29, Ho Decl., ¶¶ 21-23).  At the 2018 preliminary injunction hearing, Dr. Ho testified that a majority of patients at PPAEO's Fayetteville clinic are 110% below the federal poverty level.  She testified that poverty impacts a woman's ability to access healthcare overall and makes it even more difficult to access abortion care, due to transportation requirements, child care requirements, and time off work requirements.

104.     Dr. Ho testified that, even for women near PPAEO's Fayetteville clinic, those women experience difficulty accessing care in Fayetteville (*Id.*).  If those women have to travel further than Fayetteville to receive care, the burden on them will mean decreased access to care and greater burdens in terms of accessing care.  According to Dr. Ho, sometimes these difficulties in accessing care mean a woman may have to delay her abortion, sometimes to the point in pregnancy where she is no longer able to access medication abortion.

105.     Dr. Ho testified that some women prefer medication abortion because these women do not wish to have instruments inserted into their vaginas.  Some are survivors of sexual abuse and prefer not to have instruments inserted into their vaginas for that reason, to avoid further

trauma. Some women prefer medication abortion due to a desire to feel more in control of the process or because the process for them feels more natural, like a miscarriage.

106. Plaintiffs also present the affidavit of Lori Williams, a nurse practitioner and the Clinical Director of LFRPS (Dkt. No. 84, Williams Decl., ¶ 1). In addition, Ms. Williams testified at the 2018 preliminary injunction hearing.

107. LRFPS has operated an abortion clinic in Little Rock since 1973, and it has been licensed by the State of Arkansas as an abortion provider since such licensing began in the mid-1980's (*Id.*, ¶ 3).

108. Ms. Williams has worked at LRFPS since 2004 and has been the Clinical Director since 2007 (*Id.*, ¶ 2). She is responsible for all aspects of LRFPS' day-to-day operations, including overseeing patient care in coordination with the physicians and other health care professionals, maintaining policies and procedures, and ensuring that LRFPS complies with all laws and regulations (*Id.*).

109. LRFPS currently has approximately 12 to 15 staff members, including registered nurses, licensed practical nurses, physicians, ultra-sonographer, surgical scrub techs, and medical assistants. LRFPS' medical director is a physician. LRFPS also has two other physicians that contract with LRFPS. Neither of these doctors reside in Arkansas. None of these doctors have admitting privileges to a hospital in Arkansas.

110. LRFPS provides early medication abortions and surgical abortions (*Id.*, ¶ 4). LRFPS is one of only three abortion clinics in Arkansas and the only one that offers surgical abortions (*Id.*). LRFPS only provides medication abortion through nine weeks LMP. LRFPS is the only one of Arkansas' abortion clinics that offers abortions past ten weeks, as dated from the first day of the patient's LMP (*Id.*).

111.    The process for obtaining a medication abortion at LRFPS is very similar to the process at PPAEO's Fayetteville clinic.  LRFPS provides patients with thorough instructions about what to expect regarding their medication abortions.  LRFPS also uses written materials during the verbal counseling sessions and sends those written materials home with the woman for later reference.  LRFPS' written materials may differ slightly from PPAEO's written materials.  LRFPS' materials include contact information for a nurse who is on-call 24 hours a day, seven days a week.  Ms. Williams testified this nurse always has access to a physician.

112.    Ms. Williams testified that she has never referred a medication abortion patient to the emergency room.

113.    Ms. Williams testified that a medication abortion at LRFPS costs $700.00, while a surgical abortion for a similar gestation costs from $600.00 to $700.00.  She confirmed that the price for an abortion increases with each passing week of pregnancy.   Specifically, she testified that 12 to 13 weeks LMP a surgical abortion costs between $650.00 and $750.00, at 14 weeks LMP one costs $800.00, at 15 weeks LMP one costs $850.00, and at 21 weeks one costs $2,000.00.

114.    Dr. Ho testified that a medication abortion from PPAEO without financial assistance costs from $700.00 to $900.00.

115.    LRFPS is not able to comply with Section 1504(d)'s requirement that medication abortion providers have a written contract with a physician who has active admitting privileges and gynecological/surgical privileges at an Arkansas hospital and who has agreed to handle complications (Dkt. No. 84, Williams Decl., ¶ 5).

116.    In 2015, LRFPS was unable to recruit an obstetrician to fulfill the contracted physician requirement.  LRFPS attempted to comply by composing a letter to obstetricians.  The letter gave a description of the background of the clinic, described LRFPS' medical director's work

as an abortion provider, and discussed compensation. LRFPS originally mailed this letter to every obstetrician/gynecologist in Little Rock and later mailed it to all obstetrician/gynecologists in Arkansas. LRFPS used the Arkansas Medical Society, the Yellow Pages, and the internet to be sure they were contacting as many obstetrician/gynecologists as possible. LRFPS received no responses to those letters. LRFPS was contacted by a doctor who did not receive the letter, but that doctor did not have the required admitting privileges.

117. Ms. Williams and LRFPS' medical director also made efforts to expand their relationship with physicians throughout the state. They attended the Arkansas Medical Society legislative sessions to talk about the problems that have arisen because of Section 1504(d). When Arkansas passed the 48-hour informed consent requirement, Ms. Williams reached out to physicians she knew to be friendly and asked if they would be agreeable to assisting far away patients. No physicians took her up on the offer.

118. During the period when medication abortion was not available in Arkansas due to the Act, Ms. Williams testified that she saw news reports about the lack of medication abortions on the television and on radio, but she received no inquiries from obstetricians/gynecologists about associating with LRFPS to meet the contracted physician requirement.

119. Record evidence shows that a physician working at LRFPS previously had admitting privileges at a rural Eastern Arkansas hospital at some point in the past, but those privileges lapsed. The record evidence also shows that the physician at LRFPS reviewed one application or more for admitting privileges, but he could never meet the requirement for the number of patients admitted per year to maintain such privileges. The record evidence also indicates that LRFPS entered into discussions with another doctor as a potential contracted physician, but this doctor lost his ability to practice in other states as a result of the rejection of his

applications to multiple hospitals for admitting privileges. Ms. Williams did admit that she was not aware of any doctor contacted by LRFPS who actually filed an application with any Arkansas hospital for admitting privileges.

120. Since LRFPS cannot comply with Section 1504(d)'s contracted physician requirement, LRFPS has cancelled medication abortions (Dkt. No. 84, Williams Decl., ¶ 7).

121. In 2017, LRFPS provided 92 medication abortions and 2,334 surgical abortions to patients (*Id.*, ¶ 8).

122. Ms. Williams testified that approximately 40% of LRFPS patients fall within federal poverty regulations or guidelines.

123. Ms. Williams avers that LRFPS regularly sees patients who prefer a medication abortion over a surgical one (*Id.*, ¶ 9). Some patients, including victims of sexual assault, want to avoid having surgical instruments in their vagina (*Id.*). Other patients prefer to complete the procedure in the privacy of their home or with another person there to support them (*Id.*). Some patients also have medical conditions, such as vaginismus and large fibroids, that make medication abortion medically indicated (*Id.*). During her testimony, Ms. Williams described the case of one patient with large fibroids positioned such that a medication abortion was medically indicated so as to avoid the risk of serious complication from surgical abortion.

124. Record evidence indicates that LRFPS operates a state-mandated hotline to provide access to patients 24 hours a day, seven days a week and that nurses answer the phone when patients call LRFPS' hotline. If a patient specifically asks to speak with a physician or if the nurse or nurse practitioner believes the patient's concern should be elevated to a physician, a physician is always available. The record evidence indicates that most women who call into LRFPS' hotline

are satisfied talking to a nurse. The record evidence does indicate that LRFPS does not specifically inform callers that they have the option to talk with a licensed physician.

125.    Ms. Williams testified that there are protestors at LRFPS' office almost every single day. She had a letter mailed to 800 of her neighbors that included a photo of her and her address, and the letter said that she is complicit in the murder of children. LRFPS' medical director was the subject of a similar letter. Protestors have knocked on Ms. Williams' and LRFPS' medical director's neighbors' doors. Both Ms. Williams and LRFPS' medical director carry firearms for protection.

126.    Finally, plaintiffs present the declaration of Colleen Heflin, a professor of public administration and international affairs at Syracuse University's Maxwell School of Citizenship and Public Affairs (Dkt. No. 84, Heflin Decl., ¶ 1).

127.    Dr. Heflin has studied, written, and opined about social policy, poverty policy, and child and family policy, and she has researched issues facing women living in poverty in the United States (*Id.*, ¶ 5).

128.    Dr. Heflin cites research that shows an association between increased travel distance and decreased abortion rates (*Id.*, ¶ 11). Specifically, she relied upon a recent study authored by Scott Cunningham and published by the National Bureau of Economic Research ("NBER") that examined the reduction in the abortion rate in Texas after the Texas legislature codified a requirement that abortion providers have admitting privileges at a hospital (*Id.*, ¶ 12). [3]

129.    The Cunningham study estimates that abortion rates decline by 15% in counties requiring between 50 and 100 miles of travel to access services, by 25% in counties requiring

---

[3]  Scott Cunningham, et al., Working Paper No. 2336: *How Far is Too Far? New Evidence on Abortion Clinic Closures, Access, and Abortions*, NBER Working Paper Series (2017, rev. 2018).

between 100 and 150 miles of travel, and by 40% for those counties requiring between 150 and 200 miles of travel (*Id.*, ¶ 13).

130.    Dr. Heflin avers that the Cunningham study examines data that is both recent in time and data from Texas, a state bordering Arkansas and that shares many characteristics with Arkansas (*Id.*, ¶ 14).

131.    Dr. Heflin states that "the data shows that a total of 571 women who received abortions at the Fayetteville health center will, as a result of the [contracted physician] requirement, have to travel over 150 miles from their home county to go to Little Rock." (*Id.*, ¶ 15).  She also notes that the "data shows that an additional 28 women will have to travel between 100-150 miles from their home county to go to Little Rock for an abortion." (*Id.*).

132.    The data relied upon by Dr. Heflin show that a total of 599 women sought medication abortions at the Fayetteville clinic (Dkt. No. 84, at 50).  The same data show that 528 of these women are Arkansas residents (Dkt. No. 84, at 50).

133.    Accordingly, based upon the analysis in the Cunningham study, Dr. Heflin estimates that a total of 235 women will be prevented from having an abortion as a result of the contracted physician requirement (Dkt. No. 84, Heflin Decl., ¶ 14).

134.    Dr. Heflin testified that Texas Legislature House Bill 2's ("H.B.2") had a waiver provision that allowed women who had to travel more than 100 miles to waive Texas' in-person counseling requirement, which means those women only had to make one trip to receive an abortion.  Dr. Heflin notes that the Cunningham study likely underestimates the burden Arkansas women would bear if Arkansas women have to undergo two trips to receive an abortion.

135.    Among the materials defendants submit, all of which this Court has considered, defendants submit the affidavit of Tumulesh K.S. Solanky, a professor and chair of the

mathematics department at the University of New Orleans (Dkt. Nos. 55-9, Amended Affidavit of Tumulesh K. S. Solanky; 101-2, Declaration of Tumulesh K.S. Solanky, ¶ 2 ("Solanky Decl.")). Dr. Solanky has written extensively on the subject of statistics, presented research at multiple conferences, and previously testified in court regarding statistical matters (Dkt. No. 101-2, Solanky Decl., ¶¶ 4-5).

136.    Dr. Solanky is critical of both the Cunningham study and Dr. Heflin's opinions offered here (*Id*., ¶¶ 22-28, 44-45).  Dr. Solanky also discusses other studies that examine abortion rates and trends that may impact the outcome of this case (*Id*., ¶¶ 12-22, 29-37).

137.    Based upon the record evidence at this early stage of the proceeding, the Court finds Dr. Heflin to be more credible than Dr. Solanky on the issues this Court is tasked with examining to resolve this legal dispute, and the Court concludes that her statistical methods employed and research relied upon are more valid, sound, and current than those discussed by Dr. Solanky.

138.    Some women who would seek abortion services will be delayed by the increased travel distances and increases in costs, forcing these women into later abortions that are both riskier and more expensive, if they can obtain them at all  (Dkt. No. 2, Fine Decl., ¶¶ 53-54; Dkt. No. 29, Ho Decl., ¶¶ 20-24).  There is evidence in the record supporting this (Dkt. No. 28, Declaration of Stanley K. Henshaw, ¶ 20 ("Henshaw Decl."); Dkt. No. 2, Fine Decl. ¶ 54).  Ms. Williams' testimony establishes that, at least in Arkansas, if a women fails to access a medication abortion, the cost of a surgical abortion goes up the longer she is delayed.

139.    Inability to travel to the sole remaining clinic in the state will lead some women to take desperate measures, such as attempting to self-abort or seeking care from unsafe providers, which would further put their health at risk (Dkt. No. 2, Fine Decl., ¶ 55).

140.     The Court has before it record evidence that "42.4% of abortion patients [nationally] have incomes below the poverty line" and that "cost is a significant barrier to access" (Dkt. No. 57-2, Fine Rebuttal Decl., ¶ 38).  Dr. Heflin offered testimony to substantiate this.

141.     The Court has before it the affidavit of Stanley K. Henshaw, an independent consultant on matters related to reproductive epidemiology (Dkt. No. 28, Henshaw Decl., ¶ 1).  Dr. Henshaw joined the Guttmacher Institute in 1979 and served as its Deputy Director of Research from 1985 to 1999 (*Id*.).

142.     According to Dr. Henshaw, in fiscal year 2015, PPAEO physicians provided over 500 medical abortions in Arkansas, over 300 of which were performed at the Fayetteville clinic (*Id*., ¶ 3).

143.     Dr. Henshaw reviewed several studies analyzing the relationship between abortion clinic closures and the rate of abortions (*Id*., ¶¶ 5-10).  Dr. Henshaw opined that "[c]onsidering the results of these studies, I estimate that, in general, an additional travel burden of 100 miles will cause 20 to 25% of women who would have otherwise obtained abortions not to obtain them. Greater distances will be a barrier to an even higher percentage of women." (*Id*., ¶ 11).

144.     Based on data reported to the Arkansas Department of Health for the Center for Health Statistics' annual report on induced abortions, there were 4,235 total abortions in the State of Arkansas in 2014 (Dkt. No. 55-8, Affidavit of Priya Kakkar, ¶ 6 ("Kakkar Aff.")).  These data were compiled from reports directed filed to the Center for Health Statistics (*Id*., ¶ 4).  Of those, 3,307 abortions were obtained by in-state residents (*Id*., at ¶ 6).  Of the total abortions, 608 were medication abortions; the remaining abortions were surgical (*Id*.).  57 of the 608 medication abortions were for out-of-state residents (*Id*., ¶ 7).  These data are broken down by county, showing how many medication and surgical abortions occurred in each Arkansas county in 2014 (*Id*.).

145.    Defendants also submit the affidavit of Shirley Louie, the Director of the Center for Public Health Practice with the Arkansas Department of Health (Dkt. No. 101-1, Louie Aff.). Attached to her affidavit are two spreadsheets, the first of which lists the Arkansas occurrences of induced abortions performed on Arkansas residents in 2017, and the second of which lists the Arkansas occurrences of induced abortions performed on residents from states other than Arkansas (*Id*., at 5-8).   Based upon these data, there were 3,249 total abortions in the State of Arkansas in 2014 (*Id*.).   Of those, 838 were medication abortions for Arkansas residents, and 83 were for non-Arkansas residents (*Id*.).   The remainder were surgical abortions.   They also present data that, in 2014, 608 total women sought medication abortions in Arkansas, 551 of whom were Arkansas residents (Dkt. No. 55-9, at 25-26).

146.    Defendants have presented no evidence private providers unaffiliated with PPAEO or LRFPS offer abortions in Arkansas.

## IV.    Standing

At this start of this litigation, defendants challenged standing.   For the reasons discussed below, the Court concludes that, based upon the record evidence before the Court at this stage of the proceeding, PPAEO and Dr. Ho have standing on behalf of themselves and their patients.   To establish Article III standing, a plaintiff must satisfy three requirements:  "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.   Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.   Third, it must be likely, as opposed

to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotes and citations omitted).

There are many cases recognizing that an abortion provider, such as PPAEO, may sue to enjoin as violations of the United States Constitution or federal law through 42 U.S.C. § 1983 state laws that restrict abortion. "These cases emphasize not the harm to the abortion clinic of making abortions very difficult to obtain legally, though that might be an alternative ground for recognizing a clinic's standing, but rather 'the confidential nature of the physician-patient relationship and the difficulty for patients of directly vindicating their rights without compromising their privacy,' as a result of which 'the Supreme Court has entertained both broad facial challenges and pre-enforcement as-applied challenges to abortion laws brought by physicians on behalf of their patients.'" *Planned Parenthood of Wisconsin, Inc. v. Schimel*, 806 F.3d 908, 917 (7th Cir. 2015) (Posner, J.) (quoting *Isaacson v. Horne*, 716 F.3d 1213, 1221 (9th Cir. 2013)).

Further, the United States Supreme Court held in *Doe v. Bolton*, 410 U.S. 179, 188 (1973), that abortion doctors have first-party standing to challenge laws limiting abortion when, as in *Doe* and the current case, the doctors are subject to penalties for violation of the laws. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 903-04, 909 (1992) (plurality opinion); *Schimel*, 806 F.3d, at 911; *Planned Parenthood of Greater Texas Surgical Health Services v. Abbott*, 748 F.3d 583, 589 (5th Cir. 2014) *("Abbott II"); Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786, 794 (7th Cir. 2013) ("*Van Hollen III*"); *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 62 (1976).

Most recently in *Hellerstedt*, the Supreme Court examined the merits of a case in which a group of abortion providers filed suit seeking an injunction to prevent the enforcement of a Texas

admitting privileges provision and a surgical-center provision, claiming these provisions violated the Constitution's Fourteenth Amendment as interpreted in *Casey*.

In their early filings in this case, defendants make several arguments challenging standing. Defendants contend that plaintiffs cannot demonstrate a "close relation" with abortion patients because they are challenging laws that were enacted to protect the health and safety of those patients. Defendants claim that this presents a conflict of interest between providers and patients, and third-party standing is forbidden if the interests of the litigant and the third-party rights-holder are even "potentially in conflict." *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 15 (2004); *see also Kowalski v. Tesmer*, 543 U.S. 125, 135 (2004) (Thomas, J., concurring) (noting that third-party standing is disallowed when the litigants "may have very different interests from the individuals whose rights they are raising"); *Canfield Aviation, Inc. v. Nat'l Transp. Safety Bd.,* 854 F.2d 745, 748 (5th Cir. 1988) ("[C]ourts must be sure . . . that the litigant and the person whose rights he asserts have interests which are aligned.").

This claim could be made with respect to any abortion regulation that purports to advance a valid state interest, but courts have repeatedly allowed abortion providers to challenge such laws, determining that the providers' and women's interests are aligned and not adverse. *See, e.g., Bellotti v. Baird,* 443 U.S. 622, 627 n.5 (1979) (holding that a physician plaintiff had standing to raise his minor patients' claims to determine whether a parental consent law should be upheld to protect the alleged vulnerability of minors); *Charles v. Carey*, 627 F.2d 772, 779 n.10 (7th Cir. 1980) (rejecting the state's claim of conflict of interest in a challenge to a counseling law designed to "protect women from abusive medical practices"). This has not defeated a providers' standing to challenge contraception restrictions. *See Carey v. Population Servs. Int'l,* 431 U.S. 678, 683-84, 690 (1977) (granting third-party standing where the government defended a contraception

restriction based on its interest in protecting health); *Eisenstadt v. Baird,* 405 U.S. 438, 445-46, 450 (1972) (allowing a plaintiff to raise the rights of others seeking contraception where the government defended a restriction as "regulating the distribution of potentially harmful articles").

Defendants also contend that, even if plaintiffs could somehow avoid these limits on third-party litigation, they still cannot assert third-party rights under 42 U.S.C. § 1983 because, defendants claim, § 1983 extends only to litigants who assert their *own* rights. Based on this, defendants contend the third-party claims may proceed only under the implied right of action established by the Supremacy Clause, and the claims cannot serve as a basis for attorneys' fees. *See Planned Parenthood of Houston & Se. Tex. v. Sanchez,* 480 F.3d 734, 739-40 (5th Cir. 2007); *Planned Parenthood of Houston & Se. Tex. v. Sanchez,* 403 F.3d 324, 333 (5th Cir. 2005).

There is no language in the statute that supports this argument. *See* 42 U.S.C. § 1983 (providing in pertinent part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."). This Court agrees with the reasoning of the Seventh Circuit Court of Appeals on this point and rejects defendants' argument regarding standing under § 1983. *See Van Hollen III*, 738 F.3d at 794-95.

Further, by arguing that PPAEO has not made sufficient efforts to comply with the contracted physician requirement or sufficient efforts to offer surgical abortions at the Fayetteville clinic, defendants are essentially arguing that the constitutional injury to Arkansas women— that in a large fraction of the cases in which the contracted physician requirement is relevant, it will

operate as a substantial obstacle to a woman's choice to undergo an abortion—is not caused by defendants, but by PPAEO. To establish standing, the injury must be "fairly traceable" to the defendant's conduct. *Allen v. Wright*, 468 U.S. 737, 756-57 (1984). Here, however, the record evidence at this stage indicates that PPAEO has attempted to comply with Section 1504(d) but has been unable to find a qualifying physician who will contract with them. Through the arguments they advance, defendants would have the Court determine that PPAEO is therefore faced with a choice: upgrade its Fayetteville clinic to offer surgical abortions or cease offering any abortions at all. Even if PPAEO could upgrade its Fayetteville clinic and adjust its operations to offer surgical abortions in the future, it is clear to the Court that Section 1504(d) is the actual and proximate cause of PPAEO's current predicament and the corresponding predicament of Arkansas women seeking medication abortion. Accordingly, the Court finds that the record evidence at this stage of the proceeding demonstrates that plaintiffs' injuries are "fairly traceable" to defendants' conduct.

Furthermore, while the record is not clear on the cost that PPAEO would incur to upgrade its facility to offer surgical abortions, there is record evidence that the cost is greater than zero. To the extent PPAEO has a cause of action under § 1983, the Eighth Circuit has held that an "economic harm—even if only a few pennies each—is a concrete, non-speculative injury." *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014).

Accordingly, based upon the record evidence before the Court at this stage of the proceeding, the Court finds that plaintiffs have demonstrated a concrete injury-in-fact sufficient to support Article III standing. Finally, the Court finds that enjoinment of Section 1504(d) will likely redress plaintiffs' alleged injury. Thus, the Court finds that plaintiffs' have Article III standing to bring their claims against defendants.

## V.    Conclusions Of Law

When determining whether to grant a motion for preliminary injunction, this Court considers:  (1) the threat of irreparable harm to the movant; (2) the movant's likelihood of success on the merits; (3) the balance between the harm to the movant and the injury that granting an injunction would cause other interested parties; and (4) the public interest.  *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Dataphase Sys. Inc. v. CL Sys.,* 640 F.2d 109, 114 (8th Cir. 1981)).  Preliminary injunctive relief is an extraordinary remedy, and the party seeking such relief bears the burden of establishing the four *Dataphase* factors.  *Watkins Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir. 2003).

The Court examines the *Dataphase* factors as applied to plaintiffs' request for a preliminary injunction.  *See Dataphase*, 640 F.2d at 109.  Under *Dataphase*, no one factor is determinative.  *Id.* at 113.  The focus is on "whether the balance of the equities so favors the movant that justice requires the court to intervene to preserve the *status quo* until the merits are determined."  *Watkins*, 346 F.3d at 844.

The Eighth Circuit revised the *Dataphase* test when applied to challenges to laws passed through the democratic process.  Those laws are entitled to a "higher degree of deference."  *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 725, 732 (8th Cir. 2008).  In such cases, it is never sufficient for the moving party to establish that there is a "fair chance" of success.  Instead, the appropriate standard, and threshold showing that must be made by the movant, is "likely to prevail on the merits."  *Id.*  Only if the movant has demonstrated that it is likely to prevail on the merits should the Court consider the remaining factors.  *Id.*

### A.    Likely To Prevail On The Merits

Federal constitutional protection of reproductive rights is based on the liberty interest derived from the due process clause of the Fourteenth Amendment.  *Casey*, 505 U.S. at 846 (majority opinion).  The United States Supreme Court, when recognizing this right, stated:

> We forthwith acknowledge our awareness of the sensitive and emotional nature of the abortion controversy, of the vigorous opposing views, even among physicians, and of the deep and seemingly absolute convictions that the subject inspires.  One's philosophy, one's experiences, one's exposure to the raw edges of human existence, one's religious training, one's attitudes toward life and family and their values, and the moral standards one establishes and seeks to observe, are all likely to influence and to color one's thinking and conclusions about abortion.
>
> In addition, population growth, pollution, poverty, and racial overtones tend to complicate and not to simplify the problem.

*Roe v. Wade*, 410 U.S. 113, 116 (1973).

Unless and until *Roe* is overruled by the United States Supreme Court, to determine whether a state statute is unconstitutional and violates substantive due process rights in this context, the Court applies the "undue burden" standard developed in *Casey*, 505 U.S. at 876-79 (plurality opinion), and *Hellerstedt,* 136 S. Ct. at 2309-11.  The Court acknowledges that defendants ask this Court to overturn *Roe* and *Casey* (Dkt. No. 140, at 22 n.4).  This Court, however, is bound to follow Eighth Circuit and Supreme Court precedent.

Below, the Court first discusses the proper legal standard that applies to plaintiffs' claims.  Second, the Court discusses what deference, if any, it owes to the Arkansas legislature's findings.  Third, applying the undue burden test from *Casey* and *Hellerstedt*, the Court analyzes the benefits, if any, caused by Section 1504(d).  Fourth, the Court engages in a two-step inquiry:  first, whether Section 1504(d) effectively prevents plaintiffs' from offering any abortions at their two clinics and prevents LRFPS from offering medication abortions; and second, the effect on women seeking medication abortions in Arkansas if no abortions are available at plaintiffs' two clinics and

medication abortions are no longer available at LRFPS' clinic. The Court also discusses whether it is appropriate to consider out-of-state abortion providers when calculating whether a "large fraction" of women seeking medication abortions in Arkansas are burdened. Finally, the Court weighs the benefits and burdens of Section 1504(d) in order to determine if 1504(d) places an unconstitutional "undue burden" on women.

### 1.     The Proper Legal Standard

Although PPAEO and Dr. Ho's complaint does not specify whether this action is brought as a "facial" constitutional challenge to the Act or as an "as-applied" challenge, at the prior preliminary injunction stage, this Court reviewed plaintiffs' claim as one for facial relief. The Eighth Circuit also implicitly treated this case as a facial challenge. *Jegley*, 864 F.3d at 958 (analyzing whether this Court correctly applied the undue burden test from *Casey*, which applies to facial challenges). The record evidence developed since this case returned from appeal, however, demonstrates that Section 1504(d)'s effects are not uniformly felt by women throughout Arkansas. At the 2018 preliminary injunction hearing, the Court sought the parties' input regarding whether facial or as-applied relief is appropriate in this matter. At this time, the Court restricts its review of this request for a preliminary injunction as a facial challenge to Section 1504(d).

Facial challenges to statutes affecting abortions may succeed only if a plaintiff can show that "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895 (majority opinion); *see Hellerstedt*, 136 S. Ct. at 2318 (striking down an admitting privileges requirement because the law "provides few, if any, health benefits for women" and "poses a substantial obstacle to women seeking abortions"); *Jegley*, 864 F.3d at 959 ("[I]n order to sustain a facial challenge and grant a

preliminary injunction, the district court was required to make a finding that the Act's contract-physician requirement is an undue burden for a large fraction of women seeking medication abortions in Arkansas."); *id.* at 690 n.9 ("The question here . . . is whether the contract-physician requirement's benefits are substantially outweighed by the burdens it imposes on a large fraction of women seeking medication abortion in Arkansas."); *see also Planned Parenthood Minn., N.D., S.D. v. Rounds*, 653 F.3d 662, 667-68 (8th Cir. 2011), *vacated in part on reh'g en banc sub nom. Planned Parenthood Minn., N.D., S.D. v. Rounds*, 662 F.3d 1072 (8th Cir. 2011) and *in part on reh'g en banc sub nom. Planned Parenthood Minn., N.D., S.D. v. Rounds*, 686 F.3d 889 (8th Cir. 2012); *see also Rounds*, 530 F.3d at 733 n.8 ("*Rounds* cases").

In *Casey*, a plurality of the Supreme Court determined that, if a government regulation has "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus," the regulation is an undue burden on a woman's right to have an abortion and is unconstitutional. 505 U.S. at 877 (plurality opinion). In *Gonzales v. Carhart*, the Supreme Court then simplified *Casey*'s description, settling on the effects test. 550 U.S. 124, 158 (2007). The Supreme Court recently reiterated the undue burden standard that "a statute which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Hellerstedt*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S. at 877 (plurality opinion)).

The Supreme Court in *Gonzales* stated as follows: "[T]he State, from the inception of the pregnancy, maintains its own regulatory interest in protecting the life of the fetus that may become a child, [and this premise] cannot be set at naught by interpreting *Casey's* requirement of a health exception so it becomes tantamount to allowing a doctor to choose the abortion method he or she might prefer. Where it has a rational basis to act, and it does not impose an undue burden, the

State may use its regulatory power to bar certain procedures and substitute others, all in furtherance of its legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn." *Gonzales*, 550 U.S. at 158. The Court acknowledges that the state may, in a valid exercise of its police power, regulate abortion. The state's police power is, however, limited where a protected liberty interest is at stake. *Casey*, 505 U.S. at 851 (majority opinion). "The State's interest in regulating abortion previability is considerably weaker than postviability." *Stenberg v. Carhart*, 530 U.S. 914, 930 (2000) (citing *Casey*, 505 U.S. at 870 (majority opinion)). Therefore, assuming without deciding that Section 1504(d) may be a valid exercise of the state's police power, the Court is obligated to examine whether it unduly burdens the constitutional right of Arkansas women to a pre-viability abortion.

To show an undue burden, PPAEO and Dr. Ho must show that "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895 (majority opinion); *see Hellerstedt*, 136 S. Ct. at 2318 (striking down an admitting privileges requirement because the law "provides few, if any, health benefits for women" and "poses a substantial obstacle to women seeking abortions"); *Jegley*, 864 F.3d at 959 ("[I]n order to sustain a facial challenge and grant a preliminary injunction, the district court was required to make a finding that the Act's contract-physician requirement is an undue burden for a large fraction of women seeking medication abortions in Arkansas."); *id*. at 690 n.9 ("The question here . . . is whether the contract-physician requirement's benefits are substantially outweighed by the burdens it imposes on a large fraction of women seeking medication abortion in Arkansas."). A court limits its inquiry to "the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* at 894 (majority opinion). "An undue burden is an unconstitutional burden." *Id*. at 877 (plurality opinion).

The undue burden analysis requires this Court to "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Hellerstedt*, 136 S. Ct. at 2309. There must be "a constitutionally acceptable" reason for regulating abortion, and the abortion regulation must also actually advance that goal in a permissible way. *Id.* at 2309-10. "[T]he means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it." *Casey,* 505 U.S. at 877 (plurality opinion).

Further, under the applicable undue burden standard, although the Court must "review 'legislative fact finding under a deferential standard,'" *Hellerstedt*, 136 S. Ct. at 2310, the court "retains an independent constitutional duty to review [a legislature's] factual findings where constitutional rights are at stake . . . . Uncritical deference to [the legislature's] factual findings in these cases is inappropriate." *Gonzales*, 550 U.S. at 165, 167; *see Hellerstedt*, 136 S. Ct. at 2310.

Generally, the state has the burden of demonstrating a link between the legislation it enacts and what it contends are the state's interests. *See Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 430 (1983), *overruled on other grounds by Casey*, 505 U.S. 833 (describing the burden as that of the state). As a part of the Court's inquiry, the Court may take into account the degree to which the restriction is over-inclusive or under-inclusive, *see, e.g., Hellerstedt*, 136 S. Ct. at 2315 (discussing over- and under-inclusive scope of the provision), and the existence of alternative, less burdensome means to achieve the state's goal, including whether the law more effectively advances the state's interest compared to prior law, *id*. (noting that prior state law was sufficient to serve asserted interest); *id*. at 2314 ("The record contains nothing to suggest that [the challenged provisions] would be more effective than pre-existing [state] law at deterring wrongdoers . . . from criminal behavior.").

PPAEO and Dr. Ho, who challenge Section 1504(d), retain the ultimate burden of proving the statute's unconstitutionality. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (reversing appellate court for enjoining abortion restriction where plaintiffs had not proven that the requirement imposed an undue burden); *Casey*, 505 U.S. at 884 (plurality opinion) (affirming provision where "there [was] no evidence on this record" that the restriction would amount to an undue burden).

## 2.    Deference To Legislative Findings

As part of evaluating the benefits of a regulation, this Court must evaluate the Arkansas General Assembly's findings when enacting the regulation. When this Court initially examined the legal issues presented, courts differed in their determination as to what level of deference is appropriately given by a court to a legislative enactment affecting a woman's right to an abortion. Prior to *Hellerstedt*, the Fifth Circuit articulated a level of deference akin to rational basis review. *See Cole*, 790 F.3d at 575-76. In *Hellerstedt*, the Supreme Court examined this issue and resolved it.

Specifically, the Supreme Court made clear that "[t]he statement that legislatures, and not courts, must resolve questions of medical uncertainty is also inconsistent with this Court's case law. Instead, the Supreme Court, when determining the constitutionality of laws regulating abortion procedures, has placed considerable weight upon evidence and argument presented in judicial proceedings." *Id.* at 2310. The Supreme Court, citing its *Casey*, 505 U.S. 833, and *Gonzales,* 550 U.S. 124, decisions, reaffirmed that a court reviews legislative fact finding under a "deferential standard" but "must not 'place dispositive weight'" on those findings. *Hellerstedt*, 136 S. Ct. at 2310 (citing and quoting *Gonzales*, 550 U.S. at 165). The Court stated that the "*Court retains an independent constitutional duty to review factual findings where constitutional rights*

*are at stake.*" *Id.* (emphasis in original) (quoting *Gonzales*, 550 U.S. at 165). Where record evidence contradicts some legislative findings, uncritical deference to the legislative factual findings is inappropriate. *Id.*

The Arkansas legislature made several legislative findings when enacting Section 1504(d) which could be interpreted to conflict with the Court's findings. *See* Ark. Code Ann. § 20-16-1502 (legislative findings). The Court has given the legislature's findings careful consideration. Here, most of the Arkansas legislature's findings are no longer accurate or current, given the FDA's update to the FPL of Mifeprex. Further, based on the evidence presented here and the Supreme Court's *Hellerstedt* majority opinion, this Court finds that, to the extent that the Arkansas legislature made factual findings that early-term abortions are unsafe, those findings were simply "incorrect." *Gonzales,* 550 U.S. at 165. The evidence in this case, and in the prior cases cited by this Court including *Hellerstedt*, is clear that the procedures are remarkably safe. On these matters, deference to the Arkansas legislature's factual findings would be inappropriate. *Id.*

In this case, unlike in others, the Arkansas legislature made no findings regarding an identified set of perceived problems with the current method of care for medication abortion patients that the contracted physician requirement is intended to address. *Cf. Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1376-77 (M.D. Ala. 2014) ("*Strange III*") (discussing and evaluating legislative findings specific to an admitting privileges requirement). Further, the Arkansas legislature made no findings that the contracted physician requirement would solve such problems or do much to solve such problems, if such problems even existed. For this additional reason, because most of this Court's findings concern the contracted physician requirement and the stated goals of the Arkansas legislature as articulated by defendants in this litigation, this

Court's findings do not otherwise conflict with the legislative findings.[4] Having resolved this, the

Court turns to analyze the purported benefits of Section 1504(d).

---

[4] There are two legislative findings that the Court highlights at this point in the litigation. The first finding is: "Abortion-inducing drugs are associated with an increased risk of complications relative to surgical abortion and the risk of complications increases with advancing gestational age, and, in the instance of the Mifeprex regimen, with failure to complete the two-step process. . . ." *See* Ark. Code Ann. § 20-16-1502 (legislative findings). The second finding is: "Medical evidence demonstrates that women who use abortion-inducing drugs incur more complications than those who have surgical abortions . . . ." (*Id.*).

At this early stage of the litigation, there is record evidence before this Court that: "[t]he FDA report on adverse events associated with mifepristone medication abortion covers a period of more than 10 years (from approval of mifepristone in September 2000 through April 2011), during which approximately 1.52 million women had a medication abortion." (Dkt. No. 2, at 5-6 (citing U.S. Food & Drug Admin., Mifepristone U.S. Postmarketing Adverse Events Summary through 04/30/2011, http://www.fda.gov.downloads/Drugs/DrugsSafety/PostmarketDrugSafety InformationforPatientsandProviders/UCM263353.pdf)). "The FDA data reflects that medication abortion is extremely safe, with a mortality rate of less than 1 per 100,000 abortions, which is comparable to the rate for first-trimester surgical abortion." *Id.* Both of these rates are lower than the mortality rate for childbirth, which is 8.8 per 100,000; the mortality rate associated with penicillin which is 2 per 100,000; and the mortality rate from outpatient plastic surgery procedures in accredited facilities which is 1.7 per 100,000 procedures. *Id.* (citing Elizabeth Raymond & David Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstet. & Gynecol. 215, 216-17 (Feb. 2012); Alfred I. Neugut et al., *Anaphylaxis in the United States: An Investigation Into Its Epidemiology*, 161 Archives Internal Med. 15, 18 (2001); Elizabeth Raymond et al., *Mortality of Induced Abortion, Other Outpatient Surgical Procedures and Common Activities in the United States*, 90 Contraception 476, 468 (2014)). Further, these two legislative findings seem inconsistent with the discussion in other court opinions regarding similarities and differences in complications from medication and surgical abortion. *See Strange III*, 33 F. Supp. 3d at 1365-67 (observing that, although still exceedingly rare, complications from surgical abortion may be more severe and dangerous to the woman).

Defendants also submit, with no sponsoring witness, two studies from the United Kingdom (Dkt. Nos. 135-4, 135-7). Based upon the Court's review of these studies, which studied surgical and medication abortions in the United Kingdom, to the extent these studies are offered to show that the complication rate of medication abortions is higher than otherwise described in the record, the Court is unpersuaded by these studies. In the first of these studies, medication abortions were performed by vaginal administration of misoprostol, with an additional dosage every three hours. T. Kelly, et al., *Comparing medical versus surgical termination of pregnancy at 13-20 weeks of gestation: a randomised controlled trial*, 117 BJOG 1512 (2010). The medication abortion was deemed to have failed if the abortion had not occurred by 8:00 a.m. *the following morning*. *Id.* at 1513-14. The study authors concluded that medication abortions were associated with more pain, bleeding, and overnight stays. *Id.* at 1519. The authors noted, however, that they were unable to recruit the intended sample size, and therefore "[t]he conclusions that can be drawn from our results are . . . limited . . . ." *Id.* at 1517. The second study utilized a similar medication abortion

### 3. Benefit Of Section 1504(d)'s Contracted Physician Requirement

Section 1504(d) of the Act, which is the statute plaintiffs continue to challenge, requires:

(1) The physician who gives, sells, dispenses, administers, or otherwise provides or prescribes the abortion-inducing drug shall have a signed contract with a physician who agrees to handle complications and be able to produce that signed contract on demand by the patient or by the Department of Health.

(2) The physician who contracts to handle emergencies shall have active admitting privileges and gynecological/surgical privileges at a hospital designated to handle any emergencies associated with the use or ingestion of the abortion-inducing drug.

(3) Every pregnant woman to whom a physician gives, sells, dispenses, administers, or otherwise provides or prescribes any abortion-inducing drug shall receive the name and phone number of the contracted physician and the hospital at which that physician maintains admitting privileges and which can handle any emergencies.

Ark. Code Ann. § 20-16-1504(d). Arkansas law also requires all women seeking abortions—medication or surgical—to receive certain state-mandated information in-person at least 48-hours prior to the abortion. *See* Ark. Code Ann. § 20-16-1703. There are no exceptions to this requirement.

The Court first turns to examine the benefits, if any, of Section 1504(d)'s contracted physician requirement. At the outset of this analysis, the Court acknowledges several matters. First, it is settled law that a state may enact regulations "to foster the health of a woman seeking abortion" or "to further the State's interest in fetal life," provided that those regulations do not

---

regimen as that used in the first study but was limited to women at nine or more weeks LMP. SC Robson, et al., *Randomised preference trial of medical versus surgical termination of pregnancy less than 14 weeks' gestation (TOPS)*, 13 Health Tech. Assessment 1, 6-7 (2009). Neither of the medication abortion regimens in these studies matches the one used in Arkansas, and the record evidence indicates that PPAEO only provides medication abortions up to 10 weeks LMP. Accordingly, the Court grants little weight to the findings of these two studies.

Even if this Court were to consider these studies as some evidence that the Arkansas legislature intended to regulate a problem that could but does not exist in the state, the contracted physician requirement is over-inclusive in doing so the Court has concerns at this stage of the litigation.

impose an "undue burden" on the woman's decision. *Casey*, 505 U.S. at 877-78 (plurality opinion). The relevant question before the Court is whether Section 1504(d)'s contracted physician requirement provides the asserted benefits *as compared to the prior law*. *See Hellerstedt*, 136 S. Ct. at 2311 ("We have found nothing in Texas' record evidence that shows that, *compared to the prior law*, . . . the new law advanced Texas' legitimate interest in protecting women's health."); *id*. at 2314 ("The record contains nothing to suggest that [the challenged law] *would be more effective than pre-existing Texas law* . . . .") (emphasis added). Therefore, the specific question at this juncture is whether requiring abortion providers in Arkansas to comply with Section 1504(d)'s contracted physician requirement furthers a legitimate interest of the state, as compared to Arkansas' pre-existing regulations affecting abortions.

Second, there is precedent from the Eighth Circuit in *Women's Health Center of West County, Inc. v. Webster*, 871 F.2d 1377 (8th Cir. 1989), in which the court addressed a Missouri statute requiring abortion providers to have admitting privileges. The Court is mindful that *Webster* was decided before *Casey* and before many other legal, social, and medical changes surrounding abortion. The Court also is aware that the evidence in *Webster* was that only one doctor state-wide could not comply with the requirement and that other doctors at that same clinic could comply with the requirement, resulting in little impact to patients and little to no effect on access to abortions statewide. *Id.* at 1381. As a result, the Court will examine Section 1504(d) in the light of all controlling current authorities and on the current record evidence before it.

In *Hellerstedt*, the Supreme Court examined a statute that did not set forth any legislative findings. *Id.* Specifically, the Supreme Court examined H.B.2's requirement that a "physician performing or inducing an abortion . . . must, on the date the abortion is performed or induced, have active admitting privileges at a hospital that . . . is located not further than 30 miles from the

location at which the abortion is performed or induced." *Id*. (citing Tex. Health & Safety Code. Ann. § 171.0031(a)). The prior Texas law required doctors who provided abortions to "have admitting privileges or have a working arrangement with a physician who ha[d] admitting privileges at a local hospital in order to ensure the necessary back up for medical complications." *Id*. (citing 25 Tex. Admin. Code, § 139.56 (2009)); *see* 33 Tex. Reg. 1093 (Dec. 19, 2018) (to be codified at 25 Tex. Admin Code § 139.56).[5]

It also is important to note that H.B.2 imposed an admitting privileges requirement on physicians performing both medication and surgical abortions, unlike Section 1504(d) of the Act under review by this Court, which imposes the requirement only on those performing medication abortions.

### a.    Health-Related Benefits Of Section 1504(d)

When considering H.B.2's admitting privileges requirement, defendants argued, and in *Hellerstedt* the Supreme Court recognized, that "[t]he purpose of the admitting-privileges requirement is to help ensure that women have easy access to a hospital should complications arise during an abortion procedure." 136 S. Ct. at 2311. The district court "found that it brought about no such health-related benefit," determining that "[t]he great weight of the evidence demonstrate[d] that, before the act's passage, abortion in Texas was extremely safe with particularly low rates of serious complications and virtually no death occurring on account of the procedure." *Id.* (citing *Whole Woman's Health v. Lakey*, 46 F. Supp. 3d 673, 684 (W.D. Tex.

---

[5]  It is important to note that Texas has a law that prohibits hospitals from discriminating against a physician applying for privileges based on that physician's status as an abortion provider or views as to abortion. *See* Tex. Occ. Code § 103.002(b). This type of statute in effect protects physicians who perform abortions from targeted discrimination when applying for admitting privileges. *See, e.g.*, *Cole*, 790 F.3d at 596 n.44; *Abbott II*, 748 F.3d at 598 n.13. As other courts have observed, the situation is different in states without such laws. *See, e.g., June Med. Servs. LLC v. Kliebert*, 158 F. Supp. 3d 473, 501(M.D. La. 2016) ("*Kliebert I*").

2014).  It was on this basis, as noted by the Supreme Court in *Hellerstedt*, that the district court determined "there was no significant health-related problem that the new law helped to cure."  *Id.*

According to *Hellerstedt*, this conclusion was based on, among other things:

- "A collection of at least five peer-reviewed studies on abortion complications in the first trimester, showing that the highest rate of major complications—including those complications requiring hospital admission—was less than one-quarter of 1%."

- "Figures in three peer-reviewed studies showing that the highest complication rate found for the much rarer second trimester abortion was less than one-half of 1% (0.45% or about 1 out of about 200)."

- "Expert testimony to the effect that complications rarely require hospital admission, much less immediate transfer to a hospital from an outpatient clinic.  *Id.*, at 266-267 (citing a study of complications occurring within six weeks after 54,911 abortions that had been paid for by the fee-for-service California Medicaid Program finding that the incidence of complications was 2.1%, the incidence of complications requiring hospital admission was 0.23%, and that of the 54,911 abortion patients included in the study, only 15 required immediate transfer to the hospital on the day of the abortion)."

- "Expert testimony stating that 'it is extremely unlikely that a patient will experience a serious complication at the clinic that requires emergent hospitalization' and 'in the rare case in which [one does], the quality of care that the patient receives is not affected by whether the abortion provider has admitting privileges at the hospital.'"

- "Expert testimony stating that in respect to surgical abortion patients who do suffer complications requiring hospitalization, most of those complications occur in the days after the abortion, not on the spot."

- "Expert testimony stating that a delay before the onset of complications is also expected for medical abortions, as 'abortifacient drugs take time to exert their effects, and thus the abortion itself almost always occurs after the patient has left the abortion facility.'"

- "Some experts added that, if a patient needs a hospital in the day or week following her abortion, she will likely seek medical attention at the hospital nearest her home."

*Hellerstedt*, 136 S. Ct. at 2311 (internal record citations omitted).

Further, the Supreme Court in *Hellerstedt* noted that, "when directly asked at oral argument whether Texas knew of a single instance in which the new requirement would have helped even one woman obtain better treatment, Texas admitted that there was no evidence in the record of such a case." *Id.* at 2311-12. The Supreme Court observed: "This answer is consistent with the findings of the other Federal District Courts that have considered the health benefits of other States' similar admitting-privileges laws." *Id.* at 2312 (citing *Planned Parenthood of Wis., Inc. v. Van Hollen*, 94 F. Supp. 3d 949, 953 (W.D. Wis. 2015) ("*Van Hollen IV*"), *aff'd sub nom Schimel*, 806 F.3d 908; *Strange III*, 33 F. Supp. at 1378).

To the extent either party wishes to revisit the issue of the dangerousness of first trimester and second trimester abortions, this Court determines that the Supreme Court has now spoken on this subject, and this Court is required to follow. *See Comprehensive Health of Planned Parenthood Great Plains, et al., v. Williams*, 263 F. Supp. 3d 729, 733 (W.D. Mo. 2017) ("*Williams I*") (granting a preliminary injunction regarding a Missouri abortion law and noting that it "would be impermissible judicial practice" to contradict the Supreme Court's dangerousness finding in *Hellerstedt*). Further, this Court agrees that the factual conclusions reached in *Hellerstedt* "were not confined to Texas." *Id.* at 733-34 (noting that the *Hellerstedt* majority relied on Texas, Wisconsin, and Alabama case-law and amicus briefs and materials unrelated to Texas). "Lower court judges are bound by Supreme Court precedent even if they seriously question what the Court has done." *Id.* at 733 (citing *MKB Mgmt. Corp. v. Stenhjem*, 795 F.3d 768, 772 (8th Cir. 2015)).

This Court acknowledges that *Hellerstedt* reviewed medication and surgical abortion statistics and research, not just medication abortion. There is nothing in the record before this Court that directly addresses the evidence relied on by the Supreme Court in *Hellerstedt* and makes

the case that a review of medication abortion statistics only would lead to a different conclusion. PPAEO has provided medication abortions in Arkansas since 2008, and the record contains evidence that PPAEO has never had an emergency situation in Arkansas in which it had to transfer directly a patient to the hospital in an ambulance, though there have been extremely rare occasions on which PPAEO has referred a patient to a local emergency room or the patient has gone to the local emergency room on her own due to medication abortion complications (Dkt. Nos. 29, Ho Decl., ¶ 16; 84, Supp. Ho Decl., ¶ 4). As a result, this Court determines that there is "no significant health-related problem" Section 1504(d) is intended to address. *Hellerstedt*, 136 S. Ct. at 2311.

### b.     Regulatory Benefits Of Section 1504(d)

The Court next turns to examine whether, despite there being no significant health-related problem with medication abortion that Section 1504(d) of the Act is intended to address, there is nonetheless a benefit from Section 1504(d) of the Act. The Eighth Circuit suggests Section 1504(d) of the Act may set a "floor of care," such as was present in Texas. *See Jegley*, 864 F.3d at 960 n.9. The Eighth Circuit also suggests that a "legal floor" "would constitute a benefit" because it would prevent an abortion provider from, in the future, reducing their continuity-of-care practices. *Id.* In its findings of fact, the Court found the pre-existing rules and regulations in Arkansas that currently govern abortion providers. To summarize these findings, by regulation in Arkansas, abortion facilities must "have written procedures for emergency transfer of a patient to an acute care facility." Ark. Admin. Code § 007.05.2-8(B). On discharge, each patient "shall have access to twenty-four (24) hour telephone consultation with either a Registered Nurse or physician associated with the facility," Ark. Admin. Code § 007.05.2-7(E), and each patient on discharge receives "written instructions for post-abortion care," including "at least the following: (a) signs and symptoms of possible complications; (b) activities allowed and to be avoided; (c) hygienic

and other post-discharge procedures to be followed; (d) abortion Facility emergency telephone numbers available on a twenty-four (24) hour basis; and (e) follow up appointment, if indicated." Ark. Admin. Code § 007.05.2-7(G)(5). Plaintiffs are not free to alter or disregard these requirements without jeopardizing the license of their facility.

Below, the Court turns to examine cases from other jurisdictions that compare the benefit of an abortion restriction against a purportedly pre-existing "floor of care."

### (1)  Examining Wisconsin Law

In *Schimel*, a case cited by the Supreme Court in *Hellerstedt*, the district court and Seventh Circuit Court of Appeals examined a Wisconsin statute that required every doctor who performed abortions to have admitting privileges at a hospital within a 30-mile radius of each clinic at which the doctor performed abortions, with the law being signed on a Friday and compliance required by the following Sunday. 806 F.3d at 911. The district court granted a temporary restraining order, *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 963 F. Supp. 2d 858 (W.D. Wis. 2013) ("*Van Hollen I*"), and a preliminary injunction, *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, No. 13-cv-465-WMC, 2013 WL 3989238 (W.D. Wis. Aug. 2, 2013) ("*Van Hollen II*"). The Seventh Circuit affirmed the entry of the preliminary injunction. *Van Hollen III*, 738 F.3d at 799 (7th Cir. 2013). The district court then conducted a full trial, resulting in the district court imposing a permanent injunction against enforcement of the statute. Defendants then appealed, arguing that "the statute protects the health of women who experience complications from an abortion." *Schimel*, 806 F.3d at 910.

On appeal, the Seventh Circuit determined that, for the proposed statute to be justified, there had to be "reason to believe that the health of women who have abortions is endangered if their abortion doctors don't have admitting privileges." *Id.* at 912. The Seventh Circuit affirmed

the district court and found that "there is no reason to believe that." *Id.* The Seventh Circuit observed:

> A woman who experiences complications from an abortion (either while still at the clinic where the abortion was performed or at home afterward) will go to the nearest hospital, which will treat her regardless of whether her abortion doctor has admitting privileges. As pointed out in a brief filed by the American College of Obstetricians and Gynecologists, the American Medical Association, and the Wisconsin Medical Society, "it is accepted medical practice for the hospital-based physicians to take over the care of a patient and whether the abortion provider has admitting privileges has no impact on the course of the patient's treatment." As Dr. Serdar Bulum, the expert witness appointed in this case by the district court judge under Fed. R. Evid. 706, testified, the most important factor would not be admitting privileges, but whether there was a transfer agreement between the clinic and the hospital. As we've said, abortion doctors in Wisconsin are *required* to have such transfer agreements . . . . The treating doctor at the hospital probably would want to consult with the doctor who had performed the abortion, but for such a consultation the abortion doctor would not need admitting privileges.

*Schimel*, 806 F.3d at 912 (citing the requirement in Wis. Admin. Code Med. § 11.04(1)(g) for abortion clinics to adopt transfer protocols intended to assure prompt hospitalization of any abortion patient who experiences complications serious enough to require hospitalization) (emphasis in original). There is no mention in *Schimel* of any "floor of care" other than the transfer agreement requirement. There is no mention of any admitting privileges requirement, other than the requirement challenged and enjoined by the court.

The *Schimel* court further concluded based on record evidence presented and cited by the court that "complications from abortion are both rare and rarely dangerous—a fact that further attenuates the need for abortion doctors to have admitting privileges." *Id.* at 913 (citing record studies and evidence). The court observed that abortion clinics uniquely among outpatient providers of medical services in Wisconsin were required to adopt transfer protocols. *Id.* The court observed that defendants "presented no other evidence of complications from abortions in Wisconsin that were not handled adequately by the hospitals in the state." *Id.* at 913. The court

rejected the argument that such admitting privileges within 30 miles of a clinic were required to ensure the "Good Housekeeping Seal of Approval" on doctors. *Id.* at 915. Further, the court rejected the argument that admitting privileges improved continuity-of-care. *Id.* ("But nothing in the statute requires an abortion doctor who has admitting privileges to care for a patient who has complications from an abortion . . . .").

### (2)    Examining Alabama Law

Alabama's statute requiring abortion providers to obtain staff privileges at a local hospital has a long history. [6] In *Strange III*, the other case cited by the Supreme Court in *Hellerstedt*, the district court examined an Alabama law requiring "every doctor performing abortions in Alabama to 'have staff privileges at an acute care hospital within the same standard metropolitan statistical area as the facility is located that permit him or her to perform dilation and cutterage, laparotomy procedures, hysterectomy, and any other procedures reasonably necessary to treat abortion-related complications.'" 33 F. Supp. 3d at 1336. A clinic administrator who knowingly and willfully operated an abortion clinic with doctors who did not have such privileges faced felony criminal liability, and the State of Alabama could revoke the clinic's license for violations of the law. *Id.*

Relevant to the issue of an established "floor of care," prior to the challenged law, to be qualified to perform an abortion in Alabama, the physician had to either "have completed a residency or fellowship that included abortion training;" had to "maintain admitting privileges at a United States hospital that allow[ed] her to perform abortions at that hospital;" or had to "provide

---

[6] Alabama's staff privileges law was declared to restrict unconstitutionally the rights of women seeking abortions in Alabama. *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1381 (M.D. Ala. 2014) ("*Strange IV*") (supplementing liability opinion with evidentiary findings); *Strange III*, 33 F. Supp. 3d at 1378 (finding that the staffing privileges requirement was unconstitutional as applied to plaintiffs); *Strange II*, 9 F. Supp. 3d at 1276 (summary judgment opinion laying the foundation for the application of the undue-burden test); *Planned Parenthood Se., Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1290 (M.D. Ala. 2013) ("*Strange I*") (temporarily enjoining the enforcement of the staff privileges requirement)

verification from a disinterested, properly trained physician that she has sufficient skill at performing abortions." *Strange II*, 9 F. Supp. 3d at 1276. The pre-existing regulations in Alabama also included other specific provisions, including requiring the physician to remain at the clinic until the last patient left; providing the patient, after she leaves the clinic, with access to a 24-hour answering service that would immediately refer calls about complications to a qualified nurse, nurse practitioner, physician assistant, or physician; and to record every such call. *Id.* at 1276. Further, the law also required that each abortion clinic "have a physician on staff who has admitting privileges at a local hospital or to maintain a written contract with a 'covering physician.'" *Id.* at 1277. The then in-effect regulations required the covering physician to "have admitting privileges that permit her to perform 'dilation and curettage, laparotomy procedures, hysterectomy, and any other procedures necessary to treat abortion-related complications' at a hospital within the same metropolitan statistical area as the clinic" and that the affiliated doctor with admitting privileges be available "for 72 hours after the procedure to treat any complications that may arise" when performing abortions. *Id.*

In *Strange III*, the State argued that the staff-privileges requirement had two "strong justifications," both related to an interest in protecting women's health. 33 F. Supp. 3d at 1341. First, the State argued the requirement ensured proper care for complications, and second, the State argued the requirement had a secondary benefit of "'credentialing' high quality doctors." *Id.* In regard to continuity-of-care, the district court identified this concept as "the goal of ensuring that a patient receives high-quality care not only during a certain procedure but also after it, including treatment of complications and any necessary follow-up care" but conceded from the evidence "this is a somewhat elusive concept." *Id.* at 1363.

According to the *Strange III* court, three models emerged for ensuring continuity-of-care. There, the court termed these the first model, the second model, and the third model, also referring to the third model as the "country-doctor model." *Id.* at 1364-65. According to the court, the first model relies upon the 24-hour telephone access to a doctor or nurse at the abortion clinic at any time. Under this model, the doctor or nurse may give instructions for in-home treatment, schedule the woman for a follow-up visit at the clinic, or, if appropriate, direct the woman to the nearest emergency room to be assessed immediately or treated. If a patient needs to be transferred directly to a hospital from the clinic, which the court found is an admittedly rare circumstance, the abortion doctor should communicate with the emergency room doctor to provide continuity-of-care. *Id.* at 1364-65.

Under the second model, there is a covering physician or a doctor with admitting privileges. *Id.* at 1365. The court recognized that the baseline of Alabama's law regulating abortion providers at the time fell under this model. Under this model, the doctor who performs the procedure may arrange for a covering doctor to provide follow-up care for any complications that may arise after the procedure. Even under this procedure, however, if it is an urgent situation, the record evidence in *Strange III* established that it was more important for a patient to go to the nearest emergency room than to be treated by the initial doctor or covering physician. *Id.*

The third model or "country-doctor" approach required the physician who performed the initial procedure to provide consistently most care for complications that may arise, rather than relying on a covering physician, a transfer agreement, or the emergency room. 33 F. Supp. 3d at 1365. A specialist may need to be brought in for certain treatments, but the original doctor would handle nearly all complications. *Id.* The State argued, and the court agreed, that the challenged admitting privileges law fell into this category. *Id.*

Based on the evidence presented, the court determined that the third model advocated by the State fell "outside that range of disagreement" within the medical community regarding the appropriate model of complication care for minor surgeries and medication-based procedures, like early term abortion. *Id.* at 1364. In making this determination, the *Strange III* court recognized this about the nature and treatment of abortion complications:

> Most complications from such [early term] abortions closely resemble the complications from early-term miscarriages. The common complications from miscarriages, as well as medication and early-term surgical abortions, are bleeding, infection, and cramps. These complications sometimes arise because fetal tissue remains in the uterus or because the cervix fails to close fully after the fetal tissue is expelled. The treatment for these complications is the same, regardless of how the pregnancy ended.

> In extremely rare instances, other complications may arise which could not occur from a miscarriage. In the case of a medication abortion, an allergic reaction to the abortion drugs was the only possibility suggested by the evidence in this case. For a surgical abortion, it is possible that an instrument may perforate or lacerate the uterus.

> Most complications from early-term abortions do not require hospital treatment. Most minor complications which arise *during* the course of an early-term surgical abortion are treated at the abortion clinic before the patient is discharged. Moreover, as discussed above, most complications that arise *after* a patient has been discharged are best treated with over-the-phone instructions, prescription medication from a pharmacy, or a follow-up visit to the abortion clinic. However, even when hospital care is unnecessary, patients will sometimes seek emergency-room treatment without first contacting the provider. Indeed, in some cases, the woman may not be suffering from any complication at all, but may simply need reassurance.

> For the majority of complications which *do* require hospitalization, the appropriate treatment may include intravenous antibiotics or a further dilation and curettage to empty the uterus completely. The staff-privileges provision requires all abortion doctors to have local-hospital privileges that allow them to perform two specific, additional gynecological procedures: hysterectomy and laparotomy. Rare circumstances, such as a suspected uterine perforation, may require a laparotomy or the similar but less invasive laparoscopy, each of which involves examining the uterus or cervix and repairing any damage. In certain other extreme situations, a hysterectomy, or removal of the uterus, may be necessary. It is extremely rare that either a hysterectomy or laparotomy would be necessary following an abortion, even a later-term abortion. Indeed, with approximately 9,000 abortions performed

in Alabama each year, in most years not a single early-term abortion in the State would require either procedure.

*Id.* at 1365-66 (emphasis in original).

The *Strange III* court determined that the initial-screening aspect of the credentialing function provided negligible benefit, as compared to Alabama's pre-existing law. *Id.* at 1373. Further, the court determined that it was "left with the speculative assertion that hospital oversight, through staff privileges, would actually ensure that the physicians and clinics" would provide high-quality care and be an "effective supplement to the Department of Public Health oversight." 33 F. Supp. 3d at 1376. The court concluded that, to determine whether a regulatory decision grounded in such speculation would be an acceptable use of the State's police powers, the court was required to engage in the balancing test applied to abortion regulations. *Id.* As a result of engaging in that balancing test, the *Strange III* court concluded that, "[i]n the light of the severity of the obstacles presented by the requirement and the weakness of the State's justifications," the "obstacles imposed by Alabama's staff-privileges requirement are 'more significant than is warranted by the State's justifications for the regulation.'" *Id.* at 1378. The case was decided by the Honorable Myron H. Thompson.[7]

Later, in 2015, a licensed abortion clinic and doctor brought a challenge against an Alabama health officer claiming that Alabama's "floor of care" regulation—that to perform abortions a doctor had to have admitting privileges at a local hospital or the clinic had to contract with a covering physician who had such privileges—was unconstitutional as applied to the clinic

---

[7] Defendants appealed Judge Thompson's ruling in *Strange III*. On July 15, 2016, on the grounds that "Alabama's law is identical in all relevant respects to the law at issue in [*Hellerstedt*]," defendants moved to dismiss the appeal because they no longer had a "good faith argument that the law is constitutional under controlling precedent." *Planned Parenthood Se., Inc., et al., v. Luther Strange, et al.*, No. 16-11867, at 6 (11th Cir. 2016, July 15, 2016).

and doctor.  *W. Ala. Women's Ctr. v. Williamson*, 120 F. Supp. 3d 1296, 1303 (M.D. Ala. 2015).  This case also was assigned to Judge Thompson.  The challenged regulation had been in effect since 2007.  *Id.* at 1300.  It would have been superseded by the admitting privileges requirement challenged and struck down by Judge Thompson in *Strange III*.  *Id.* at 1300-01.

Five abortion clinics operated in Alabama at the time of *Williamson*, a case that followed *Strange III*.  Two clinics had physicians on staff who had local admitting privileges, and three operated by having a contract with a covering physician.  Those three clinics that operated by having a contract with a covering physician sued to enjoin the admitting privileges law as applied to the three clinics.  *Id.*

Until December 2014, the clinic in Tuscaloosa complied with Alabama's "floor of care" regulation by having a doctor on staff with local admitting privileges.  *Id.* at 1301.  That doctor retired in December 2014.  *Id.*  The Tuscaloosa clinic hired a replacement doctor, but that doctor lacked local admitting privileges.  120 F. Supp. 3d at 1301.  Further, the Tuscaloosa clinic could not find a covering physician willing to contract with it.  As a result, it brought an as applied challenge to Alabama's "floor of care" regulation.  *Id.* at 1301-02.

The Tuscaloosa clinic operated for 20 years, providing reproductive health services, including abortions, birth control, treatment for sexually transmitted infections, pregnancy counseling, and referral for adoption.  *Id.* at 1302.  By 2013, 40% of all abortions in Alabama took place at the Tuscaloosa clinic, far more than any other clinic in the state.  In fact, during that time, the Tuscaloosa clinic performed almost two and a half times more abortions than the next Alabama clinic.  Further, about 80% of abortion procedures performed there were performed prior to 10 weeks postfertilization, with almost 96% of abortion procedures being performed before 16 weeks postfertilization.  About 4% of abortions were performed mid-second trimester.  *Id.*  It was only

one of two clinics in Alabama that performed abortions throughout the first 20 weeks postfertilization, and it provided around 75% of Alabama's mid-second-trimester abortions. *Id.*

During its 20 years of operation, the Tuscaloosa clinic had never been placed on probation, suspended, or revoked for failure to meet any safety regulation. *Id*. at 1302. Further, during the most recent five year period, less than one-tenth of 1% of its patients were transferred to a hospital for observation or complication. 120 F. Supp. 3d at 1302. The clinic had never been closed for failing to treat its patients. *Id.*

After its long time doctor retired, the clinic hired Dr. Parker, a replacement doctor who was board certified in obstetrics and gynecology with subspecialty training in family planning, contraception, and abortion. *Id.* at 1303. He had over 20 years of experience in women's health, was on the faculty of Northwestern School of Medicine, and held admitting privileges there. *Id.* He performed abortions in a number of states, including Alabama and Mississippi, and when hired was providing abortions at the Montgomery clinic. *Id.* This doctor attempted to obtain admitting privileges himself in Tuscaloosa. *Id.* He was unable to do so because the hospital there required him to perform a number of hysterectomies and laparotomies, but according to the court "the reality is that, because Dr. Parker is a full-time abortion provider and because complications from abortions are so rare, he would never be able to do the required amount of procedures." 120 F. Supp. 3d at 1303. The record evidence indicated that, of the estimated 10,000 abortions Dr. Parker performed in the three years prior on women up to 20 weeks postfertilization, only two were transferred to the hospital, and one was transferred for observation only. *Id.* Dr. Parker had never had a patient who needed a hysterectomy from an abortion complication. *Id.*

Dr. Parker made a good faith effort to work with the hospital board, offering to perform the requisite number of procedures on other patients; he could not satisfy the requirement by

performing the procedure on his own patients, because his own patients would not need them due to the low complication rate from abortion. *Id.* Record evidence indicated that an agreement appeared to be reached to satisfy the hospital board's requirement in this way, but that agreement never materialized and instead quickly fell apart. *Id.* The hospital board reiterated its demand that Dr. Parker satisfy the required procedures by performing them on his own patients. *Id.* As the court recognized, this was "an impossible task for a full-time abortion provider . . . given the low number of complications from abortion." 120 F. Supp. 3d at 1303.

Dr. Parker and the Tuscaloosa clinic then attempted to contract with a covering physician instead. *Id.* at 1304. None of the physicians in the area agreed to contract, some citing anti-abortion views or the fear of reputational harm. *Id.* Dr. Parker and the Tuscaloosa clinic then applied for a waiver, citing Dr. Parker's safety record and the clinic's policies and procedures in place if complications were to arise, including a 24-hour hotline and a protocol for the clinic to communicate with any treating physicians at emergency rooms. *Id.* The request for waiver was denied. *Id.*

The court enjoined enforcement of Alabama's "floor of care" regulation as applied to the Tuscaloosa clinic, concluding that plaintiffs had a substantial likelihood of success on their argument that the Alabama "floor of care" regulation would have imposed an undue burden on a woman's right to choose to have an abortion in violation of the Due Process Clause of the Fourteenth Amendment. *Id.* at 1306-07. The court first examined the burdens. 120 F. Supp. 3d at 1307-12. The court then turned to examine the justifications for the challenged regulation. *Id.* at 1312.

Alabama justified the challenged regulation by claiming that the regulation was "meant to ensure that women who obtain abortions receive adequate complication-related care" and do so

"by authorizing two alternative models for continuity of care." *Id.* The court then analyzed the three possible models for continuity-of-care first articulated in *Strange III*. *Id.* Plaintiffs argued that the Tuscaloosa clinic's protocol was sufficient to ensure adequate continuity-of-care and that requiring the clinic to contract with a covering physician would not benefit patient health in any meaningful way. *Id.* at 1313. Plaintiffs argued this based on Dr. Parker's "extraordinary safety record" and the clinic's emergency-care protocol which it claimed was as effective at ensuring high-quality continuing of care as the covering physician model. *Id.*

The court reaffirmed its determination that "complications from early-term abortions which are the vast majority of the procedures performed at the [Tuscaloosa clinic] are 'vanishingly rare.'" *Id.* The court cited statistics that only 0.89% of first trimester abortions cause any complication of any kind and that only 0.05% of first trimester abortions cause a complication that requires hospital-based care. *Id.* The court concluded that "clinics do not make frequent use of their covering physicians because the procedures they perform are extremely safe and because, where possible, the clinics themselves provide complication care." *Id.* (citing *Strange III*, 33 F. Supp. 3d at 1370 n.23).

Further, the court observed:

Moreover, when a complication requires hospital admission, the regulation itself does not guarantee that a clinic patient would ever be seen by the covering physician, even if the Center were to contract with one. First, the regulation itself does not actually require a clinic to *make use* of the covering physician in the case of any complication: to comply with the regulation, a clinic need only maintain a contract promising the covering physician's availability. Second, if a patient who experiences complications lives outside the Tuscaloosa area—as do at least some of the Center's patients—the fact that the Center might have a contract with a covering physician who could admit her to the Tuscaloosa hospital is unlikely to affect her complication-related care in any way, as she will (and should) seek emergency care closer to home.

*Id.* (emphasis in original).

In the case of a patient transferred directly from the clinic to the hospital, the clinic was already required to "alert 911 and the hospital to the pending transfer; to provide the hospital's emergency department with necessary information about the patient's case; and to send a copy of the patient's medical records to the hospital along with the patient." *Id.* The emergency room doctor and staff, along with a hospital specialist, might examine the patient. *Id*. at 1314-15. The clinic would "communicate directly with the hospital and Dr. Parker would be available for consultation with the hospital's physicians at any time during the patient's course of treatment." 120 F. Supp. 3d at 1315.

If a contracted physician relationship existed, the court acknowledged the likely scenario that Dr. Parker would contact that contracted doctor at the soonest possible point in the process, that contracted doctor would meet the patient at the hospital to assume care, and that contracted doctor would in theory have a relationship with Dr. Parker. *Id.* Although, as the court observed, because complications from abortion procedures are rare, it is unclear whether Dr. Parker would be in regular communication or have a relationship with the contracted physician in reality. *Id.*

The court also noted that, if there were a contracted physician and if that contracted physician had staff privileges at the hospital nearest to the patient, then Dr. Parker and clinic staff might notify the contracted physician so that she could admit the patient to the hospital herself. *Id*. However, as the court determined, nothing in Alabama's regulation required Dr. Parker and the clinic staff to do so. *Id*.

Even if Dr. Parker and the clinic staff notified the contracted physician, the court determined that "there is no guarantee that the covering physician will reach the hospital to admit the patient before the patient is assessed or treated by the emergency-room physicians; that the covering physician will be any more knowledgeable about the patient or her condition than would

be the hospital physician; or that the covering physician will be any more qualified to treat the patient than would be the hospital physicians." *Id.* Further, the court determined that, because Dr. Parker and clinic staff continue to advocate for the patient directly with the hospital and provide consultation as necessary, the patient has an advocate for her care even after a transfer to the hospital. 120 F. Supp. 3d at 1320.

The court also concluded the clinic's policies ensured that patients received adequate continuity-of-care after discharge from the clinic. *Id.* The court determined that the current practice required that Dr. Parker be accessible for at least 72-hours following any procedure. *Id.* "[P]atients are provided 24-hour telephone access to the Center's medical staff." *Id.* The Court found that the patient could speak to a nurse or to Dr. Parker. If the patient needed to be assessed immediately, the Court noted that the nurse or Dr. Parker could advise the patient to go to the nearest hospital. *Id.* Further, the nurse or Dr. Parker could call the hospital ahead to provide any pertinent information about the patient or provide his contact information to the patient to provide to the hospital along with the request that the patient ask the hospital to contact Dr. Parker. *Id.* As a result of this benefits analysis, when weighed against the burdens of the regulation, the court enjoined the regulation as applied to Dr. Parker and the Tuscaloosa clinic. *Id.* at 1320.

### (3)    Examining Louisiana Law

Likewise, in *Kliebert I*, the district court examined Louisiana's Act 620 which required every doctor who performed abortions in Louisiana to have "active admitting privileges" at a hospital within 30 miles of the facility where the abortions were performed. 158 F. Supp. 3d at 484. The district court, given the controlling law of the Fifth Circuit at that time, applied rational basis review to determine whether Act 620 was rationally related to a legitimate state interest. *Id.* at 485.

In *Kliebert I*, doctors performing abortions at Louisiana's abortion clinics could not comply with the admitting privileges law, despite being given time to attempt to do so. *Id*. at 506-07. The court observed that there was no state or federal statute governing the rules for granting or denying hospital admitting privileges in Louisiana and that the process and rules varied from hospital to hospital. *Id*. at 491-92. Further, the court determined there was "no Louisiana statute which prohibits a Louisiana hospital or those individuals charged with credentialing responsibilities from deciding an application for admitting privileges based on the applicant's status as an abortion provider," regardless of the provider's competency. *Id*. at 495. In addition, Louisiana had no maximum time period within which applications had to be acted upon, so a hospital could effectively deny an application for admitting privileges by failing to act on it, without expressing the true reasons or any reasons for doing so. 158 F. Supp. 3d. at 533.

Based on record evidence, the court determined that Louisiana's abortion providers were not given privileges or given only limited privileges that did not meet the statutory requirement. *See id*. at 489. The resulting effect was an undue burden on the right of a large fraction of Louisiana women to an abortion, based on the record evidence. *Id*. at 533. As a result, the court determined Louisiana's Act 620 was facially unconstitutional. *Id*.

### (4)    Examining Mississippi Law

In *Currier*, the Fifth Circuit examined Mississippi's House Bill 1390 ("H.B. 1390") which required, as relevant to the dispute, that "[a]ll physicians associated with the abortion facility must have admitting privileges at a local hospital and staff privileges to replace local hospital on-staff physicians." 760 F.3d at 450. Prior to H.B. 1390's enactment, Mississippi law required that "abortion facilities have only a transfer agreement with a local hospital, a written agreement for backup care with a physician with admitting privileges, and at least one affiliated doctor with

admitting privileges." *Id.* (citation omitted).  In *Currier*, doctors performing abortions at Mississippi's only abortion clinic in Jackson could not comply with the admitting privileges law, despite being given time to attempt to do so.  *Id.* at 450-51.  As a result, the record indicated the only abortion clinic in Mississippi would close.  *Id.* at 452-53.  The district court, and the Fifth Circuit, determined plaintiffs met the undue burden requirement in the as-applied challenge and enjoined enforcement of the law.  *Id.* at 455, 459.  Both courts applied rational basis review to the proposed regulation as then required by controlling Fifth Circuit law at that time; the Supreme Court in *Hellerstedt* later rejected that lower level of scrutiny for abortion regulations.  *Id.* at 455, 459.

## (5)    Other States Surrounding Arkansas

Even in *Williams II*, cited by defendants, the court explained at the temporary restraining order stage in regard to a Missouri regulation very similar to Section 1504(d) of the Act that the court "harbor[ed] serious doubts that requiring the Columbia clinic to contract with an OB/GYN who will provide 24 hour a day, seven day a week treatment of all complications produces any benefit to women or the State."  296 F. Supp. 3d at 1140.  The court did not alter this view of the regulation's purported benefits at the preliminary injunction stage, despite denying the request for a temporary restraining order and preliminary injunction.  Case No. 17-4207-cv-c-BP, 2018 WL 2927775, at *5-7 (W.D. Mo. June 11, 2018).

The Court also notes that Oklahoma struck down an admitting privileges law.  *Burns v. Cline*, 387 P.3d 348, 354 (Okla. 2016) (holding that, in the light of *Hellerstedt*, Oklahoma's admitting privileges law "creates a constitutionally impermissible hurdle for women who seek lawful abortions.").  Tennessee, after *Hellerstedt*, agreed not to enforce an admitting privileges law that was being challenged.  *See Adams & Boyle P.C., et al. v. Herbert Slaterly, et al.*, Case

No. 3:15-cv-00705, Dkt. No. 60, at 2-3 (M.D. Tenn. April 14, 2017) (agreeing to enjoin permanently enforcement of, among other things, an admitting-privileges statute that was "similar to the provision[] struck down in [*Hellerstedt*] . . . .").

### c. Section 1504(d)'s Actual Benefits

Having these controlling and persuasive precedents in mind, the Court turns to examine the issues presented here. In regard to the state's interests, defendants' main argument is that this provision purportedly ensures continuity-of-care for the woman having the abortion (Dkt. No. 55, at 25). Defendants also claim that the Act's contracted physician requirement "protects not only the health of the woman having the abortion, but also the integrity, ethics, and reputation of the medical provider who performs it for her." (Dkt. No. 55, at 5). *See* Ark. Code Ann. § 20-16-1502(b) ("[I]t is the purpose of this subchapter to . . . protect women from the dangerous and potentially deadly off-label use of abortion-inducing drugs . . . .").

The Court begins its analysis of the state's claimed interest by examining the details of the contracted physician requirement. Section 1504(d) requires a contracted physician to agree to handle complications that arise from medication abortion, Arkansas Code Annotated § 20-16-1504(d)(1), but nothing requires the contracted physician actually to handle such complications. Defendants acknowledged in their questions at the 2018 preliminary injunction hearing that the Act does not require hands-on treatment from the contracted physician. As many other courts have observed, if the patient does not call the abortion clinic or the contracted physician, and instead presents her to a local emergency room, there is nothing to assure that the contracted physician will care for the patient who has complications from a medication abortion, see the patient before the complications arise, accompany the patient to the hospital, be able to admit the patient to that hospital, treat her there, visit her, or call her. *See e.g.*, *Van Hollen III*, 738 F.3d at 798 ("[N]othing

in the statute requires an abortion doctor who has admitting privileges to care for a patient who has complications from an abortion.  He doesn't have to accompany her to the hospital, treat her there, visit her, call her, or indeed do anything that a doctor employed by the hospital might not do for the patient."); *Williamson*, 120 F. Supp. 3d at 1315 (same).  If the medication abortion patient takes her additional pill or pills to complete the medication abortion procedure and has complications later near her home, but not near the clinic or the location where the contracted physician has admitting privileges, the patient is just as apt to call PPAEO's nurses or physicians or, in cases where necessary, go to the nearest hospital emergency room if she is experiencing complications—a hospital at which the contracted physician under this provision is not likely to have admitting privileges, especially in this case based on the patient population and the distances traveled by those patients as described by PPAEO and Dr. Ho  (Dkt. No. 2, de Baca Decl., ¶ 4).  Further, defendants suggested in questioning Dr. Ho at the 2018 preliminary injunction hearing that the requirement could be met by a physician who resides out of state.  Finally, Section 1504(d) does not actually require an abortion provider to use the contracted physician to treat complications or provide consultations regarding the same.  *See Williamson*, 120 F. Supp. 3d at 1315 ("[T]here is no guarantee that the covering physician will arrive at the hospital before the patient or before she is treated by the emergency-room doctor; will be any more knowledgeable about the patient than the hospital staff; or will be any more qualified to treat her.").

Given the mandatory language of Section 1504(d), it is unclear whether medication abortion providers would be required to provide only the contracted physician's phone number and hospital with admitting privileges, regardless of the distance involved or the level of emergency, or whether the option would still exist to provide the information and guidance PPAEO and Dr. Ho currently provide, and are required to provide and document under Arkansas law, to

their patients, including their contact information and advice to proceed to the nearest emergency room for troubling complications.

The contracted physician would be agreeing to be continuously on call, a difficult commitment. Defendants seem to suggest that PPAEO's phone line is deficient because it does not guarantee phone access to a physician at all times. That requirement is not part of the contracted physician requirement either. There is nothing in this provision that requires the contracted physician to manage his or her calls any differently than the record evidence establishes that PPAEO and Dr. Ho manage such calls, which is to staff the telephone line with either a doctor or nurse practitioners competent to answer questions and skilled enough to elevate concerns as necessary to a doctor trained and able to respond (Dkt. No. 84, Supp. Ho Decl., ¶ 12). This requirement also cannot be changed by PPAEO or Dr. Ho without jeopardizing their abortion facility license. *See* Ark. Admin. Code § 007.05.2-7(E) (requiring abortion facilities to provide patients with 24-hour access to telephone consultation).

Nothing in the challenged provision ensures that the contracted physician will be familiar with the details of the patient's case or be able to access timely and effectively her medical records. As other courts have observed, the likely scenario is that the contracted physician would contact PPAEO staff or Dr. Ho to obtain information about the patient's medical records. PPAEO and Dr. Ho are required to maintain medical records for all patients and are regulated by the Arkansas Department of Health in doing so. *See* Ark. Admin. Code § 007.05.2-9.

Nothing in the statute requires that the contracted physician have the ability or experience necessary to provide a surgical abortion; that is not a statutory requirement. PPAEO and Dr. Ho contend that "the vast majority" of hospitals do not provide abortions and do not provide admitting

privileges to physicians who provide abortions (Dkt. Nos. 57 at 20 n.12; 57-2, Fine Rebuttal Decl., ¶¶ 13-14).

The contract would be available to many upon demand, thereby assuring that the identity of the contracted physician would become public knowledge.  There is record evidence that physicians who provide abortion services, or otherwise associate themselves with this practice, subject themselves and their staff to protestors, harassment, potential violence, and professional isolation (Dkt. No. 30, Stulberg Decl., ¶¶ 13-17).  Ms. Williams testified that there are protestors at LRFPS' office almost every single day.  She had a letter mailed to 800 of her neighbors that included a photo of her, her address, and said that she is complicit in the murder of children.  Dr. Ho also described an article on the internet stating something like "Beware:  Dr. Stephanie Ho also works for Planned Parenthood" and other antiabortion websites that publish photos and personal identifying information regarding abortion providers.  Other courts to examine these types of regulations confirm this.  *See Schimel*, 806 F.3d at 917 (finding it is difficult for abortion providers to recruit physicians "because of the vilification, threats, and sometimes violence directed against abortion clinics and their personnel in states such as Wisconsin, in which there is intense opposition to abortion"); *Strange III*, 33 F. Supp. 3d at 1348-53 (finding it is difficult for abortion providers to recruit physicians "due to the severe professional consequences of [association with abortion] and the lingering threat of violence against abortion doctors, particularly in Alabama," including protestors who "threaten economic destruction for any doctor who enable[s] the provision of abortion").

Even if a willing physician could be found, there is record evidence that clinics or hospitals associated with the physician are not likely to be similarly inclined, and the provision requires disclosure of the hospital at which the contracted physician maintains admitting privileges and

which can handle any emergencies. There is record evidence that at least one Arkansas hospital system, UAMS, did not permit its physicians to work with PPAEO (Dkt. No. 29, Ho Decl., ¶ 6). Dr. Ho testified about harassment she perceived during residency as a result of her efforts to obtain training to provide abortion care and to provide abortion care, the impact her desire to provide abortion services had on her job search after residency, and the lack of physicians willing to associate publicly with her in practice or to go into practice with her. Ms. Williams testified that she is aware of one abortion doctor who lost his ability to practice in other states as a result of the rejection of his applications to multiple hospitals for admitting privileges. Other courts to examine these types of regulations also confirm this. *See e.g.*, *Van Hollen III*, 738 F.3d at 792 (referring to "pretexts" for denying abortion physicians admitting privileges); *Kliebert I*, 158 F. Supp. 3d at 491-97 (detailing difficulties experienced by abortion physicians who attempted to gain admitting privileges at various hospitals in Louisiana).

PPAEO and Dr. Ho maintain that their protocols already guarantee continuity-of-care (Dkt. No. 29, Ho Decl., ¶¶ 11-19). As an initial matter, PPAEO and Dr. Ho include record evidence that only a small subset of medication abortion patients experience complications (Dkt. No. 57-2, Fine Rebuttal Decl., ¶ 3). There is record evidence that, for most of the small number of patients who experience complications or need follow-up care, many can be, and are, treated at the clinic or health center, not a hospital (Dkt. No. 57-2, Fine Rebuttal Decl., ¶ 3). In those cases, a contracted physician could provide no benefit (*Id*.). The Court further notes that PPAEO has provided medication abortions in Arkansas since 2008, and the record contains evidence that it is "extremely rare" for PPAEO to refer a patient to a local emergency room or for a patient to go to an emergency room on her own due to medication abortion complications (Dkt. Nos. 29, Ho Decl., ¶ 16; 84, Supp. Ho Decl., ¶ 4). Dr. Ho testified that she has only once thought that one of her patients had

a true complication requiring emergency care. Ms. Williams testified that she has never referred a medication abortion patient to an emergency room. To the extent either party wishes to revisit the issue of the dangerousness of first and second trimester abortions, this Court determines that the Supreme Court has now spoken on this subject, and this Court is required to follow. *See Williams I*, 263 F. Supp. 3d at 733.

PPAEO and Dr. Ho contend that, as with any outpatient medical procedure, when patients are sent home from the health center, they are sent home with specific instructions for home care, directions on how to contact PPAEO if they are experiencing any concerns or complications, and an appointment for follow-up with PPAEO clinicians (Dkt. Nos. 2, de Baca Decl., ¶¶ 7-8; 57-1 de Baca Rebuttal Decl., ¶¶ 2-3). Contrary to defendants' assertions, there is no record evidence that those instructions direct patients just to go to the emergency department if they need care or otherwise indicate these patients are abandoned (Dkt. No. 29, Ho Decl., ¶¶ 11-19). Further, these instructions are set out and required by Arkansas regulation. Ark. Admin. Code § 007.05.2-8(B). That these instructions have been given to each patient is a matter PPAEO and Dr. Ho are required to document in medical records. Ark. Admin. Code § 007.05.2-9. The Arkansas Department of Health is tasked with ensuring compliance with the regulation. *Id.*

The record evidence demonstrates that, as required under Arkansas regulation, PPAEO instructs patients that, if they are experiencing a complication or concern, they should call PPAEO and speak to nurse practitioners or Dr. Ho, who are available 24 hours a day (Dkt. No. 84, Supp. Ho Decl., ¶ 12). The nurse practitioners cannot access patient medical records from outside the office; they can do so when they are in the office (*Id.*). If remote access is needed, the record indicates that the nurse practitioners may always contact a physician with remote access (*Id.*). Any calls made to the 24-hour hotline are entered into a patient's medical record on the next business

day (*Id.*).  Dr. Ho testified that those nurses can consult, as needed, with Dr. Ho or PPAEO's medical director, Dr. Moore.  Dr. Moore is board certified in obstetrics and gynecology, a fellow of the ACOG, licensed to practice medicine in Kansas, and a provider of both medication and surgical abortion with over 30 years of experience practicing medicine (Dkt. No. 84, Supp. Ho Decl., ¶¶ 12-13).  As necessary, Dr. Ho testified that the physician can speak directly to the patients.  In most cases, according to the record evidence presented by PPAEO and Dr. Ho, patients can be reassured over the phone or, if need be, arrangements are made for the patient to return to the health center for care (Dkt. No. 2, de Baca Decl., ¶ 9).

In what PPAEO and Dr. Ho describe as the "extremely rare" event that a case warrants more immediate treatment, PPAEO staff will refer a patient to a local emergency department, where she will obtain any necessary treatment from the hospital-based physicians (Dkt. Nos. 29, Ho Decl., ¶ 16; 84, Supp. Ho Decl., ¶ 4).  In Arkansas, if a medication abortion patient is referred to a local emergency department, at least one of PPAEO's physicians is notified (Dkt. Nos. 29, Ho Decl., ¶¶ 16-18; 57-1, de Baca Rebuttal Decl., ¶ 5).  Dr. Ho also testified that when she recommends a patient to an emergency room, she recommends that they go to the nearest one.  In the rare event that she believes the patient is experiencing a true emergency, Dr. Ho testified that she calls ahead to the emergency room to let them know that the patient is coming.  This practice is consistent with what Dr. Wilbur describes as common practice;  his affidavit points out that "[i]t is common for outpatient physicians to call the emergency room, even when that that physician is in a separate community, to inform us that they are sending their patient in for an evaluation, diagnosis, or treatment of a specific condition." (Dkt. No. 56, Wilbur Amend. Aff., ¶ 15).  There is record evidence that the PPAEO staff always follows-up with the patient the next day, requests

a release for hospital records from the patient, and arranges for the patient to receive any necessary follow-up care recommended by hospital physicians (Dkt. No. 57-1, de Baca Rebuttal Decl., ¶ 5).

Further, there is record evidence that, if a hospital physician ever needed information about a patient who arrived at the hospital, that physician could also reach PPAEO nurses, nurse practitioners, or physicians and PPAEO on-call physicians as necessary either during business hours or after hours, and PPAEO staff have access to patient health records, which are maintained electronically, even when they are out of the office (Dkt. Nos. 29, Ho Decl., ¶¶ 16-18; 57-1, de Baca Rebuttal Decl., ¶ 6; 84, Supp. Ho Decl. ¶ 12-13).  Again, the maintenance of medical records is a matter of Arkansas regulation.  Ark. Admin. Code § 007.05.2-9.  PPAEO and Dr. Ho maintain that this practice complies with the standard of care provided by other providers of outpatient care (Dkt. Nos. 29, Ho Decl., ¶ 19; 57-2, Fine Rebuttal Decl., ¶ 5).  As explained in this Court's analysis, other courts to have examined these issues agree.

PPAEO and Dr. Ho also maintain that this practice complies with the ACOG's Practice Bulletin 143, which states:

> Women who undergo medical abortion may need to access emergency surgical intervention, and it is medically appropriate to provide referral to another health care provider.  However, state or local laws may have additional requirements.
>
> Clinicians who wish to provide medical abortion services either should be trained in surgical abortion or should be able to refer to a clinician trained in surgical abortion.

The American College of Obstetricians and Gynecologists, *Medical Management of First-Trimester Abortion* (Practice Bulletin 143, March 2014) ("Practice Bulletin 143"), *available at* https://www.acog.org/~/media/Practice%20Bulletins/Committee%20on%20Practice%20Bulletins%20--%20Gynecology/Public/pb143.pdf?dmc=1.

Defendants dispute that PPAEO and Dr. Ho comply with the ACOG's recommendation but, in this Court's view, fail to cite with specificity what is missing from the protocol that the ACOG recommends. Contrary to defendants' assertions, this Court is not swayed on the record evidence before it currently that PPAEO and Dr. Ho's practice is inconsistent with the ACOG Practice Bulletin 143 (Dkt. No. 55, at 27-28). Consistent with ACOG's recommendation, PPAEO and Dr. Ho can and do refer patients in need of care to other providers and specifically "a clinician trained in surgical abortion" (Dkt. Nos. 57-1, de Baca Rebuttal Decl., ¶ 7; 57-2, Fine Rebuttal Decl., ¶ 9). PPAEO and Dr. Ho maintain that, in a small number of cases and after a repeat dose of medication if the patient chooses, patients will need a surgical procedure after their medication abortion has failed or is incomplete (Dkt. Nos. 29, Ho Decl., ¶ 17; 57-1, de Baca Rebuttal Decl., ¶ 7). Record evidence establishes that regimen for medication abortion utilized by PPAEO has a failure rate of less than 2% (Dkt. No. 57-2, Fine Rebuttal Decl., ¶ 37).

PPAEO and Dr. Ho make arrangements for referral of patients to other providers, depending on where the patient lives, for the surgical abortion (Dkt. No. 57-1, de Baca Rebuttal Decl., ¶ 7). The only surgical abortion provider in Arkansas is LRFPS (Dkt. Nos. 57-1, de Baca Rebuttal Decl., ¶ 7; 84, Williams Decl., ¶ 4). PPAEO and Dr. Ho also maintain that surgical completion does not require urgent or hospital-based care, and PPAEO and Dr. Ho state that they do not just refer their patients to the emergency department, despite defendants' claim (Dkt. Nos. 29, Ho Decl. ¶¶ 11-19; 57-1, de Baca Rebuttal Decl., ¶ 7). If medication abortion is not complete, Dr. Ho testified that she refers the patient to surgical abortion providers who are able to perform the type of procedure the patient requires and who are close geographically to the patient. PPAEO and Dr. Ho contend that their protocols for treating a patient experiencing a rare complication after medication abortion are both consistent with the standard of care and provide continuity-of-care

(Dkt. Nos. 29, Ho Decl., ¶¶ 11-19; 57-2, Fine Decl., ¶¶ 32-39). As explained in this Court's analysis, other courts to have examined these issues agree.

In their post-trial briefing, defendants, for the first time, raise the argument that Section 1504(d) provides a "floor of care" for private abortion providers in Arkansas. At this stage of the litigation, there is no evidence in the record that such providers operate in Arkansas. For example, defendants present data that Arkansas residents sought 2,039 surgical abortions in 2017, and non-residents sought 289 surgical abortions in Arkansas, for a total of 2,328 surgical abortions in Arkansas in 2017 (Dkt. No. 101-1, at 4-8). LRFP, the only surgical abortion provider in Arkansas, indicates that it conducted 2,334 surgical abortions in 2017 (Dkt. No. 84, Williams Decl. ¶ 8). The discrepancy between these data sets is not explained by the parties at this stage of the litigation. In any event, if private physicians unaffiliated with the three abortion clinics in Arkansas were conducting medication or surgical abortions, then the Court would expect the number of abortions reported by plaintiffs likely to be *lower* than those reported by defendants. This is not the case.

Furthermore, the Court notes that "[e]ach induced termination of pregnancy which occurs in [Arkansas] regardless of the length of gestation shall be reported to the [Division of Vital Records] within five (5) days by the person in charge of the institution in which the induced termination of pregnancy was performed." Ark. Code Ann. § 20-18-603(b)(1). If "the induced termination of pregnancy was performed outside an institution, the attending physician shall prepare and file the report." Ark. Code Ann. § 20-18-603(b)(2). Defendants—who presumably have access to such records—have presented none to the Court. At this stage of the litigation, given that there is no record evidence to indicate that private physicians are currently providing abortions in Arkansas, the Court declines to find that Section 1504(d) sets a "floor of care" for

these providers.[8]  To the extent this was the legislature's intent there are less restrictive means to accomplish this goal; given the record evidence presented at this stage, the Court is skeptical that any benefit is conferred by § 1504(d).

### d.  Defendants' Affidavits

As an initial matter, based on the factual determinations in *Hellerstedt*, it is established that any complications that arise after a medication abortion are exceedingly rare.  Dr. Ho has only once referred a medication abortion patient to the emergency room for what she believed as a true emergency, and Ms. Williams has never referred a medication abortion patient to the emergency room.  The types of issues that arise in rare emergent care situations, according to record evidence, are identical to those suffered by women experiencing miscarriage, who receive treatments in hospitals every day through emergency physicians and on-call specialists, if necessary (Dkt. No. 2, Fine Decl., ¶ 34).  Dr. Wilbur, an emergency physician and witness for defendants, appears to acknowledge this (Dkt. No. 56, Wilbur Amend. Aff., ¶¶ 12, 14).  Nothing in Dr. Wilbur's affidavit explains why the contracted physician requirement is better than the protocol PPAEO and Dr. Ho have in place currently (Dkt. No. 57-2, Fine Rebuttal Decl., ¶ 26).  Again, the lack of specificity still makes defendants' written submissions less compelling at this stage, and none of defendants' affiants except Dr. Solanky testified at the 2018 preliminary injunction hearing.

The limitations in § 1504(d) as identified by the Court seem not to be acknowledged or addressed by the individuals whose affidavits defendants submit.  Defendants' witness affidavits also do not specifically identify in relation to PPAEO and Dr. Ho's protocol—which is currently required under Arkansas regulations—what should be modified or how the contracted physician

---

[8]  Even if such providers do exist—and there is no evidence in the record that they do—there is no evidence that they exist in such numbers that would alter the undue burden analysis.

requirement serves to effectuate that modification. These witnesses' testimony offered by affidavit seems disconnected with the contracted physician provision and evidences unfamiliarity with PPAEO and Dr. Ho's existing protocol. Regardless of which party bears the burden in relation to the state's interest, the lack of specificity makes defendants' written submissions less compelling at this stage.

Dr. Harrison, the executive director of AAPLOG, states that "[s]ince complications from medical abortions are common, not rare, it is reasonable and medically necessary that the abortion provider have a concrete plan to quickly and effectively handle the predictable complications that arise after drug-induced abortion." (Dkt. No. 55-4, Harrison Decl., ¶ 40). Defendants argue that PPAEO's management of patient emergencies is insufficient to ensure continuity-of-care (*Id.*, ¶ 45). The Court determines that, in the light of the factual underpinning accepted by the majority in *Hellerstedt*, Dr. Harrison's statements regarding the incidence of complications from medication abortions must be rejected. Further, her statements are contradicted and disputed by record evidence presented in this case. Dr. Fine's rebuttal affidavit explains why the studies Dr. Harrison cites, for a variety of reasons, do not support her position (Dkt. No. 57-2, Fine Rebuttal Decl., ¶¶ 43-48, 56-57). The Court also considers that Dr. Harrison does not indicate that she provides abortions, medication or otherwise, in her practice. Dr. Harrison also notes that, since 2002, she has focused her professional activities on AAPLOG (Dkt. No. 57-2, Fine Rebuttal Decl., ¶ 3).

Defendants also present an affidavit from Dr. Breniman, who is of the opinion that the Act "ensures . . . continuity of care" (Dkt. No. 55-7, Breniman Aff., ¶ 7). The Court affords it little weight at this stage of the litigation given the record evidence as a whole. He states that admitting privileges "ensure that a physician is qualified and competent in his or her stated area of practice." (Breniman Aff., ¶ 4). Current Arkansas regulations require the medical director for an abortion

facility and any doctor performing an abortion in Arkansas to be licensed by the State of Arkansas. Ark. Admin. Code § 007.05.2-6(K). The record evidence is unclear as to what Arkansas hospitals require for admitting privileges and whether, based on what is required, acquiring admitting privileges provides any incremental evidence of qualification or competence over and above what Arkansas law currently requires. Further, the record does not include evidence that Dr. Breniman has provided abortions to his patients. In fact, plaintiffs allege that Dr. Breniman is a member of AAPLOG and is actively involved in anti-abortion politics (*see* Dkt. No. 57, at 17 n.10).

Scott Archer, M.D., who is Chief of Emergency Medicine for Saline Memorial Hospital and another defense witness, implies that admitting privileges are based on qualifications and competence as a practitioner (Dkt. No. 55-6, Archer Aff., ¶ 3). This Court also affords Dr. Archer's affidavit little weight at this stage of the litigation. There is record evidence, and other courts have determined, that although competence may be a factor in admitting privileges, other considerations are involved, many of which have nothing to do with competence, such as where a physician resides, whether the physician can meet a minimum number of admissions each year, or whether the physician has any faculty appointments (Dkt. No. 57-2, Fine Rebuttal Decl., ¶ 13). *See Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591 (8th Cir. 2009) (involving an economic credentialing policy and alleging as a result antitrust claims against the nonprofit hospital operator, nonprofit mutual insurance company and its subsidiary, operator of health maintenance organization, and health maintenance organization operator's owner); *see also Kliebert I*, 158 F. Supp. 3d at 492 n.25 (noting that the decision to grant admitting privileges may be swayed by many factors unrelated to competence, including but not limited to economic factors and views on abortion); *Williamson*, 120 F. Supp. 3d. at 1316 (same); *Van Hollen IV*, 94 F. Supp. 3d at 953 (same); *Strange III*, 33 F. Supp. 3d at 1338 (same). Dr. Archer also fails to indicate whether he

has ever performed a medication or surgical abortion. Indeed, Dr. Archer's affidavit does not clearly represent that he has ever treated a woman who presents with complications arising from an abortion; rather, he states, "In my experience, women who have abortions are not forthright with their past medical care." (Dkt. No. 55, Archer Aff., ¶ 7). Finally, plaintiffs allege that Dr. Archer has been involved for nearly two decades with the Central Arkansas Crisis Pregnancy Center, an organization "fundamentally opposed" to abortion (Dkt. No. 57, at 17 n.10).

Defendants also submit an affidavit from Lee G. Wilbur, M.D., a Professor of Emergency Medicine and Vice Chairman for the Department of Emergency Medicine at UAMS. Dr. Wilbur notes that "[s]maller facilities located in less populated, rural areas are less equipped to provide the highest level of care because of the availability of providers or specialists and the availability of equipment is limited." (Dkt. No. 56, Wilbur Amend. Aff., ¶ 6). Dr. Wilbur also states that "[t]he contracted physician requirement establishes a line of communication between the physician and a contracted physician with greater expertise." (*Id.*, ¶ 10). Dr. Wilbur also contends that, "[w]ithout this contracted physician requirement, [Dr. Wilbur] is left to arrange follow up with a local obstetrician/gynecologist that is unfamiliar with the patient, unfamiliar with the medication regimen she received, and unfamiliar with the staff and capabilities of the facility that provided the original procedure." (*Id.*, ¶ 16).

It remains unclear to the Court why Dr. Ho and PPAEO's physicians would not be able to serve this function of a line of communication for doctors like Dr. Wilbur, given there is record evidence that they do. In the rare event that she believes the patient is experiencing a true emergency, which she testified occurred one time in nearly five years of providing abortion care, Dr. Ho testified that she calls ahead to the emergency room to let them know that the patient is

coming. Any suggestion that the contracted physician would provide a better line of communication under these circumstances is not supported by record evidence at this point.

Dr. Wilbur also contends, contrary to the record before the Court, that "[t]he physicians that currently prescribe medication-induced abortion, the nurses that administer the medication, and the nurses that staff the hot-line for the abortion facilities in Arkansas are not trained to perform the surgical intervention necessary for complications associated with medication-induced abortions." (*Id.*, ¶ 10). The record evidence before the Court indicates that Dr. Ho is trained to perform surgical abortions, although she does not do so in Arkansas. Dr. Moore is trained to do so, as well. If Dr. Wilbur is implying that there are complications that a surgical abortion provider cannot address, then the Court questions why the contracted physician requirement is limited to medication abortion providers only. In this regard, the Act appears under-inclusive.

Further, Dr. Wilbur concedes that "I am not able to provide emergency (immediate) or urgent (1-3 days) surgical intervention for the complications associated with the medical and surgical abortion procedures. Any surgical interventions must be provided by a board-certified obstetrician/gynecologist." (Dkt. No. 56, Wilbur Amend. Aff., ¶ 13). He also concedes that the scope of practice for most emergency room doctors "does not include surgical management of complications related to miscarriage, medication induced abortion, or surgical abortion." (*Id.*). If the facts are as Dr. Wilbur states, the Court questions why the contracted physician requirement is limited to medication abortion providers only. Again, the Act appears under-inclusive.

The Court also notes that Dr. Wilbur does not point to any instance where he needed to contact a patient's original medication abortion provider and was unable to do so, resulting in a continuity-of-care gap. Further, the Court notes that many of Dr. Wilbur's representations about the benefits of a contracted physician requirement are general in nature. For example, Dr. Wilbur

states that without the contracted physician requirement, he is left to arrange follow-up with a physician who is "unfamiliar with the patient [and] . . . the medication regimen she received . . . ." (*Id.*, ¶ 16). Dr. Wilbur does not explain why the contracted physician would be any more knowledgeable about a particular patient than the staff at PPAEO or LRFPS. Further, he does not explain why he would need to contact an out-patient provider who is unfamiliar with the patient when a medication abortion patient already has an outpatient provider at PPAEO or LRFPS able to assist the patient.

According to the materials presented to the Court at this stage, the contracted physician likely will not have experience in providing abortions, will not have had prior contact with the patient, and will not have access to her records. Dr. Ho is experienced in providing medication abortions, and her supervisor at PPAEO, Dr. Moore, who is board certified in obstetrics and gynecology, a fellow of the ACOG, licensed to practice medicine in Kansas, and has over 30 years of experience in practicing medicine, including providing abortions, is an experienced provider of both surgical and medication abortions (Dkt. Nos. 29, Ho Decl., ¶ 4; 57-1, de Baca Rebuttal Decl., ¶ 4; 84, Supp. Ho Decl. ¶ 13). In fact, the contracted physician requirement does not actually require PPAEO or LRFPS to actually use the contracted physician, which illustrates the gap between the reality of the contracted physician requirement and its purported benefits. *See Williamson*, 120 F. Supp. 3d at 1314 ("[T]he regulation itself does not actually require a clinic to *make use* of the covering physician in the case of any complication . . . .") (emphasis in original).

Defendants also questioned at the 2018 preliminary injunction hearing whether the medical director for PPAEO could obtain admitting privileges in Arkansas so as to comply with the contracted physician requirement. However, defendants do not explain at any point what admitting privileges would do to better serve Arkansas women. Arkansas women currently served by

PPAEO are able to access and receive consultation now from the medical director for PPAEO if complications from medication abortion arise. It is unclear to the Court how admitting privileges add anything to this level of care already afforded Arkansas women.

Defendants also suggested at the 2018 preliminary injunction hearing that the contracted physician requirement may be satisfied by a non-obstetrician/gynecologist. This position, however, seems to undercut defendants' argument that Section 1504(d) confers a benefit, as Dr. Wilbur averred that "[n]o other physician specialty, other obstetrics/gynecology, receives specific training in the procedure, anticipated effects, or complication related to medication-induced abortion." (Dkt. No. 56, Wilbur Amend. Aff., ¶ 11). If non-obstetricians/gynecologists may satisfy the contracted physician requirement, the Court questions the benefits of the requirement.

Further, based on the record before the Court at this stage of the proceeding, the Court concludes, at least preliminarily, that emergency room physicians are well qualified to evaluate and treat most complications that can arise after a medication abortion, to the extent they arise, and, when necessary, have immediate access to consultation with on-call specialists (Dkt. Nos. 2, Fine Decl., ¶ 34; 29, Ho Decl., ¶¶ 11-19).

Defendants argue that abortion patients are unwilling to acknowledge they have had an abortion. This statement was repeated by defendants at the earlier preliminary injunction stage without record support. Dr. Ho's testimony is that she tells her patients to be forthright with emergency room personnel. Even if the Court assumes it to be true at this stage of the proceeding, it is unclear what the contracted physician requirement would do to change this circumstance. Whether the contracted physician requirement is implemented or not, if the patient does not acknowledge she has had a medication abortion and provide information to the treating emergency room physician, it appears to matter little if there is a contracted physician or a PPAEO physician

on stand-by to consult. Further, there is evidence in the record that this should not impact the ability of the hospital physician to care for these patients, given the similarity of miscarriage management to post-medication-abortion follow-up care (Dkt. Nos. 29, Ho Decl., ¶ 13; 57-2, Fine Rebuttal Decl., ¶ 25). Dr. Fine and Dr. Wilbur agree that patients are usually frank about their medical history and that hospital physicians are trained to elicit information from reluctant patients (Dkt. Nos. 56, Wilbur Amend. Aff., ¶ 9; 57-2, Fine Rebuttal Decl., ¶ 2).

For these reasons, the Court is skeptical, based upon the limited record before it, that Section 1504(d) sets a minimum standard of care that exceeds the pre-existing protocols followed by medication abortion providers in Arkansas and mandated by the state. This is especially so given that, as established by the Supreme Court, abortion in the first and second trimester is a safe procedure. *See Hellerstedt*, 136 S. Ct. 2302 (noting that rate of complications for first-trimester abortions is less than "one-half of 1%"); *Schimel*, 806 F.3d at 913 (noting rate of complications "is below 1 percent" and the rate of complications requiring hospitalization is "one-twentieth of 1 percent"); *Strange III*, 33 F. Supp. 3d at 1364 (noting that an abortion is "[s]afer than getting a shot of penicillin."); *see also June Med. Servs. LLC v. Kliebert*, 250 F. Supp. 3d 27, 61 (M.D. La. 2017) (same) ("*Kliebert II*").

The Court also rejects, at least at this stage of the litigation and on the record before it, defendants' alternative argument that the contracted physician requirement furthers the "integrity, ethics and reputation of the medical provider" who performs the abortion (Dkt. No. 55, at 5). On this record, there is no evidence Section 1504(d) furthers this interest any more than it furthers the asserted interest in women's health. As this Court explained, current Arkansas regulations require the medical director for an abortion facility and any doctor performing an abortion in Arkansas to be licensed by the State of Arkansas. Ark. Admin. Code §§ 007.05.2-6(K); 007.05.2-7(A)(1). The

record evidence is unclear as to what Arkansas hospitals require for admitting privileges and whether, based on what is required, acquiring admitting privileges provides any incremental evidence of qualification or competence over and above what Arkansas law currently requires. This argument has been examined and rejected by many other courts under circumstances similar to those presented here. *See Kliebert I*, 158 F. Supp. 3d at 522; *Strange III*, 33 F. Supp. 3d at 1378.

### e.    Quantifying Section 1504(d)'s Purported Benefit

At this point, on the record before it, the Court reaffirms that PPAEO's existing protocol casts doubt as to any benefit gained from the contracted physician requirement (Dkt. No. 2, de Baca Decl., ¶¶ 7-11). A careful review and balancing of the existing record evidence suggests that the state's overall interest in the regulation of medication abortions through the contracted physician requirement is low and not compelling. In making this determination, the Court has taken into account the degree to which the restriction is over-inclusive or under-inclusive, *see, e.g., Hellerstedt*, 136 S. Ct. at 2315, and the existence of alternative, less burdensome means to achieve the state's goal, including whether the law more effectively advances the state's interest compared to prior law, *see, e.g., id.* at 2311, 2314. The Court remains persuaded, for now, that PPAEO and Dr. Ho have established that Section 1504(d)'s contracted physician requirement does little if anything to advance Arkansas' "legitimate interest in protecting women's health." *Hellerstedt*, 136 S. Ct. 2311.

### 4.    Effects On The Clinics

This Court next turns to examine PPAEO's efforts to comply with Section 1504(d) and whether PPAEO can offer surgical abortions in Fayetteville. As discussed further below, this Court finds on the record before it at this stage of the proceeding that, despite trying to find a contracted physician, PPAEO and Dr. Ho cannot comply with the contracted physician

requirement (Dkt. No. 2, de Baca Decl., ¶ 12). Additionally, the Court finds that PPAEO and Dr. Ho cannot offer surgical abortions at the Fayetteville clinic because the clinic does not currently comply with state mandated regulations for facilities providing surgical abortion and would incur a financial burden in attempting to comply, even if it could do so.

### a.      Inability To Comply

*Casey* requires a contextualized inquiry into how an abortion restriction interacts with facts on the ground, not only on the law's direct effects.  505 U.S. at 887-895 (majority opinion); *see Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 915 (9th Cir. 2014).  Defendants claim that PPAEO has not made a serious effort to locate a contracted physician (Dkt. No. 101, at 9).  Specifically, defendants argue that PPAEO has only offered "token compensation" to potential contracted physicians and that LRFPS offers no proof that it offered any compensation to potential contract physicians (*Id*.).  Defendants acknowledge that PPAEO sent letters to "every ob-gyn [PPAEO] could identify," but defendants point out that this letter "criticiz[ed] the Arkansas General Assembly and denounc[ed] the contract-physician requirement as 'medically unnecessary.'" (*Id*., at 9-10).

PPAEO and Dr. Ho maintain that, in addition to the efforts undertaken in 2016 and explained at more length in this Court's Order's findings of fact, they compiled a list of every obstetrician/gynecologist in Arkansas using the physician directories of the Arkansas Medical Society and Arkansas State Medical Board and sent a letter in August 2017 to every one of those obstetrician/gynecologists (Dkt. No. 84, Supp. Ho. Decl., ¶ 16).  This letter described the contracted physician requirement and asked the recipients to "consider contracting with PPGP as required by the Act." (Dkt. No. 84, at 15).  This letter asked the recipients to "contact [PPGP] as soon as possible if you are interested in serving as a contracting physician and we can discuss

compensation and other logistics." (*Id.*).  The letter also invited the recipient to inform PPAEO if the recipient knew of any other physicians "with the requisite privileges who would be willing to serve as a contracting physician . . . ." (*Id.*).  Ms. Williams, the Clinical Director of LRFP, states that LRFPS "sent a letter to every obstetrician-gynecologist we could identify in the state, but were unable to retain a physician with privileges." (Dkt. No. 84, Williams Decl. ¶ 6).

Dr. Ho also called many of the identified obstetrician/gynecologists—at least 60 physicians were contacted via telephone by her or PPAEO's staff (Dkt. No. 84, Supp. Ho. Decl., ¶ 17).  These physicians would also have received the letter sent in August 2017.  Certain physicians or group practices informed PPAEO that they do not support a woman's right to access abortion and would not help PPAEO (*Id.*).  Others stated that they could not work with PPAEO, while at others the front staff "was so hostile once they heard that we were calling from Planned Parenthood that they would not even let us speak to the physicians and refused to take messages." (*Id.*).  Dr. Ho represents that, despite these efforts, PPAEO is still unable to satisfy the contracted physician requirement (*Id.*, ¶ 18).

There is evidence in the record that physicians who provide abortions or associate with physicians who provide abortions risk being ostracized from their communities and face harassment and violence toward themselves, their families, and their private practices (Dkt. No. 30, Stulberg Decl., ¶¶ 13-17).  Even if a physician is willing to take on these risks, there is evidence in the record that many private practice groups, hospitals, HMOs, and health networks will not permit physicians working for them to associate with abortion providers (Dkt. No. 30, Stulberg Decl., ¶¶ 9-12).  There is specific evidence that Arkansas's urban medical facility, the UAMS system, did not want to risk association with PPAEO or risk permitting its physicians to work with

PPAEO (Dkt. No. 29, Ho. Decl., ¶ 6).  Defendants have presented no information to the contrary on these points.

Other district courts have found that abortion providers face threats of physical violence and professional stigmatization.  *See Kliebert II*, 250 F. Supp. 3d at 51-53 (abortion doctors received threats as a result of affiliation with abortion clinics); *Schimel*, 806 F.3d at 917 (noting the "vilification, threats, and sometimes violence directed against abortion clinics and their personnel in states . . . in which there is intense opposition to abortion."), *cert. denied*, 136 S. Ct. 2545; *Williamson*, 120 F. Supp. 3d at 1303 (discussing possible violence, harassment, and stigma abortion providers face); *Strange III*, 33 F.Supp.3d at 1349-53 (describing the anti-abortion harassment and stigma that prevents physicians from associating with abortion providers, including protestors who "threaten economic destruction for any doctor who enable[s] the provision of abortion").  These dangers are magnified by Section 1504(d)'s requirement that the contracted physician make public his or her name and phone number.  Ark. Code Ann. § 20-16-1504(d)(3).

Several other courts have found that recruiting abortion providers, especially those able to obtain admitting privileges, is difficult due to significant threats to their livelihoods and safety as a result of their association with abortion, and other courts have found that hospitals are hesitant, if not hostile, to the prospect of granting admitting privileges to doctors who provide abortions. *See Schimel*, 806 F.3d at 917 (noting it is difficult for abortion providers to recruit physicians "because of the vilification, threats, and sometimes violence directed against abortion clinics and their personnel in states such as Wisconsin, in which there is intense opposition to abortion"); *Kliebert I*, 158 F. Supp. 3d at 506-17 (outlining results of continued efforts to comply); *Strange III*, 33 F.Supp.3d at 1348-49 (noting it is difficult for abortion providers to recruit physicians "due

to the severe professional consequences of [association with abortion] and the lingering threat of violence against abortion doctors, particularly in Alabama").

Finally, other courts have found that hospitals deny admitting privileges to abortion doctors for other various reasons. *See Van Hollen III*, 738 F.3d at 792 ("The criteria for granting admitting privileges are multiple, various, and unweighted."), *cert. denied*, 134 S. Ct. 2841 (2014). Other courts have analyzed the multiple factors that are considered when determining if a doctor should be granted admitting privileges, including how often the physician uses the hospital, the quantity of services provided to the patient at the hospital, the revenue generated by a particular admitting physician, and the physician's admission to a particular practice or academic faculty. *Id.*; *see Kliebert I*, 158 F. Supp. 3d at 506-17. In *Hellerstedt*, the Supreme Court noted that it would be difficult for doctors performing abortions at the El Paso, Texas, clinic to gain admitting privileges because "[d]uring the past 10 years, over 17,000 abortion procedures were performed at the El Paso clinic [and n]ot a single one of those patients had to be transferred to a hospital for emergency treatment, much less admitted to the hospital." 136 S. Ct. at 2312 (alterations in original). Or, in other words, abortion doctors are unable to gain admitting privileges because "abortions are so safe" that such doctors are "unlikely to have any patients to admit." *Id.*; *Van Hollen III*, 738 F.3d at 793 ("[T]he number of patient admissions by doctors who perform abortions is likely to be negligible because there appear to be so few complications from abortions and only a fraction of those require hospitalization . . . ."); *Williamson*, 120 F. Supp. 3d at 1303 (admitting privileges denied "because complications from abortions are so rare" that abortion doctor "would never be able to do the required amount of procedures.").

The record evidence at this stage of the litigation is consistent with the findings in the cases discussed above. There is record evidence that Arkansas doctors face threats to their livelihoods

and physical safety if they attempt to provide abortions, and this same hostility is likely to befall any physician willing to act as contracted physicians to abortion providers. Ms. Williams testified that "what it means to be an abortion provider is well-known throughout the medical community." She testified that this discourages physicians from affiliating with abortion providers, and she testified that it is and has been difficult for many years to recruit doctors and staff to associate with abortion providers in Arkansas. She has first-hand knowledge of those difficulties, addressed them, and addressed LRFPS' on-going efforts to recruit.

Dr. Ho testified that she has faced stigma since residency as a result of expressing her desire to provide abortion care. She explained the difficulties she faced in gaining employment or securing other doctors with whom to practice given her desire to perform abortions. She also testified that, while she was in medical school, faculty discouraged her from becoming an abortion provider. She testified that, if her name is searched on the internet, one of the results is an article titled "Beware, Dr. Stephanie Ho also works for Planned Parenthood."

Record evidence demonstrates that anti-abortion protestors regularly target LRFPS, based on Ms. Williams' testimony. There is record evidence that a doctor who works at LRFPS has been targeted by anti-abortion protestors, including protests at his home and his children's school. Ms. Williams also testified that anti-abortion advocates have targeted her personally. Ms. Williams offered testimony that anti-abortion activists sent a letter with her name, address, and picture to several hundred of her neighbors, which she considered to be a threatening act. This mailing stated that Ms. Williams was complicit in the murder of children. The record also contains evidence that one of LRFPS' prior clinical directors worked at a facility where one of the staff members was murdered. Ms. Williams also testified about the murder of George Tiller, an abortion doctor who was murdered at his church ten years ago in Kansas. Ms. Williams also testified that she, along

with many other staff members at LRFPS, maintains a concealed carry license to protect herself. Defendants attempted to counter this evidence by challenging when and in what states these events occurred. The Court is skeptical of any claim by defendants that this issue—abortion—causes less division or incites fewer passionate views in our society today as compared to the recent past or in Arkansas as compared to neighboring states.

The Court also is skeptical that the compensation offered by plaintiffs or that any compensation to be offered would be enough to overcome these obstacles. These obstacles very likely keep even those doctors in Arkansas who may not have a moral or ethical opposition to abortion from providing abortions or serving as contracted physicians. *See Strange III*, 33 F. Supp. 3d at 1355 ("[T]he inability to obtain local abortion doctors is not a matter of money, but rather a reflection of the difficulty of pursuing that occupation in the State."). Further, there is record evidence that, even in the light of widespread publicity surrounding this case, no doctor stepped forward to fulfill the contracted physician requirement, though some did make calls in support of PPAEO and LRFPS's efforts to provide abortion care and explained why they believed they were not in positions to serve as the contracted physician. The record evidence shows that there is a stigma associated with being an abortion provider in Arkansas that impacts safety, economics of medical practice, job opportunities, and perceived standing in the community. This stigma will make it difficult for PPAEO to find a contracted physician.

In regard to the suggestion that abortion providing doctors could obtain admitting privileges themselves, Ms. Williams testified that a physician working at LRFPS previously had admitting privileges at a rural Eastern Arkansas hospital at some point in his career, but those admitting privileges lapsed because he was not admitting enough patients to maintain them. The record evidence also shows that the physician reviewed one or more applications for admitting

privileges, but he determined he could never meet some of the requirements, including but not limited to the requirement for the number of patients admitted per year to maintain such privileges and participation with faculty meetings on a very regular basis. The record evidence also indicates that LRFPS entered into discussions with another doctor as a potential contracted physician, but this doctor was threatened with losing or lost his ability to practice in other states as a result of the rejection of his applications to multiple hospitals for admitting privileges because he did not meet the qualifications like the number of patients admitted. Ms. Williams did admit that she was not aware of any doctor contacted by LRFPS who actually filed an application with any Arkansas hospital for admitting privileges since 2015.

After the 2018 preliminary injunction hearing, the Court admittedly has lingering questions regarding PPAEO's efforts to comply with the contracted physician requirement, but the record evidence overall at this stage of the litigation weighs solidly in favor of PPAEO. A lingering question arises due to Dr. Ho's relationship with a group of physician hospitalists who had admitting privileges at Sparks when this regulation took effect. However, such a relationship falls short of fulfilling the contracted physician requirement because there is no evidence in the record that Dr. Ho had admitting privileges herself or that this group of hospitalists was or would be willing or qualified to serve as the contracted physician. The Act sets forth specific requirements the contracted physician must meet, and there is no evidence in the record any of these physicians qualified or willing to serve in the contracted physician role. Further, there is no record evidence that Sparks would be willing to serve as the hospital granting admitting privileges to the contracted physician. LRFPS also attempted to comply through its own efforts and failed to do so. Moreover, when given extended time by other courts in an effort to comply with comparable regulations, no

doctor in a surrounding state has been able to do so. *See Kliebert I*, 158 F. Supp. 3d at 522; *see also Currier*, 760 F.3d at 450.

For all of these reasons, the Court finds that, based on the record evidence at least at this stage of the litigation, it is highly unlikely that the abortion clinics in Arkansas will be able satisfy Section 1504(d)'s contracted physician requirement.

### b.      Inability To Offer Alternative Services

The burden the Court is asked to examine also exists because of plaintiffs' purported inability to provide surgical abortion at its Fayetteville clinic. In evaluating this claim, the Court acknowledges that, at the 2018 preliminary injunction hearing, Dr. Ho testified that she has never spoken with the landlord of the Fayetteville clinic nor did she know if her staff members or colleagues had ever spoken to the landlord of the Fayetteville clinic to determine if that landlord would be possible to renovate the premises of the clinic. She also testified that she did not know if the landlord had ever been contacted regarding other available locations for a surgical abortion clinic in Fayetteville. Dr. Ho testified that she did not know if there are other properties in Fayetteville that PPAEO could lease.

To renovate its current Arkansas health centers, PPAEO would incur considerable expense which Dr. Ho represents PPAEO cannot afford at this time (*Id.*). PPAEO represents that it does not have a sufficient budget to make these moves (Dkt. No. 57-1, de Baca Rebuttal Decl., ¶ 8). Further, PPAEO maintains that the stigma against abortion providers in Arkansas makes it extremely difficult for PPAEO to locate and secure real estate, as landlords and sellers are unwilling to work with PPAEO (Dkt. No. 57-1, de Baca Rebuttal Decl., ¶ 8; Dkt. No. 30, Stulberg Decl., ¶ 14). Other federal courts have acknowledged the obstacles facing landlords who lease properties to abortion providers. *See Miller*, 299 F. Supp. 3d at 1259 ("Anti-abortion protestors in

Alabama have targeted the landlords that lease space to organizations and individuals that provide abortions. After demonstrations targeted the former landlord of the Tuscaloosa clinic, the landlord did not renew the clinic's lease.").

At this stage of the proceeding and based upon the record evidence, the Court concludes that it is unlikely PPAEO will be able to lease or purchase new facilities in Fayetteville and offer surgical abortions in sufficient time to ameliorate the substantial burden imposed on a large fraction of Arkansas women seeking medication abortion in Fayetteville. Based on evidence presented at the preliminary injunction hearing, the Court is more skeptical about PPAEO's inability to provide a facility for surgical abortions in the future. However, a few points have to be acknowledged as uncontroverted at this stage of the litigation. First, PPAEO is not positioned today to provide surgical abortion in Fayetteville. That fact creates the burden this Court is asked to analyze here. The current PPAEO Fayetteville clinic does not meet state mandated requirements for providing surgical abortion, and that is not disputed on the record evidence. The state mandated requirements for providing surgical abortion are not newly enacted and are not the subject of the current challenge. Second, even if PPAEO could provide surgical abortion in Fayetteville at some point in the future, it has to be recognized that, to provide surgical abortion in Fayetteville, PPAEO will incur some economic cost to comply with state mandated regulations. Record evidence is that PPAEO will have to pay for facility upgrades to meet state mandated requirements to provide surgical abortion—whether that is renovation costs, increased rent costs even if the landlord "builds to suit" as defendants suggest is possible, or building a facility of its own that complies. This Court has no record evidence regarding anticipated cost to comply with this existing state regulation for surgical abortion, unlike in *Hellerstedt.* 136 S. Ct. at 2302-03. Shifting that cost to private entities to ameliorate the substantial burden imposed on a large fraction of Arkansas

women seeking medication abortion in Fayetteville due to the impact of the contracted physician requirement, when there is little to no benefit to the Act, convinces this Court that, at this stage of the litigation, this factor tips in favor of plaintiffs.[9]

### 5. Out-Of-State Clinics And Patients

This Court, in its prior preliminary injunction and temporary restraining Orders, declined to consider the availability of abortions at out-of-state clinics when determining if the contracted physician requirement imposes an undue burden on women seeking medication abortions in Arkansas (Dkt. Nos. 60, at 66-67; 114, at 49-50). Other federal courts have held that States may not outsource their duty to protect the constitutional rights of their citizens. *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 457 (5th Cir. 2014), *cert denied*, 136 S. Ct. 2536 (2016) (holding that the undue-burden analysis "focuses solely on the effects within the regulating state") *See Schimel*, 806 F.3d at 918 (rejecting argument that the availability of second-trimester abortions in Chicago could justify the closure of Wisconsin's only abortion clinic); *see also Strange III*, 33 F. Supp. 3d at 1360-61 (even if out-of-state providers were considered, 80 mile distance to out-of-state clinic means the "threshold difficulties related to losing an abortion clinic in her home city" still present a burden).

Plaintiffs' position finds additional support in *State of Missouri ex rel. Gaines v. Canada*, 305 U.S. 337 (1938). There, the Supreme Court held that the University of Missouri law school could not deny Gaines admission to the school on the basis of his race, even though the University

---

[9] Defendants cite *Harris v. McRae*, 448 U.S. 297 (1980), to support their argument that plaintiffs' "unwillingness to invest in providing surgical abortions cannot render Arkansas's contract-physician requirement unconstitutional." (Dkt. No. 140, 35). The Court recognizes that Arkansas is allowed to subsidize unequally abortion versus other medical services. *See Harris*, 448 U.S. at 315. Here, however, on these facts, the Court determines that it must apply *Casey*, not *Harris*.

offered him a stipend to use at a law school in an adjacent state. *Id.* at 342. The Supreme Court reasoned that:

> [T]he obligation of the State to give the protection of equal laws can be performed only where its laws operate, that is, within its own jurisdiction . . . . That obligation is imposed by the Constitution upon the States severally as governmental entities,— each responsible for its own laws establishing the rights and duties of persons within its borders. It is an obligation the burden of which cannot be cast by one State upon another, and no state can be excused from performance by what another State may do or fail to do. That separate responsibility of each State within its own sphere is of the essence of statehood maintained under our dual system.

*Id.* at 350.

While *Gaines* was an equal protection case—this is a due process case—the Court finds that its logic applies here. *See Currier*, 760 F.3d 448, 457 (citing *Gaines* for the proposition that Mississippi could not rely upon neighboring states to reduce the undue burden placed on women by abortion restrictions). Further, the text of the Due Process Clause is clear: no "State" shall "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. This constitutional command is directed at the States, and "no State can be excused from performance by what another state may do or fail to do." *Gaines*, 305 U.S. at 350.

The Court acknowledges that the Supreme Court did not address whether out-of-state abortion facilities should be considered in the undue burden analysis. *See Hellerstedt*, 136 S. Ct. at 2304. Prior to the Supreme Court's ruling in *Hellerstedt*, the Fifth Circuit reversed the district court's finding that abortion restrictions were unconstitutional as-applied to the El Paso clinic because women in El Paso could and did use abortion providers in nearby New Mexico. Specifically, the Fifth Circuit noted that, if the El Paso clinic closed, there was an abortion facility "approximately twelve miles away in Santa Teresa, New Mexico," and that "independent of the actions of the State," "Texas women regularly *choose to have an abortion in New Mexico*." *See Cole*, 790 F.3d at 596-97 (emphasis in original). Still, rather than upholding the Fifth Circuit's

decision, the Supreme Court reversed the Fifth Circuit's decision and found that the same statute at issue in *Cole* was facially unconstitutional because it imposed an undue burden on women seeking abortions. *Hellerstedt*, 136 S. Ct. at 2318.

Here, citing no legal authority in support of their position, defendants urge this Court to consider the availability of abortions in Tulsa, Oklahoma,[10] when determining whether Section 1504(d) unduly burdens women seeking medication abortions in Arkansas.

Given the legal authorities reviewed by this Court and the possibility that a neighboring state might unilaterally alter access to abortion, the Court declines to consider out-of-state abortion providers in this analysis. This Court infers that if the availability of an out-of-state abortion provider within 12 miles of the Texas border was not enough in *Hellerstedt* to ameliorate the burdens imposed by Texas' surgical-center requirement, then the approximately 90 mile distance between Fayetteville and Tulsa, Oklahoma, will not relieve any undue burden created by Section 1504(d)'s contracted physician requirement. Because defendants continue to focus on this point, to give fair consideration, the Court engages in an examination of how abortions in Tulsa, Oklahoma, might impact outcomes.

### 6. Burdens Imposed By Section 1504(d) Throughout Arkansas

The Court will first analyze whether the burdens created by Section 1504(d) entitle plaintiffs to facial relief. Plaintiffs represent they are entitled to facial relief because, if the contracted physician requirement of the Act goes into effect, only one health center in the state—located in Little Rock—will provide abortions (Dkt. No. 84, Williams Decl., ¶ 4). They also represent that these abortions will only be surgical. There is record evidence that, if Section

---

[10]   The record contains no evidence of other abortion clinics that may be closer to Fayetteville, Arkansas, than the one in Tulsa, Oklahoma.

1504(d) takes effect, all three Arkansas health centers will no longer offer medication abortion (Dkt. No. 84, Supp. Ho. Decl., ¶ 3; Williams Decl., ¶ 7). In sum, plaintiffs argue that because Section 1504(d) effectively bans medication abortions throughout Arkansas and leaves surgical abortion in Little Rock as the only method and location of abortion in Arkansas, Section 1504(d) is facially unconstitutional.

### a.    Women For Whom The Regulation Is Relevant

To evaluate the burdens imposed by the contracted physician requirement, the Court must first define the group of women whose burdens must be analyzed. *See Hellerstedt*, 136 S. Ct. at 2320 ("[T]he relevant denominator is 'those [women] for whom [the provision] is an actual rather than an irrelevant restriction.'") (quoting *Casey*, 505 U.S. at 895 (majority opinion)). When this Court first analyzed this question, it was unclear if the "denominator" in the "large fraction" analysis was "all women of child-bearing age in Arkansas" or "all women seeking a medication abortion in Arkansas." In the interim, the Supreme Court decided *Hellerstedt* and reaffirmed that a law creates an undue burden when it places a "substantial obstacle to a woman's choice" in "a large fraction of the cases in which" it "is relevant." 136 S. Ct. at 2313 (quoting *Casey*, 505 U.S. at 895 (majority opinion)). Furthermore, the Eighth Circuit held that "because the contract-physician requirement only applies to medication-abortion providers, the 'relevant denominator' here is women seeking medication abortions in Arkansas." *Jegley*, 864 F.3d at 958 (citing *Hellerstedt*, 136 S. Ct. at 2320).

### b.    Examining The "Large Fraction" Test

The Court next turns to examine the "large fraction" test. Defendants cite, and urge this Court to follow, the Sixth Circuit Court of Appeals' 2006 decision in *Cincinnati Women's Services, Inc. v. Taft*, 468 F.3d 361 (6th Cir. 2006), when assessing the large fraction. In *Taft*, the

Sixth Circuit determined that Ohio's requirement that women receive an informed-consent lecture in person at least 24 hours prior to obtaining an abortion would be an almost insurmountable barrier for only about 12% of Ohio women. *Id.* at 364-65, 372-73. Specifically, analyzing the impact of the informed-consent requirement, the Sixth Circuit found that

> [O]f every 1000 women who seek an abortion, 50 to 100 are excused by the clinic from an in-person informed-consent meeting. According to the facts provided by the clinics, 6 to 12.5 of those 50 to 100 excused women will face a substantial obstacle in obtaining an abortion if forced to comply with the In–Person Rule. Therefore, for approximately 6 to 12.5 women out of every 1000 women seeking an abortion, the state's In–Person Rule would likely deter them "from procuring an abortion as surely as if [Ohio] has outlawed abortion in all cases." *Casey,* 505 U.S. at 894.

*Id.* at 373. The Sixth Circuit found that, accepting the relevant denominator as "all women presently excused by the clinic from the clinic's own in-person informed-consent requirement," the informed-consent requirement did not burden a "large fraction" because "[a]lthough a challenged restriction need not operate as a *de facto* ban for all or even most of the women actually affected, the term 'large fraction,' which, in a way, is more conceptual than mathematical, envisions something more than the 12 out of 100 women identified here." *Id.* at 373.

The parties concede that the Eighth Circuit addressed the "large fraction" test articulated in *Casey* in *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1462 (8th Cir. 29915) (Arnold, J.), *cert. denied sub nom.*, 116 S. Ct. 1582 (1996), but the parties do not agree on the characterization of the holding or application of that holding to this type of abortion restriction. At least one other district court has examined the "large fraction" test and undue burden analysis the Eighth Circuit applied in *Miller*. *See Planned Parenthood Minnesota, North Dakota, South Dakota v. Daugaard*, 799 F. Supp. 2d 1048 (D. S.D. 2011) (Schreier, J.).

Most recently, the Fifth Circuit Court of Appeals held that 17% was not a "large fraction." *Whole Woman's Health v. Cole*, 790 F.3d 563, 588 (5th Cir. 2015). The *Cole* Court used "women

of reproductive age" as the denominator in the calculation. *Id*. This decision was reversed and remanded by the Supreme Court's decision in *Hellerstedt* a year later. 136 S. Ct. at 2320 (noting that the "large fraction" referred to "a class narrower than 'the class of *women seeking abortions* identified by the state'") (quoting *Casey*, 505 U.S. at 894-95) (majority opinion) (emphasis in original). This Court acknowledges that the percentage affected by the restrictions at issue in *Cole* may be higher on remand if, as the Supreme Court suggests in *Hellerstedt*, a class of women narrower than "all women of reproductive age" is used as the denominator. The Court applies the "large fraction" test as it understands it from *Hellerstedt*, *Casey*, *Miller*, and *Jegley*.

In this case, the Eighth Circuit expressed skepticism that 4.8 to 6.0% is sufficient to qualify as a "large fraction." *Jegley*, 864 F.3d at 959 n.8 (citing *Taft*, 468 F.3d at 374).[11] The Eighth Circuit reversed and remanded this Court's prior preliminary injunction, determining that, "in order to sustain a facial challenge and grant a preliminary injunction," this Court is "required to make a finding that the Act's contract-physician requirement is an undue burden for a *large fraction of women seeking medication abortions in Arkansas*." *Id*. at 959 (emphasis added). The Eighth Circuit held that this Court "did not make this finding," noting that this Court's prior findings of fact "did not determine how many women would face increased travel distances," nor did they "estimate the number of women who would forgo abortions." *Id*. Accordingly, in making these findings of fact, the Court follows the Eighth Circuit's direction and uses those "women seeking medication abortions in Arkansas" as the denominator of the "large fraction" test.

---

[11] To illustrate its point, in a footnote, the Eighth Circuit proposed one possible numerator to determine whether a "large fraction" of women are burdened by the contracted physician requirement in this case. In this footnote, the Eighth Circuit focused only on those women living in Washington County, Arkansas, who, as a result of the contracted physician requirement, will not receive *any* abortion, medication or otherwise. For reasons explained in this Order, focusing only on the impact in Washington County, Arkansas, overlooks the broader impact this regulation will have on women in surrounding counties, given Arkansas' geography.

### c.     Analyzing Burdens Imposed By Section 1504(d)

The Court now turns to analyze and attempt to quantify based on the record evidence at this stage of the proceedings the burdens imposed by the contracted physician requirement upon those women in Arkansas who would otherwise have received a medication abortion.  Below, the Court makes the findings requested by the Eighth Circuit in *Jegley*.

First, the Court describes the burden imposed due to the effective ban on medication abortions in Arkansas.  The record evidence before the Court at this stage of the proceedings shows that medication abortion will no longer be available in Arkansas for any woman who might choose that method of abortion over surgical abortion or for any woman for whom medication abortion is medically necessary or preferred.

Second, the Court observes that the contracted physician requirement will effectively deny Northwest Arkansas an operational abortion clinic.  Only one area of Arkansas, in Little Rock, will have a provider that performs surgical abortions.  Plaintiffs maintain that the contracted physician requirement is burdensome, in part, because it requires women seeking an abortion who live significant distances from LRFPS to make two lengthy trips to have an abortion—one for the informed consent appointment mandated by Arkansas Code Annotated § 20-16-1703 and a second for the surgical abortion itself.[12]  Several burdens flow from this, as explained below.

---

[12]  The Court presumes, based upon the record evidence, that a surgical abortion in Arkansas requires two round-trips:  the first for the 48-hour waiting period requirement and the second for the procedure itself.  The Court notes that Texas' pre-existing regulatory framework, which was analyzed in *Hellerstedt*, required a women to wait 24 hours after receiving state-mandated information, but this requirement could be shortened to a two-hour wait if the woman certified that she lived more than 100 miles from her nearest abortion provider.  *Cole*, 790 F.3d at 594.

Third, the Court analyzes the burden on women who will not obtain an abortion at all because medication abortions are no longer available in Fayetteville and traveling to Little Rock for a surgical abortion will present too great a burden. The Court finds credible and determines that a percentage of women will entirely forgo an abortion as a result of the contracted physician requirement, and the Court quantifies, using various metrics, what percentage of women seeking medication abortions in Arkansas will face this burden.

Fourth, the Court discusses the burden that falls upon those women who must, as a result of the contracted physician requirement, travel to Little Rock for a surgical abortion. These women, who would otherwise have sought medication abortions in Fayetteville, will opt to travel to Little Rock to obtain a surgical abortion but will face a burden in doing so.

Fifth, the Court discusses the potential burden facing all women who will seek an abortion at Arkansas' sole remaining abortion clinic in Little Rock. The number of clinics in Arkansas offering abortion services will be reduced. This decrease in providers will burden Arkansas women who seek medication abortion and also burden all Arkansas women who seek abortion, as explained. With all of these burdens considered individually and collectively, and cognizant of the fact that "the 'large fraction' standard is in some ways 'more conceptual than mathematical,'" the Court makes the finding that, at this point in the litigation on the limited record evidence before it, "in a large fraction of the cases in which [the contracted physician requirement] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895 (majority opinion); *see Hellerstedt*, 136 S. Ct. at 2318 (striking down an admitting privileges requirement because the law "provides few, if any, health benefits for women" and "poses a substantial obstacle to women seeking abortions"); *Jegley*, 864 F.3d at 959 ("[I]n order to sustain a facial challenge and grant a preliminary injunction, the district court was required to

make a finding that the Act's contract-physician requirement is an undue burden for a large fraction of women seeking medication abortions in Arkansas."); *id*. at 690 n.9 ("The question here . . . is whether the contract-physician requirement's benefits are substantially outweighed by the burdens it imposes on a large fraction of women seeking medication abortion in Arkansas.").

### (1) Burdens Imposed: Effective Ban On Medication Abortions

First, the Court finds that every woman in Arkansas seeking a medication abortion faces a burden due to the contracted physician requirement. The parties agree that, as a result of the contracted physician requirement and plaintiffs' inability to comply with it, none of the three existing abortion clinics in Arkansas will offer medication abortions. There is no exception to the contracted physician requirement, so every woman seeking a medication abortion in Arkansas is affected by the unavailability of such abortions in Arkansas.

While the Court acknowledges that the lack of medication abortion in Arkansas does not ban pre-viability abortions in the state, the record evidence indicates that some women "have a very strong preference" for medication abortions as opposed to surgical ones (Dkt. No. 84, Supp. Ho Decl., ¶ 23).[13] Both Dr. Ho and Ms. Williams testified to this at the 2018 preliminary injunction hearing. Dr. Ho asserts that this finding is "consistent with [her] own personal experience," as some of her patients are afraid of surgical procedures, others feel that a medication abortion is "more natural than a surgical abortion and is more like a miscarriage," and still others "want to

---

[13] In their post-trial briefing, defendants argue that, citing two studies without sponsoring witnesses, there is record evidence that fewer women prefer medication abortions (Dkt. No. 140, at 32-33). These studies, which the Court discussed *supra*, are based upon medication abortion regimens that are unlike the one currently used in Arkansas. Accordingly, the Court gives little weight to the findings of those studies as applied to Arkansas women.

complete the procedure in the privacy of their own homes or in the presence of their support person or loved ones." (*Id.*, ¶ 24).

Defendants point to a finding by the Sixth Circuit that "these statements give rise to the inference that some women prefer a medical abortion over a surgical abortion, but they do not support the conclusion that the unavailability of a medical abortion would create a *substantial obstacle* for a large fraction of women in deciding whether to have an abortion." *Planned Parenthood Southwest Ohio Region v. DeWine*, 696 F.3d 490, 516 (6th Cir. 2012) (emphasis in original). Here, the record evidence indicates that some women who seek abortions have a strong preference for medication abortions (Dkt. No. 84, Supp. Ho Decl., ¶ 23). Further, the Supreme Court in *Hellerstedt* found that medication abortions, like surgical abortions, are not dangerous. 136 S. Ct. at 2311 (citing evidence that abortions in general have a complication rate of "less than one-quarter of 1%"). The Court acknowledges that, under the holding in *DeWine*, the unavailability of a medication abortion does not, by itself, create a substantial obstacle to a woman's right to have an abortion if other methods of pre-viability abortion remain available. Although Section 1504(d) only regulates medication abortion, and the Court uses the number of Arkansas women seeking medication abortion as the denominator for the large fraction test, the Court looks to the availability of medication and surgical abortions overall when assessing the Act's purported burden on accessing pre-viability abortion.

Regardless, the Court finds that the record evidence does support an inference that the lack of medication abortion in Arkansas presents some burden to those women who prefer medication abortions over surgical ones due to the cost, risk, and potential recovery required by a surgical abortion. In other words, the Court concludes that, by effectively ending medication abortions in

Arkansas, the contracted physician requirement burdens those women who are seeking medication abortions in Arkansas.

Even if this burden, by itself, does not render the contracted physician requirement a "substantial obstacle in the path of a woman's choice," *Hellerstedt*, 136 S. Ct. 2312 (citing *Casey*, 505 U.S. at 877 (plurality opinion)), the Court will not discount it as some evidence of burden. To make the "substantial obstacle" determination, the burden imposed by the elimination of medication abortions "must be taken together with other[]" burdens caused by the contracted physician requirement and weighed against "any health benefit" to determine if an "undue burden" exists. *Id*. at 2313.

The Court also notes that, in *DeWine,* the Sixth Circuit did not apply the balancing test articulated in *Hellerstedt*, but instead reviewed only the burden imposed by Ohio's ban on medication abortions. *Compare DeWine*, 696 F.3d at 516 (discussing only the burden imposed upon women), *with Hellerstedt*, 136 S. Ct. at 2310 ("The rule announced in *Casey*, however, requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer."). The Court questions whether the analysis in *DeWine* survives muster in the wake of *Hellerstedt*. In *Humble*, the Ninth Circuit Court of Appeals found that Arizona's medication abortion ban imposed an undue burden because the "the Arizona law substantially burdens women's access to abortion services, and Arizona has introduced no evidence that the law advances in any way its interest in women's health." 753 F.3d at 916. The Ninth Circuit noted that "the burden imposed by the Arizona law is undue even if some women who are denied a medication abortion under the evidence-based regimen will nonetheless obtain an abortion," as the Supreme Court has never "held that a burden must be absolute to be undue." *Id*. at 917 (citation

omitted).  The Court finds the Ninth Circuit's reasoning in *Humble* consistent with the balancing test articulated by the Supreme Court in *Hellerstedt*.

Further, the Court notes, as part of the undue burden analysis at this stage, that the contracted physician requirement applies to all medication abortion providers and has no stated exception for cases where a medication abortion, in the considered judgment of the patient's physician, is necessary to preserve a woman's life or health.  The ban applies equally to victims of rape, incest, other forms of sexual abuse, and domestic violence, who may choose medication abortion to feel more in control of the experience and to avoid trauma from having instruments placed in their vagina (Dkt. No. 2, Fine Decl., ¶ 12).  The ban also applies to women with medical reasons why medication abortion is better for them than surgical abortion, including but not limited to certain medical conditions identified in the record that make medication abortion a safer option with a lower risk of complications and failure than surgical abortion (Dkt. No. 2, Fine Decl., ¶ 13).  It is unclear from this record what percentage of the patient population this may be.  Ms. Williams testified regarding the very clinical details that relate to whether the physician may deem medication abortion safer for the patient, but no witness quantified the number of women for whom medication abortion is medically indicated.

In the present case, regardless of the fraction of women who prefer medication abortions to surgical ones, *none* of the women who prefer medication abortions can satisfy that preference in Arkansas, if the contracted physician requirement takes effect given that plaintiffs have demonstrated an inability to comply with it.  Accordingly, 100% of "women seeking medication abortions in Arkansas," *Jegley*, 864 F.3d at 959, are unduly burdened by the contracted physician requirement.  The fact that some of the women who prefer medication abortions will nonetheless receive a surgical abortion does not affect this analysis.

### (2) Burdens Imposed: Reduction In Number Of Clinics Providing Abortions

If the contracted physician requirement takes effect and if plaintiffs are unable to comply with it, PPAEO's clinics will be forced to cease offering any type of abortion. PPAEO's clinics in Fayetteville and Little Rock do not provide surgical abortions and cannot upgrade their facilities to do so based in part on existing state regulations applicable to surgical abortion facilities but not medication-only facilities (Dkt. Nos. 57-1, de Baca Rebuttal Decl., ¶ 8; 84, Supp. Ho. Decl., ¶ 7 (averring that PPAEO would need to relocate or upgrade its facilities to offer surgical abortions partly in order to comply with state regulations that apply to surgical abortion facilities but not medication abortion facilities; it may not find a landlord willing to rent space to an abortion provider and does not have a sufficient budget to renovate the existing center at this time)). There is no record evidence of an abortion provider prepared to step in to fill this void. *See Hellerstedt*, 136 S. Ct. 2318 (noting that record evidence of the cost of expanding clinics supported a conclusion that more clinics "will not soon fill the gap when licensed facilities are forced to close."). As explained, if the contracted physician requirement takes effect and plaintiffs are unable to comply with it, Arkansas will be left without a medication abortion provider. Further, the Fayetteville metropolitan area will no longer have an abortion provider that can provide either medication or surgical abortions. In other words, the number of clinics in Arkansas offering abortion services will be reduced; whereas before the regulation took effect there were two population centers with abortion clinics open, there will only be one population center in Arkansas with an abortion clinic open if this regulation takes effect and if plaintiffs are unable to comply, as they represent.

The Court compares the Arkansas situation to the Missouri situation recently analyzed by Judge Phillips in *Comprehensive Health of Planned Parenthood Great Plains v. Williams*, Case No. 4:17-cv-4207-BP (W.D. Mo. June 11, 2018) ("*Williams II*"). Judge Phillips denied plaintiffs'

motion for preliminary injunction finding that, while the abortion regulation at issue in Missouri restricts the provision of medication abortion, surgical abortion is able to be provided in all relevant areas of the state of Missouri. *Id.* at 16-17. There, abortion clinics in Springfield and Columbia, Missouri, cannot satisfy a "complication plan" requirement and will therefore be forced to cease providing medication abortions. *Id*. at 16. The Columbia clinic, however, provides surgical abortions, and Judge Phillips concluded that there is no "legal impediment" preventing the Springfield clinic from doing so as well. *Id*. Further, abortion clinics in Kansas City and St. Louis, Missouri, still offer medication abortions. *Id*. at 3. That is not the case here; PPAEO's clinics in Fayetteville and Little Rock do not provide surgical abortions and cannot upgrade their facilities to comply with state mandated requirements for a surgical abortion facility, at least not without incurring additional costs. Accordingly, compared to the effect of Missouri's "complication plan" requirement, at least at this stage of the litigation, the Court concludes that the effect of Section 1504(d)'s contracted physician requirement imposes a qualitatively greater burden upon women seeking medication abortions in Arkansas.

### (3) Burdens Imposed: Women Who Will Forgo An Abortion

In *Jegley*, to determine whether a "large fraction" of women were burdened, the Eighth Circuit focused on the number of women forced to forgo *any* abortion as a result of the contract physician requirement. 864 F.3d at 959 n.8. To determine the number of women who will forgo an abortion due to the contracted physician requirement, the Court must rely upon the opinions of statistical researchers to determine how many women will forgo an abortion as a result of the contracted physician requirement. In the following sections, the Court first considers the conclusions and methodologies offered by plaintiffs, as well as the objections presented by defendants.

Next, based upon the record before it, the Court makes the findings sought by the Eighth Circuit. Given the Eighth Circuit's ruling in *Jegley*, the Court will calculate the "large fraction" by using the number of women seeking medication abortions in Arkansas as the denominator. Dr. Ho asserts that, in 2017, PPAEO's physicians performed 843 medication abortions in Arkansas, 653 of which were at the Fayetteville health center (Dkt. No. 84, Supp. Ho. Decl. ¶ 6). Ms. Williams asserts that LRFPS conducted 92 medication abortions in 2017 (Dkt. No. 84, Williams Decl., ¶ 8). Accordingly, the Court infers that 935 medication abortions occurred in Arkansas in 2017. Defendants' data indicate that Arkansas residents sought 838 medication abortions and 83 non-Arkansas residents sought medication abortions in Arkansas in 2017, for a total of 921 total medication abortions in Arkansas (Dkt. No. 101-1, at 5-8). It is not clear whether the Eighth Circuit intended this Court to include non-Arkansas residents who seek medication abortions in Arkansas as part of the denominator of the "large fraction." Accordingly, in the following sections, the Court analyzes the various combinations of denominators and numerators which may be used to calculate whether a "large fraction" of women seeking medication abortions in Arkansas will forgo an abortion altogether.

(i)    **Statistical Evidence Regarding The Relationship Between Abortion Rates And Clinic Closures**

Plaintiffs present the expert testimony of Dr. Colleen Heflin in support of their position that Section 1504(d) will burden a "large fraction" of women seeking medication abortions in Arkansas. Relying upon the Cunningham study, Dr. Heflin adopts the conclusions of the study, which states that "compared to having an abortion clinic relatively close (which [the study authors] define as within 50 miles), abortion rates decline by 15% in counties requiring between 50 and 100 miles of travel to access services, by 25% in counties requiring between 100 and 150 miles of

travel[,] and by 40% for those counties requiring between 150 and 200 miles of travel." (Dkt. No. 84, Heflin Decl., ¶ 13). At the preliminary injunction hearing, Dr. Heflin stated that she relied upon the Cunningham study because it is the most up-to-date and rigorous study analyzing the causal relationship between abortion clinic closures and the rate of abortions. Applying the conclusions of the Cunningham study to Fayetteville, Arkansas, Dr. Heflin concludes that, if the Fayetteville clinic closes, a total of 235 women will be prevented from having an abortion (*Id.*, ¶ 15). She reached this conclusion by applying the reduction rates from the Cunningham study to the number of women who sought medication abortions at the Fayetteville clinic in 2017 (*Id.*).

Evidence that increased travel distances lead to decreases in the abortion rate has been accepted by several federal courts. *See Schimel*, 806 F.3d at 919 (noting that "18 to 24 percent of women who would need to travel to Chicago or the surrounding area [from Wisconsin] would be unable to make the trip."); *Strange III*, 33 F. Supp. 3d at 1356-60 (crediting statistical evidence that increased travel distance led to decreased abortion rates, particularly for urban women who are forced to travel more than 50 miles to an abortion clinic); *see also Kliebert II*, 250 F. Supp. 3d at 83 (crediting evidence that "[i]ntercity travel for low-income women presents a number of significant hurdles" and that "with just one or two providers remaining, many more women will be forced to travel significant distances to reach a clinic, which also imposes a substantial burden."); *Williams I*, 263 F. Supp. 3d at 735 ("A fall-off in professionally-handled abortions in a locale seems almost certain when there is no convenient place to go."). The Court notes that those women who forgo a legal abortion may attempt to self-abort or seek care from unsafe providers (Dkt. No. 2, Fine Decl., ¶ 55).

Defendants present the expert testimony of Dr. Solanky to counter Dr. Heflin's conclusions. Dr. Solanky raised three issues with Dr. Heflin's conclusions: (1) the Cunningham

study is deficient; (2) the conclusions of the Cunningham study are not applicable to Arkansas; and (3) Dr. Heflin incorrectly applied the conclusions of the Cunningham study. Specifically, Dr. Solanky testified that the Cunningham study fails to account for background trends, including the falling rate of abortions in Texas that predated H.B.2. Further, Dr. Solanky testified that the Cunningham study over-estimates the reduction in abortions because it fails to account for abortions sought by Texas residents in other states and in Mexico.

Dr. Solanky also testified that the Cunningham study is not applicable to Arkansas because Texas—unlike Arkansas—has an international border with Mexico. Dr. Solanky also argued that it would have been preferable for Dr. Heflin to review literature from jurisdictions throughout the United States.

Finally, Dr. Solanky criticizes Dr. Heflin's conclusions on the grounds that she "apparently failed to realize that the Cunningham study she relies on measures the effect of increased driving distances *where there is an abortion facility within 50 miles*." (Dkt. No. 101, at 28 (emphasis in original)). Accordingly, he concludes that Dr. Heflin "improperly used the total driving distance from the patients' county of residence to Little Rock, instead of the *change* in driving distance from travelling to Little Rock rather than Fayetteville." (*Id*. (emphasis in original)). In explaining this criticism during his testimony, Dr. Solanky was very careful to cite only the abstract of the Cunningham study to support this position; he did not cite to any other page of the study itself to explain how the study's findings should be applied nor did he respond to the explanation offered by Dr. Heflin while quoting an excerpt from the study itself on why she used this methodology. Defendants also note that Dr. Heflin's calculations "rest on an erroneous assumption" that patients who would have otherwise gone to the Fayetteville clinic will not go to a private physician or an out-of-state clinic for an abortion (*Id*., at 28-29). As discussed previously, there is no record

evidence to support the first argument, and the Court determines for legal reasons it will not consider out-of-state providers in this analysis.

Dr. Heflin testified in rebuttal to address the arguments made by defendants through Dr. Solanky. Further, Dr. Heflin's rebuttal affidavit is in the record (Dkt. No. 102). Dr. Heflin testified that the Cunningham study is the most rigorous analysis of the effects of a restriction similar to Section 1504(d), and she relied upon the Cunningham study because it "is a causal analysis and does not show mere correlation [between clinic closures and decreases in the abortion rate]." (*Id.*, ¶ 4). Dr. Heflin points out that the Cunningham study "incorporates data before and after the [Texas admitting-privileges law] [was] implemented" and "controls for differences in treatment and control groups . . . ." (*Id.*). This "difference-in-difference" design, according to Dr. Heflin, "allows the author [of the Cunningham study] to identify the impact of the change in access on abortion rates (*Id.*, ¶ 4). In response to Dr. Solanky's criticism that the Cunningham study does not account for alternative causal explanations (such as declining abortion rates), Dr. Heflin testified that the Cunningham study controlled for such "baseline" effects by measuring both the abortion rates prior to and after the enforcement of H.B.2.

In response to Dr. Solanky's criticism that the Cunningham study over-estimates the reduction in abortions due to undercounted out-of-state abortions, Dr. Heflin points out that the Cunningham study carefully considered the effects of abortions in surrounding states and Mexico. The Cunningham study conducted a sensitivity analysis which "focus[ed] . . . attention on counties for which the nearest abortion clinic is always in Texas." (Dkt. No. 135-5, at 17). The authors of the Cunningham analysis concluded that "[t]his robustness check yields estimated effects quite similar to our main results." (*Id.*). The study also considered "whether the effects of abortion clinic access on legal abortions differs for counties near the Mexican border relative to those that are

further away." (*Id.*, at 32). While the study did conclude that, especially among Hispanic women living within 100 miles of the Mexican border, "substitution to self-induced abortion may have been widespread," this finding was isolated to those counties near the Mexican border (*Id.*, at 33, 55). Dr. Heflin testified that, based on this sensitivity analysis, the Cunningham study's results can be applied to Arkansas.

Furthermore, Dr. Heflin points out that she did not rely upon other studies, including those others she cited in her initial declaration, because the Cunningham study "is a more rigorous study." (*Id.*, ¶ 5). She points out that the Fischer study cited in her initial declaration uses fewer "refinements" than the Cunningham study and is therefore "less precise." (*Id.*, ¶ 6). The other study she considered, the "Quast study," she explains, is "less appropriate" because it looks at the number of licensed abortion clinics to determine how many abortions occurred, rather than whether the licensed clinics were actually performing abortions (*Id.*, ¶¶ 5-7). Dr. Heflin also testified that a study by Joerg Dreweke which was cited by Dr. Solanky is a mere "associational study" that does not support any causal inference. Further, Dr. Heflin criticizes Dr. Solanky for misconstruing the findings of certain Guttmacher Institute reports. According to Dr. Heflin, these reports acknowledge that there has been a change in abortion clinic access that likely drives reductions in abortion rates, but they acknowledge there are other potential causes. Furthermore, in response to Dr. Solanky's argument that she should have considered data from Iowa, Dr. Heflin explained that the Iowa study—which the Court does not understand to be in the record—does not measure causality. Also, under questioning, Dr. Heflin conceded that the Cunningham study has not undergone peer review, but she notes that it has undergone a thorough "friendly review" which makes its findings reliable, citing the acknowledgments section of the paper and explaining the review process undertaken by presenting the paper at economic conferences. Dr. Heflin also points

out that the NBER working paper series, where the Cunningham study is published, is extremely well-regarded.

In response to Dr. Solanky's criticism that the Cunningham study's conclusions are not applicable to Arkansas, Dr. Heflin makes the point that, in her field, it is extremely common to apply findings from one state to another. She testified that Arkansas and Texas are both rural states with high poverty rates, which likely means the effects in Texas mirror the burden that travel distance will have on women in Arkansas. Furthermore, she testified that because Arkansas and Texas are adjacent, it is appropriate to apply the conclusions of that study to Arkansas. She explained that, in social science, certain variables among populations—such as culture, health behavior, or comfort with travel distance—are difficult to build explicitly into a model, so it is preferable to apply findings from states that are geographically proximate.

Finally, Dr. Heflin contends that, contrary to Dr. Solanky's contention, she did not commit a "fundamental mathematical error" when she applied the Cunningham study's conclusions to Arkansas (Dkt. No. 102, at 4). She explained that she took data from those counties that are closer to Fayetteville than Little Rock and separated each county into a "50-mile bin." Then, depending upon which 50-mile bin the county fell into, she applied the appropriate reduction rate from the Cunningham study to determine how many women would forgo an abortion if the Fayetteville clinic stops offering abortion services. Dr. Heflin also argues that she correctly "included women who reside in counties that are more than 50 miles from the Fayetteville health center in estimating the number of women prevented from accessing abortion by the Arkansas law," because the Cunningham study uses a multiple regression model that "includes travel distance from every county in Texas for each year, but breaks those travel distances into 50 mile categories or 'bin[s].'" (*Id.*, ¶ 8). Therefore, according to Dr. Heflin, the Cunningham study "provides causal estimates

of the relationship between travel distances in specific bins relative to those counties with access within 50 miles and the reduction in abortion rates." (*Id.*).

Dr. Heflin states that "[it] is correct to use the total driving distance when applying the Cunningham study to Arkansas, rather than the change in driving distance, because the Cunningham study relied upon data that measured the total driving distance (in a particular county in a particular year) as its measure of access in the analysis." (*Id.*). Dr. Heflin conceded that the change in travel distances is what allows the Cunningham model to create the reduction rate estimates, but "the interpretation of the method of the estimates in the Arkansas case would be to the travel distance post-regulation for women in counties impacted by the regulation. And so that's the total travel distance post-regulation." Indeed, she notes that the Cunningham study not only measures total distance traveled to an abortion clinic, but it also includes "a measure of congestion to account for the fact that remaining providers in Texas were unable to meet the new higher level of demand for their services." (Dkt. No. 102, ¶ 3).

Dr. Solanky conceded at the preliminary injunction hearing that he is not a social policy expert, and he acknowledged that he is not offering a contrary finding to determine how many women will forgo abortions due to the enactment of Section 1504(d). Dr. Heflin, on the other hand, is an expert in research methods and has broad experience studying the effects of policy interventions on populations. Further, Dr. Solanky urges the Court to reject the Cunningham study, but he has no plans to conduct a study based upon what he considers to be the complete data. While defendants do not carry the burden here, the Court must compare Dr. Solanky's opinion against Dr. Heflin's, which relies upon the most up-to-date data and uses a rigorous analysis. The Court also hesitates to credit Dr. Solanky's counterintuitive assertion that the closure of PPAEO's clinics in Fayetteville and Little Rock will lead to only a two percent reduction in the

abortion rate. The Court notes that Dr. Solanky's declaration appears to continue to focus upon travel distances for all women of reproductive age in Arkansas (Dkt. No. 101-2, Solanky Decl., at 23-24), when the Eighth Circuit held that the relevant denominator is all women seeking medication abortions in Arkansas. In the light of the record evidence, at this stage of the litigation, and given the widespread acceptance of such methodology by other federal courts, *see e.g., Schimel*, 806 F.3d at 919; *Strange III*, 33 F. Supp. 3d at 1356-60, the Court concludes having observed the testimony and demeanor of both witnesses that, at this early stage of the litigation and having studied their written submissions, Dr. Heflin's conclusions appear grounded in valid statistical methods and appear to be analytically sound. Accordingly, at this early stage of the litigation, the Court accepts Dr. Heflin's conclusion that when abortion clinics are closed, "abortion rates decline by 15% in counties requiring between 50 and 100 miles of travel to access services, by 25% in counties requiring between 100 and 150 miles of travel[,] and by 40% for those counties requiring between 150 and 200 miles of travel." (Dkt. No. 84, Heflin Decl., ¶ 13).

As discussed in more depth below, by applying these metrics to the data attached to Dr. Heflin's declaration, the Court analyzes whether a large fraction of women seeking medication abortions in Arkansas will be prevented from having an abortion at all, medication or surgical, due to the contracted physician requirement. Because we are at an early stage in this litigation and because Dr. Solanky is critical of Dr. Heflin's analysis, the Court also tests the burden analysis against numbers that account for some of defendants' criticisms.

> **(ii)**      **Dr. Heflin's Calculation Applied To All Women Who Sought Medication Abortions In Fayetteville**

Dr. Heflin's declaration includes a spreadsheet that indicates 599 medication abortions occurred at the Fayetteville clinic in 2017 (Dkt. No. 84, at 50). Applying her findings about the

effects of increased travel distance to these data, Dr. Heflin estimates that of those women who sought a medication abortion at the Fayetteville clinic, "a total of 235 women will be prevented from having an abortion" due to the effects of the contracted physician requirement (Dkt. No. 84, Heflin Decl., ¶ 15). If a total of 935 medication abortions occurred in Arkansas in 2017, Dr. Heflin's calculation means that at least 25% of all women seeking medication abortions in Arkansas will forgo an abortion entirely.[14] Using 921 as the denominator, then approximately 26% of all women seeking medication abortions in Arkansas will forgo an abortion entirely.[15] If the Court limits its denominator to the 838 medication abortions sought by Arkansas residents in Arkansas in 2017, then Dr. Heflin's calculation means that 28% of Arkansas residents seeking medication abortions in Arkansas will forgo an abortion entirely.[16]

(iii)      **Dr. Heflin's Data Applied To Arkansas Residents Living In Northwest Arkansas**

The Court also applies Dr. Heflin's findings to those Arkansas residents who live in Northwest Arkansas and who would have otherwise sought an abortion in Fayetteville. This analysis is intended to explore Dr. Solanky's criticism of Dr. Heflin's use of out-of-state resident numbers.

Dr. Heflin's spreadsheet indicates that, of those 599 medication abortions at the Fayetteville clinic in 2017, 519 of those women live in Arkansas counties that are reasonably construed as "Northwest Arkansas."[17] Of those 519 women in Northwest Arkansas, 500 of them

---

[14] 235/935=25%.

[15] 235/921=26%.

[16] 235/838=28%.

[17] The Court determined this number by adding the number of reported patients for Benton, Boone, Carroll, Crawford, Johnson, Madison, Franklin, Newton, Sebastian, and Washington

live in counties that are 150 miles or more from Little Rock (Dkt. No. 84, at 50).[18]  The remaining

19 live in counties that are 100 to 150 miles from Little Rock (*Id.*).[19]  According to Dr. Heflin's

affidavit, "compared to having an abortion clinic relatively close (which they define as within 50

miles), abortion rates decline . . . by 40% for those counties requiring between 150 and 200 miles

of travel" and "25% in counties requiring between 100 and 150 miles of travel . . . ." (*Id.*, Heflin

Decl., ¶ 13).   Forty percent of 500 women equals 200 women, and 25% of 19 women is

approximately eight (8) women.   Accordingly, applying Dr. Heflin's methodology to Northwest

Arkansas, approximately 208 women will forgo an abortion entirely.   Using 208 women as the

numerator, if the Court credits Dr. Ho and Ms. Williams' representations that 935 medication

abortions occurred in Arkansas in 2017, this means that at least[20] 22% of all women seeking

medication abortions in Arkansas will forgo an abortion entirely.[21]  If 921 is the denominator, then

at least approximately 23% of all women seeking medication abortions in Arkansas will forgo

---

counties who sought medication abortions from the Fayetteville clinic in 2017 (Dkt. No. 84, at 50).
Given the geography of Arkansas, at this stage of the litigation and with the record before it, the
Court determines this is a reasonable estimate. *See 2017-2019 Highway Map of Arkansas* (2017),
http://ardot.gov/Trans_Plan_Policy/mapping_graphics/2017-2019/Statehwymap_front17-19.pdf.
The Court notes defendants' data (Dkt. No. 101-1, at 4-5) indicate that 526 women in the
aforementioned counties received medication abortions in 2017.

[18]  Benton, Carroll, Crawford, Madison, Sebastian, and Washington counties are more than
150 miles away from Little Rock (Dkt. No. 84, at 50).

[19]  Boone, Franklin, Johnson, and Newton counties are 100 to 150 miles away from Little
Rock (Dkt. No. 84, at 50).

[20]  The Court focuses upon those women who live in Northwest Arkansas to illustrate that
Dr. Heflin's overall conclusion is consistent even if out-of-state residents are excluded from the
calculation.

[21]  208/935=22%.

one.[22]  If, on the other hand, the Court credits defendants' data that Arkansas residents sought 838 medication abortions in Arkansas in 2017, then if 208 women are prevented from obtaining an abortion, that means at least 25% of Arkansas residents seeking medication abortions in Arkansas will forgo an abortion entirely.[23]

**(iv)    Dr. Heflin's Data, Applied To Women In Benton And Washington Counties**

Defendants also object to Dr. Heflin's conclusions on the grounds that defendants contend the study she relies upon measures decreases in the abortion rate due to *increased* travel distances once an abortion clinic is closed (Dkt. No. 101, at 28).  Dr. Solanky specifically criticizes Dr. Heflin's conclusions on the grounds that "of the 14 Arkansas Counties she has based her computations on, 11 (=78.6%) are not less than 50 miles from the Fayetteville facility." (Dkt. No. 101-2, Solanky Decl., ¶ 44).  For the reasons explained, the Court disagrees with Dr. Solanky's criticism.

For illustration purposes only, and to explore Dr. Solanky's criticism that Dr. Heflin inappropriately included in her calculations women whose travel distances will not increase specifically to alter her conclusions, the Court examines what percentage of women seeking medication abortions in Arkansas would forgo an abortion entirely if the Court were to restrict its analysis to a group of women who no party can dispute would experience an *increase* in travel distance of more than 150 miles as a result of the contracted physician requirement.

With few exceptions, any woman living in either Benton or Washington County will face increased travel distances of approximately 150 miles or more to receive an abortion as a result of

---

[22]  208/921=23%

[23]  208/838=25%

the contracted physician requirement. Dr. Heflin's data indicate that 404 women residing in Benton and Washington counties sought medication abortions at the Fayetteville clinic in 2017 (Dkt. No. 84, at 50).[24] The Court acknowledges that more women in Arkansas likely will face an increase of more than 150 miles as a result of this requirement, but the Court focuses on this class of women for illustration purposes, as there can be no dispute that these women will be forced to *increase* their travel distance between approximately 150 to 200 miles due to the cessation of abortion at the Fayetteville clinic to receive an abortion in Little Rock. Again, applying Dr. Heflin's 40% metric to these women, the Court concludes that 162 of these women will be forced to forgo an abortion entirely as a result of the increased travel burden.[25] Using 162 women as the numerator, if the Court credits Dr. Ho and Ms. Williams' representations that 935 medication abortions occurred in Arkansas in 2017, this means that at least 17% of all women seeking medication abortions in Arkansas will forgo an abortion entirely.[26] If the Court uses 921 as the denominator, then at least 17% of all women seeking medication abortions in Arkansas will forgo one entirely.[27] If the Court credits defendants' data that Arkansas residents sought 838 medication abortions in Arkansas in 2017, then at least 19%[28] of Arkansas residents seeking medication abortions in Arkansas will forgo an abortion entirely.[29]

---

[24]  182 women in Benton County sought abortions in Fayetteville in 2017, and 222 women in Washington County sought abortions in Fayetteville in 2017.  182+222=404.

[25]  404*40%=162.

[26]  162/935=17%.

[27]  162/921=17%.

[28]  162/838=19%.

[29]  Plaintiffs' data show that the overwhelming majority of the medication abortions performed in Arkansas occurred at PPAEO's Fayetteville clinic:  of the 935 medication abortions

The Court also reviews the data as it existed in the record prior to the Eighth Circuit's decision in *Jegley*. According to defendants' evidence, in 2014 there were 551 medication abortions sought by Arkansas residents (Dkt. No. 55-8, Kakkar Aff., ¶ 7).[30] The record does not indicate how many non-residents sought medication abortions in 2014. Dr. Henshaw stated that in fiscal year 2015, PPAEO physicians performed 500 medication abortions, over 300 of which were performed at the Fayetteville clinic (Dkt. No. 28, Henshaw Decl., ¶ 13). Dr. Henshaw opines that "an additional travel burden of 100 miles will cause 20 to 25% of women who would have otherwise obtained abortions not to obtain them." (*Id.*, ¶¶ 11, 22). He also opines that "greater distances will be a barrier to an even higher percentage of women" and that "the effect of eliminating the closest abortion provider would likely be even more burdensome for women in and around Fayetteville . . . ." (*Id.*, ¶ 22). Dr. Henshaw does not quantify the percentage of women who will forgo an abortion if they have a travel distance greater than 100 miles, though he does acknowledge that such greater distances will lead to higher reductions in the abortion rate— reductions of more than 20 to 25% (*Id.*, ¶¶ 11, 22). According to the 2014 data provided by defendants, Arkansas residents in Benton, Boone, Carroll, Crawford, Johnson, Madison, Franklin, Newton, Sebastian, and Washington counties (each more than 100 miles distant from Little Rock) sought 288 medication abortions. The Court assumes these medication abortions were performed

_____

performed in Arkansas in 2017, 653, or 70%, of those occurred at the Fayetteville clinic (Dkt. No. 84, Supp. Ho. Decl. ¶ 6; Williams Decl., ¶ 8).

[30] The Court is aware that defendants' have filed data, compiled by the Center for Health Statistics, on the number of induced abortions for 2011 and 2017 (*see* Dkt. No. 135-3). These data, however, are not disaggregated by county.

in Fayetteville, as Fayetteville is closer to these counties than Little Rock. Applying Dr. Henshaw's reduction estimate to these data, the Court concludes that at least 58 to 72 women would have forgone an abortion entirely due to the increased travel distance.[31] This means that at least 11 to 13% of the 551 medication abortions sought in 2014 would not have occurred.[32] Dr. Henshaw places the number of abortions performed at the Fayetteville clinic in fiscal year 2015 at over 300, so the Court's figure might be slightly lower than it should be. Using Dr. Henshaw's numbers, the Court concludes that approximately 11 to 14% of the 551 medication abortions sought in 2014 would not have occurred.[33]

Applying Dr. Henshaw's reduction estimate to the 2017 data on women living in counties distant to Little Rock presents different results. In 2017, according to Dr. Heflin, 519 women in Benton, Boone, Carroll, Crawford, Johnson, Madison, Franklin, Newton, Sebastian, and Washington counties sought medication abortions in Fayetteville. If 20 to 25% of those women would not receive any abortion as a result of the contracted physician requirement, at least 104 to 130 women would forgo an abortion.[34] This means that approximately 11 to 14% of the 935 medication abortions sought in 2017 would not have occurred.[35] If 921 is the denominator, then at least approximately 11 to 14% of those women would forgo an abortion.[36] If the Court credits

---

[31] 288*20%=58 and 288*25%=72.

[32] 58/551=11% and 72/551=13%.

[33] 300*.2=60 and 300*.25=75. Further, 60/551=11% and 75/551=14%.

[34] 519*20%=104 and 519*25%=130.

[35] 104/935=11% and 130/935=14%.

[36] 104/921=11% and 130/921=14%.

defendants' assertion that only 838 Arkansas residents sought medication abortions in Arkansas in 2017, Dr. Henshaw's data indicates that approximately 12 to 16% of those medication abortions would not have occurred.[37]

(vi)     **Dr. Heflin's Data Versus Dr. Henshaw's Data**

The Court credits Dr. Heflin's data and methodology as they are based upon more up-to-date information. Dr. Henshaw's conclusions, although well-supported, were submitted to the Court in 2016 and are based on information that is out-of-date compared to the Cunningham study that Dr. Heflin relies upon. In fact, the most up-to-date analysis Dr. Henshaw cites is a 2014 study of the effects of the abortion restrictions that were eventually overturned in *Hellerstedt* (Dkt. No. 28, Henshaw Decl., ¶ 10). These restrictions were also the subject of the Cunningham study, but the Cunningham study has the added benefit of one years' additional data from 2015 (Dkt. No. 84, Heflin Decl., ¶ 12). Dr. Heflin testified that Dr. Henshaw's findings are "based on a set of studies that were a little bit older than the ones that I was able to review given that he wrote [his report] in 2016." Accordingly, the Court credits Dr. Heflin's data and conclusions over Dr. Henshaw's. The Court also observes that Dr. Heflin's conclusions are not inconsistent with Dr. Henshaw's. Dr. Henshaw's data is not incorrect but applying it to all women facing a burden due to Section 1504(d) on these facts leads to incomplete results. Dr. Henshaw acknowledges travel distance over 100 miles leads to a greater than 20 to 25% reduction in abortions. He did not quantify how much greater a reduction given increased travel distances over 100 miles. Dr. Heflin does (*Compare* Dkt. No. 28, Henshaw Decl., ¶¶ 11, 22, *with* Dkt. No. 84, Heflin Decl., ¶ 13). She provides a

---

[37]   104/838=12% and 130/838=16%.

percentage to be applied in that scenario. The Court is satisfied that scenario regarding travel distances over 100 miles exists here.

The Court also concedes that neither researcher's estimates may be precisely correct. The highest percentage generated by analyzing these data indicates that 28% of women seeking medication abortion in Arkansas will forgo one entirely as a result of the contracted physician requirement, while the lowest percentage is 11%. The average of these two percentages is approximately 20%. The Court considers all of these figures when assessing the proportion of women in Arkansas seeking medication abortions who will forgo one entirely as a result of the contracted physician requirement. The Court has conducted these same types of analyses including the Tulsa, Oklahoma, clinic as explained in the next section of this Order, and the high and low number do not change.

<table>
<tr><td>(vii)</td><td>**The Effect Of Considering Out-Of-State Abortion Providers**</td></tr>
</table>

As discussed *supra* by this Court, this Court concludes that the existence of out-of-state abortion providers does not enable Arkansas to forgo safeguarding the constitutional rights of Arkansas women. For illustrative purposes only, and to explore defendants' criticism that Dr. Heflin inappropriately failed to consider out-of-state abortion providers, the Court conducts an analysis that factors in Tulsa, Oklahoma.

First, the Court must calculate the distance between the Tulsa, Oklahoma, abortion clinic and the counties of residence which are closer to Tulsa, Oklahoma, than Little Rock[38] for the women who sought medication abortions from the Fayetteville clinic. As this evidence is not in

---

[38] Dr. Heflin testified that the Cunningham study's conclusions are to be applied to the "nearest clinic."

the record, the Court takes judicial notice that eight of the counties Dr. Heflin considered in her

analysis[39] are more than 150 miles from the Tulsa clinic. Of the 44[40] women in these counties

who sought a medication abortion at the Fayetteville clinic, approximately 18[41] of them would

forgo an abortion due to Section 1504(d). There are another eight counties[42] which are closer to

Tulsa than Little Rock but are still 100 to 150 miles from Tulsa, which means that of the 320[43]

women in those counties who sought medication abortions in Fayetteville in 2017, approximately

80[44] of them would forgo an abortion. There are five counties[45] which are closer to Tulsa than

Little Rock but are 50 to 100 miles from Tulsa, and of the 190[46] women in those counties who

sought medication abortions in Fayetteville in 2017, approximately 29[47] of them would forgo an

---

[39] These counties are Carroll County, Arkansas; Hickory County, Missouri; Newton County, Missouri; Polk County, Missouri; Barry County, Missouri; Lawrence County, Missouri; Greene County, Missouri; and Christian County, Missouri (*see* Dkt. No. 84, at 50). The Court takes judicial notice of the distances between these counties and the Planned Parenthood clinic in Tulsa, Oklahoma.

[40] 16+1+7+1+5+2+11+1=44 (*see* Dkt. No. 84, at 50).

[41] 44*.4=17.6.

[42] These counties are Washington County, Arkansas; Sebastian County, Arkansas; Madison County, Arkansas; Crawford County, Arkansas; Jasper County, Missouri; Latimer County, Oklahoma; Adair County, Oklahoma; and Le Flore County, Oklahoma (*see* Dkt. No. 84, at 50).

[43] 222+60+5+15+8+1+2+7=320 (*see* Dkt. No. 84, at 50).

[44] 320*.25=80.

[45] These counties are Benton County, Arkansas; Ottawa County, Oklahoma; Delaware County, Oklahoma; Cherokee County, Oklahoma; and Sequoyah County, Oklahoma (*see* Dkt. No. 84, at 50).

[46] 182+1+1+3+3=190.

[47] 190*.15=28.5.

abortion.  The Court does not apply a reduction rate to the women living in those counties that are less than 50 miles from Tulsa.[48]  Of the remaining counties[49] where women sought medication abortions at the Fayetteville clinic but are closer to Little Rock than Tulsa, each of those counties is more than 150 miles from Little Rock.  Therefore, of the 43[50] women in those counties who sought a medication abortion from Fayetteville in 2017, approximately 17[51] of them would forgo an abortion.  Accordingly, the Court finds that, although the Court concludes it is not legally appropriate to do so, even if the out-of-state abortion provider in Tulsa, Oklahoma, is considered, approximately 143[52] women would forgo an abortion.

Considering the statewide data, if Tulsa is considered, then either 15% or 16% of all women seeking medication abortions in Arkansas will forgo an abortion.[53]  Alternatively, if the Court restricts this analysis to only Arkansas women seeking medication abortions in Arkansas, then approximately 14% of those women will forgo an abortion even if Tulsa is considered in the analysis.[54]

---

[48]  These counties include Creek County, Oklahoma, and Mayes County, Oklahoma (*see* Dkt. No. 84, at 50).

[49] These counties are Baxter County, Arkansas; Boone County, Arkansas; Marion County, Arkansas; Newton County, Arkansas; Scott County, Arkansas; Franklin County, Arkansas; Logan County, Arkansas; Johnson County, Arkansas; Douglass County, Missouri; Howell County, Missouri; Stone County, Missouri; and Taney County, Missouri.

[50]  4+9+2+1+1+3+2+6+1+1+2+11=43.

[51]  43*.4=17.2.

[52]  17.6+80+28.5+17.2=143.3.

[53]  143.3/925=15% and 143.3/921=16%.

[54]  120.4/838=14%.

Finally, this Court will conduct a similar analysis based upon the available 2014 data. According to those data, which only list the counties of residence for Arkansas women who sought abortions, 290 women from counties closer to Fayetteville than Little Rock sought medication abortions in Arkansas that year.[55]  277 of those women lived in counties closer to Tulsa than Little Rock.[56]  Of those 277 women, five[57] of those women live more than 150 miles from Tulsa, which means approximately 2[58] of those women would have forgone an abortion; 180[59] of those women live between 100 to 150 miles from Tulsa, so approximately 45[60] of them would have forgone an abortion; and 92[61] of those women live 50 to 100 miles away from Tulsa, so approximately 14[62] of those women would have forgone an abortion.  The remaining 13[63] Arkansas women living in counties closer to Little Rock than Tulsa who would otherwise have sought an abortion in

---

[55]  The following counties are closer to Fayetteville than Little Rock:  Baxter, Benton, Boone, Carroll, Crawford, Franklin, Johnson, Logan, Madison, Marion, Newton, Scott, Sebastian, and Washington counties (Dkt. No. 55-8, at 3-5).  2+92+8+5+8+0+2+0+1+0+1+0+26+145=290.

[56]  These counties are Benton, Carroll, Crawford, Madison, Sebastian, and Washington counties.  92+5+8+1+26+145=277.

[57]  Five women in Carroll County, Arkansas, sought medication abortions in 2014 (Dkt. No. 55-8, at 3).

[58]  $5*.4=2$.

[59]  This is the sum of the women in Crawford, Madison, Sebastian, and Washington counties who sought medication abortions in 2014 (Dkt. No. 55-8, at 3-5).  8+1+26+145=180.

[60]  $180*.25=45$.

[61]  This is the sum of the women in Benton County, Arkansas, who sought medication abortions in 2014 (Dkt. No. 55-8, at 3).

[62]  $92*.15=13.8$.

[63]  13 women in Baxter, Boone, Franklin, Johnson, Logan, Marion, Newton, and Scott counties sought medication abortions in 2014 (Dkt. No. 55-8, at 3-5).

Fayetteville all live in counties more than 150 miles from Little Rock, which means approximately five[64] of them would have forgone an abortion. In sum, applying the Cunningham methodology to the 2014 data, approximately 66[65] Arkansas women would have forgone an abortion.

The same data set shows a total of 551 Arkansas women from anywhere in the state sought a medication abortion in 2014, which means approximately 12% of these women would have forgone an abortion due to Section 1504(d) (Dkt. No. 55-8, Kakkar Aff., ¶ 7).[66] If the Court includes those out-of-state women who sought medication abortions in Arkansas in 2014 in this calculation, then approximately 11% of all women who sought medication abortions in Arkansas would have forgone an abortion due to Section 1504(d).[67]

### (4) Burdens Imposed: Women Who Will Travel For Surgical Abortion

The record evidence reveals that a large fraction of women who would otherwise receive medication abortions at the Fayetteville clinic will face various and substantial burdens if they must travel to LRFPS for surgical abortions. Per the data submitted by Dr. Ho and Ms. Williams, 653 medication abortions were performed at the Fayetteville clinic in 2017, out of a total of 935 medication abortions in Arkansas (Dkt. No. 84, Supp. Ho. Decl. ¶ 6; Williams Decl., ¶ 8). Defendants assert that a total of 921 medication abortions occurred in Arkansas in 2017 (Dkt. No. 101-1, at 5-8). Accordingly, if all of those women seek an abortion in Little Rock, approximately

---

[64] 13*.4=5.2.

[65] 2+45+13.8+5.2=66.

[66] Defendants' data indicate 608 total medication abortions in Arkansas in 2014, 57 of which were for out-of-state residents. Therefore, the Court concludes that 551 Arkansas women sought medication abortions that year. 608-57=551. 66/551=12%.

[67] 66/608=11%.

70 to 71%[68] "of women seeking medication abortions in Arkansas," *Jegley*, 864 F.3d at 959, face increased travel distances due to the contracted physician requirement. If, as discussed above, approximately 208[69] women in Northwest Arkansas forgo an abortion entirely, then approximately 46%[70]of women seeking medication abortions in Arkansas will face increased travel distances. Limiting this analysis to the 519 women in Northwest Arkansas who sought medication abortions in Fayetteville in 2017 (Dkt. No. 84, at 50), even if 208 of those women forgo an abortion entirely, the remainder—60%—of Northwest Arkansas women seeking a medication abortion will face increased travel distances.[71]

The Court is aware of the language in *Casey* stating that "the incidental effect of making it more difficult or more expensive to procure an abortion" is in and of itself not enough to meet the substantial obstacle requirement. 505 U.S. at 874. While lengthy travel "do[es] not always constitute an 'undue burden,'" such travel is a "legitimate burden" that, depending upon the particular facts of the case, can ultimately contribute to a determination that a statute creates an undue burden. *See Schimel*, 806 F.3d at 919 (noting that requiring women to travel 90 miles is a burden on women seeking abortions and a particular burden on low-income women); *Van Hollen III*, 738 F.3d at 796 (noting that a 400 mile trip for two required appointments is a "nontrivial

---

[68] 653/935=70% and 653/921=71%.

[69] As discussed previously, by applying Dr. Heflin's reduction estimate to the number of women in Northwest Arkansas who sought an abortion at the Fayetteville clinic in 2017, the Court concludes that 208 women in Northwest Arkansas would forgo an abortion entirely due to the contracted physician requirement. If the Court used Dr. Heflin's estimate that 235 women will forgo an abortion, then at least approximately 45 to 48% of women seeking medication abortions in Arkansas will face increased travel distances. 653-235=418. 418/935=48% and 418/921=45%.

[70] 635-208=427. 427/935=46% and 427/921=46%.

[71] 519-208=311. 311/519=60%.

burden on the financially strapped and others who have difficulty traveling long distances to obtain an abortion, such as those who already have children"); *Planned Parenthood of Indiana and Kentucky Inc. v. Commissioner, Indiana State Dep't of Health*, 273 F. Supp. 3d 1013, 1037 (S.D. Ind. 2017), *appeal filed*, No. 17-1883 (7th Cir. 2017) (citing *Hellerstedt*, 136 S. Ct. 2313). Nothing in *Hellerstedt* or the Eighth Circuit's decision alters this. A round-trip drive from Fayetteville to Little Rock is 380 miles (Dkt. No. 2, Fine Decl., ¶ 52; de Baca Decl., ¶ 18). Thus, due to Arkansas' 48-hour waiting period, a woman living in Fayetteville must travel 760 miles to obtain a surgical abortion in Little Rock. Women living in Northwest Arkansas are similarly burdened.

As an example, since it is beyond dispute that those women who live in Washington and Benton County, Arkansas, will face increased travel distances as a result of the contracted physician requirement, the Court notes that the undisputed record indicates that in 2017, 222 patients from Washington County, Arkansas, and 182 patients from Benton County, Arkansas, received medication abortions from plaintiffs' Fayetteville location (Dkt. No. 84, at 50). Accordingly, 404[72] residents of those two counties sought medication abortions from the Fayetteville clinic. All of these women—43% of the 935 (or 44% of the 921) women who sought medication abortions in Arkansas in 2017 and 48% of the 838 Arkansas residents who sought medication abortions in Arkansas in 2017—would now face two round-trip commutes to Little Rock to complete a surgical abortion.[73] Due to Arkansas' 48-hour waiting requirement, the record evidence indicates that some of those women who would otherwise have received medication abortions in Fayetteville will be forced to take off two full days of work in order to make two

---

[72]  182+222=404.

[73]  These figures are derived from the following calculations:  404/935=43%; 404/921=44%; and 404/838=48%.

round-trips to Little Rock to have an abortion (*Id.*, ¶ 20). These women will be forced to pay for additional travel expenses, to pay childcare expenses, to lose wages, and perhaps to risk their employment altogether. *See Planned Parenthood of Indiana and Kentucky Inc.*, 273 F. Supp. 3d at 1037.

Such travel is especially difficult for low-income women who do not have access to a car. The record evidence indicates that 57% of the women who receive medication abortions at the Fayetteville clinic live at or below 110% of the federal poverty level (Dkt. No. 84, Supp. Ho. Decl. ¶ 21). Dr. Heflin also testified that poor and low income women will likely be burdened if they must overcome the logistical and financial requirement to travel to Little Rock for an abortion. Dr. Heflin testified that low wage jobs or minimum wage jobs tend to have irregular hours associated with them, often with no paid sick time or vacation time. Therefore, women may not know their schedules ahead of time in order to schedule an appointment with an abortion provider. Such women may have to ask for unpaid time off work, potentially from more than one job. To do so, they may have to disclose the reason they need the time off, compromising their privacy.

Defendants attempt to cast doubt on the figure of women seeking medication abortion at PPAEO's Fayetteville clinic who are below the federal poverty level by suggesting that many of these women are college students who study more than they work and, therefore, report little income. As an initial matter, there is no record evidence to demonstrate how many women who seek care at PPAEO's Fayetteville clinic are college students. Further, even if the Court accepts this premise advanced by defendants, there is no indication that these women have access to any more financial resources to afford abortion or the travel cost associated with abortion if only surgical abortion is offered and offered only in Little Rock because they are poor students rather than working poor non-students.

Dr. Heflin testified that the majority of women who have abortions already have at least one child, so if they must travel to obtain services, they will need to figure out childcare. Furthermore, to make a 380-round trip to Little Rock, they will likely be traveling in nonstandard childcare hours, leaving early in the morning or coming home late at night, so someone will have to help them pick-up and drop-off their child. Dr. Heflin testified that this means they will have to seek support from friends or family and potentially disclose the reason for their trip.

Some women who will seek abortion services in Little Rock will be delayed by the increased travel distances and increases in costs, forcing these women into later abortions that are both riskier and more expensive, if they can obtain them at all (Dkt. Nos. 2, Fine Decl., ¶¶ 53-54; 29, Ho Decl., ¶¶ 20-24). There is evidence in the record supporting this (Dkt. Nos. 28, Henshaw Decl. ¶ 20; 2, Fine Decl. ¶ 54). Further, inability to travel to the sole remaining clinic in the state will lead some women to take desperate measures, such as attempting to self-abort or seeking care from unsafe providers, which would further put their health at risk (Dkt. No. 2, Fine Decl., ¶ 55). Ms. Williams testified that many of LRFPS' patients discuss the time off work they have to acquire for two or three visits to the clinic. She also testified that they discuss their childcare needs, privacy issues, and transportation difficulties. Similar record evidence exists in regard to PPAEO's patients (Dkt. No. 84, Supp. Ho Decl., ¶ 19).

Defendants argue that plaintiffs overstate the burdens presented by increased travel times. First, during the preliminary injunction hearing, they argued that there are private funds that assist women travelling for abortions, thereby defraying the cost of obtaining an abortion. The record evidence, however, indicates that this fund in Arkansas is very limited and is run by a group of volunteers. Ms. Williams testified that the fund is not large enough "to do as much out there as needed."

Second, defendants argue that Dr. Heflin overstates the burdens caused by the contracted physician requirement because she does not address the fact that, under Arkansas law, any licensed physician may provide an abortion (Dkt. No. 101, at 28). As discussed earlier, *see supra* Section I.A.c. of this Order, at this stage of the litigation, there is no record evidence to indicate that private physicians are currently providing abortions in Arkansas.

Finally, during the preliminary injunction hearing, defendants argued that abortions are not unique: women face burdens whenever they seek healthcare. For example, defendants argued that a woman who chips her tooth and requires an emergency dentist appointment would be required to schedule time off from work and arrange for childcare. The Court does not disagree that various medical maladies pose inconveniences to all women. However, this Court is not asked to evaluate the abortion restriction's impact as compared to those women. The Court is asked to evaluate the abortion restriction's impact on those women seeking medication abortion in Arkansas. There can be no doubt that, if before the regulation a woman in proximity to the Fayetteville clinic could seek medication abortion services there, having to make multiple trips to a distant clinic to receive a surgical abortion instead is an increased burden over and above what she would have faced prior to the restriction's enactment. By making this argument, defendants fail to recognize that state action burdening a woman's right to pre-viability abortion carries constitutional ramifications, while similar burdens on other medical procedures are not subject to the heightened scrutiny laid out in *Hellerstedt* and *Casey*.

### (5)    Burdens Imposed:  All Women Seeking Abortions At LRFPS' Little Rock Clinic

The record also contains evidence that all women seeking medication abortions in Arkansas—not just those who would otherwise have received a medication abortion in Fayetteville—will be burdened by the effects of the contracted physician requirement. If the

contracted physician requirement takes effect, and if plaintiffs are unable to comply with the requirement as they represent, then there will only be one abortion provider in Arkansas—LRFPS located in Little Rock, and LRFPS will only be able to provide surgical abortions (Dkt. No. 84, Williams Decl., ¶ 4).

Based upon the record evidence before the Court, LRFPS provided 92 medication abortions and 2,334 surgical abortions in 2017 (Dkt. No. 84, Williams Decl. ¶ 8). Dr. Ho represents that, in 2017, PPAEO's physicians performed 843 medication abortions in Arkansas, both in Little Rock and in Fayetteville (Dkt. No. 84, Supp. Ho. Decl. ¶ 6). Plaintiffs therefore assert that 935 medication abortions were performed in Arkansas in 2017.[74] Defendants assert that a total of 921 women sought medication abortions in Arkansas in 2017 (Dkt. No. 101-1, at 5-8). Minus the number of women who will forgo an abortion due to the burdens imposed by the contracted physician requirement, the remainder of the women who would previously have sought medication abortions from PPAEO will be forced to turn to LRFPS for a surgical abortion. Applying the Court's prior finding that at least approximately 208 Arkansas residents in Northwest Arkansas will forgo abortions entirely, *see supra*, the Court presumes that between approximately 713 to 727 women who would otherwise have sought medication abortions will seek surgical abortions

---

[74] 843+92=935.

from LRFP.[75]  This is an approximately 31% increase from the number of surgical abortions LRFPS provided in 2017.[76]

Based upon the testimony offered by Ms. Williams, the Court concludes that LRFPS likely can absorb the increased demand for surgical abortions, though, as she testified, the timetable to do so is unclear, and LRFPS will be forced to hire additional staff including possibly additional physicians to perform surgical abortion to accommodate the increased demand.  At a minimum, however, due to an increase in surgical abortions at LRFP's facility, the care provided to each surgical abortion patient would likely not be equal in quality to the care provided prior to the enforcement of the contracted physician requirement:  the LRFP clinic would become more crowded, certainly in the interim and perhaps going forward, and the women who seek abortions there are "less likely to get the kind of individualized attention, serious conversation, and emotional support that doctors at less taxed facilities may have offered."  *Hellerstedt*, 136 S. Ct. at 2318.

Accordingly, based upon the record evidence at this stage of the litigation, the Court concludes that the contracted physician requirement will likely force those women who choose to seek a surgical abortion at LRFPS' Little Rock facility to endure longer wait times and reduced quality of care compared to the quality of care they would have received if the contracted physician requirement were not enforced, even if LRFPS can absorb the increased demand for surgical

---

[75]  921-208=713 and 935-208=727.  The 208 number is derived by the Court by applying Dr. Heflin's reduction estimate to the number of women in Northwest Arkansas who, according to plaintiffs, sought an abortion at the Fayetteville clinic in 2017.  If the Court uses Dr. Heflin's estimate that 235 women will forgo an abortion, then 700 to 686 women will still seek surgical abortions at LRFPS' clinic.  921-235=686 and 935-235=700.  This would present LRFPS with a 29 to 30% increase in surgical abortions.  686/2,334=29% and 700/2,334=30%.

[76]  727/2,334=31% and 713/2,334=31%.

abortions. As LRFPS will be the sole remaining abortion provider in Arkansas, the Court concludes that this burden will fall upon 100% of the women seeking any abortion in Arkansas after Section 1504(d) takes effect.

### (6) Cumulative Burden

The record evidence at this stage of the litigation, viewed cumulatively, indicates that the contracted physician requirement places a "substantial obstacle in the path of a woman's choice." *Hellerstedt*, 136 S. Ct. at 2312 (citing *Casey*, 505 U.S. at 877 (plurality opinion)). The record evidence indicates that some women seeking abortions prefer medication abortions to surgical ones for various reasons (Dkt. No. 84, Supp. Ho Decl. ¶ 23). Of those women who prefer medication abortions over surgical ones, 100% of them cannot obtain a medication abortion in Arkansas. The record evidence shows that the contracted physician requirement will render Northwest Arkansas without any operational abortion provider. Depending upon how the numerator and denominator of the "large fraction" are manipulated, upwards of 28% to as low as 11% of all women seeking medication abortions in Arkansas will be forced to forgo any abortion altogether. These findings are consistent even if the Court considers increased travel distance only, not total travel distance, and considers the availability of an abortion provider in Tulsa, Oklahoma. The record evidence suggests that at least 43% and as many as approximately 71% of all women seeking medication abortions in Arkansas will be forced to travel greater distances to receive an abortion as a result of the contracted physician requirement. Finally, the record evidence suggests that, if LRFPS becomes the sole option for an abortion in Arkansas, any women seeking an abortion in Arkansas will be burdened by longer wait times and reduced quality of care, even if LRFPS can absorb the increased demand for surgical abortions.

Per *Hellerstedt*, the Court considers these burdens cumulatively to determine if a large fraction of women seeking medication abortions in Arkansas face a "substantial obstacle in the path of [their] choice." 136 S. Ct. at 2312, 2313 (noting that different burdens—driving distance and clinic closings—should be considered together). Applying the "large fraction" test from *Hellerstedt*, *Casey*, *Miller*, and *Jegley*, considering all of the burdens presented in the record evidence at this stage of the proceedings and the controlling precedents, the Court finds that, for "a large fraction of women seeking medication abortions in Arkansas," *Jegley*, 864 F.3d at 959, the contracted physician requirement "places a 'substantial obstacle in the path of a woman's choice.'" *Hellerstedt*, 136 S. Ct. at 2312 (citing *Casey*, 505 U.S. at 877 (plurality opinion)).

### 6.      Weighing The Benefits And Burdens

Having considered separately the benefits and burdens of Section 1504(d)'s contracted physician requirement, the Court must next resolve the ultimate question of whether Section 1504(d) creates an undue burden. Facial challenges to statutes affecting abortions may succeed only if a plaintiff can show that "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895 (majority opinion); *see Hellerstedt*, 136 S. Ct. at 2318 (striking down an admitting privileges requirement because the law "provides few, if any, health benefits for women" and "poses a substantial obstacle to women seeking abortions"); *Jegley*, 864 F.3d at 959 ("[I]n order to sustain a facial challenge and grant a preliminary injunction, the district court was required to make a finding that the Act's contract-physician requirement is an undue burden for a large fraction of women seeking medication abortions in Arkansas."); *id*. at 690 n.9 ("The question here . . . is whether the contract-physician requirement's benefits are substantially outweighed by the burdens it imposes on a large fraction of women seeking medication abortion in Arkansas.").

In regard to the benefit of Section 1504(d), analyzing the record evidence currently before the Court at this stage of the litigation, and binding and persuasive legal precedents, this Court concludes at this stage that Section 1504(d)'s contracted physician requirement confers little if any benefit on those women who are affected by it. The Court's findings are consistent with those of other district courts that have considered the benefits (or lack thereof) of contracted physician requirements.

In regard to burdens, considered cumulatively, the record evidence at this stage of the litigation demonstrates that the contracted physician requirement, given plaintiffs' inability to comply with it, substantially burdens a large faction of women in Arkansas seeking medication abortions. *See Casey*, 505 U.S. at 895 (majority opinion) (holding that the undue burden analysis looks "to those for whom [the challenged law] is an actual rather than an irrelevant restriction.").

Weighing the benefits and burdens, given the foregoing evidence in the record currently before the Court at this stage of the litigation and given binding and persuasive legal precedents, the Court determines that Section 1504(d)'s contracted physician requirement, given plaintiffs' inability to comply with it, imposes substantial burdens on a large fraction of Arkansas women seeking medication abortions against a near absence of evidence that the law promotes any state interest or provides any benefits to those women. *See Hellerstedt*, 136 S. Ct. at 2318 (striking down an admitting privileges requirement because the law "provides few, if any, health benefits for women" and "poses a substantial obstacle to women seeking abortions"); *Van Hollen III*, 738 F.3d at 798 ("The feebler the medical grounds, the likelier the burden, *even if slight*, to be 'undue' in the sense of disproportionate or gratuitous.") (emphasis added); *Miller*, 299 F. Supp. 3d at 1286 (noting fetal demise law was passed in pursuit of legitimate goals, but those goals were not sufficient to justify "such a substantial obstacle to the constitutionally protected right to terminate

a pregnancy before viability"); *Kliebert II*, 250 F. Supp. 3d at 88 (noting that admitting privileges law provided no "measurable benefit to women's health, but it is clear that the Act will drastically burden women's right to choose abortion."); *Williams I*, 263 F. Supp. 3d at 735 (noting that case was "not a close one" where hospital affiliation law forced women into two round-trips of hundreds of miles with little concomitant benefit); *Planned Parenthood of Indiana and Kentucky, Inc.*, 273 F. Supp. 3d at 1039 (noting undue burden where law required ultrasound viewing a day before an abortion rather than the day of the abortion because this change provided little to no benefit when measured against prior law). In other words, the Court concludes that, based upon the limited record before it at this stage of the litigation, requiring medication abortion providers to contract with a physician with admitting privileges presents a substantial undue "burden for a large fraction of women seeking medication abortions in Arkansas," *Jegley*, 864 F.3d at 959, with little to no benefit to those women.

Plaintiffs have shown that "in a large fraction of the cases in which [the contracted physician requirement] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895 (majority opinion); *see Hellerstedt*, 136 S. Ct. at 2318 (striking down an admitting privileges requirement because the law "provides few, if any, health benefits for women" and "poses a substantial obstacle to women seeking abortions"); *Jegley*, 864 F.3d at 959 ("[I]n order to sustain a facial challenge and grant a preliminary injunction, the district court was required to make a finding that the Act's contract-physician requirement is an undue burden for a large fraction of women seeking medication abortions in Arkansas."); *id.* at 690 n.9 ("The question here . . . is whether the contract-physician requirement's benefits are substantially outweighed by the burdens it imposes on a large fraction of women seeking medication abortion in Arkansas.").

Because Section 1504(d) likely does not "confer[] benefits sufficient to justify the burdens upon access [to abortion] that [it] imposes," *Hellerstedt*, 136 S. Ct. at 2301, the Court finds that plaintiffs are likely to prevail on the merits of their due process challenge that Section 1504(d) is facially unconstitutional because it places a "substantial obstacle to a woman's choice" to terminate a pregnancy before viability in "a large fraction of the cases in which" it "is relevant." *Hellerstedt*, 136 S. Ct. 2313 (quoting *Casey*, 505 U.S. at 895 (majority opinion)).

## B.    Irreparable Harm

A plaintiff seeking preliminary injunctive relief must establish that the claimant is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The deprivation of constitutional rights "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977) (same).

PPAEO and Dr. Ho allege that enforcement and enactment of Section 1504(d) causes irreparable harm because plaintiffs are unable to comply and the contracted physician requirement therefore eliminates medication abortions in Fayetteville and Little Rock, forcing some women to forgo abortion all together and forcing any woman in Arkansas who seeks an abortion to drive to Little Rock for a surgical abortion (Dkt. No. 84, Supp. Ho. Decl., ¶ 20). Defendants contest these assertions, arguing that there is no irreparable harm caused to Arkansas women by the contracted physician requirement (Dkt. No. 101, at 31). Also, reiterating their prior argument, defendants argue that the contracted physician requirement does not irreparably harm Arkansas women seeking medication abortions because out-of-state abortion providers remain a viable option (*Id.*). Defendants argue that, even if this Court cannot consider out-of-state abortion providers in the

undue burden analysis, such providers may be considered in the irreparable harm analysis. Defendants cite no authority for this proposition.

For now, this Court finds, based on the state of the record before the Court at this stage of the proceeding, that Section 1504(d) causes ongoing and imminent irreparable harm to the plaintiffs and their patients. As detailed above, the record at this stage of the proceeding indicates that Section 1504(d) will force PPAEO's two abortion clinics to cease providing medication abortions, the only type of abortion offered by those two clinics, leaving Arkansas with only one abortion clinic, which is located in Little Rock and provides only surgical abortions. Those women who live in Northwest Arkansas and seek a medication abortion are now faced with the prospect of making two 380-mile round trips to Little Rock for a surgical abortion (Dkt. Nos. 2, Fine Decl., ¶ 52; 84, Supp. Ho. Decl., ¶ 20). Further, it makes little sense for this Court to disregard out-of-state providers at the "burden" stage of this analysis, as this Court concludes is required by established precedent, but, on the other hand, consider out-of-state providers to determine if "irreparable harm" has or will occur. To do so would lead to absurd results, and this Court declines to do so. Even if the Court were inclined to consider abortion providers in other states, the results of this Court's analysis would not change. There are no abortion providers within the same metropolitan area as Fayetteville. It is not a short distance to an alternative provider for most women seeking a medication abortion in Arkansas affected by the challenged regulation, and the availability of abortions at all in states surrounding Arkansas is subject to on-going and changing regulation, as well. Since the record at this stage of the proceedings indicates that Arkansas women seeking medication abortions face an imminent threat to their constitutional rights, the Court concludes that they will suffer irreparable harm without preliminary relief.

146

### C. Balance Of Equities And The Public Interest

PPAEO and Dr. Ho argue that the aforementioned injuries caused to their patients by Section 1504(d) far outweigh the harm that will be caused to defendants if preliminary relief is granted (Dkt. No. 85, at 20). PPAEO and Dr. Ho also argue that the public interest weighs in favor of entering a preliminary injunction as "Arkansas can have no interest in enforcing unconstitutional laws." (*Id.*). Defendants respond that the public interest favors "setting minimal continuity-of-care standards where none previously existed," and they argue that the public has an interest "in ensuring that abortion providers do not . . . abandon patients who suffer complications." (Dkt. No. 101, at 31).

The Court must examine its case in the context of the relative injuries to the parties and to the public. *Dataphase*, 640 F.2d at 114. After balancing the relative injuries and the equities, while evaluating the limited record before it, the Court finds that because enforcement of Section 1504(d) would result in irreparable harm to PPAEO and Dr. Ho, as well as the patients of PPAEO and Dr. Ho, the resulting harm to PPAEO and Dr. Ho is greater than the potential harm to the state. Accordingly, at this stage of the proceedings, the Court finds that the threat of irreparable harm to PPAEO and Dr. Ho, and the public interest, outweighs the immediate interests and potential injuries to the state.

### VI. Security

Under Federal Rule of Civil Procedure 65(c), a district court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In these proceedings, Mr. Jegley and Mr. Durrett have neither requested security in the event this Court grants a preliminary injunction nor have they presented

any evidence that they will be financially harmed if they are wrongfully enjoined. For these reasons, the Court declines to require security from PPAEO or Dr. Ho.

## VII. Conclusion

For the foregoing reasons, the Court determines that PPAEO and Dr. Ho have met their initial burden for the issuance of a preliminary injunction. Therefore, the Court grants PPAEO and Dr. Ho's second motion for preliminary injunction (Dkt. No. 116). The Court modifies the form of injunctive relief awarded at this stage to address lingering questions. Defendants Mr. Jegley and Mr. Durrett, and all those acting in concert with them, may enforce Section 1504(d) against medication abortion providers subject to the Act only to the extent that abortion providers must make an effort to comply with Section 1504(d) by continuing to seek a contracted physician. Defendants are, however, preliminarily enjoined from imposing any civil or criminal penalties for continuing to perform medication abortion while abortion providers subject to the Act continue in their efforts to comply with Section 1504(d). Further, Mr. Jegley and Mr. Durrett are enjoined from failing to notify immediately all state officials responsible for enforcing the requirements of Section 1504(d) of Arkansas Act 577, codified at Arkansas Code Annotated § 20-16-1504(d), about the existence and requirements of this preliminary injunction. The Court orders plaintiffs to report to the Court every 30 days on their efforts to comply with Section 1504(d). Plaintiffs may file redacted and under seal reports to the extent consistent with the protective order in effect in this case (Dkt. No. 39). This preliminary injunction remains in effect until further order from this Court. No party is barred from seeking modified or additional relief.

So ordered this 2nd day of July, 2018, at 5:00 p.m.

_Kristine G. Baker_
Kristine G. Baker
United States District Judge